Nos. 22-13992 & 22-13994

# In the United States Court of Appeals for the Eleventh Circuit

─────────────────────────────

LEROY PERNELL, ET AL.,
*Plaintiffs–Appellees*,

v.

BRIAN LAMB, ET AL.,
*Defendants–Appellants.*

─────────────────────────────

ADRIANA NOVOA, ET AL.,
*Plaintiffs–Appellees*,

v.

MANNY DIAZ, JR., ET AL.,
*Defendants–Appellants.*

─────────────────────────────

## MOTION FOR STAY PENDING APPEAL

─────────────────────────────

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NOS. 4:22-CV-304-MW-MAF & 4:22-CV-324-MW-MAF

─────────────────────────────

CHARLES J. COOPER
JOHN D. OHLENDORF
MEGAN M. WOLD
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9660
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants-Appellants*

*Leroy Pernell, et al. v. Brian Lamb, et al.,* 22-13992
*Adriana Novoa, et al. v. Manny Diaz, Jr., et al.,* 22-13994

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendants-Appellants certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1.  Almond, Russell, *Plaintiff-Appellee*

2.  American Civil Liberties Union of Florida, *Attorney for Plaintiffs-Appellees*

3.  American Civil Liberties Union of New York, *Attorney for Plaintiffs-Appellees*

4.  Austin, Sharon Wright, *Plaintiff-Appellee*

5.  Azis, Jacqueline Nicole, *Attorney for Plaintiffs-Appellees*

6.  Ballard Spahr LLP, *Attorneys for Plaintiffs-Appellees*

7.  Blankenship, Katherine, *Attorney for Plaintiffs-Appellees*

8.  Boaz, Timothy, *Defendant-Appellant*

9.  Callahan, Sandra, *Defendant-Appellant*

10. Carrere, Michael, *Defendant-Appellant*

11. Cerio, Timothy, *Defendant-Appellant*

12. Coleman, Santino, *Attorney for Plaintiffs-Appellees*

13. Cooper & Kirk, PLLC, *Attorneys for Defendants-Appellants*

*Leroy Pernell, et al. v. Brian Lamb, et al.,* 22-13992
*Adriana Novoa, et al. v. Manny Diaz, Jr., et al.,* 22-13994

14.   Cooper, Charles J., *Attorney for Defendants-Appellants*

15.   Corcoran, Richard, *Defendant-Appellant*

16.   Dauphin, Johana, *Plaintiff-Appellee*

17.   Diaz, Jr., Manny, *Defendant-Appellant*

18.   Donnelly, N. Rogan, *Defendant-Appellant*

19.   Dorsey, Dana Thompson, *Plaintiff-Appellee*

20.   Dunn, Marvin, *Plaintiff-Appellee*

21.   Edge, Aubrey, *Defendant-Appellant*

22.   Edinger, Gary, *Attorney for Plaintiffs-Appellees*

23.   Edwards, Jerry Crawford, *Attorney for Plaintiffs-Appellees*

24.   Fajana, Morenike, *Attorney for Plaintiffs-Appellees*

25.   First Amendment Forum at University of South Florida, *Plaintiff-Appellee*

26.   Fitzpatrick, Magistrate Judge Martin A., U.S. District Court for the Northern District of Florida

27.   Florida A&M University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

28.   Florida Board of Governors of the State University System, *Defendant (Dismissed on Nov. 22, 2022)*

*Leroy Pernell, et al. v. Brian Lamb, et al.,* 22-13992
*Adriana Novoa, et al. v. Manny Diaz, Jr., et al.*, 22-13994

29. Florida International University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

30. Florida State University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

31. Foundation for Individual Rights and Expression, *Attorney for Plaintiffs-Appellees*

32. Frost, Patricia, *Defendant-Appellant*

33. Gabadage, Nimna, *Defendant-Appellant*

34. Gary S. Edinger & Associates PA - Ganesville FL, *Attorney for Plaintiffs-Appellees*

35. Greubel, Greg, *Attorney for Plaintiffs-Appellees*

36. Griffin, Michael, *Defendant-Appellant*

37. Haddock, Edward, *Defendant-Appellant*

38. Hinger, Sarah Ann, *Attorney for Plaintiffs-Appellees*

39. Horton, Oscar, *Defendant-Appellant*

40. Johnson, Alexsis Marie, *Attorney for Plaintiffs-Appellees*

41. Jones, Ken, *Defendant-Appellant*

42. Jordan, Darlene Luccio, *Defendant-Appellant*

43. Lamb, Brian, *Defendant-Appellant*

44. Leckerman, Jason Allen, *Attorney for Plaintiffs-Appellees*

*Leroy Pernell, et al. v. Brian Lamb, et al.,* 22-13992
*Adriana Novoa, et al. v. Manny Diaz, Jr., et al.,* 22-13994

45.    Lee, Jin Hee, *Attorney for Plaintiffs-Appellees*

46.    Leftheris, Julie, *Defendant-Appellant*

47.    Levine, Alan, *Defendant-Appellant*

48.    Lydecker, Charles, *Defendant-Appellant*

49.    Mabatah, Isiuwa Jacqueline, *Attorney for Plaintiffs-Appellees*

50.    Mateer, Craig, *Defendant-Appellant*

51.    McNamara, Caroline A., *Attorney for Plaintiffs-Appellees*

52.    Michael, Deanna, *Defendant-Appellant*

53.    Monbarren, Lauran, *Defendant-Appellant*

54.    Moraff, Laura Beth, *Attorney for Plaintiffs-Appellees*

55.    Morris, Joshua, *Attorney for Plaintiffs-Appellees*

56.    NAACP Legal Defense & Education Fund, *Attorneys for Plaintiffs-Appellees*

57.    Nascimento, Isabella Salomao, *Attorney for Plaintiffs-Appellees*

58.    Novoa, Adriana, *Plaintiff-Appellee*

59.    Ohlendorf, John David, *Attorney for Defendants-Appellants*

60.    Palyam, Nithin, *Defendant-Appellant*

61.    Park, Shelley, *Plaintiff-Appellee*

62.    Patel, Shilen, *Defendant-Appellant*

63.    Pernell, Leroy, *Plaintiff-Appellee*

*Leroy Pernell, et al. v. Brian Lamb, et al.,* 22-13992
*Adriana Novoa, et al. v. Manny Diaz, Jr., et al.,* 22-13994

64.  Piccolo, Fredrick, *Defendant-Appellant*

65.  Ramer, John, *Attorney for Defendants-Appellants*

66.  Rechek, Samuel, *Plaintiff-Appellee*

67.  Sandoval, Jennifer, *Plaintiff-Appellee*

68.  Schneider, Jenifer, *Defendant-Appellant*

69.  Scott, Steven, *Defendant-Appellant*

70.  Seixas, Melissa, *Defendant-Appellant*

71.  Self, William, *Defendant-Appellant*

72.  Silagy, Eric, *Defendant-Appellant*

73.  Steinbaugh, Adam, *Attorney for Plaintiffs-Appellees*

74.  Stermon, Kent, *Defendant-Appellant*

75.  Sykes, Emerson James, *Attorney for Plaintiffs-Appellees*

76.  Tilley, Daniel Boaz, *Attorney for Plaintiffs-Appellees*

77.  Tobin, Charles David, *Attorney for Plaintiffs-Appellees*

78.  University of Central Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

79.  University of Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

80.  University of South Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

*Leroy Pernell, et al. v. Brian Lamb, et al.,* 22-13992
*Adriana Novoa, et al. v. Manny Diaz, Jr., et al.,* 22-13994

81.    Walker, Judge Mark E., U.S. District Court for the Northern District of

      Florida

82.    Watson, Leah Monique, *Attorney for Plaintiffs-Appellees*

83.    Weatherford, William, *Defendant-Appellant*

84.    Wold, Megan M., *Attorney for Defendants-Appellants*

Apart from undisclosed members of Appellees, no publicly traded company

or corporation has an interest in the outcome of this case or appeal.

  Dated: December 5, 2022             Respectfully submitted,

                                    /s/Charles J. Cooper
                                    Charles J. Cooper

                                    *Counsel for Defendant-Appellants*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ............................................................................1

BACKGROUND .........................................................................10

I.    Factual Background. ....................................................................10

II.   Prior Proceedings. .......................................................................12

ARGUMENT ...............................................................................14

I.    Appellants Are Likely To Succeed On the Merits of Their Appeal..............14

  A. Plaintiffs Lack Standing To Challenge Several of the Act's
     Provisions. ...........................................................................14

  B. The Act Does Not Violate the First Amendment. ....................................19

    1. Classroom Instruction in Public Universities Is Government Speech
       and Thus Not Entitled to First Amendment Protection.......................19

    2. The Act's Educational Provisions Satisfy Any Understanding of the
       Standard Established by *Bishop*. ...........................................32

  C. The Challenged Provisions Are Not Unconstitutionally Vague. .............34

II.   The Remaining Stay Factors Favor A Stay. ...................................41

CONCLUSION ...........................................................................41

## TABLE OF AUTHORITIES

**Cases**                                                                       **Page**

*Akridge v. Sch. Bd. of Alachua Cnty.*,
    2019 WL 13084482 (N.D. Fla. May 28, 2019)............................................39

*Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174 (3rd Cir. 2020) ...................31, 32

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ...........................................32, 33, 36

*Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*,
    529 U.S. 217 (2000)...............................................................................21

*Bishop v. Aronov*, 926 F.2d 1077 (11th Cir. 1991).........................................*Passim*

*Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983)..................................33

*Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364 (4th Cir. 1998)................25

*Cacchillo v. Insmed, Inc.*, 638 F.3d 401 (2d Cir. 2022) ........................................15

*Davis v. FEC*, 554 U.S. 724 (2008) .........................................................................15

*Edwards v. Calif. Univ. of Penn.*, 156 F.3d 488 (3rd Cir. 1998)................6, 24, 31

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
    624 F.3d 332 (6th Cir. 2010) ................................................................24, 25

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ...............................................6, 7, 23, 24

*Gilder-Lucas v. Elmore Cnty. Bd. Of Educ.*,
    186 Fed. Appx. 885 (11th Cir. 2006) ...........................................................25

*Hand v. Scott*, 888 F.3d 1206 (11th Cir. 2018).......................................................14

*High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225 (11th Cir. 1982)...........................35

*Honeyfund.com, Inc. v. DeSantis*,
    2022 WL 3486962 (N.D. Fla. Aug. 18, 2022) ............................................37

*HVLPO2, LLC v. Oxygen Frog, LLC*,
    2019 WL 13164663 (N.D. Fla. Feb. 20, 2019) ............................................39

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019).................................................................4

*Jones v. Governor of Fla.*, 975 F.3d 1016 (11th Cir. 2020) ...............................34, 35

*Lee v. York Cnty. Sch. Div.*, 484 F.3d 687 (4th Cir. 2007) ......................................25

*Loving v. Virginia*, 388 U.S 1 (1955) .........................................................................2

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ...............................................24

*Miller v. Johnson,* 515 U.S. 900 (1995)................................................................1, 2

*Maryland v. King*, 567 U.S. 1301 (2012) .............................................................9, 41

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.,*
    474 F.3d 477 (7th Cir. 2007) ..................................................................7, 24

*Nat'l Endowment for Arts v. Finley*, 524 U.S. 569 (1998) ......................................29

*Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987).......................14, 15

*O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045 (11th Cir. 2022)....................34, 35

*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460 (2009)......................................... 22, 23, 28, 29, 30, 31

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ...........................................................30

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995).........................................6, 21, 22, 24, 25, 30

*Rust v. Sullivan*, 500 U.S. 173 (1991)..............................................................6, 7, 29

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)......................................29, 30

*Shurtleff v. City of Boston, Mass.*, 142 S. Ct. 1583 (2022).........................23, 30, 31

*Tracy v. Fla. Atl. Univ. Bd. of Tr.*, 980 F.3d 799 (11th Cir. 2020).........................35

*United States v. Nat'l Treasury Emp. Union*, 513 U.S. 454 (1995) .................33, 34

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
    413 U.S. 548 (1973)........................................................................36

*Vill. of Hoffman v. Flipside, Hoffman Est., Inc.*,
    455 U.S. 489 (1982)........................................................................35

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*
    576 U.S. 200 (2015)............................................... 7, 21, 22, 23, 28, 29, 30, 31

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
    900 F.3d 250 (6th Cir. 2018) .......................................................15

*Wilborn v. Ocwen Loan Servicing, LLC*,
    2019 WL 12288376 (N.D. Fla. Mar. 17, 2019)............................................39

*Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017)............34

## **Rules, Statutes, and Constitutions**

FED. R. CIV. P. 12(b)(1)...........................................................12, 13

FED. R. CIV. P. 12(b)(6)...........................................................12, 13

15 U.S.C. § 77k .......................................................................37

26 U.S.C. § 501 .......................................................................37

52 U.S.C. § 30116 ....................................................................37

2022 Fla. Laws

    2022 Fla. Laws 72......................................................................10
    2022 Fla. Laws 72, § 2 .................................................................10
    2022 Fla. Laws 72, § 8 .................................................................10

FLA. STAT.

    § 1000.03(2)(a) ........................................................................10
    § 1000.05(2)............................................................................10
    § 1000.05(4)(a) .........................................................1, 20, 21, 36
    § 1000.05(4)(a)(1)–(8)............................................................10, 11
    § 1000.05(4)(a)(4)......................................................................37
    § 1000.05(4)(b).........................................................2, 8, 11, 38
    § 1000.05(6)(b).........................................................................11

Regulation 10.005(3)(c) ...............................................................36

Regulation 10.005(4)(a) ...............................................................12

FLA. CONST. art. 9, § 7 ...................................................................11

## **Other Authorities**

Andi Babineau, *White teacher in Texas fired after telling students his race is 'the superior one'*, CNN (Nov. 15, 2022), https://cnn.it/3VCQWl4...................32

H.G. Koenig, Religion, Spirituality, and Health: The Research and Clinical Implications, ISRN PSYCHIATRY, 2012, https://bit.ly/3F7WqyK (last visited Nov. 28, 2022).......................................5

*10.005*, *Prohibition of Discrimination in University Training or Instruction*, BD. OF GOVERNORS, STATE UNIV. SYS. OF FLA. (Aug. 26, 2022), *available at* https://bit.ly/3xqDCX8 (last visited Nov. 28, 2022) .................12

PATTERN JURY INSTRUCTIONS, CIVIL CASES, ELEVENTH CIRCUIT (2013 revision), https://bit.ly/3OGuaWU ................................................................39

*Objective*, MERRIAM-WEBSTER'S DICTIONARY (last visited Nov. 28, 2022), https://bit.ly/3zcLbB1 ...................................................................38

*Endorse*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed. 2002) .............38

**APPELLANTS' MOTION FOR STAY PENDING APPEAL AND
INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rule of Appellate Procedure 8(a)(2)(A)(ii), Appellants—members of the Florida Board of Governors of the State University System and the University of South Florida Board of Trustees—respectfully move for this Court to stay pending appeal the district court's preliminary injunction, ordered on November 17, 2022.

## INTRODUCTION

"Members of one race … are morally superior to members of another race."

The People of Florida believe that this proposition is invidiously discriminatory and that it should not be advocated by teachers in Florida's public classrooms. Accordingly, the Florida Legislature prohibited public school teachers and university educators from subjecting students to instruction that espouses or otherwise endorses this proposition, along with seven other "concepts" of similar ilk, such as "[m]embers of one race … cannot and should not attempt to treat others without respect to race," and "[a] person, by virtue of his or her race … is inherently racist …." FLA. STAT. § 1000.05(4)(a).

Enacted in April 2022, the statute at issue in this case, the Individual Freedom Act ("Act" and "IFA"), expresses the State's view that classroom indoctrination of students in the eight prohibited concepts violates the fundamental moral principle at the heart of the Equal Protection Clause—that "the Government must treat citizens

1

as individuals, not as simply components of a racial, religious, sexual or national class," *Miller v. Johnson,* 515 U.S. 900, 946 (1995), and that discriminating against people solely because of such immutable characteristics is "odious to a free people whose institutions are founded upon the doctrine of equality," *Loving v. Virginia*, 388 U.S 1, 11 (1955). The Act, it should be noted, does not banish the enumerated concepts from the classroom altogether; to the contrary, it expressly permits classroom instruction that includes "discussion" of the listed concepts so long as the "instruction is given in an objective manner without endorsement of the concepts." FLA. STAT. § 1004.05(4)(b). Nor does the Act prevent the State's educators from advocating the concepts, or any other views they may hold, outside the classroom or other instructional settings. All the Act does is prohibit the State's educators from endorsing the enumerated concepts while teaching the State's curriculum, in the State's classrooms, on the State's time, in return for a State paycheck.

The Plaintiffs in these cases—eight college professors, two students, and a student organization—are not content with classroom discussion of the concepts, objectively without endorsement. The Plaintiff Professors believe and embrace the concepts and contend that they have a First Amendment right to inculcate their students in the concepts in their courses. The Plaintiff Students argue that they have a correlative First Amendment right to receive the professors' personal opinions and views endorsing the concepts.

2

The constitutional question in this case thus boils down to this: who decides what is, and is not, to be taught in Florida's college classrooms—individual professors or their employer, the State, in prescribing by law the content requirements and standards that govern public universities in setting their course curricula? That question is not a hard one, for it was squarely resolved in favor of the State by this Court in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), which held that the University of Alabama did not violate a physiology professor's free speech rights by "prevent[ing] him from presenting his religious viewpoint during instructional time, even to the extent that it represents his professional opinion about his subject matter." *Id.* at 1077. The Court was not equivocal in stating the governing rule: "In short, Dr. Bishop and the University disagree about a matter of content in the courses he teaches. The University must have the final say in such a dispute." *Id*. at 1076.

The district court below, however, read *Bishop* to mean precisely the opposite of what it plainly says. After denouncing the Individual Freedom Act as Orwellian "doublespeak," and the State's defense of it as "positively dystopian" and a "Frankenstein's monster," the district court based its First Amendment analysis on what it saw as the sharp distinction between "the State's right to make *content-based* choices in setting the public school curriculum" and the State's "discretion in limiting a professor's ability to express certain *viewpoints* about the curriculum once

3

it is set." Ex.A.27 (emphasis in original)). A State's authority "to determine the content of its public school curriculum," according to the district court, means that "[a] professor cannot decide to teach something entirely different or do an end-run around the prescribed curriculum by paying lip service to the subject they are supposed to teach and then spend the rest of class time instructing on something else." Ex.A.26-27. But a professor is constitutionally entitled, the court below held, to inculcate students in his or her personal viewpoints on matters that are within the scope of the assigned course: "The State of Florida, as an employer and educator, cannot restrict university employees from expressing a disfavored viewpoint about a matter within the established curriculum while instructing on that curriculum. Such viewpoint discrimination 'is poison to a free society.'" Ex.A.107 (quoting *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) ) (Alito, J., concurring)). What that means is that once the State chooses to place a subject in the curriculum, it cannot say how that subject is taught. A history professor teaching a course on World War II, for example, would be free to espouse the view that the Holocaust was a hoax and to lament the fact that the Nazis were defeated. Even worse hypotheticals can be imagined. Thus, under the district court's rule, the professors have the final say, and so the court preliminarily enjoined enforcement of the Act.

The district court's First Amendment analysis is fatally flawed at multiple levels.

First, and dispositively, the district court's ruling is squarely at odds with *Bishop*. The district court sought to distinguish *Bishop* on the ground that the university had determined that Dr. Bishop's classroom discussion of his personal religious viewpoints "was not part of its curriculum with respect to the exercise physiology course he taught." Ex.A.92. True enough. But the university's determination that Dr. Bishop's personal religious beliefs were outside the course curriculum was based on the fact that *they were his personal religious beliefs*; it did not matter that those "religious viewpoints . . . represent[ed] his professional opinion about his subject matter." 926 F.2d at 1077. The university did not seek to prohibit all classroom discussion of matters touching generally on religion, such as the extensively studied relationship between religion and both mental and physical health. *See, e.g.*, H.G. Koenig, Religion, Spirituality, and Health: The Research and Clinical Implications, ISRN PSYCHIATRY, 2012, https://bit.ly/3F7WqyK. Rather, as this Court emphasized, "[t]he University has simply said that he may not discuss *his religious beliefs or opinions* under the guise of University courses." 926 F.2d at 1076 (emphasis added). And that viewpoint-based restriction on his speech was "within [the University's] powers to control the content of curriculum in the classroom." *Id.* at 1078. The Plaintiff Professors in this case stand on no different First Amendment footing. In their dispute with the State about the content of their courses, including

5

their advocacy of viewpoints contrary to the Individual Freedom Act, the State must have the final say.

Second, quite apart from its conflict with this Court's binding decision in *Bishop*, the decision below cannot be squared with the Supreme Court's "government speech" cases establishing that the speech of public employees, when made "pursuant to their official duties," is not protected by the First Amendment at all. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The leading government speech case in the area of public education is *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995), where the Supreme Court made clear that "when the university determines the content of the education it provides, it is the university speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker." *Id*. at 833. This language was read by then-Judge Alito to mean that "a public university professor does not have a First Amendment right to decide what will be taught in the classroom." *Edwards v. Calif. Univ. of Penn.*, 156 F.3d 488, 491 (3d Cir. 1998).

Of like import are the government speech cases in which the government provides public funds to private entities or permits them to use public property to communicate the government's own message. These cases make clear that the government is not restricted by the First Amendment in expressing its own

viewpoints. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173 (1991); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.* 576 U.S. 200 (2015).

Thus, the Court's government speech cases compel reversal of the decision below even before one gets to the seminal *Garcetti* decision. And while the *Garcetti* Court reserved the question whether its holding governs with full force in the context of classroom instruction—a question not before it—the reasoning of the decision is squarely applicable. Indeed, given that an educator's essential "official dut[y]" *is* classroom speech, applying *Garcetti* to a teacher's instruction is "an easier case for the employer than *Garcetti*" itself, "where speech was not what the employee was being paid to create." *Mayer v. Monroe Cnty. Cmty. Sch. Corp.,* 474 F.3d 477, 479 (7th Cir. 2007) (Easterbrook, J.).

Third, the implications of the district court's decision are startling, for it anoints individual professors as universities unto themselves, at liberty under the First Amendment to indoctrinate college students in whatever views they please, no matter how contrary to the university's curriculum or how noxious to the People of Florida.

In short, the district court's First Amendment ruling was wrong, and this Court is likely to reverse it.

The district court's Plan B ruling was to declare the Act void, in its entirety, for vagueness, on the theory that it is "impossible" to expect "ordinary persons using

7

ordinary common sense" (the test for vagueness in the public employment context), Ex.A.113-14, to understand the meaning of the "loaded and contested" and "utterly ambiguous" term "objective," Ex.A.119, 124, in the Act's provision permitting classroom discussion of the prohibited concepts "in an *objective* manner without endorsement," FLA. STAT. 1000.05(4)(b) (emphasis added). The common, everyday distinction between objectively considering and discussing an idea and advocating or endorsing the idea is not at all confounding to ordinary persons, let alone to university instructors. Indeed, our adversarial legal system is founded on the distinction: it is the difference between what lawyers do and what judges do. Indeed, the term "objective" is ubiquitous in our written law, statutory and judicial, and the district court itself has used the term in numerous opinions without offering a definition of its supposedly "utterly ambiguous" meaning. There's nothing vague about the language of the Individual Freedom Act, and this Court is likely to reverse the district court's contrary decision.

Finally, although the district court correctly held that plaintiffs seeking a preliminary injunction have the burden of producing evidence of specific facts sufficient to establish their standing for each of the Act's concepts that they challenge, it erred in concluding that Plaintiffs had done so with respect to at least four of the eight prohibited concepts. No Plaintiff Professor in either case even adequately *alleged*, let alone produced supporting evidence, that they intended to

subject students to instruction that would violate the Act's prohibition on advocating concepts 1, 3, 5, and 6. To remedy this jurisdictional deficiency, the district court took it upon itself to parse through the Plaintiff Professors' course materials *beyond* what they had alleged in their complaints and stated in their declarations and briefing, in search of ways in which their teaching could "arguably violate" the concepts that Plaintiffs had not even mentioned. The district court's supplementation of Plaintiffs' submissions exceeded the proper bounds of the judicial role, and this Court is thus likely to reverse the court's finding that the "Plaintiffs have standing to challenge all eight concepts." Ex.A.130.

The remaining stay factors also decisively favor a stay of the preliminary injunction, especially given the clarity of the district court's errors on the merits. The State has a compelling—indeed, constitutionally imperative—interest in combating invidious discrimination, and enjoining a state from enforcing its laws is by definition a form of irreparable injury. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C. J., in chambers).

The Court should stay the district court's order granting a preliminary injunction.

# BACKGROUND

## I.    Factual Background.

Earlier this year, pursuant to its authority to "establish education policy, enact education laws, and appropriate and allocate education resources," FLA. STAT. § 1000.03(2)(a), the Florida Legislature passed the Individual Freedom Act. *See* 2022 Fla. Laws 72. Governor DeSantis approved the Act on April 22, and it took effect on July 1. *See Id.* § 8.

As relevant here, the Act amended the Education Code to enumerate actions that constitute "discrimination on the basis of race, color, national origin, [or] sex" and are thus prohibited under Section 1000.05(2). *Id.* § 2. Specifically, the Act prohibits "subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:"

1.    Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

2.    A person, by virtue of his or her race, color, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3.    A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4.    Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

10

5.      A person, by virtue of his or her race, color, national origin, or sex, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6.      A person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.      A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8.      Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

FLA. STAT. § 1000.05(4)(a)(1)-(8) (as amended by the Act).

The Act, however, draws a sharp distinction between *indoctrination* and *discussion*: it prohibits all persons from subjecting a student to instruction that advocates these concepts, but at the same time makes clear that it does not "prohibit discussion of the concepts … as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." FLA. STAT. § 1000.05(4)(b).

The Florida Board of Governors is vested with the constitutional authority to "adopt regulations to implement [§ 1000.05] as it relates to state universities." FLA. STAT. § 1000.05(6)(b); FLA. CONST. art. 9, § 7. Pursuant to that authority, the Board

11

adopted Regulation 10.005 to implement the Act. *See 10.005*, *Prohibition of Discrimination in University Training or Instruction*, BD. OF GOVERNORS, STATE UNIV. SYS. OF FLA. (Aug. 26, 2022), *available at* https://bit.ly/3xqDCX8 ("Regulation 10.005"). Under the Regulation, universities are required to adopt their own regulations implementing the Act, and the Board takes enforcement action only against a university that "willfully and knowingly failed to correct a violation of the university regulation." Regulation 10.005(4)(a).

## II. Prior Proceedings.

This appeal arises from two separate challenges to the Act—*Pernell v. Florida Board of Governors* and *Novoa v. Diaz*—which have not been formally consolidated but which were briefed in tandem, argued together, and resulted in the district court's issuance of a single preliminary injunction. In *Pernell*, the Plaintiffs are six current professors at Florida universities, one professor emeritus who hosts a university-sponsored bus tour, and one university student.

In *Novoa*, the Plaintiffs are one professor at the University of South Florida ("USF"), one USF student, and one USF student group. Both sets of Plaintiffs challenged the Act on the grounds, *inter alia*, that it violates their free speech rights under the First Amendment and their rights under the Fourteenth Amendment Due Process Clause's vagueness doctrine. They each sought preliminary injunctive relief.

Defendants opposed the motions and also moved to dismiss all claims under Rule 12(b)(1) and (6) for lack of standing and failure to state a claim.

On November 17, the district court granted Plaintiffs' request for a preliminary injunction in principal part. The court concluded that all Plaintiffs except two of the *Pernell* Plaintiffs had standing. Ex.A.84-85. Moreover, while the court determined that the standing analysis has to be conducted on a provision-by-provision basis, it held that at least one Plaintiff had adequately alleged an injury traceable to each of the Act's eight enumerated concepts, such that the entire Act was properly before it. *See id.* On the merits, the court concluded that the Act restricts Plaintiffs' free speech rights and, applying a balancing test the court drew from this Court's decision in *Bishop*, it held that the Act violates the First Amendment. Finally, it also concluded that two of the Act's provisions are unconstitutionally vague, including the Act's exception allowing "objective" classroom discussion of the eight enumerated concepts—which, the court determined, "commands the entire statute" and thus "renders the [Act] as a whole unconstitutionally vague." Ex.A.125 & n.62.

The court thus entered a preliminary injunction barring any further enforcement of the Act or of the Board's regulation implementing it. And in a closing section, the court refused to stay its injunction pending any appeal to this Court. Appellants now seek such a stay from this Court.

13

## ARGUMENT

To secure a stay pending appeal, this Court considers four factors:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018). Of these factors, the first two are the "most critical." *Id.*

As explained below, each of the four factors favors granting a stay of the district court's preliminary injunction.

## I.    Appellants Are Likely To Succeed On The Merits Of Their Appeal.

### A. Plaintiffs Lack Standing To Challenge Several of the Act's Provisions.

In their complaints and declarations, Plaintiffs did not demonstrate—nor even adequately allege—that their intended teaching would plausibly violate *each one* of the eight concepts the Act forbids. Yet the district court granted Plaintiffs a preliminary injunction against the Act as a whole, including all eight concepts. That decision is clearly wrong, and this Court will likely reverse it.

To obtain a preliminary injunction, Plaintiffs bear the burden of demonstrating "a likelihood of success on the merits," which includes "a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that [a] plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987)

14

(Williams, J., concurring and dissenting) (emphasis in original); Ex.A.35. And a plaintiff seeking a preliminary injunction must do more than merely *allege* facts sufficient to demonstrate standing. A plaintiff must demonstrate standing "under the heightened standard for evaluating a motion for summary judgment," *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (cleaned up), by "set[ting] forth by affidavit or other evidence specific facts," *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2022) (cleaned up); Ex.A.36.

Moreover, because "[s]tanding is not dispensed in gross," a "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up). Plaintiffs cannot leverage an alleged injury under *one* of the Act's eight concepts into a challenge against—and entitlement to a preliminary injunction barring the enforcement of—*other* prohibited concepts that they have not demonstrated any intention of espousing, not to mention the Act as a whole. Instead, as the district court correctly recognized, "Plaintiffs must also demonstrate standing for each provision of the statute they challenge," by "demonstrate[ing] how their speech arguably implicates each way the [Act's] prohibition could be violated." Ex.A.44. Under this provision-by-provision analysis, the district court should have dismissed Plaintiffs' challenges to the Act's concepts 1, 3, 5, and 6, because no Plaintiff—in either of the cases

15

below—adequately alleged that they intended to subject students to instruction espousing those concepts.

In *Pernell*, as we explained in our preliminary injunction briefing there, no Plaintiff demonstrated (or even adequately alleged) standing to challenge the Act's concepts 1, 3, 5, 6, and 7. *See Pernell,* MTD Mem., Doc. 51-1 at 12-14 (Sept. 22, 2022). Indeed, no *Pernell* Plaintiff even *claimed any intention* to subject students to instruction that would plausibly violate concepts 1 or 5. *Id*. at 12-13. Only Plaintiff Sandoval mentioned concept 3, but he did not explain what planned teaching would plausibly violate it. *Id*. at 13. And only Plaintiff Almond mentioned concept 6—but again, without addressing how his intended teaching would advocate that some individuals should be treated *adversely* on account of their race. *Id*. Several *Pernell* Plaintiffs claimed that their teaching would violate the Act's concept 7, but only because they misunderstood that concept to cover teaching that merely *could cause* students to feel guilt or anguish. But this concept, as the district court itself has correctly recognized in another pending challenge to the Act, covers only teaching that instructs students that they *must* feel guilt or anguish over past actions committed by other members of their race in which the students played no part. *Id*. at 13-14; *see* Order, *Falls v. DeSantis*, No.22-cv-166, Doc. 68, at 9-10 (N.D. Fla. July 8, 2022). None of the *Pernell* Plaintiffs alleged any intent to teach *that*.

Similarly, in *Novoa*, Plaintiff Novoa never even *claimed* that her teaching would violate the Act's concepts 1, 2, 4, 5, 6, and 8. In fact, Plaintiff Novoa alleged *only* that her intended teaching would plausibly violate the Act's concepts 3 and 7.[1] And her claims clearly failed as to concept 3, because she misunderstood that concept to mean that it covered mere descriptions of instances of *past* historical racism. *Novoa*, MTD Mem., Doc. 33-1 at 4-14 (Sept. 30, 2022).

Appellants explained all of this in their preliminary injunction oppositions below. In response, neither the *Pernell* Plaintiffs nor the *Novoa* Plaintiffs made any effort to show that their intended teachings arguably *would* violate the specific concepts at issue. Instead, the *Pernell* Plaintiffs responded only that their challenge is a "facial" one, that Defendant's concept-by-concept arguments "go to the scope of remedy and are not relevant to the Court's jurisdiction over the claims," and that even if they were relevant, all of the Act's concepts are implicated in the *Pernell* Plaintiffs' vagueness arguments. *Pernell*, MTD Opp., Doc. 55 at 10-13 (Oct. 4, 2022). And the *Novoa* Plaintiffs reasserted Plaintiff Novoa's challenge to the Act's concepts 3 and 7, and further argued that Plaintiff Novoa has blanket standing to "challenge all eight concepts" of the Act because they are vague, overbroad, and viewpoint discriminatory, but without making any assertion as to *what* planned

---

[1] As the district court recognized, the *Novoa* Plaintiff Students' standing is derivative of Plaintiff Novoa's standing. Ex.A.81-82.

teaching would violate *each* of the Act's concepts. *Novoa*, MTD Opp., Doc. 38 at 10-16 (Oct. 7, 2022).

That should have been the end of the matter. Yet the district court itself filled in the gaps in what Plaintiffs had alleged in their complaints and stated in their declarations and their briefs, parsing their course materials to uncover ways in which Plaintiffs' teaching could "arguably violate" concepts in the Act that the Plaintiffs themselves did not even raise. This judicial intervention was the plainest of errors.

For example, Plaintiff Pernell mentions only concept 8 in his declaration, *Pernell*, Pernell Decl., Doc. 13-1 at ¶ 20 (Aug. 24, 2022), but the district court concluded (without addressing concept 8) that his coursework would arguably violate concepts 3 and 4, Ex.A.58. Plaintiff Dorsey did not call out a specific provision of the Act at all, *Pernell*, Dorsey Decl., Doc. 13-2 (Aug. 24, 2022), but the district court concluded that her course assignments might violate concepts 3, 4, and 8, Ex.A.59. And even more extraordinary, while Plaintiff Novoa alleged only that her planned teaching might violate concepts 3 and 7, *Novoa*, Compl., Doc. 1 at ¶¶205-06, the district court *sua sponte* concluded her teaching might violate concepts 1, 2, 3, 5 and 7—effectively conferring upon her standing to raise challenges to the Act that she did not plead, Ex.A.68.

The net result of the district court's supplementation of the Plaintiffs' allegations and arguments was to permit the court's preliminary injunction to apply

to all eight of the of the Act's concepts. Ex.A.130-31. That was error, and this Court is likely to conclude that Plaintiffs' failure to challenge concepts 1, 3, 5, and 6 means that they *lack* standing to challenge those concepts.

**B. The Act Does Not Violate the First Amendment.**

In the name of preserving "a healthy democracy," Ex.A.135, the district court took control of Florida's public-university curriculum away from the State's elected officials. It reached this result by erroneously applying heightened First Amendment scrutiny to what is indisputably government speech, which is wholly unprotected by the First Amendment. The district court's analysis was contrary to *decades* of precedent from both this Court and the Supreme Court, and so this Court will likely reverse.

**1. Classroom Instruction in Public Universities Is Government Speech and Thus Not Entitled to First Amendment Protection.**

Over thirty years ago, this Court made clear that the content of classroom instruction at public universities is subject to control by the government (i.e., the university), not individual instructors. In *Bishop v. Aronov*, the Court held that a public university's decision to prohibit an individual physiology professor from sharing his personal religious viewpoints "during instructional time" did not violate the professor's free speech rights. 926 F.2d at 1076-77. Although the Court applied a balancing test, it determined that the university's viewpoint-based restriction on

19

the professor's in-class speech was subject to the mildest of scrutiny—whether it was "reasonable"—and that such restrictions are effectively *per se* reasonable. *See id.*

*Bishop* spoke in no uncertain terms: The university's "conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Id.* at 1077. When an educator and the university "disagree about a matter of content in the courses he teaches," the Court explained "the University must have the final say in such a dispute." *Id.* at 1076-77. Therefore, the university, "as an employer and educator can direct" a professor "to refrain from expression" of particular "viewpoints in the classroom." *Id.* at 1077. The Court summed up the principle succinctly: "The University necessarily has dominion over what is taught by its professors and may so manage them." *Id.* at 1078.

*Bishop*'s holding resolves this case. The gravamen of Plaintiff Professors' First Amendment claim is that the Constitution entitles *them* to decide the content of the instruction they offer when teaching the State's prescribed curriculum, in the State's classroom, for a State paycheck. The Act regulates only "training or instruction," FLA. STAT. § 1000.05(4)(a), and thus does not limit any professor's scholarship, research, or other activities outside the classroom or other instructional setting. And *Bishop already balanced* the First Amendment interests in this precise context—concluding, again, that "*[t]he University* necessarily has dominion over

20

what is taught by its professors." *Id.* (emphasis added). That square holding should have been the beginning and end of the district court's analysis of Plaintiffs' First Amendment claim.

      a.    The result compelled in this case under *Bishop* mirrors the result required under the Supreme Court's government-speech cases, which make clear that the speech at issue here is not protected by the First Amendment at all. Take first the Supreme Court's seminal decision in *Rosenberger*. There, the Court explained that it is "the University speaking" when it "determines the content of the education it provides." 515 U.S. at 833. And when the government "is the speaker," it may "regulate the content of what is or is not expressed," including imposing "viewpoint-based restrictions." *Id.* at 834. The Court confirmed this sentiment in *Board of Regents of Univ. of Wisc. Sys. v. Southworth*, stating that "speech by an instructor or a professor in the academic context" implicates the "principles applicable to government speech." 529 U.S. 217, 235 (2000). Here, the State of Florida is specifically regulating "what is or is not expressed" in "the education it provides." Therefore, it is regulating its own speech when it restricts "speech by an instructor or a professor in the academic context." And when "government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker*, 576 U.S. at 207.

Second, consider the Supreme Court's government-funding cases. The Court has consistently "refused to hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program" to the exclusion of other viewpoints. *Id.* at 208 (cleaned up). This refusal stems from the Court's recognition "that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Rosenberger*, 515 U.S. at 833. Here, the State of Florida "appropriates public funds" to support public education at the State's universities. Under these principles, the State of Florida is thus "entitled to say what it wishes" and to specify the "viewpoint" that is taught in the public education that it provides. Under the district court's decision, however, it is the State-funded educators, not the State, who are entitled, uniquely among public employees, to say what they wish in their workplace.

Third, consider the Court's cases involving the use of public property by private parties to communicate a government message. The Court has made clear that the government may "express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009). *Pleasant Grove* held that "even when 'accepting a privately donated monument and placing it on city property,'" the government "had 'engaged in expressive conduct'" and was thus entitled to control the content, including the viewpoint, of its message. *Walker*, 576

22

U.S. at 209 (quoting *Pleasant Grove*, 555 U.S. at 476 (cleaned up)). The Court applied these principles again in *Walker*, holding "that license plate designs proposed by private groups also amounted to government speech" and thus were not subject to First Amendment scrutiny. *See Shurtleff v. City of Boston, Mass.*, 142 S. Ct. 1583, 1590 (2022) (describing *Walker*). Again, this line of government-speech cases renders the decision below completely untenable. For if the speech of private individuals proposing license plate slogans is government speech, then surely the classroom speech of state-employed educators at state universities is too.

Finally, consider the Supreme Court's 2006 decision in *Garcetti*. There, the Supreme Court explained that when "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. at 421-22. And "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* Therefore, a public employer may punish or otherwise regulate an employee's professional speech, and "the employee has no First Amendment cause of action." *Id.* at 418. The classroom speech of public-university professors clearly falls within the rationale of *Garcetti* because statements are made "pursuant to their official duties." 547 U.S. at 421-22. To be sure, *Garcetti* reserved the question whether its holding applies in full to classroom instruction. *Id.* at 425. But this case invites the Court to make clear that

*Bishop* anticipated and answered that reserved question, and that, in any event, on the plain reasoning of *Garcetti* and the other government speech cases, the answer cannot reasonably be in doubt.

Several circuits, including this one, have recognized that the government-speech doctrine applies to in-class instruction by state-employed educators. As then-Judge Alito explained for the Third Circuit in a closely analogous case, "a public university professor does not have a First Amendment right to decide what will be taught in the classroom." *Edwards*, 156 F.3d at 491. That decision was grounded in "the Supreme Court's jurisprudence concerning the state's ability to say what it wishes when it is the speaker." *Id.* (citing *Rosenberger*, 515 U.S. at 833-34). Writing for the Seventh Circuit, Judge Easterbrook explained that, because "teachers hire out their own speech," applying *Garcetti* to public high school teachers' in-class speech is "an *easier case* for the employer than *Garcetti*" itself, "where speech was not what the employee was being paid to create." *Mayer*, 474 F.3d at 479 (emphasis added). The Sixth Circuit has likewise applied *Garcetti* to in-class instruction in a public high school. *See Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332 (6th Cir. 2010).[2]

---

[2] In a subsequent decision, the Sixth Circuit cabined *Evans-Marshall* to the K-12 context, *see Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), but *Meriwether*'s basis for distinguishing that case from the university context was expressly premised on the notion that academic freedom is an independent First Amendment right of college educators, a view that this Court expressly rejected in *Bishop*, 926 F.2d at 1075.

Judge Sutton's opinion for the court explained that "[w]hen a teacher teaches," the school has *hired* that speech and, accordingly, the school "can surely 'regulate the content of what is or is not expressed.'" *Id.* at 340 (quoting *Rosenberger*, 515 U.S. at 833). The Fourth Circuit reached the same result: where speech is "curricular in nature," it is "not protected by the First Amendment." *See Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 696-97 (4th Cir. 2007) (citing *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 368-69 (4th Cir. 1998) (en banc)).

Finally, this Court, in an unpublished opinion, made short work of a First Amendment claim by a high school teacher who was fired as a result of her written responses to questions asked by her principal. "We apply *Garcetti* … and conclude that [the teacher's] speech was not protected by the First Amendment because she spoke pursuant to her official duties." *Gilder-Lucas v. Elmore Cnty. Bd. Of Educ.*,186 F. App'x 885, 886 (11th Cir. 2006) (cleaned up).

In sum, all three strands of the Supreme Court's government-speech doctrine apply in this case: public university professors are employed by the State, are funded by the State, and work in the State's classrooms. Thus, while *Bishop* alone requires reversal, even if that case had never been decided, the Supreme Court's subsequent government-speech cases compel the same result: the Individual Freedom Act regulates only government speech and thus does not implicate the First Amendment rights of educators in Florida's public schools.

25

b.    The court below, however, read *Bishop* to yield the *precise reasoning that the decision repudiated*: that the State of Florida, instead of having "dominion over what is taught by its professors," 926 F.2d at 1078, is *constitutionally prohibited* from prescribing what is, and is not, to be taught by state-employed educators in its state-funded universities. And according to the district court, the principles from the Supreme Court's government-speech cases do not apply to university professors. Under this theory, university professors—called the "priests of democracy," by the district court—stand alone among all other public employees, with the First Amendment freedom to say whatever they wish pursuant to their official duties, their employer be damned.[3]

Turning first to *Bishop*, the district court erred at multiple levels in applying that decision. For example, the court repeatedly suggested that *Bishop* was effectively an Establishment Clause case. *See* Ex.A.90, 93. But *Bishop* made clear (numerous times) that its holding arose under the Speech Clause and not the Establishment Clause. *See* 926 F.2d at 1078 ("[W]e hold" that the government's decision "was reasonable and within its power to control the content of curriculum in the classroom, *regardless of the Establishment Clause*." (emphasis added)); *id.* at

---

[3] The district court correctly concluded that the Plaintiff Students' claims were "coextensive" with the professors' speech rights and thus the students' claims rise or fall with the resolution of the professors' claims. *See* Ex.A.30-31.

1077 ("[W]e do not reach the establishment questions raised by Dr. Bishop's conduct.").

The district court also attempted to distinguish *Bishop* on the ground that it involved only one professor. But that, again, conflicts directly with *Bishop's* teaching that "the University necessarily has dominion over what is taught by its professors and may so manage them." *Id.* at 1078.

But the district court's most fundamental error, as discussed *supra* at pp. 3-6, 20-21, was its insistence that *Bishop* drew a distinction between the State's unquestioned authority to control the subjects taught in "the established curriculum," Ex.A.94, and professors' freedom to express their personal viewpoints on matters *within* the scope of that curriculum. According to the district court, the State may permissibly ban, wholesale, discussion of a "subject," but once the State decides to permit the *discussion* of a particular "subject," the State's professors have the "academic freedom" to advocate their own *viewpoints* related to that subject. *See* Ex.A.92, 95.[4]

---

[4] The subjective malleability of this standard is evidenced in the district court's standing analysis. While the district court assures that the attempt "to teach an introductory botany class through the lens of critical race theory" would not be within the established curriculum, Ex.A.92, it nevertheless enjoined enforcement of the Act against a Plaintiff *statistics professor* who teaches through the lens of "systemic discrimination." Ex.A.39. The district court's distinction between this professor and the hypothetical botany professor is neither explained nor obvious.

That distinction is nowhere to be found in *Bishop* and is, in fact, fundamentally inconsistent with it. *Bishop* did not concern the scope of the State's authority to establish which courses will be taught in the curriculum prescribed for its universities. That state authority is questioned by no one. Instead, as in this case, *Bishop* concerned "what is taught by its professors," 926 F.2d at 1078—the "course content," *id*. at 1077—and in particular, whether the State could require "that its courses be taught without personal religious bias unnecessarily infecting the teacher or the students." 926 F.2d at 1076. Nor did *Bishop* concern a dispute about the "content" of classroom speech rather than "viewpoint." Dr. Bishop's "Christian perspective," *id.*, and his advocacy of intelligent design, *was a component of his professional viewpoint on the physiology curriculum he was teaching*. Indeed, this Court specifically held that the university could "prevent him from presenting his religious viewpoint during instructional time, *even to the extent that it represents his professional opinion about his subject matter*." *Id.* at 1077 (emphasis added); *see id.* at 1076 n.7 (crediting that Professor Bishop's "professional views" as a physiology professor were "informed by his religious beliefs").

Moreover, it is nonsensical to import a content-viewpoint distinction into the government-speech doctrine. "Were the Free Speech Clause interpreted otherwise, government would not work." *Walker*, 576 U.S. at 207. "Indeed, it is not easy to imagine how government"—and a public university in particular—"could function

28

if it lacked th[e] freedom" to have a viewpoint. *Pleasant Grove*, 555 U.S. at 568; *see also Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring) ("It is the very business of government to favor and disfavor points of view."). A university must be entitled to prohibit its political-science professors from inculcating in class the idea that slavery should be legal or its science professors from inculcating in class the idea that eugenics should be used for population control.

The district court repeatedly emphasized that "*Bishop* explicitly adopted a balancing test." Ex.A.87. But it failed to appreciate that, as discussed above, *Bishop itself balanced* the First Amendment interest in this precise context and declared the outcome: a university's "conclusions about course content must be allowed to hold sway over an individual professor's judgments." 926 F.2d at 1077. Lower courts are not free to *reject* the balance specifically struck in *Bishop* by reweighing the factors that it *already balanced*.

Second, the district court largely elided the reasoning of the Supreme Court's government-speech precedent. The court's 139-page opinion did not even mention *Rust*, *Walker*, or *Pleasant Grove*. As for *Garcetti*, the district court simply noted that the *Garcetti* Court reserved the question whether its rule would apply to the academic context—a question not before the Court. Missing from its analysis is any recognition that courts are bound by not only the result, but also *the reasoning* of a

Supreme Court decision. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1416 n.6 (2020) (Kavanaugh, J., concurring).

In an effort to distinguish *Rosenberger*, the district court recast that decision as permitting *only* content-based discrimination and foreclosing viewpoint discrimination when the government regulates in-class speech. To be sure, *Rosenberger* used the word "content" in stating that "it is the University speaking" when it "determines the content of the education it provides." *Rosenberger*, 515 U.S. at 833. But the Court's point in this sentence was about *who was speaking*, not the substance of the speech. Determining who is the speaker—the government or a private individual—is, after all, the dispositive constitutional question. And the *Rosenberger* Court clearly implied that "viewpoint-based restrictions are proper" when the university itself speaks. *See id.* at 834. Indeed, subsequent decisions have cited this same passage from *Rosenberger* for the proposition that the government is "'entitled to say what it wishes'" and to "express *its views*" when it speaks. *Pleasant Grove*, 555 U.S. at 467-68 (quoting *Rosenberger*, 515 U.S. at 833) (emphasis added). That the Supreme Court has used the words "content" and "view" or "viewpoint" interchangeably in government-speech cases simply confirms there is no distinction between "content" and "viewpoint" discrimination when *the government* is speaking. *Compare Walker*, 576 U.S. at 207 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of

what it says." (citing *Pleasant Grove*, 555 U.S. at 467-68)), *with Shurtleff*, 142 S. Ct. at 1589 ("The First Amendment's Free Speech Clause does not prevent the government from declining to express a view." (citing the same pages of *Pleasant Grove*)).

In short, the principles established by the Supreme Court's government-speech cases make clear that the speech at issue here is government speech and thus is not protected by the First Amendment.

c.    The implications of the district court's ruling are horrifying. Under the court's reasoning, if a university permits the *discussion* of World War II in a history course within the "established curriculum," then a professor has a First Amendment right to advocate the viewpoint that the Holocaust is a hoax and Nazis were the good guys. Or if a university permits the *discussion* of the Jim Crow era within the "established curriculum," then a professor has a First Amendment right to inculcate the viewpoint that Jim Crow was justified because white people are "superior" to black people. To avoid these results, according to the district court, the university would presumably be forced to ban discussion of World War II and Jim Crow altogether. That cannot be the law.

These are not mere wild hypotheticals. The Third Circuit—following then-Judge Alito's opinion in *Edwards*—held that a world history teacher did not have a First Amendment right to, among other things, "questio[n] historical accounts of the

Holocaust, and opin[e] that 'Hitler didn't hate the Jews.'" *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 178, 184 (3d Cir. (2020). And a white high-school teacher in Texas was recently fired for telling students that his race "is the superior one"— using language remarkably similar to concept 1 in the Act. Andi Babineau, *White teacher in Texas fired after telling students his race is 'the superior one'*, CNN (Nov. 15, 2022), https://cnn.it/3VCQWl4. While these examples concern the context of K-12 instruction—a context where the district court's decision does not apply—under the court's reasoning, both of these teachers would have a First Amendment claim if they were teaching at a university that permitted any discussion of either World War II or Jim Crow "within the established curriculum." Despite the differences between the K-12 and university-level contexts, that reasoning is clearly wrong in both, and this Court will likely reverse the decision below.

> ## 2. The Act's Educational Provisions Satisfy Any Understanding of the Standard Established by *Bishop*.

Even if the Court reads *Bishop* as adopting a level of scrutiny marginally more stringent than rational basis review, that standard still requires, only and at most, that the Act's provisions be "reasonable." *Bishop*, 926 F.2d at 1076. The educational provisions here easily pass that test. As the Ninth Circuit held, educational statutes that, among other things, prohibit teaching classes that "[p]romote resentment toward a race or class of people" or "[a]dvocate ethnic solidarity instead of the treatment of pupils as individuals" are "reasonably related to the state's legitimate

pedagogical interest in reducing racism." *Arce v. Douglas*, 793 F.3d 968, 973, 985-86 (9th Cir. 2015) (cleaned up). And *Bishop* itself recognized that a university has an inherent "interest[] in the classroom conduct of its professors." *Bishop*, 926 F.2d at 1076.

In contrast, the district court concluded that the State's regulation of the viewpoints taught in class by its state-employed educators is *never* "reasonable" within the meaning of *Bishop*. *See* Ex.A.97. The district court held that, even if the interest served by the IFA was to "address the pedagogical concern of reducing racism or prohibiting racial discrimination," a viewpoint-based restriction "is certainly *not* reasonable." Ex.A.96-97 (emphasis in original); *see also* Ex.A.103. That conclusion is untenable. The compelling nature of the government's interest in stamping out invidious racial discrimination is so fundamental that it is embodied in our highest law. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983).

But the substance of the district court's holding is that government regulation of *any viewpoint* taught in government-funded courses by government-employed instructors—no matter how compelling the government interest—is *per se* unconstitutional.[5] Under this theory, literally no viewpoint is out of bounds. The

---

[5] The district court suggested that Defendants "may" face a higher burden than the burden imposed by *Bishop* because the Act is a "prophylactic ban on expression" applicable to all public instructors. *See* Ex.A.96 n.53 (citing *United States v. Nat'l Treasury Emp. Union*, 513 U.S. 454 (1995) ("*NTEU*"). But *NTEU* applied a

district court offered no authority for this extreme proposition, and it certainly does not come from *Bishop*.

### C. The Challenged Provisions Are Not Unconstitutionally Vague.

Appellants are also likely to succeed in overturning the district court's ruling that two of the Act's provisions are unconstitutionally vague. "Under the Due Process Clause, a law is void for vagueness if it fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites arbitrary enforcement." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1046 (11th Cir. 2020). Neither condition is present here.

In the typical speech context, the government must regulate "with narrow specificity"—though "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017). But "[i]n the public employment context," a more lenient standard applies: a provision governing public employees is "not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (cleaned up).

---

heightened standard only "[b]ecause the vast majority of the speech at issue" did "not involve the subject matter of Government employment and takes place outside the workplace." 513 U.S. at 470; *see also id.* at 475. *NTEU* is thus simply irrelevant here.

The district court acknowledged that this public-employee standard applies here. Ex.A.113-14. And the Act readily satisfies it. *O'Laughlin*, 30 F.4th at 1055.

Each of the challenged provisions uses plain, everyday language that has an "ordinary or natural meaning" commonly known and understood by ordinary people, and certainly by highly educated university instructors. Yes, "the fact that the [Act] uses real words found in an English dictionary does not magically extinguish vagueness concerns." Ex.A.113. But courts routinely use dictionaries to confirm that allegedly vague language in fact has an "ordinary meaning" that "is readily understandable." *Tracy v. Fla. Atl. Univ. Bd. of Tr.*, 980 F.3d 799, 807 (11th Cir. 2020). Nor is the Act's language "so standardless" that it invites arbitrary enforcement. *Jones*, 975 F.3d at 1046. Because Plaintiffs challenge the Act on a pre-enforcement basis, their burden to show the risk of discriminatory enforcement is much higher. *See Vill. of Hoffman v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 503 (1982); *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1231 (11th Cir. 1982). And two further features of the Act and the Board's regulation render Plaintiffs' burden insurmountable.

First, "even laws that are in some respects uncertain may be upheld against a vagueness challenge if they contain a scienter requirement." *Jones*, 975 F.3d at 1047. And the scienter requirement in the Act and the Board's Regulation 10.005 eliminates any genuine vagueness concerns. The Act uses terms that clearly imply a

35

scienter requirement—restricting only the intentional act of providing classroom instruction that "espouses, promotes, advances, inculcates, or compels [a student] to believe" one of the enumerated concepts. FLA. STAT. § 1000.05(4)(a); *see Arce*, 793 F.3d at 988-89 (noting that verbs like "advocate" and "promote" "impl[y] an affirmative act and intent").

Second, Regulation 10.005 explains that universities should enforce the Act against individual instructors who violate it by first mandating that the instructor "modify" the offending training or instruction, and second by using "disciplinary measures" only "if there is a failure or refusal to comply with the mandate." Regulation 10.005(3)(c). This structure—punishing only a failure or refusal to take corrective action—likewise reduces vagueness concerns. *See U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 580 (1973). The district court pointed out that discipline is authorized under the Regulation for an instructor's "failure," as well as "refusal," to conform his teaching to the Act. Ex.A.123-24. But even such a "'failure' to comply" can subject the instructor to discipline only *after* the University has informed him precisely what the Act requires and precisely which teachings it has concluded violate it—thus mitigating any potential vagueness concerns.

The district court rejected these considerations and held that the Act is unconstitutionally vague. Its reasoning, however, was limited to just two provisions

of the Act. Both of them use plain, commonly understood language and provide fair notice of what the Act prohibits.

1.    The district court first rejected as vague concept 4—that "[m]embers of one race … cannot and should not attempt to treat others without respect to race, …." FLA. STAT. § 1000.05(4)(a)(4). Much of the court's discussion (with respect to this provision and the other one it addressed) incorporated its earlier opinion in another case challenging to the Act, *Honeyfund.com, Inc. v. DeSantis*, 2022 WL 3486962 (N.D. Fla. Aug. 18, 2022), which is currently before this Court on appeal, No. 22-13135 (11th Cir.). The court deemed this concept "unintelligible" largely because of its use of "a rarely seen triple negative." Ex.A.114. But this concept simply and clearly bars instructors from endorsing the view that members of one race are powerless to treat others in a color-blind manner, and they should not even try to do so. If this provision is so "unintelligible" as to be unconstitutionally vague, one wonders what is to become of the thousands of far more intricate provisions that riddle the statute books. *See, e.g.*, 15 U.S.C. § 77k; 26 U.S.C. § 501; 52 U.S.C. § 30116.

Indeed, the hypotheticals posed by the district court in the very next paragraph show that the court had no genuine difficulty whatsoever in cutting through the alleged "cacophony of confusion" purportedly created by the provision's "triple negative." Ex.A.114. Ordinary people will not have any difficulty either. Nor will

they have any difficulty in seeing that the concept plainly does not ban general discussion of "diversity" or acknowledgement of students "differing cultural backgrounds," Ex.A.115—since such discussions do not amount to advocacy of the idea that individuals "cannot and should not attempt to treat others" without respect to their race.

2.     The district court's second and more extended discussion centered around the supposed vagueness of the word "objective" in the Act's provision permitting "discussion of the [eight] concepts … in an *objective* manner without endorsement of the concepts." FLA. STAT. § 1000.05(4)(b) (emphasis added). It concluded that the concept of "objectivity" is "utterly ambiguous," and that because "this 'objectivity' savings clause commands the entire statute," the Act is unconstitutionally vague *in its entirety*, and Plaintiffs are entitled to a blanket preliminary injunction against *all* of it. Ex.A.125 & n.62. Not so.

To discuss a concept "in an objective manner" is, obviously, to discuss it "without distortion by personal feelings, prejudices, or interpretations." *Objective*, MERRIAM-WEBSTER'S DICTIONARY, https://bit.ly/3zcLbB1. In contrast, to "endorse" a concept is "to give approval to" or "support" it. *Endorse*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 470 (4th ed. 2002). Therefore, the plain meaning of the Act permits instructors to discuss the concepts without *expressing approval* of them.

The district court insisted that "few terms are as loaded and contested as 'objective.'" Ex.A.124. But ordinary people understand the plain, everyday meaning of objectivity. Moreover, the *entire American legal framework* is built upon the belief that it is possible—and indeed, critically necessary to the law's very legitimacy—to distinguish between endorsing and advocating an idea and neutrally and objectively discussing and considering it. That is a line that appears *throughout* the law and that our adversarial legal system trusts its judges, attorneys, and officers to draw *every single day*. This Court's Pattern Jury Instructions, for example, repeatedly instructs juries—ordinary people drawn randomly from the community— to draw this line, instructing them to determine when an action or belief is "objectively reasonable," or to distinguish "objective" conditions from a "plaintiff's subjective feelings." *See, e.g.*, PATTERN JURY INSTRUCTIONS, CIVIL CASES, ELEVENTH CIRCUIT (2013 revision) 4.19, 4.22 cmt. 2, https://bit.ly/3OGuaWU. Indeed, while the district court professed to find the Act's use of the term "objective" "utterly ambiguous," Ex.A.119, the court itself has used that term on numerous occasions, without any apparent concern that his readers would be confounded by it.[6]

---

[6] *See, e.g.*, *Akridge v. Sch. Bd. of Alachua Cnty.*, 2019 WL 13084482, at *5 n.3 (N.D. Fla. May 28, 2019); *Wilborn v. Ocwen Loan Servicing, LLC*, 2019 WL 12288376, at *8 (N.D. Fla. Mar. 17, 2019); *HVLPO2, LLC v. Oxygen Frog, LLC*, 2019 WL 13164663, at *8 (N.D. Fla. Feb. 20, 2019).

The court's principal response to this argument was to claim that even if the term "objective" has a commonly understood meaning on its own, "the term loses that meaning" here, because the Act "allows for the most zealous condemnation of the eight concepts—motivated by an instructor's own personal prejudice or biases," but it does not allow endorsement of the concepts by those "who wish to promote the[ir] merits." Ex.A.120. Thus, according to the court below, the Act "redefine[s] 'objectivity' in a manner that does not comport with common sense," by allowing "for only one side of the debate in Florida's public universities." *Id.*

This argument is built upon a fundamental and obvious misunderstanding of the Act's text and structure. Yes, of the three possible dispositions towards the eight concepts enumerated by the Act—condemnation, neutral objectivity, and endorsement—Florida's public-university instructors are only prohibited from endorsement. But that is not because the Act somehow "has redefined 'objectivity'" in subsection (4)(b)'s *exception* to the Act's prohibition, Ex.A.120; it is because subsection (4)(a)'s *operative prohibition* only proscribes *endorsing* the concepts, not *condemning* them. That has nothing to do with subsection (4)(b)'s *exception*—which merely confirms that "discussion of the concepts … in an objective manner" that does not endorse *any* particular view of the concepts remains permissible—so it cannot render subsection (4)(b) unconstitutionally vague.

## II.    The Remaining Stay Factors Favor A Stay.

The district court's principal reason for concluding that Plaintiffs had shown irreparable injury was its conclusion that an "ongoing First Amendment violation … constitutes irreparable injury" per se. Ex.A.127. But because Plaintiffs have little likelihood of showing that the Act *actually violates* their First Amendment freedoms, this presumption does not apply.

The balance of the equities and the public interest weigh decisively in favor of staying the district court's order preliminarily enjoining the Act. As shown above, the State has a compelling interest in ending discrimination based on race and other immutable characteristics, and enjoining the Act will sanction curricular speech that Florida has determined, in the exercise of its sovereign judgment, is invidiously discriminatory and contrary to the State's most cherished ideals. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," *Maryland*, 567 U.S. at 1303 (Roberts, C.J., in chambers) (cleaned up), and that is true all the more when the statute at issue furthers interests as fundamental as those at the heart of Florida's Individual Freedom Act.

## CONCLUSION

For the foregoing reasons, this Court should stay the district court's order of a permanent injunction pending appeal.

Dated: December 5, 2022

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper
John D. Ohlendorf
Megan M. Wold
John D. Ramer
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
ccooper@cooperkirk.com
johlendorf@cooperkirk.com
mwold@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion contains 9,748 words, excluding accompanying documents authorized by FED. R. APP. P. 27(a)(2)(B), in accordance with Defendants-Appellants' motion for excess words, which requested a word limit of 10,000 words and was filed simultaneously with this motion.

This motion complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this motion has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: December 5, 2022

s/ Charles J. Cooper
Charles J. Cooper
*Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on December 5, 2022. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 5, 2022                      s/ Charles J. Cooper
                                             Charles J. Cooper
                                             *Counsel for Defendants-*
                                             *Appellants*