No. 22-13994

# In the United States Court of Appeals for the Eleventh Circuit

---

ADRIANA NOVOA, ET AL.,
*Plaintiffs–Appellees,*

v.

MANNY DIAZ, JR., ET AL.,
*Defendants–Appellants.*

---

## RESPONSE OF PLAINTIFFS-APPELLEES NOVOA, RECHEK, AND FIRST AMENDMENT FORUM TO MOTION FOR STAY PENDING APPEAL

---

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
4:22-CV-324-MW-MAF

---

GREG HAROLD GREUBEL
ADAM STEINBAUGH
JT MORRIS
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel:   (215) 717-3473
Fax:   (267) 573-3073
greg.greubel@thefire.org
adam@thefire.org
jt.morris@thefire.org

GARY S. EDINGER
BENJAMIN, AARONSON, EDINGER &
    PATANZO, P.A.
305 N.E. 1st Street
Gainesville, Florida 32601
Tel:   (352) 338-4440
Fax:   (352) 337-0696
GSEdinger12@gmail.com

*Counsel for Plaintiffs-Appellees Adriana Novoa, Samuel Rechek, and
the First Amendment Forum at University of South Florida*

## <u>APPELLEES' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule No. 26.1(a)(6), Plaintiff-Appellees Adriana Novoa, Samuel Rechek, and the First Amendment Forum at the University of South Florida certify that the following persons have an interest in the outcome of this case:[1]

1. Almond, Russell, *Plaintiff-Appellee*

2. American Civil Liberties Union of Florida, *Attorney firm for Plaintiffs-Appellees*

3. American Civil Liberties Union of New York, *Attorney firm for Plaintiffs-Appellees*

4. Austin, Sharon Wright, *Plaintiff-Appellee*

5. Azis, Jacqueline Nicole, *Attorney for Plaintiffs-Appellees*

6. Ballard Spahr LLP, *Attorney firm for Plaintiffs-Appellees*

7. Benjamin, Aaronson, Edinger & Patanzo, P.A., *Attorney firm for Plaintiffs-Appellees*

8. Blankenship, Katherine, *Attorney for Plaintiffs-Appellees*

9. Boaz, Timothy, *Defendant-Appellant*

10. Callahan, Sandra, *Defendant-Appellant*

11. Carrere, Michael, *Defendant-Appellant*

12. Cerio, Timothy, *Defendant-Appellant*

---

[1] This certificate includes parties involved in the related appeal of *Pernell v. Lamb*, No. 22-13992.

C-1 of 6

13.  Coleman, Santino, *Attorney for Plaintiffs-Appellees*

14.  Cooper & Kirk, PLLC, *Attorney firm for Defendants-Appellants*

15.  Cooper, Charles J., *Attorney for Defendants-Appellants*

16.  Corcoran, Richard, *Defendant-Appellant*

17.  Dauphin, Johana, *Plaintiff-Appellee*

18.  Diaz, Jr., Manny, *Defendant-Appellant*

19.  Donnelly, N. Rogan, *Defendant-Appellant*

20.  Dorsey, Dana Thompson, *Plaintiff-Appellee*

21.  Dunn, Marvin, *Plaintiff-Appellee*

22.  Edge, Aubrey, *Defendant-Appellant*

23.  Edinger, Gary. S., *Attorney for Plaintiffs-Appellees*

24.  Edwards, Jerry Crawford, *Attorney for Plaintiffs-Appellees*

25.  Fajana, Morenike, *Attorney for Plaintiffs-Appellees*

26.  First Amendment Forum at University of South Florida, *Plaintiff-Appellee*

27.  Fitzpatrick, Martin A., *Magistrate Judge, U.S. District Court for the Northern District of Florida*

28.  Florida A & M University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

29.  Florida Board of Governors of the State University System, *Defendant (Dismissed on Nov. 22, 2022)*

30.  Florida International University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

31. Florida State University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

32. Foundation for Individual Rights and Expression, *Attorney Firm for Plaintiffs-Appellees*

33. Frost, Patricia, *Defendant-Appellant*

34. Gabadage, Nimna, *Defendant-Appellant*

35. Greubel, Greg, *Attorney for Plaintiffs-Appellees*

36. Griffin, Michael, *Defendant-Appellant*

37. Haddock, Edward, *Defendant-Appellant*

38. Hinger, Sarah Ann, *Attorney for Plaintiffs-Appellees*

39. Horton, Oscar, *Defendant-Appellant*

40. Johnson, Alexsis Marie, *Attorney for Plaintiffs-Appellees*

41. Jones, Ken, *Defendant-Appellant*

42. Jordan, Darlene Luccio, *Defendant-Appellant*

43. Lamb, Brian, *Defendant-Appellant*

44. Leckerman, Jason Allen, *Attorney for Plaintiffs-Appellees*

45. Lee, Jin Hee, *Attorney for Plaintiffs-Appellees*

46. Leftheris, Julie, *Defendant-Appellant*

47. Levine, Alan, *Defendant-Appellant*

48. Lydecker, Charles, *Defendant-Appellant*

49. Mabatah, Isiuwa, Jacqueline, *Attorney for Plaintiffs-Appellees*

50.    Mateer, Craig, *Defendant-Appellant*

51.    McNamara, Carline A., *Attorney for Plaintiffs-Appellees*

52.    Michael, Deanna, *Defendant-Appellant*

53.    Monbarren, Lauran, *Defendant-Appellant*

54.    Moraff, Laura Beth, *Attorney for Plaintiffs-Appellees*

55.    Morris, Joshua T. (JT), *Attorney for Plaintiffs-Appellees*

56.    NAACP Legal Defense & Education Fund, *Attorney firm for Plaintiffs-Appellees*

57.    Nascimento, Isabella Salomao, *Attorney for Plaintiffs-Appellees*

58.    Novoa, Adriana, *Plaintiff-Appellee*

59.    Ohlendorf, John David, *Attorney for Defendants-Appellants*

60.    Palyam, Nithin, *Defendant-Appellant*

61.    Park, Shelley, *Plaintiff-Appellee*

62.    Patel, Shilen, *Defendant-Appellant*

63.    Pernell, Leroy, *Plaintiff-Appellee*

64.    Piccolo, Fredrick, *Defendant-Appellant*

65.    Ramer, John, *Attorney for Defendants-Appellants*

66.    Rechek, Samuel, *Plaintiff-Appellee*

67.    Sandoval, Jennifer, *Plaintiff-Appellee*

68.    Schneider, Jenifer, *Defendant-Appellant*

69.  Scott, Steven, *Defendant-Appellant*

70.  Seixas, Melissa, *Defendant-Appellant*

71.  Self, William, *Defendant-Appellant*

72.  Silagy, Eric, *Defendant-Appellant*

73.  Steinbaugh, Adam, *Attorney for Plaintiffs-Appellees*

74.  Stermon, Kent,  *Defendant-Appellant*

75.  Sykes, Emerson James, *Attorney for Plaintiffs-Appellees*

76.  Tilley, Daniel Boaz, *Attorney for Plaintiffs-Appellees*

77.  Tobin, Charles David, *Attorney for Plaintiffs-Appellees*

78.  University of Central Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

79.  University of Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

80.  University of South Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

81.  Walker, Mark E., *District Judge, U.S. District Court for the Northern District of Florida*

82.  Watson, Leah Monique, *Attorney for Plaintiffs-Appellees*

83.  Weatherford, William, *Defendant-Appellant*

84.    Wold, Megan M., *Attorney for Defendants-Appellants*

Dated:        December 22, 2022

Respectfully submitted,

/s/  Greg  H.  Greubel
Greg H. Greubel

*Counsel for Plaintiff-Appellees Adriana Novoa, Samuel Rechek, and First Amendment Forum at University of South Florida*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..............................................................iii

INTRODUCTION ...........................................................................1

BACKGROUND.............................................................................4

    I.    Factual Background ................................................................4

          A.    The Stop WOKE Act seeks to suppress viewpoints in higher education.................................................................4

          B.    Plaintiffs' academic expression is chilled by the Stop WOKE Act.................................................................6

    II.    Prior Proceedings .................................................................7

STANDARD OF REVIEW .............................................................. 8

ARGUMENT.................................................................................9

    I.    Florida Fails to Identify Any Irreparable Injury It Will Suffer Without a Stay, Which Would Chill Plaintiffs' Expression and Undermine the Public Interest. ......................10

          A.    Florida's only identified "harm"—an inability to enforce the law for enforcement's sake—is circular and conclusory.................................................................11

          B.    A stay would injure Plaintiffs' First Amendment rights and those of thousands of faculty and students interested in this action. ...................................14

          C.    The public interest lies in universities unfettered by the "pall of orthodoxy." ...................................................16

    II.    The State Cannot Make a "Strong Showing" of a Likelihood of Success on the Merits. .........................................18

          A.    The district court correctly found the Act fails scrutiny under *Bishop*'s balancing test. ..........................19

              1.    Because the Stop WOKE Act is viewpoint-discriminatory, it necessarily fails *Bishop*'s balancing test. ......................................................20

*i*

2.    The district court correctly applied the "context" and employment factors of the *Bishop* balancing test. ..............................................23

3.    The district court correctly applied the "countervailing" academic freedom factor of the *Bishop* balancing test. ......................................27

B.    The First Amendment protects academic expression by university faculty. ......................................................28

1.    Like the district court, this Court cannot—and should not—find that college faculty classroom speech is government-speech...............29

2.    Every circuit considering *Garcetti* has rejected its application to academic expression in higher education. ...................................................32

3.    The State waived its government-funding theory, which is also inapplicable because Florida cannot restrict expression within the university "sphere." ................................................37

C.    The district court correctly ruled that the Act is unconstitutionally vague. .................................................38

D.    Florida conceded in the district court that the Novoa parties have standing.......................................................42

CONCLUSION.............................................................................44

CERTIFICATE OF COMPLIANCE .............................................45

CERTIFICATE OF SERVICE ....................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abrams v. United States,*
    250 U.S. 616 (1919)............................................................................3, 4

*Access Now, Inc. v. Sw. Airlines Co.,*
    385 F.3d 1324 (11th Cir. 2004)........................................................ 37

*Adams v. Trs. of the Univ. of N.C.-Wilmington,*
    640 F.3d 550 (4th Cir. 2011) .............................................................35

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.,*
    39 F.4th 95 (3d Cir. 2022)................................................................. 21

*Arce v. Douglas,*
    793 F.3d 968 (9th Cir. 2015) .............................................................25

*Bd. of Educ. of Westside Cmty. Schs. v. Mergens,*
    496 U.S. 226 (1990).......................................................................... 13

*Bd. of Regents v. Southworth,*
    529 U.S. 217 (2000)..........................................................................34

*Bethel Sch. Dist. v. Fraser,*
    478 U.S. 675 (1986) ..........................................................................26

*Bishop v. Aronov,*
    926 F.2d 1066 (11th Cir. 1991)..................................................*passim*

*Bob Jones Univ. v. United States,*
    461 U.S. 574 (1983)..........................................................................25

*Boring v. Buncombe Cnty. Bd. of Educ.,*
    136 F.3d 364 (4th Cir. 1998) ............................................................ 20

*Brooks v. Auburn Univ.,*
    296 F. Supp. 188 (M.D. Ala. 1969) ...................................................22

*Buchanan v. Alexander,*
    919 F.3d 847 (5th Cir. 2019)..............................................................35

*Busch v. Marple Newtown Sch. Dist.*,
    567 F.3d 89 (3d. Cir. 2009) ................................................................22

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) ...........................................................................25

*DeJohn v. Temple Univ.*,
    537 F.3d 301 (3d Cir. 2008) ..............................................................25

*Demers v. Austin*,
    746 F.3d 402 (9th Cir. 2014) .............................................................35

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) .....................................................8, 42

*Elrod v. Burns*,
    427 U.S. 347 (1976)............................................................................ 14

*FCC v. Fox TV Stations, Inc.*,
    567 U.S. 239 (2012) ...........................................................................39

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)..............................................................2, 33, 34

*Gay & Lesbian Students Ass'n. v. Gohn*,
    850 F.2d 361 (8th Cir. 1988) ............................................................23

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ..........................................................................34

*Hand v. Scott*,
    888 F.3d 1206 (11th Cir. 2018).................................................. 10, 13

*Hardy v. Jefferson Cmty. Coll.*,
    260 F.3d 671 (6th Cir. 2001) ............................................................25

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) ............................................................................ 12

*Hawkins v. Sarasota Cnty. Sch. Bd.*,
    322 F.3d 1279 (11th Cir. 2003)........................................................ 12

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) ........................................................................ 20

*Healy v. James,*
    408 U.S. 169 (1971)........................................................................23, 33

*Hill v. Colorado,*
    530 U.S. 703 (2000)..............................................................................39

*Hill v. Snyder,*
    No. 10-cv-14568, 2018 U.S. Dist. LEXIS 59660, 2018 WL 1704231
    (E.D. Mich. Apr. 9, 2018) .................................................................. 12

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019) .................................................................. 2, 21

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.,*
    385 U.S. 589 (1967) ....................................................................*passim*

*Kolender v. Lawson,*
    460 U.S. 352 (1983)..............................................................................39

*Mahoney v. Hankin,*
    593 F. Supp. 1171 (S.D.N.Y 1984) .......................................................32

*Mailloux v. Kiley,*
    323 F. Supp. 1387 (D. Mass. 1971) .......................................................32

*Maryland v. King,*
    567 U.S. 1301 (2012)........................................................................... 12

*Matal v. Tam,*
    137 S. Ct. 1744 (2017)..........................................................................30

*McCauley v. Univ. of the V.I.,*
    618 F.3d 232 (3d Cir. 2010)..................................................................26

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021).........................................................35, 36

*Molpus v. Fortune,*
    432 F.2d 916 (5th Cir. 1970)................................................................22

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) ........................................................................... 12

*Nken v. Holder,*
    556 U.S. 418 (2009)....................................................................*passim*

*O'Laughlin v. Palm Beach Cnty.,*
    30 F.4th 1045 (11th Cir. 2022) ..........................................................39

*Pickering v. Bd. of Educ.,*
    391 U.S. 563 (1968) ...........................................................................19

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ..........................................................................37

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ........................................................................... 21

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ..................................................................22, 23, 34

*Rust v. Sullivan,*
    500 U.S. 173 (1991) .......................................................................37, 38

*Searcey v. Harris,*
    888 F.2d 1314 (11th Cir. 1989) ........................................................22

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ..................................................................... 16, 33

*Shurtleff v. City of Boston,*
    142 S. Ct. 1583 (2022) ............................................................30, 31, 32

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ................................................... 20, 33

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) ......................................................................17, 31

*United States v. Nat'l Treasury Emps. Union,*
    513 U.S. 454, 466–475 (1995) .....................................................26, 33

*United States v. Schwimmer,*
    279 U.S. 644 (1929) ............................................................................3

*Va. Petrol. Jobbers Ass'n v. Fed. Power Comm'n,*
    259 F.2d 921 (D.C. Cir. 1958) .......................................................... 12

*W. Va. State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ............................................................36

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
  576 U.S. 200 (2015)....................................................37, 38

*Wolfe v. Barnhart,*
  446 F.3d 1096 (10th Cir. 2006)........................................22

## Statutes

2022 Fla. Laws 72 ............................................................... 13

Fla. Stat. § 1000.05(4)(a)......................................................5

Fla. Stat. § 1000.05(4)(b).................................................5, 39

Fla. Stat. § 1001.706(13)(b) ............................................... 31

Fla. Stat. § 1001.92(5) ...................................................15, 21

Fla. Stat. § 1003.41 ..............................................................32

Fla. Stat. § 1003.42..............................................................32

Fla. Stat. § 1003.421............................................................32

Fla. Stat. § 1003.44..............................................................32

Fla. Stat. § 1004.097 ............................................................. 8

Fla. Stat. § 1004.097(2)(f)................................................... 17

Fla. Stat. § 1004.097(3)(a) .................................................. 17

Fla. Stat. § 1004.097(3)(f).................................................... 17

## Regulations

Fla. Bd. of Govs. Reg. No. 10.005(2) ...................................5

Fla. Bd. of Govs. Reg. No. 10.005(3)(b)................................5

Fla. Bd. of Govs. Reg. No. 10.005(3)(c) ........................................ 5, 6, 15, 42

la. Bd. of Govs. Reg. No. 10.005(4)(d) ........................................................... 6

## Other Authorities

American Ass'n of Univ. Profs., *1940 Statement of Principles on Academic Freedom and Tenure* (rev. Apr. 1970) .............................. 24

Fla. Bd. of Govs., *State University System Free Expression Statement* (Apr. 15, 2019), STATE UNIV. SYS. OF FLA. ..................................................... 31

Fla. Dep't of Educ., *Policies & Procedures Specifications for the Florida Instructional Materials Adoption* (effective Aug. 18, 2020) ............ 32

Michael D. Johnson, *News about the House Bill 7 Preliminary Injunction*, Provost Newsroom, Univ. of Cent. Fla. (Nov. 22, 2022) ................... 16

Univ. of S. Fla., *Classroom Instruction & HB 7* .......................................... 16

Under Federal Rule of Appellate Procedure 27(a)(3) and Eleventh Circuit Rules No. 8-1 and 27-1, Plaintiffs-Appellees Adriana Novoa, Samuel Rechek, and the First Amendment Forum at the University of South Florida respectfully submit this response in opposition to Defendants-Appellants' motion for stay pending appeal of the district court's order preliminarily enjoining enforcement of the "Stop WOKE Act" in higher education. Defs.' Mot. to Stay Pending Appeal, Dec. 5, 2022, Doc. 7 (Stay Mot.).

## **INTRODUCTION**

The State of Florida has established a blacklist of ideas on college campuses. Dubbed the "Stop WOKE Act" by its proponents, the law sets forth eight viewpoints that faculty are forbidden to advance, even once. In granting Plaintiffs' motion to preliminarily enjoin the Act, the district court summed up the Act's essence in two words: "positively dystopian." The district court correctly enjoined this Florida law because it violates the First Amendment. Defendants cannot meet their heavy burden to justify staying the preliminary injunction against a law that threatens the expressive freedoms of thousands of faculty and students at Florida's colleges and universities.

Indeed, Defendants' failure to show irreparable harm from the district court's preliminary injunction is enough to deny their motion. The *only* harm they identify is an inability to enforce the law, for the sake of enforcing the

law. But that falls far short of the showing necessary to establish that irreparable harm justifies a stay, especially given that the State's robust antidiscrimination measures remain unaffected by the preliminary injunction. By contrast, staying the injunction will cause irreparable harm to Plaintiffs' First Amendment rights and chill the classroom discussions of thousands of faculty and students just as they return from winter break.

Moreover, even if the Court looks beyond the State's failure to show irreparable harm, the State does not and cannot make the "strong" showing that it is likely to succeed on the merits needed to stay the injunction. Defendants admit the Stop WOKE Act discriminates against viewpoints— something "poison to a free society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring).  Yet to justify this, the State proffers a dubious theory never adopted by any other court: that faculty members' academic speech is government-speech devoid of any First Amendment protection.

The district court correctly refused that dangerous theory. Instead, it faithfully followed this Court's application of the First Amendment to classroom teaching in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991). This Court is not alone in applying the First Amendment to academic speech; each of its sister circuits to have considered application of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), to academic speech in higher education has rejected the

argument that faculty academic speech is unprotected by the First Amendment. That is all the more reason to deny Defendants' motion for a stay.

Unable to identify a need for the law beyond disdain for the prohibited viewpoints, the State now marches a parade of horribles into this Court, warning that if it cannot censor at will, someone on a college campus might say something offensive. But the State ignores how the Stop WOKE Act will be applied in practice and how state officials are interpreting the law. For example, the State conceded that Plaintiff Adriana Novoa, a professor of history and a native of Argentina, has standing to challenge the Act because she endorses the argument that she, by virtue of her Argentine national origin, bears personal responsibility for and feels guilt over her country's extermination of indigenous peoples.[2]

Ideas like those of Professor Novoa may be greeted with skepticism by some. But the "principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate," *United States v. Schwimmer*, 279 U.S. 644, 654–55 (1929) (Holmes, J., dissenting), provides that the remedy is not censorship, but the "free trade in ideas . . . in the competition of the market[.]" *Abrams v. United States*, 250 U.S. 616, 630

---

[2]    *See* Doc. 33-1 at 5–6.

3

(1919) (Holmes, J., dissenting). And the college classroom is where the uninhibited free trade in ideas must flourish, as it "is peculiarly the 'marketplace of ideas,'" where students learn "through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, rather than through any kind of authoritative selection.'" *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967). In short, the Stop WOKE Act exemplifies the "laws that cast a pall of orthodoxy over the [college] classroom" that the First Amendment forbids. *Id.*

Because the State identifies no irreparable harm and asks the Court to ignore—if not completely defy—binding precedent, the Court should deny the motion to stay.

## **BACKGROUND**

### I.    **Factual Background**

#### A.    **The Stop WOKE Act seeks to suppress viewpoints in higher education.**

The Florida legislature passed the "Stop WOKE Act," formally known as the "Individual Freedom Act," in 2022. The Act amends the Florida Educational Equity Act (FEEA) to prohibit "instruction" in a public university or college that "espouses, promotes, advances, inculcates, or compels" a student "to believe" eight specified "concepts," each of which—as

the State concedes[3]—is a specific viewpoint. Fla. Stat. §§ 1000.05(4)(a)(1)–(8). The Act purports to limit the reach of the prohibited concepts, stating that the statute shall "not be construed to prohibit discussion of the concepts . . . as part of a larger course of training or instruction" if the "instruction is given in an objective manner without endorsement of the concepts." Fla. Stat. § 1000.05(4)(b).

As required by the FEEA, the Board of Governors issued implementing regulations in August 2022, which compelled each public university in Florida to adopt their own policies to comply with the Act. Doc. 44 at 6; Fla. Bd. of Govs. Reg. No. 10.005(2) (Prohibition of Discrimination in University Training or Instruction). The Board of Governors regulation further requires that universities investigate "credible complaints that identify . . . instruction that espouses, promotes, advances, inculcates, or compels a student . . . to believe any of the concepts," and "take prompt action to correct" violations. Fla. Bd. of Govs. Reg. No. 10.005(3)(b)–(c). If an "instruction . . . is inconsistent with university regulation," the university "must take prompt action to correct the violation by mandating" that the offending instructor "modify" their teaching to be consistent with the Stop WOKE Act. *Id.* Fla. Bd.

---

[3] During the district court's preliminary injunction proceedings, counsel conceded that the State "believe[s] that these eight concepts are viewpoints." *See* Greubel Decl. Ex. 1 (Tr. of Oral Arg.) at 86:22–23.

of Govs. Reg. No. 10.005(3)(c). The university, "where appropriate," must issue "disciplinary measures" and "remove, by termination if appropriate," faculty members who fail or refuse "to comply with the mandate." *Id*. If the Board determines that a university "willfully and knowingly" violated the Act and failed to "take appropriate corrective action," the university cannot receive tens of millions of dollars in state funding for the following year. *Id*. Fla. Bd. of Govs. Reg. No. 10.005(4)(d).

### B. Plaintiffs' academic expression is chilled by the Stop WOKE Act.

Plaintiff Adriana Novoa is a history professor at the University of South Florida who teaches several courses, including Science in Cultural Context, History of Sports from National to Global Contexts, and Modern Latin America. Ex. A at 40. The Stop WOKE Act has forced Novoa to alter her course instruction, refraining from using materials that promote viewpoints enumerated in the Act. *Id*. at 41. Plaintiff Samuel Rechek, an undergraduate at USF, plans to take Novoa's Science in Cultural Context next semester and wants to do so without the State's filter on Novoa's instruction. Rechek is also president of the First Amendment Forum at USF, a registered student organization dedicated to ensuring that students have a right to engage in unfettered discussion on controversial topics, and whose members seek to take classes unfettered by the "pall of orthodoxy." *Id*. at 41–42.

## II.    Prior Proceedings

In September 2022, Plaintiffs filed a verified complaint and a motion for a preliminary injunction seeking to enjoin enforcement of the Act. *See* Doc. 1; Doc. 19. On October 13, the district court held a hearing on Plaintiffs' motion and a motion for a preliminary injunction in the related matter, and on November 17, 2022, resolved both in a single opinion.[4] Doc. 44.

The district court granted, in part, the motions for preliminary injunction and, with respect to the *Novoa* plaintiffs' motion, ordered Defendants to halt enforcement of certain provisions of the Act relating to higher education and its implementing regulations. *Id.* at 137–39. Specifically, the district court enjoined enforcement of concepts 1, 2, 3, 5, and 7 of the Act, section 4(b) of the Act as to those concepts, and Board of Governors regulations 10.005(2)-(3) and 4(d) as to the enjoined concepts. *Id.* The Court held that Plaintiffs were likely to succeed on their claims that the Stop WOKE Act violated their First Amendment rights and determined that the entirety of the Act was impermissibly vague in violation of the Fourteenth Amendment. *Id.* at 107–08, 130.

---

[4]    By agreement of the parties, the State's arguments in the related matter, *Pernell v. Fla. Bd. of Governors of the State Univ. Sys*, No. 4:22cv304-MW/MAF (N.D. Fla. Aug. 18, 2022), were incorporated by reference into its responses to the *Novoa* plaintiffs' complaint and motion for preliminary injunction. While the actions have not been formally consolidated, the State's appeal and its instant motion addresses both *Pernell* (No. 22-13992 in this Court) and *Novoa* (No. 22-13994).

In a subsequent order on Defendants' motion to dismiss,[5] the Court dismissed a cause of action under Florida's Campus Free Expression Act, Fla. Stat. § 1004.097, reasoning that the State had not waived its Eleventh Amendment immunity. Doc. 45 at 6. The Court denied Defendants' motion to dismiss Plaintiffs' remaining claims. *Id.* at 8–9.

## <u>STANDARD OF REVIEW</u>

When "considering whether to stay a preliminary injunction," this Court "examine[s] the district court's grant of the preliminary injunction for abuse of discretion, reviewing *de novo* any underlying legal conclusions and for clear error any findings of fact." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019) (denying motion to stay because risk of irreparable injury was "significantly overstated" and the movant had not demonstrated a "strong likelihood of success on the merits of appeal . . . ."). The Court considers: (1) whether the moving party has made a "strong showing" it is likely to succeed on the merits; (2) if the moving party "will be irreparably injured" if a stay is not granted; (3) "whether issuance of the stay will substantially injure the other parties" to the proceeding; and (4) "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426, 434 (2009). The first two factors of this inquiry are the "most critical." *Id.*

---

[5] Doc. 33-1.

## **ARGUMENT**

The Court should deny a stay—and it need look no further than the State's failure to show it "will be irreparably injured" if a stay is not granted. *Nken*, 556 U.S. at 426. Indeed, the State offers no reasons why a stay is necessary to prevent irreparable harm to anyone, offering only the circular proposition that its inability to enforce the law will prevent it from enforcing the law. The State's failure to make this "most critical" showing is alone enough to deny its motion. *Id.* at 434.

On the other hand, a stay *would* irreparably harm Plaintiffs and thousands of other Florida college students and faculty, chilling their expression where it should be most unfettered: the college classroom. That chill would subvert the national public interest in "safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603.

Yet even if this Court reaches the "likely to succeed on the merits" factor, the State cannot make the "strong showing" necessary to win on that factor. *Nken*, 556 U.S. at 426–27. The district court faithfully applied the factors this Court identified in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), to find the Act violates the First Amendment. To that end, the district court rightly rejected the State's invitation to ignore *Bishop* and the Supreme

9

Court's holdings in *Keyishian* and *Garcetti* and adopt an incorrect and dangerous view of the First Amendment: that academic speech is government-speech, over which legislators and college administrators have unfettered authority to ban disfavored viewpoints. The district court also correctly concluded that the Act's viewpoint-discriminatory language was vague, and held—as the State conceded below—that Plaintiffs have standing to challenge the Act.

## I.    Florida Fails to Identify Any Irreparable Injury It Will Suffer Without a Stay, Which Would Chill Plaintiffs' Expression and Undermine the Public Interest.

The State acknowledges that irreparable injury is one of the two "most critical" factors in evaluating whether a stay is appropriate. Stay Mot. 14 (quoting *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018)). Yet it offers only one "harm": absent a stay, it will be unable to enforce a law its legislature adopted. Stay Mot. 41. This circular and conclusory assertion does not show even the "possibility" of harm, much less irreparable injury. *Nken*, 556 U.S. at 434–35. The failure to identify any real irreparable harm is reason alone to deny the motion.

The irreparable harm to Plaintiffs and damage to the public interest from a stay (the third and fourth *Nken* factors, respectively) are real. *See Nken*, 556 U.S. at 426. A stay would "substantially injure" Professor Novoa

and the student Plaintiffs' First Amendment rights by restricting their exploration of viewpoints in the college classroom. So, too, would the conflicting rulings resulting from a stay engender confusion among the thousands of faculty and students in Florida's college classrooms about what they can or cannot say. And the Supreme Court has recognized a strong, national interest in safeguarding the free exchange of ideas in college classroom—something a stay would chill significantly. *Keyishian*, 385 U.S. at 603.

## A. Florida's only identified "harm"—an inability to enforce the law for enforcement's sake—is circular and conclusory.

The first "critical" *Nken* factor evaluates "whether the applicant will be irreparably injured absent a stay[.]" *Nken*, 556 U.S. at 434. Even "showing some possibility of irreparable injury fails to satisfy" this factor. *Id.* (cleaned up). The State does not even show the possibility of injury.

First, the State identifies only one potential injury that would result from denial of their motion: an inability to immediately enforce the law. Stay Mot. 41. This assertion is as circular as it is conclusory: *any* injunction enjoining enforcement of a law would cause irreparable harm to the State, so

every preliminary injunction enjoining a state law would justify a stay.[6] Judicial review is not a revolving door. Rather, a stay is an extraordinary remedy because it is an "intrusion into the ordinary process of administration and judicial review." *Nken*, 556 U.S. at 427 (quoting *Va. Petrol. Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Moreover, the State fails to specify *any* harm that would result from an inability to enforce the law. If its concern is the possibility of discrimination, denial of a stay will not prevent the State from protecting students from discrimination and harassment. In fact, the State can turn to federal and state laws prohibiting discriminatory conduct that provide ample administrative and civil remedies for hostile environment harassment.[7] If, instead, its concern is that faculty might express ideas State officials find

---

[6]    The State's solitary authority for this proposition is *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers), which was "not the order of the full Court, but the individual order of Chief Justice Roberts acting in chambers." *Hill v. Snyder*, No. 10-cv-14568, 2018 U.S. Dist. LEXIS 59660, 2018 WL 1704231, at *2 (E.D. Mich. Apr. 9, 2018) (distinguishing *King*, 567 U.S. 1301). Chief Justice Roberts' order, in turn, was quoting another case—which, too, was "also the order of a single Justice, who cited no authority on the issue of irreparable harm associated with enjoining enforcement of statutes." *Id.* (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

[7]    *See, e.g.*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (noting that Title VII prohibits discriminatory conduct that is severe or pervasive); *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1286 (11th Cir. 2003) ("Florida has enacted the 'Florida Educational Equity Act,' . . . which is patterned after Title IX and prohibits discrimination based on" membership in a protected class "in the state system of public education.").

offensive, the "proposition that schools do not endorse everything they fail to censor is not complicated." *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion). But the State identifies no consequence justifying a stay, offering only enforcement of the Act for enforcement's sake.

Florida's inability to identify any irreparable harm mirrors its inability to identify any function—other than suppression of disfavored views—for the Act.[8] Notably, while the State asserts here that its inability to enforce the Act is an irreparable harm, it has not sought a stay of the injunction against the Act's provisions targeting employer trainings. *See Honeyfund.com, Inc. v. Governor*, No. 22-13135 (11th Cir. Sept. 19, 2022). Neither the Constitution nor the orderly judicial process yield to the State's whims.

Finally, the State argues that *Nken*'s "irreparable harm" factor is satisfied because Plaintiffs will suffer no injury from a stay. Not only will Plaintiff suffer irreparable harm from a stay, but the State's argument turns the legal standard on its head. "[T]he applicant" must show that *it* "will be irreparably injured absent a stay[.]" *Hand*, 888 F.3d at 1207. Whether

---

[8] Although House Bill 7 purported to make supportive "legislative findings," it made no findings related to higher education. *See* 2022 Fla. Laws 72 ("providing legislative findings").

Plaintiffs will be injured has no bearing on whether the State will be injured in the absence of a stay.

Florida's failure to identify any substantial, let alone irreparable, injury is reason alone to deny its motion.

### B.    A stay would injure Plaintiffs' First Amendment rights and those of thousands of faculty and students interested in this action.

The third *Nken* factor, "whether issuance of the stay will substantially injure the other parties" to the proceeding, militates against a stay that would again chill the exchange of ideas by Professor Novoa and the student plaintiffs. *Nken*, 556 U.S. at 434. And the only parties at risk of irreparable harm on the State's motion are Professor Novoa and the student Plaintiffs, as the district court found. Doc. 44 at 68, 127. In contrast with the absence of irreparable harm to the State if a stay is denied, issuance of a stay would chill Plaintiffs' expression, at the very least, for the pendency of this appeal. That itself would be an irreparable harm to Plaintiffs, as the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

That a stay will "substantially injure" Plaintiffs is certain. Novoa and Rechek are to begin the Science in Cultural Context course—in which Novoa's

instruction will violate the Act—on January 9.[9] As the district court observed, the consequences in store for Professor Novoa and her colleagues will be significant: Novoa herself faces disciplinary action and potential termination. Doc. 44 at 57. And a "significant" amount of her institution's annual performance funding—some $70,000,000—hangs in the balance if regulators subjectively determine that her institution's sanctions were insufficiently "appropriate." *Id.* at 57, 123–24 (citing Fla. Bd. of Govs. Reg. No. 10.005(3)(c)). This funding is also jeopardized if a legislative committee finds *any* violation of the law. Fla. Stat. § 1001.92(5) (any "substantiated violation" of the Act means a university "shall be ineligible" for annual performance funding). As a result, institutions have a strong incentive to impose substantial sanctions on faculty members who knowingly—or even unintentionally—violate the Act. Doc. 44 at 124.

These hazards would lead every rational faculty member to self-censor. *Id.* at 68. And for students like Plaintiff Rechek, in his final semester at USF, the chill imposed by a stay cannot be reversed.

So, too, would a stay chill the expression of thousands of students and faculty interested in this action as courses resume. Administrators, faculty,

---

[9] Univ. of S. Fla., *Important Dates and Deadlines*, https://www.usf.edu/registrar/calendars/#spring2023 [https://perma.cc/2Q7N-EDPP] (last visited Dec. 19, 2022).

and students across Florida are relying on the preliminary injunction as they prepare their syllabi, reading materials, and lesson plans. Indeed, universities have begun informing their faculty that the law is on hold, seeking to assure students and faculty that the Stop WOKE Act's viewpoint discriminatory mandates do not yet govern their classrooms.[10] Conflicting rulings will sow confusion about what views are permitted, leading rational faculty to refrain from speaking, turning a chilling effect into a permafrost.

### C. The public interest lies in universities unfettered by the "pall of orthodoxy."

The fourth *Nken* factor, where the "public interest lies," also weighs against a stay. *Nken*, 556 U.S. at 426. The Supreme Court's recognition of a national public interest in "safeguarding academic freedom" in college classrooms, where "vigilant protection" of the free exchange of ideas "is nowhere more vital," weighs decidedly against an order permitting a legislated "pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603 (quoting, in part, *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

---

[10] *See, e.g.*, Univ. of S. Fla., *Classroom Instruction & HB 7*, https://www.usf.edu/provost/faculty-success/teaching-learning/hb7-resources.aspx [https://perma.cc/56VA-X67E] (last visited Dec. 11, 2022) (rescinding guidance); Michael D. Johnson, *News about the House Bill 7 Preliminary Injunction*, Provost Newsroom, Univ. of Cent. Fla. (Nov. 22, 2022), https://provost.ucf.edu/news/provost/news-about-the-house-bill-7-preliminary-injunction [https://perma.cc/9FAB-UQ5J].

As the Court explained in *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957):

> The essentiality of freedom in the community of American universities is almost self-evident. . . . To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

Florida recognizes the importance of this unfettered discourse. Just a year before adopting the Stop WOKE Act, Florida enshrined in its Campus Free Speech Act recognition of students' right of "access to . . . ideas and opinions," including lectures, without being "shield[ed]" from "ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1004.097(2)(f), (3)(a), (3)(f). A stay here serves only to shield students from ideas on lawmakers' promulgated blacklists, frustrating the ability of adults to debate contentious ideas and imperiling academic freedom, an "area[] in which government should be extremely reticent to tread." *Sweezy*, 354 U.S. at 250.

17

In short, the harm from a stay to Plaintiffs, Florida's college students and faculty, and the public at large would be significant. The harm to Defendants without a stay is not. That is enough to deny Defendants' motion, and the Court need go no further.

## II.    The State Cannot Make a "Strong Showing" of a Likelihood of Success on the Merits.

Even if the Court considers the merits of Plaintiffs' claims, it should still refuse to stay the injunction because Florida has not made a "strong showing" that it is likely to succeed on the merits, a second "critical" *Nken* factor. *Nken*, 556 U.S. at 434. Four reasons show why.

First, the district court faithfully applied the balancing test this Court prescribed in *Bishop*, reaching a conclusion consistent with—and mandated by—the Supreme Court's holding that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over" the college classroom. *Keyishian*, 385 U.S. at 603 (1967).

Second, the State seeks an end-run around *Bishop*'s application of the First Amendment to classroom speech, arguing that faculty academic speech is not protected by the First Amendment because it is government-speech. That position not only defies *Keyishian* and this Court's decision in *Bishop*, but is at odds with the four circuits that have considered and rejected *Garcetti*'s application to higher education.

18

Third, the district court correctly concluded that the Act's prohibition on viewpoints unless in an "objective manner without endorsement"—which the State interprets to require that discussion be devoid of "feelings, prejudices, or opinions"—is vague and viewpoint-discriminatory.

Fourth, the district court's conclusion that Professor Novoa and the student plaintiffs have standing was correct, resting both on the factual allegations of the verified complaint and the State's concession that Plaintiffs had standing.

## A.    The district court correctly found the Act fails scrutiny under *Bishop*'s balancing test.

This Court, in *Bishop*, crafted a "case-by-case" balancing test, derived from *Pickering v. Board of Education*, 391 U.S. 563 (1968), to evaluate the First Amendment rights of faculty members' curricular speech. *Bishop,* 926 F.2d at 1074–75. That test weighs whether the "legitimate interests" of the university are sufficient to justify a "reasonable" restriction of a particular professor's in-class comments. *Id*. at 1074. The Defendants' attack on *Bishop* fails for two reasons. First, the Act discriminates against speech based on its viewpoint—an egregious First Amendment violation by any measure. Second, the district court correctly applied the *Bishop* factors to find the Stop WOKE Act violates Plaintiffs' First Amendment rights.

### 1. Because the Stop WOKE Act is viewpoint-discriminatory, it necessarily fails *Bishop's* balancing test.

*Bishop's* balancing test adapts the "reasonably related to legitimate pedagogical concerns" test of *Kuhlmeier* and the *Pickering* balancing test. *Bishop*, 926 F.2d at 1072, 1074 (quoting, in part, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272–73 (1988)). Neither *Kuhlmeier* nor *Pickering* permit the State to engage in the type of wholesale viewpoint discrimination effectuated by the Stop WOKE Act—especially in higher education.[11] And because it is derivative of *Kuhlmeier* and *Pickering*, neither does *Bishop*.

The Stop WOKE Act is nakedly viewpoint-discriminatory. The State conceded in the district court that each prohibited concept itself represents a viewpoint. Tr. of Oral Arg. 86:17–87:2. They maintain as much now. Stay Mot. 33 (defending "the State's regulation of the viewpoints taught in class"). The State accentuates its contempt for these viewpoints by precariously balancing millions in funding on institutions' willingness to penalize—to the

---

[11]    *Kuhlmeier* is a K–12 student speech case evaluating the "emotional maturity" of students and limited by its terms to "elementary" through "high school" students. *Kuhlmeier*, 484 U.S. at 272–73. In leaning heavily on *Kuhlmeier*, Defendants infantilize adult students, demonstrating why the *Tinker* line of K–12 student speech cases is not appropriate for application to collegiate speech generally, and particularly collegiate faculty speech. *See, e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022); *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 373 (4th Cir. 1998) (*Kuhlmeier's* "test for evaluating restrictions on student speech within curricular activities" is inapplicable to "*teacher* speech *through* the curriculum itself") (emphasis in original).

satisfaction of state regulators or a committee of the Florida Legislature—any professor who introduces a banned viewpoint. Fla. Stat. § 1001.92(5) (any "substantiated violation" of the Act means a university "shall be ineligible" for annual performance funding). The State asserts that the Act is no more than undistilled viewpoint discrimination. Stay Mot. 2, 40 ("All the Act does is prohibit [professors] from endorsing the enumerated concepts," and permits only "condemnation" or "neutral objectivity" while "prohibiting [any] endorsement."). The Act does not serve to address discriminatory conduct or hostile environments; it serves only to restrict viewpoints the State abhors.

Yet the sources of *Bishop*'s authority—*Kuhlmeier* and *Pickering*—do not permit viewpoint discrimination, which is "poison to a free society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring). The Supreme Court has cautioned that "[v]igilance is necessary" in the *Pickering* balancing test "to ensure" that a policy is not intended to "silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987). As such, viewpoint-based restrictions on employee speech do not survive the *Pickering* balancing test. *See, e.g.*, *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d

Cir. 2022); *Wolfe v. Barnhart*, 446 F.3d 1096, 1108–09 (10th Cir. 2006) (collecting cases).

So, too, with *Kuhlmeier*. The Eleventh Circuit holds *Kuhlmeier* to "require that a school's restriction be not only reasonable, but also viewpoint neutral." *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 108–09 (3d. Cir. 2009). Under *Kuhlmeier*, the "prohibition against viewpoint discrimination" remains "firmly embedded" in First Amendment analyses, and this Circuit "will continue to require" that curricular decisions be "viewpoint neutral." *Searcey v. Harris*, 888 F.2d 1314, 1324–25 (11th Cir. 1989).

This is consistent with *Keyishian*'s observation holding that legislatures cannot limit the range of ideas available in higher education. For decades, courts have rebuffed attempts to restrict ideas by limiting who may teach,[12] who may be invited to speak,[13] which publications may be funded,[14]

---

[12]    *Keyishian*, 385 U.S. at 603 (loyalty oaths for university faculty).

[13]    *Molpus v. Fortune*, 432 F.2d 916, 917 (5th Cir. 1970) (university speaker bans); *Brooks v. Auburn Univ.*, 296 F. Supp. 188, 196 (M.D. Ala. 1969) (holding that the "State of Alabama cannot . . . regulate the content of the ideas students may hear" as it is "unconstitutional censorship in its rawest form.").

[14]    *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 825–29 (1995) (denial of funding to Christian newspaper).

and what organizations may be recognized or funded.[15] Florida's Stop WOKE Act skips the pretext and outlaws ideas themselves.

This alone is fatal to the Stop WOKE Act. Because it regulates speech "because of its message," it is "presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. There is no basis to relieve the Act of this presumption, and the district court did not abuse its discretion in finding the Act viewpoint-discriminatory or in considering the Act's viewpoint discrimination in *Bishop*'s "context" factor. Doc. 44 at 93, 95–97.

### 2. The district court correctly applied the "context" and employment factors of the *Bishop* balancing test.

The first and second *Bishop* factors consider the "context" of a regulation and the extent to which the employment relationship bears upon the expressive freedom of faculty. *Bishop*, 926 F.2d at 1074–75. The district court properly considered the pedagogical relevance of the speech regulated by the Act and the sweeping scope of the regulation at issue—in *Bishop*, a response to a solitary professor, as contrasted with the Act's limit on the speech of thousands of faculty. Doc. 44 at 90–96. It likewise considered

---

[15]    *Healy v. James*, 408 U.S. 169 (1971) (denial of recognition to student political group); *Gay & Lesbian Students Ass'n. v. Gohn*, 850 F.2d 361, 363–67 (8th Cir. 1988) (refusal of funding to student gay rights group following state legislature's resolution).

*Bishop*'s important recognition of the risk of coercion within the meaning of the Establishment Clause—a risk not addressed by the Act. *Id.*

On its facts, *Bishop* involved fundamentally different issues and interests than the Act. The former involved the response by a university—not a legislature—tailored to address "particular conduct" by an individual professor offering personal religious views with little (if any) connection to the course subject matter, physiology. *Bishop*, 926 F.2d at 1069–71.

In contrast, the Act is a prophylactic, viewpoint-discriminatory speech code restricting thousands of faculty. And where the university in *Bishop* sought to limit comments with uncertain relevance to a single anatomy course, the Act has not "prescribed" a curriculum. Stay Mot. 20. Instead, it is a speech code applicable to *any* course, restricting viewpoints no matter how pedagogically-relevant to the discussion.

First, the district court was correct to weigh pedagogical relevance in evaluating the context of the regulation. Doc. 44 at 90–96. Academic freedom would not protect a professor who consistently introduced controversial, but irrelevant, subject matter in her classes.[16] Such speech can

---

[16] *See, e.g.*, American Ass'n of Univ. Profs., *1940 Statement of Principles on Academic Freedom and Tenure* (rev. Apr. 1970), https://www.aaup.org/report/1940-statement-principles-academic-freedom-and-tenure    [https://perma.cc/RH7Y-FS7Q] ("Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching controversial matter which has no relation to their subject.").

be regulated not because of its viewpoint, but because of its relevance. Conversely, the First Amendment protects teaching viewpoints that, "however repugnant," are "germane to the classroom subject matter." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001).

Second, *Bishop* was concerned with the university's weighty constitutional interests in avoiding coercion within the meaning of the Establishment Clause. *Bishop*, 926 F.2d at 1069. While the State asserts that its "interest in stamping out invidious racial discrimination . . . is embodied in our highest law," Stay Mot. 33 (citing *Bob Jones University*), even that interest must be addressed through "less restrictive means." *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983). That's why, as the district court recognized, restrictions on pure speech in academia—including those designed to address hostile environment harassment—must be cabined to speech which meets a "severe, pervasive, and objectively offensive" standard, so as to provide "shelter for core protected speech." *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).[17] The Act, by declaring certain viewpoints *de facto*

---

[17]   The State's reliance on *Arce v. Douglas*—an out-of-circuit case considering the "primary legitimate purpose" of a statute intended to teach "pupils" in K-12 schools "to treat and value" others—does not supply a legitimate, much less compelling, interest that would justify broad restrictions on pedagogically relevant material and discussion among

harassment, does an end-run around the narrowing features intended to provide breathing room for speech in hostile environment laws.

Third, the district court correctly recognized that the scope of the State's regulation—a prophylactic measure prohibiting speech by thousands of faculty members—requires the State to meet a "heavy" burden. Stay Mot. 93–94.[18] While the *Bishop* balancing test is designed to facilitate a *Pickering*-based "case-by-case" analysis of a university's response to a given incident, the Act is a broad ban on speech, frustrating the ability to perform a "case-by-case" analysis of speech and its impact. That results in the dynamic at play in the instant case, in which a willing speaker like Professor

---

adults. 793 F.3d 968, 986 (9th Cir. 2015). The pedagogical concerns in educating children (instilling community values, as in *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 681 (1986)) and higher education (providing unfettered exposure to divergent views (*Keyishian*, 385 U.S. at 603)) are profoundly different. *See, e.g.*, *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 248–49 (3d Cir. 2010) (distinguishing cases concerning application of the First Amendment in secondary schools due to the age and maturity of students and recognizing that the "desire to protect the listener cannot be convincingly trumpeted as a basis for censoring speech for university students").

[18] The district court recognized—and the State conceded at oral argument—that *United States v. National Treasury Employees Union*, 513 U.S. 454, 466–75 (1995) ("*NTEU*"), may require a heavier burden. Doc. 44 at 93–94; Tr. of Oral Arg. 88:07–13. *NTEU*, one of the *Pickering* cases, correctly recognizes that when a public employer imposes a broad restriction on the speech of many employees—as opposed to, as in *Pickering*, seeking to discipline a single employee for particular speech—it is subject to a "heavy" burden, requiring the government to establish "that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 466–75. Plaintiffs urge the Court to apply that *Pickering/NTEU* burden given that *Bishop* rests in large part on applying the *Pickering* balancing test. In any event, the Stop WOKE Act fails scrutiny under *Bishop* even without *NTEU*'s heavier burden.

Novoa wants to address a willing listener, like student-Plaintiff Rechek, but the State holds that speech in contempt.

### 3. The district court correctly applied the "countervailing" academic freedom factor of the *Bishop* balancing test.

The third factor of the *Bishop* balancing test is the "countervailing" factor of our constitutional system's "strong predilection for academic freedom as an adjunct of . . . the First Amendment." *Bishop*, 926 F.2d at 1075.

The State's reading of *Bishop* would render this factor a nullity. Its motion places "academic freedom" in scare quotes and never otherwise addresses this factor. Stay Mot. 27. Instead, the State urges that the academic freedom to express relevant viewpoints is "nowhere to be found in *Bishop*" because it is "fundamentally inconsistent with it." Stay Mot. 28.

But that's wrong—and for good reason. The Act concerns not the selection of classes or subject matter. It, instead, grafts a speech code across *every* class, prohibiting endorsement of certain viewpoints no matter how relevant they are to the class. The district court considered—as *Bishop* required—the plaintiff-professors' interests in academic freedom. The district court correctly recognized that the professors are not "attempting to alter the permitted curriculum," but instead are interested in the academic

freedom to engage in discussion of pedagogically-relevant ideas free from the "pall of orthodoxy." Doc. 44 at 105–06 (quoting *Keyishian*, 385 U.S. at 603).

The district court was correct. The Act has significant ramifications for faculty members' academic freedom, which provides breathing room to navigate controversial, pedagogically-relevant subject matter. They may do so by feigning endorsement of a position—that is, devil's advocacy—or by inviting a guest speaker (even one rebutted by another guest speaker) who sincerely believes in a prohibited viewpoint.[19] Or they may do so by presenting written material ("instruction" within the meaning of the Act) that endorses a prohibited viewpoint—not because they agree with it, but because students may learn best by grappling with difficult material. And in Professor Novoa's classes, she inescapably endorses a prohibited viewpoint by assigning her own book.

### B.    The First Amendment protects academic expression by university faculty.

Cognizant that the Act cannot survive first contact with the First Amendment, the State seeks shelter in the government-speech doctrine, asking this Court to be the first to rule that faculty members' academic speech is subject to unfettered state control.

---

[19]    Tr. of Oral Arg. 79:11–81:15 (conceding that a guest speaker's endorsement of a prohibited viewpoint violates the Act and cannot be rendered "objective" by rebuttal).

The State's novel theory is dangerous and wrong. When faculty speak as academics, they speak for themselves, not for their state government, and a state legislature is forbidden from adopting "laws that cast a pall of orthodoxy over the [college] classroom." *Keyishian*, 385 U.S. at 603. This Court's application of the First Amendment in *Bishop* forecloses the State's contention that faculty speech is unprotected by the First Amendment because it is government-speech. Even if *Bishop* did not do so, the government-speech doctrine is inapplicable to the context of higher education faculty—which is why every circuit to have considered *Garcetti*'s application to academic speech in higher education has rejected it. Finally, the State waived its newfound "government-funding" theory by failing to raise it in the district court.

### 1.  Like the district court, this Court cannot—and should not—find that college faculty classroom speech is government-speech.

Having admitted that the Stop WOKE Act censors speech based on its viewpoint, the State has only one path: inviting this Court be the first to hold that faculty speech is government-speech. This Court should decline the invitation, like the district court did. Doc. 44 at 25.

First and foremost, *Bishop* forecloses the State's argument. In *Bishop*, the Eleventh Circuit considered not *whether* faculty have First Amendment

rights, but "*to what degree* a school may control classroom instruction" without violating the First Amendment. *Bishop*, 926 F.2d at 1073 (emphasis added). This Court applied *Pickering* to a professor's religious proselytization during human physiology classes. *Id*. at 1068, 1072. Because the First Amendment limits the extent to which faculty classroom speech may be regulated, the government-speech doctrine does not apply.

Nor *should* this Court accept the State's invitation. The government-speech doctrine is fundamentally at odds with higher education and our national commitment to academic freedom. Faculty are hired to speak from their academic expertise, not—as the district court observed—to "all read from the same music." Ex. A at 9. If the divergent viewpoints that faculty use to educate students in public university classrooms constitute *government*-speech, then Florida's government "is babbling prodigiously and incoherently," expressing at once "contradictory views." *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017).

Indeed, none of the government-speech factors weigh in favor of finding that faculty are government speakers. *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589–92 (2022) (identifying and applying factors to ascertain "whether the government intends to speak for itself or" instead regulate others' expression). On the first factor, the "history of the expression at

issue," *id.*, the Supreme Court has long recognized the "self-evident" importance that faculty speech not be subject to state "straight jacket[s.]" *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Faculty have historically been employed to speak for themselves as one of "a multitude of tongues" providing "wide exposure to [the] robust exchange of ideas"—not as government mouthpieces. *Keyishian*, 385 U.S. at 603.

On the second *Shurtleff* factor, the "public's likely perception as to who . . . is speaking," the public understands that faculty speak independently. *Shurtleff*, 142 S. Ct. at 1589. The State fosters this perception, urging that the availability of "divergent ideas, opinions and philosophies, new and old," even if "abhorrent," is a "fundamental purpose" of universities.[20] And in its statutes, Florida requires surveys of "intellectual freedom" to gauge whether "competing ideas and perspectives are presented and . . . faculty . . . feel free to express *their* beliefs and viewpoints on campus *and in the classroom*." Fla. Stat. § 1001.706(13)(b) (emphasis added).

On the third *Shurtleff* factor, faculty at the undergraduate and graduate level are not subject to the "active control[]" indicative of

---

[20]    Fla. Bd. of Govs., *State University System Free Expression Statement* (Apr. 15, 2019), STATE UNIV. SYS. OF FLA., https://www.flbog.edu/2019/04/15/state-university-system-free-expression-statement [https://perma.cc/KGQ2-DH3F].

government-speech. *Shurtleff*, 142 S. Ct. at 1592.[21] University faculty have "independent traditions," "broad discretion as to teaching methods," and "intellectual qualifications" beyond those typically found in primary and secondary schools. *Mailloux v. Kiley*, 323 F. Supp. 1387, 1392 (D. Mass. 1971).[22] Faculty in higher education are regulated by academic officers and are left to design and teach their classes according to their professional competency, even where administrators may "establish the parameters of focus and general subject matter of curriculum." *Bishop*, 926 F.2d at 1073 (quoting *Mahoney v. Hankin*, 593 F. Supp. 1171, 1174 (S.D.N.Y 1984)).

### 2. Every circuit considering *Garcetti* has rejected its application to academic expression in higher education.

The State's assertion that *Garcetti* strips faculty members' classroom discussions of protection under the First Amendment, Stay Mot. 18, 23–24, is not only inconsistent with *Bishop*, but at odds with every circuit to have considered the argument.

---

[21]  *See, e.g.*, Fla. Dep't of Educ., *Policies & Procedures Specifications for the Florida Instructional Materials Adoption* (effective Aug. 18, 2020), https://www.fldoe.org/core/fileparse.php/5574/urlt/PoliciesandProceduresSpecifications.pdf [https://perma.cc/S4TB-GFYN].

[22]  Contrast the *laissez faire* of the exchange of ideas in higher education with the State's tight control of K–12 instruction (*e.g.*, Fla. Stat. §§ 1003.41–.42), even specifying the number of hours students spend studying freedom's blessings (Fla. Stat. § 1003.421), what material of "patriotic nature" may be displayed (Fla. Stat. § 1003.44), and exacting specifications for every textbook.

When the government acts as an employer, its regulation of employee speech is evaluated under the *Pickering* test. *NTEU*, 513 U.S. at 466; *Bishop*, 926 F.2d at 1072. "Nowhere is free speech more important than in our leading institutions of higher learning." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022). For faculty at public universities, where the "vigilant protection of constitutional freedoms is nowhere more vital," the ability to speak free from State censorship is critical. *Healy v. James*, 408 U.S. 169, 180–81 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) and "reaffirming this Nation's dedication to safeguarding academic freedom").

*Garcetti* did not change this calculus. If anything, it suggests that the government-speech doctrine *does not* limit First Amendment protection for academic speech. In his dissent, Justice Souter raised concern that the *Garcetti* majority opinion would represent a departure from that dedication to academic freedom by reaching "even the teaching of a public university professor," who "necessarily speak[s] and write[s] 'pursuant to . . . official duties.'" *Garcetti*, 547 U.S. at 438 (Souter, J., dissenting). Justice Souter emphasized the Court's longstanding recognition that universities "occupy a special niche in our constitutional tradition" in light of the "expansive freedoms of speech and thought associated with the university

33

environment." *Id.* at 438–39 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003)). The *Garcetti* majority, answering Justice Souter's concern that its reasoning would "imperil First Amendment protection of academic freedom in public colleges and universities," expressly left open the question as to whether its analysis would reach "classroom instruction" by faculty at public universities, recognizing the "important ramifications for academic freedom . . . as a constitutional value." *Id.* at 425 (majority opinion); *Garcetti*, 547 U.S. at 438 (Souter, J., dissenting).

Nor do *Rosenberger* or *Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 217 (2000), both predating *Garcetti*, subvert this analysis. If the *Garcetti* majority—citing *Rosenberger* throughout its majority opinion—believed either foreclosed Justice Souter's concern, it would have said so. Instead, the Court acknowledged that "classroom instruction" may implicate "additional constitutional interests"— and expressly left the question open. *Garcetti*, 547 U.S. at 425.

Just as the *Garcetti* majority treated *Rosenberger*'s offhand reference to curricula as *dicta*, the district court correctly rejected the State's attempt to "cherry-pick[]" language from *Rosenberger* and *Garcetti* to suggest that the Supreme Court endorsed the authority to engage in wholesale viewpoint discrimination over faculty speech. Doc. 44 at 19–23.

34

As the district court recognized, every circuit considering *Garcetti*'s open question has concluded that academic speech—including in the classroom—is *not* government-speech subject to *Garcetti*.[23] Doc. 44 at 25. Instead, faculty speech is protected by the First Amendment and analyzed under the *Pickering* balancing test.[24]

In *Meriwether v. Hartop*, for example, the Sixth Circuit held that the First Amendment protected faculty members—there, a professor who refused to use a student's preferred gender pronouns in class—when "engaged in core academic functions, such as teaching and scholarship[.]" 992 F.3d 492, 505 (6th Cir. 2021). Because the professor was speaking on matters of public concern, the Sixth Circuit applied the *Pickering* balancing test, taking into account the "robust tradition of academic freedom in our nation's" universities and colleges. *Id*. at 509.

---

[23] *See Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) (holding that *Garcetti* "cannot apply to teaching and academic writing" of a professor, and that the "academic employee speech not covered by *Garcetti* is protected under the First Amendment, using the analysis established in *Pickering*"); *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 562–63 (4th Cir. 2011) (rejecting application of *Garcetti* in lieu of *Pickering* in the context of "speech related to scholarship or teaching" by an "outspoken Christian and conservative" professor); *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019) (applying *Pickering* to professor's in-class speech).

[24] Plaintiffs urge this Court to hold, like its sister circuits, that *Garcetti* does not apply to faculty speech. In any case, the district court's faithful application of *Bishop* is enough to deny Defendants' extraordinary request for a stay.

35

As the Sixth Circuit warned in *Meriwether*, stripping faculty of First Amendment rights would embolden censors left and right:

> If professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity. A university president could require a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of God, or a Soviet émigré to address his students as "comrades." That cannot be. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe" such orthodoxy.

*Id*. at 506 (quoting, in part, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

The State's theory invites exactly that. In the district court, the State conceded that if Florida's legislature changed hands, the State "could prohibit the instruction on American exceptionalism because it alienates people of color and minorities because it suggests . . . that America doesn't have a darker side that needs to be qualified." Tr. of Oral Arg. 42:10–43:3. If officials can disseminate lists of views that are *per se* discrimination, expression on matters of profound public concern will be limited to the whim of lawmakers and administrators, left and right.

### 3. The State waived its government-funding theory, which is also inapplicable because Florida cannot restrict expression within the university "sphere."

The State faults the district court for failing to address the "government-funding cases," complaining in particular that the district court "did not even mention *Rust*, *Walker*, or *Pleasant Grove*." Stay Mot. 22–23, 29 (citing *Rust v. Sullivan*, 500 U.S. 173 (1991); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209 (2015); *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009)). But the district court never addressed government funding because the State didn't raise that theory below. The district court never mentioned *Rust* because Florida's briefing never mentioned *Rust*, and referenced *Pleasant Grove* only once, for the unremarkable proposition that government-speech cases involve private speakers. Doc. 34 at 6. Likewise, the State cited *Walker* only for the general principle that the Free Speech Clause doesn't apply to government-speech. *Id.*; Defs.' Opp'n to Mot. for Prelim. Inj. at 2, 10–11, 13, *Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, No. 4:22-cv-304 (N.D. Fla. Sept. 22, 2022), Doc. 52 (*Pernell* PI Opp'n). By failing to raise a government-funding theory in the district court, the State has waived the argument. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

Even if the Court considers the government-funding argument, those cases do not apply to the higher education context. The Court in *Rust* cautioned "that the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to" funding is restricted by the First Amendment. *Rust*, 500 U.S. at 200 (citing *Keyishian*, 385 U.S. at 603, 605–06)). Likewise, the *Walker* Court—addressing speech on state-issued license plates, which do not have the long history of expressive freedom associated with universities—correctly noted that government funding does "not *normally* trigger the First Amendment rules designed to protect the marketplace of ideas." *Walker*, 576 U.S. at 207 (emphasis added). In other words, the *Walker* Court acknowledged that even government funding will sometimes implicate First Amendment rules when necessary to preserve the free exchange of ideas. As it is "peculiarly the 'marketplace of ideas,'" the college classroom is where the interest in discussion uninhibited by state selection is most pronounced. *Keyishian*, 385 U.S. at 603.

### C. The district court correctly ruled that the Act is unconstitutionally vague.

The district court correctly held that the Act is unconstitutionally vague. Florida's arguments only highlight the Act's muddled meaning and its

failure to notify "ordinary persons using ordinary common sense" of the conduct it prohibits. Stay Mot. 34; *See O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (holding that in the public employment context, a statute is not vague if "ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge.").

The vagueness standard encompasses two crucial concerns: (1) fair notice of the conduct prohibited; and (2) protection against arbitrary and discriminatory enforcement. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Kolender v. Lawson*, 460 U.S. 352, 357 (1983). These considerations are especially important in the First Amendment context, where "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

Florida contends that the Act's provision permitting "discussion of the concepts . . . in an objective manner without endorsement of the concepts" is not vague. Stay Mot. 38 (citing Fla. Stat. § 1000.05(4)(b)). Citing *Merriam-Webster*'s definition*,* Florida asserts that to discuss something in an objective manner means "[t]o discuss it 'without distortion by personal feelings, prejudices, or interpretations.'" Stay Mot. 38. That argument only

succeeds in proving its vagueness. After pointing to the *Merriam-Webster* definition of the term "objective," the State concedes that the Act does not actually prevent faculty from discussing the viewpoints "without distortion by personal feelings, prejudices, or interpretations," so long as they do not "*express[] approval*" of any of the viewpoints. Stay Mot. 38. That, the district court rightly noted, "allows for only one side of the debate in Florida's public universities—or for no debate at all." Doc. 44 at 119. In doing so, the State "redefined 'objectivity'" such that it is divorced from "common sense." *Id.* at 120.

Moreover, the State's constructive interpretation invites arbitrary enforcement. Whether a discussion—especially one concerning hotly-contested issues fraught with emotion—is conducted in "an objective manner without endorsement" is contingent upon the interpretation of audiences inside and outside the classroom about whether a faculty member's explication is tantamount to "endorsement." Faculty will rationally self-censor, even from devil's advocacy or the Socratic method, if a student's subjective perception of the discussion's "objectiv[ity]" or "endorsement"

will be used by a legislative committee or regulators to forfeit millions in annual funding.[25]

Florida's remaining attempts to demonstrate the Act is not vague fail as well. First, as the State acknowledges, the fact that the Act uses real language found in a common dictionary "does not magically distinguish vagueness concerns." Stay Mot. 35 (citing Doc. 44 at 113). As explained above, a statute that uses seemingly ordinary words—as many laws do—can still fail to notify citizens of what conduct it prohibits.

Second, while a scienter requirement could conceivably temper arbitrary enforcement in other contexts, its mere inclusion does not automatically render an otherwise vague restriction constitutional. *See, e.g.*, *Keyishian*, 385 U.S. at 599–600 (holding a statute denying employment to persons who "willfully and deliberately advocate[] forceful overthrow of government" vague). Even *if* the terms "espouses, promotes, advances, inculcates, or compels" did imply scienter, the district court recognized that they "do nothing to clarify how a professor can continue to incorporate such discussions in their classrooms in an 'objective' manner without violating the

---

[25] The State's construction of the meaning of the "objective manner without endorsement" mirrors the intent of the Act's architects. As the district court noted, the Act's sponsor asserted that the clause was intended to prevent the introduction of any "personal point of view into the discussion"—unless that point of view is to condemn the viewpoint—and that whether a discussion was "objective" depended on students' subjective response. Ex. A at 117–18, n.59; 120, n.61.

law." Doc. 44 at 123. Thus, even implied scienter does not provide fair notice as to whether an instructor's classroom discussions are sufficiently objective.

Third, Regulation 10.005 does not "reduce[] vagueness concerns" by mitigating the potential for arbitrary enforcement. Stay Mot. 36. The State contends that the Regulation requires universities to *first* order faculty to modify their instruction or teaching *before* issuing disciplinary measures. *Id.* Not so. The regulation provides no clear opportunity for modification before punishment. Instead, it sets forth a range of arbitrary options and incentivizes institutions to impose harsh sanctions to avoid a loss of millions in funding due to an insufficiently "appropriate" response. Fla. Bd. of Govs. Reg. No. 10.005(3)(c).

## D.    Florida conceded in the district court that the *Novoa* parties have standing.

The State attacks the district court's findings of facts—that Professor Novoa's planned teaching would violate the Act's prohibited viewpoints—but fails to identify the "clear error" necessary to justify a stay. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019).

First, the State conceded in the district court that Professor Novoa has "standing to challenge concept number Seven[.]" Doc. 33-1 at 6. That Novoa has undisputed standing with respect to concept seven is reason alone the State's standing arguments cannot justify a stay.

Second, Defendants argue that the district court should have ignored the facts in the verified complaint and confined its analysis to the primary concepts identified by Novoa. But that is wrong. The district court correctly determined from the complaint that Novoa's teaching—including her assignment of her own book[26] and contentions about the relative perception of Latin American scientists—implicates the first, second, third, fifth, and seventh concepts of the Act. Doc. 44 at 26, 67 n.34.

Finally, Defendants contend that Novoa's teaching would not violate concept three because that concept reaches only "mere descriptions of instances of *past* historical racism." Stay Mot. 17. Yet the Act does not contain any temporal restrictions as suggested by Defendants. Even if it did, it would not deprive Novoa of standing because she plans to advance views by other scholars concerning the impact of racism on today's world, including an author who asserts that despite making progress on racial issues, the United States remains segregated by race. Doc. 1 at 184. The district court properly determined that Novoa had standing to challenge the first, second, third, fifth, and seventh concepts of the Act based on Defendants' concession and the well-pled facts in the Verified Complaint.

---

[26] Because Novoa assigns her own book, which advances concept three, she necessarily endorses its viewpoints.

## **CONCLUSION**

The State's motion fails to identify any irreparable harm necessitating a stay. This failure is reason alone to deny extraordinary relief. Even if the State identified some harm, its motion fails on the merits, inviting this Court to stray from the district court's correct holding into uncharted territory that would chill the protected speech of thousands of students and faculty. It should be denied.

DATED:      December 22, 2022                Respectfully Submitted,

/s/ Greg H. Greubel                          /s/ Gary S. Edinger

GREG HAROLD GREUBEL                          GARY S. EDINGER, ESQUIRE
PA. Bar No. 321130; NJ No. 171622015         Fla. Bar No. 0606812
ADAM STEINBAUGH                              BENJAMIN, AARONSON, EDINGER &
PA. Bar No. 326475; CA No. 304829                PATANZO, P.A.
JT MORRIS                                    305 N.E. 1st Street
Tex. Bar No. 24094444                        Gainesville, Florida 32601
FOUNDATION FOR INDIVIDUAL RIGHTS AND         Tel:   (352) 338-4440
    EXPRESSION                               Fax:  (352) 337-0696
510 Walnut Street, Suite 1250                GSEdinger12@gmail.com
Philadelphia, PA 19106
Tel:   (215) 717-3473
Fax:  (267) 573-3073
greg.greubel@thefire.org
adam@thefire.org
jt.morris@thefire.org

*Counsel for Plaintiffs-Appellees Adriana Novoa, Sam Rechek, and the First
Amendment Forum*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this response contains 9,837 words, excluding accompanying documents authorized by FED. R. APP. P. 27(a)(2)(B), in accordance with Plaintiffs-Appellees' December 8, 2022 unopposed motion for excess words, which requested a limit of 10,000 words.

This response complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the typestyle requirements of FED. R. APP. P. 32(a)(6) because this response has been prepared in a proportionately spaced typeface using Microsoft Office for Word in 14-point Georgia font.

Dated:      December 22, 2022

/s/ Greg H. Greubel
Greg H. Greubel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on December 22, 2022. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:       December 22, 2022

/s/ Greg H. Greubel
Greg H. Greubel

46