Nos. 22-13992 & 22-13994

# In the United States Court of Appeals for the Eleventh Circuit

---

LEROY PERNELL, ET AL.,
*Plaintiffs–Appellees*,

v.

BRIAN LAMB, ET AL.,
*Defendants–Appellants*.

---

ADRIANA NOVOA, ET AL.,
*Plaintiffs–Appellees*,

v.

MANNY DIAZ, JR., ET AL.,
*Defendants–Appellants*.

---

## APPENDIX VOLUME I

---

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NOS. 4:22-CV-304-MW-MAF & 4:22-CV-324-MW-MAF

---

Charles J. Cooper
John D. Ohlendorf
Megan M. Wold
John D. Ramer
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9660
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants-Appellants*

# INDEX OF APPENDIX

**Docket/Tab #**

**Volume I**

Docket Sheet,
*Pernell v. Lamb*, 4:22-cv-304 (N.D. Fla.) .......... A

Docket Sheet,
*Novoa v. Diaz*, 4:22-cv-324 (N.D. Fla.) .......... B

Initial Complaint, Doc. 1,
*Pernell v. Lamb*, 4:22-cv-304 (N.D. Fla. Aug. 18, 2022) .......... 1

Complaint, Doc. 1,
*Novoa v. Diaz*, 4:22-cv-324 (N.D. Fla. Sept. 6, 2022) .......... 1

**Volume II**

Complaint, Doc. 1,
*Novoa v. Diaz*, 4:22-cv-324 (N.D. Fla. Sept. 6, 2022) (continued) .......... 1

Preliminary Injunction Opinion, Doc. 63,
*Pernell v. Lamb*, 4:22-cv-304 (N.D. Fla. Nov. 17, 2022) .......... 63

Motion to Dismiss Order, Doc. 64,
*Pernell v. Lamb*, 4:22-cv-304 (N.D. Fla. Nov. 22, 2022) .......... 64

Motion to Dismiss Order, Doc. 45,
*Novoa v. Diaz*, 4:22-cv-324 (N.D. Fla. Nov. 22, 2022) .......... 45

**Volume III**

Amended Complaint, Doc. 76,
*Pernell v. Lamb*, 4:22-cv-304 (N.D. Fla. Dec. 9, 2022) .......... 76

Defendants' Answer to Plaintiffs' Amended Complaint, Doc. 82,
*Pernell v. Lamb*, 4:22-cv-304 (N.D. Fla. Dec. 30, 2022) .......... 82

Certificate of Service

# A

APPEAL,MEDIATION,STAY DIS

# U.S. District Court
# Northern District of Florida (Tallahassee)
# CIVIL DOCKET FOR CASE #: 4:22-cv-00304-MW-MAF

PERNELL et al v LAMB et al
Assigned to: CHIEF JUDGE MARK E WALKER
Referred to: MAGISTRATE JUDGE MARTIN A FITZPATRICK
Case in other court: USCA, 22-13992-J
Cause: 42:1983 Civil Rights Act

Date Filed: 08/18/2022
Jury Demand: Defendant
Nature of Suit: 448 Civil Rights: Education
Jurisdiction: Federal Question

**Plaintiff**

**LEROY PERNELL**

represented by

**CAROLINE ANDREWS MCNAMARA**
ACLU FOUNDATION OF FLORIDA INC - MIAMI FL
4343 W FLAGLER STREET
SUITE 400
MIAMI, FL 33134
786-363-1392
Email: cmcnamara@aclufl.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES DAVID TOBIN**
BALLARD SPAHR LLP - WASHINGTON DC
1909 K STREET NW
12TH FLOOR
WASHINGTON, DC 20006
202-661-2218
Fax: 202-661-2299
Email: tobinc@ballardspahr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXSIS MARIE JOHNSON**
NAACP LEGAL DEFENSE & EDUCATION FUND - NEW YORK NY
40 RECTOR STREET
5TH FLOOR
NEW YORK, NY 10006
217-766-7045
Email: amjohnson@naacpldf.org
*ATTORNEY TO BE NOTICED*

**ANNA OCCHIPINTI**
NAACP LEGAL DEFENSE & EDUCATION FUND - NEW YORK NY

40 RECTOR STREET
5TH FLOOR
NEW YORK, NY 10006
212-965-2200
Fax: 212-226-7592
Email: aocchipinti@naacpldf.org
*ATTORNEY TO BE NOTICED*

**CATHARINE ELIZABETH LUBIN**
BALLARD SPAHR LLP - PHILADELPHIA PA
1735 MARKET STREET
51ST FLOOR
PHILADELPHIA, PA 19103
215-864-8751
Email: lubink@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**CHARLES EDWARD MCLAURIN**
NAACP LEGAL DEFENSE & EDUCATION FUND - WASHINGTON DC
700 14TH STREET NW
SUITE 600
WASHINGTON, DC 20005
929-448-5242
Fax: 202-682-1312
Email: cmclaurin@naacpldf.org
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
ACLU FOUNDATION OF FLORIDA INC - MIAMI FL
4343 W FLAGLER STREET
SUITE 400
MIAMI, FL 33134
786-363-2714
Fax: 786-363-1257
Email: dtilley@aclufl.org
*ATTORNEY TO BE NOTICED*

**EMERSON JAMES SYKES**
ACLU FOUNDATION - NEW YORK NY
25 BROAD STREET
18TH FLOOR
NEW YORK, NY 10004
646-905-8949
Email: esykes@aclu.org
*ATTORNEY TO BE NOTICED*

**EMILY SHAW PARSONS**
BALLARD SPAHR LLP - WASHINGTON DC
1909 K STREET NW
12TH FLOOR

WASHINGTON, DC 20006
202-661-2200
Email: parsonse@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**ISABELLA SALOMAO NASCIMENTO**
BALLARD SPAHR LLP - MINNEAPOLIS MN
2000 IDS CENTER
80 SOUTH 8TH STREET
MINNEAPOLIS, MN 55402
612-371-3281
Email: salomaonascimentoi@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**ISIUWA JACQUELINE MABATAH**
BALLARD SPAHR LLP - SALT LAKE CITY UT
201 SOUTH MAIN STREET
SUITE 800
SALT LAKE CITY, UT 84111
801-531-3000
Email: mabatahj@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**JACQUELINE NICOLE AZIS**
AMERICAN CIVIL LIBERTIES UNION OF FLORIDA
4500 BISCAYNE BLVD
SUITE 340
MIAMI, FL 33137
786-363-2700
Email: jazis@aclufl.org
*ATTORNEY TO BE NOTICED*

**JASON ALLEN LECKERMAN**
BALLARD SPAHR LLP - PHILADELPHIA PA
1735 MARKET STREET
51ST FLOOR
PHILADELPHIA, PA 19103
215-864-8266
Fax: 215-864-8999
Email: leckermanj@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**JIN HEE LEE**
NAACP LEGAL DEFENSE & EDUCATION FUND - WASHINGTON DC
700 14TH STREET NW
SUITE 600
WASHINGTON, DC 20005
202-682-1300

Fax: 202-682-1312
Email: jlee@naacpldf.org
*ATTORNEY TO BE NOTICED*

**KATHERINE BLANKENSHIP**
ACLU OF FLORIDA
4343 W FLAGLER STREET
SUITE 400
Miami, FL 33134
615-796-9027
Email: kblankenship@aclufl.org
*ATTORNEY TO BE NOTICED*

**LAURA BETH MORAFF**
ACLU FOUNDATION - NEW YORK NY
125 BROAD STREET
18TH FLOOR
NEW YORK, NY 10004
212-549-2500
Email: lmoraff@aclu.org
*ATTORNEY TO BE NOTICED*

**LAUREN A JOHNSON**
NAACP LEGAL DEFENSE &
EDUCATION FUND - WASHINGTON DC
700 14TH STREET NW
SUITE 600
WASHINGTON, DC 20005
202-682-1300
Fax: 202-682-1312
Email: ljohnson@naacpldf.org
*TERMINATED: 02/07/2023*

**LEAH MONIQUE WATSON**
ACLU FOUNDATION - NEW YORK NY
125 BROAD STREET
18TH FLOOR
NEW YORK, NY 10004
212-519-7855
Email: lwatson@aclu.org
*ATTORNEY TO BE NOTICED*

**MORENIKE FAJANA**
NAACP LEGAL DEFENSE &
EDUCATION FUND - NEW YORK NY
40 RECTOR STREET
5TH FLOOR
NEW YORK, NY 10006
646-891-6448
Email: mfajana@naacpldf.org
*ATTORNEY TO BE NOTICED*

**SANTINO COLEMAN**
NAACP LEGAL DEFENSE &

EDUCATION FUND - WASHINGTON DC
700 14th STREET NW
SUITE 600
WASHINGTON, DC 20005
202-682-1300
Email: scoleman@naacpldf.org
*ATTORNEY TO BE NOTICED*

**SARAH ANN HINGER**
ACLU FOUNDATION - NEW YORK NY
125 BROAD STREET
18TH FLOOR
NEW YORK, NY 10004
212-519-7882
Email: shinger@aclu.org
*ATTORNEY TO BE NOTICED*

**JERRY CRAWFORD EDWARDS**
ACLU FOUNDATION OF FLORIDA INC
933 LEE ROAD
SUITE 102
ORLANDO, FL 32810
786-363-1107
Email: jedwards@aclufl.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DANA THOMPSON DORSEY** represented by **CAROLINE ANDREWS MCNAMARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES DAVID TOBIN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXSIS MARIE JOHNSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ANNA OCCHIPINTI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CATHARINE ELIZABETH LUBIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHARLES EDWARD MCLAURIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**

(See above for address)
*ATTORNEY TO BE NOTICED*

**EMERSON JAMES SYKES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMILY SHAW PARSONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISABELLA SALOMAO NASCIMENTO**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISIUWA JACQUELINE MABATAH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JACQUELINE NICOLE AZIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JASON ALLEN LECKERMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JIN HEE LEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KATHERINE BLANKENSHIP**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAURA BETH MORAFF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN A JOHNSON**
(See above for address)
*TERMINATED: 02/07/2023*

**LEAH MONIQUE WATSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MORENIKE FAJANA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SANTINO COLEMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH ANN HINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JERRY CRAWFORD EDWARDS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SHARON WRIGHT AUSTIN** represented by **CAROLINE ANDREWS MCNAMARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES DAVID TOBIN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXSIS MARIE JOHNSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ANNA OCCHIPINTI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CATHARINE ELIZABETH LUBIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHARLES EDWARD MCLAURIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMERSON JAMES SYKES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMILY SHAW PARSONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISABELLA SALOMAO NASCIMENTO**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISIUWA JACQUELINE MABATAH**
(See above for address)

*ATTORNEY TO BE NOTICED*

**JACQUELINE NICOLE AZIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JASON ALLEN LECKERMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JIN HEE LEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KATHERINE BLANKENSHIP**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAURA BETH MORAFF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN A JOHNSON**
(See above for address)
*TERMINATED: 02/07/2023*

**LEAH MONIQUE WATSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MORENIKE FAJANA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SANTINO COLEMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH ANN HINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JERRY CRAWFORD EDWARDS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SHELLEY PARK** represented by **CAROLINE ANDREWS MCNAMARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES DAVID TOBIN**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JASON ALLEN LECKERMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXSIS MARIE JOHNSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ANNA OCCHIPINTI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CATHARINE ELIZABETH LUBIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHARLES EDWARD MCLAURIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMERSON JAMES SYKES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMILY SHAW PARSONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISABELLA SALOMAO NASCIMENTO**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISIUWA JACQUELINE MABATAH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JACQUELINE NICOLE AZIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JIN HEE LEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KATHERINE BLANKENSHIP**
(See above for address)

*ATTORNEY TO BE NOTICED*

**LAURA BETH MORAFF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN A JOHNSON**
(See above for address)
*TERMINATED: 02/07/2023*

**LEAH MONIQUE WATSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MORENIKE FAJANA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SANTINO COLEMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH ANN HINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JERRY CRAWFORD EDWARDS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**JENNIFER SANDOVAL** represented by **CAROLINE ANDREWS MCNAMARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES DAVID TOBIN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXSIS MARIE JOHNSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ANNA OCCHIPINTI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CATHARINE ELIZABETH LUBIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHARLES EDWARD MCLAURIN**

(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMERSON JAMES SYKES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMILY SHAW PARSONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISABELLA SALOMAO NASCIMENTO**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISIUWA JACQUELINE MABATAH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JACQUELINE NICOLE AZIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JASON ALLEN LECKERMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JIN HEE LEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KATHERINE BLANKENSHIP**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAURA BETH MORAFF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN A JOHNSON**
(See above for address)
*TERMINATED: 02/07/2023*

**LEAH MONIQUE WATSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MORENIKE FAJANA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SANTINO COLEMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH ANN HINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JERRY CRAWFORD EDWARDS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RUSSELL ALMOND** represented by **CAROLINE ANDREWS MCNAMARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES DAVID TOBIN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXSIS MARIE JOHNSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ANNA OCCHIPINTI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CATHARINE ELIZABETH LUBIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHARLES EDWARD MCLAURIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMERSON JAMES SYKES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMILY SHAW PARSONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISABELLA SALOMAO NASCIMENTO**
(See above for address)

*ATTORNEY TO BE NOTICED*

**ISIUWA JACQUELINE MABATAH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JACQUELINE NICOLE AZIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JASON ALLEN LECKERMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JIN HEE LEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KATHERINE BLANKENSHIP**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAURA BETH MORAFF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN A JOHNSON**
(See above for address)
*TERMINATED: 02/07/2023*

**LEAH MONIQUE WATSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MORENIKE FAJANA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SANTINO COLEMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH ANN HINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JERRY CRAWFORD EDWARDS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**MARVIN DUNN** represented by **CAROLINE ANDREWS MCNAMARA**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**CHARLES DAVID TOBIN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXSIS MARIE JOHNSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ANNA OCCHIPINTI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CATHARINE ELIZABETH LUBIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CHARLES EDWARD MCLAURIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMERSON JAMES SYKES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMILY SHAW PARSONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISABELLA SALOMAO NASCIMENTO**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISIUWA JACQUELINE MABATAH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JACQUELINE NICOLE AZIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JASON ALLEN LECKERMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JIN HEE LEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KATHERINE BLANKENSHIP**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAURA BETH MORAFF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN A JOHNSON**
(See above for address)
*TERMINATED: 02/07/2023*

**LEAH MONIQUE WATSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MORENIKE FAJANA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SANTINO COLEMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH ANN HINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JERRY CRAWFORD EDWARDS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHANA DAUPHIN** represented by **CAROLINE ANDREWS MCNAMARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES DAVID TOBIN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXSIS MARIE JOHNSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ANNA OCCHIPINTI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CATHARINE ELIZABETH LUBIN**
(See above for address)

*ATTORNEY TO BE NOTICED*

**CHARLES EDWARD MCLAURIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMERSON JAMES SYKES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EMILY SHAW PARSONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISABELLA SALOMAO NASCIMENTO**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ISIUWA JACQUELINE MABATAH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JACQUELINE NICOLE AZIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JASON ALLEN LECKERMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JIN HEE LEE**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KATHERINE BLANKENSHIP**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAURA BETH MORAFF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LAUREN A JOHNSON**
(See above for address)
*TERMINATED: 02/07/2023*

**LEAH MONIQUE WATSON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MORENIKE FAJANA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SANTINO COLEMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH ANN HINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JERRY CRAWFORD EDWARDS**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY**
*TERMINATED: 11/22/2022*

represented by

**CHARLES JUSTIN COOPER**
COOPER & KIRK PLLC - WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202-220-9600
Email: ccooper@cooperkirk.com
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
COOPER & KIRK PLLC - WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202-220-9600
Email: johlendorf@cooperkirk.com
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
COOPER & KIRK PLLC - WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202-220-9621
Email: jramer@cooperkirk.com
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
COOPER & KIRK PLLC - WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW

WASHINGTON, DC 20036
202-220-9650
Email: mwold@cooperkirk.com
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BRIAN LAMB**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ERIC SILAGY**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TIMOTHY CERIO**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**RICHARD CORCORAN**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**AUBREY EDGE**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PATRICIA FROST**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NIMMA GABADAGE**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**EDWARD HADDOCK**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KEN JONES**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DARLENE LUCCIO JORDAN**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ALAN LEVINE**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHARLES LYDECKER**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CRAIG MATEER**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEVEN SCOTT**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**WILLIAM SELF**
*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*
*TERMINATED: 11/17/2022*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KENT STERMON**
*IN THEIR OFFICIAL CAPACITIES AS*

represented by **CHARLES JUSTIN COOPER**
(See above for address)

*MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNIVERSITY OF FLORIDA BOARD OF TRUSTEES**
*TERMINATED: 11/22/2022*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*TERMINATED: 11/22/2022*

**JOHN D OHLENDORF**
(See above for address)
*TERMINATED: 11/22/2022*

**JOHN D RAMER**
(See above for address)
*TERMINATED: 11/22/2022*

**MEGAN MARIE WOLD**
(See above for address)
*TERMINATED: 11/22/2022*

**Defendant**

**UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES**
*TERMINATED: 11/22/2022*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*TERMINATED: 11/22/2022*

**JOHN D OHLENDORF**
(See above for address)
*TERMINATED: 11/22/2022*

**JOHN D RAMER**
(See above for address)
*TERMINATED: 11/22/2022*

**MEGAN MARIE WOLD**
(See above for address)
*TERMINATED: 11/22/2022*

**Defendant**

**FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES**
*TERMINATED: 11/22/2022*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**Defendant**

**FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES**
*TERMINATED: 11/22/2022*

represented by

**CHARLES JUSTIN COOPER**
(See above for address)
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*TERMINATED: 11/22/2022*
*ATTORNEY TO BE NOTICED*

**Defendant**

**FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES**
*TERMINATED: 11/22/2022*

represented by

**CHARLES JUSTIN COOPER**
(See above for address)
*TERMINATED: 11/22/2022*

**JOHN D OHLENDORF**
(See above for address)
*TERMINATED: 11/22/2022*

**JOHN D RAMER**
(See above for address)
*TERMINATED: 11/22/2022*

**MEGAN MARIE WOLD**
(See above for address)
*TERMINATED: 11/22/2022*

**Defendant**

| | | |
|---|---|---|
| **UNIVERSITY OF CENTRAL FLORIDA BOARD OF TRUSTEES**<br>*TERMINATED: 11/22/2022* | represented by | **CHARLES JUSTIN COOPER**<br>(See above for address)<br>*TERMINATED: 11/22/2022*<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D OHLENDORF**<br>(See above for address)<br>*TERMINATED: 11/22/2022*<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D RAMER**<br>(See above for address)<br>*TERMINATED: 11/22/2022*<br>*ATTORNEY TO BE NOTICED*<br><br>**MEGAN MARIE WOLD**<br>(See above for address)<br>*TERMINATED: 11/22/2022*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **MANNYY DIAZ JR**<br>*IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE FLORIDA STATE BOARD OF EDUCATION* | represented by | **CHARLES JUSTIN COOPER**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D OHLENDORF**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D RAMER**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**MEGAN MARIE WOLD**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **DEEANA MICHAEL**<br>*IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM* | represented by | **JOHN D RAMER**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**CHARLES JUSTIN COOPER**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D OHLENDORF**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**MEGAN MARIE WOLD** |

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MORTEZA HOSSEINI** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**THOMAS G KUNTZ** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DAVID L BRANDON** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**RICHARD P COLE** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHRISTOPHER T CORR** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMES W HEAVENER** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**LAUREN D LEMASTERS** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DANIEL T O'KEEFE** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**RAHUL PATEL** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**AMANDA J PHALIN** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARSHA D POWERS** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**FRED S RIDLEY** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANITA G ZUCKER** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**WILLIAM WEATHERFORD** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL E GRIFFIN** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SANDRA CALLAHAN** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL CARRERE** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**N ROGAN DONELLY** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OSCAR HORTON** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JENIFER JASINSKI SCHNEIDER** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**LAURAN MONBARREN** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NITHIN PALYAM** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SHILEN PATEL** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**FREDRICK PICCOLO** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MELISSA SEIXAS** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEAN C COLSON** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROGELIO TOVAR** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CESAR L ALVAREZ** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOSE J ARMAS** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEANNE BUTCHEY** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CARLOS A DUART** represented by **CHARLES JUSTIN COOPER**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Defendant**

**NATASHA LOWELL** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CRISTHOFER LUGO** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**T GENE PRESCOTT** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHANEL T ROWE** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARC D SARNOFF** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CARLOS TRUJILLO** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KEVIN LAWSON** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KIMBERLY MOORE** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANN MARIE CAVAZOS** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**THOMAS W DORTCH, JR** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OTIS CLIATT, II** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL DUBOSE** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KRISTIN HARPER** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**BELVIN PERRY, JR** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CRAIG REED** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KENWARD STONE** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NICOLE WASHINGTON** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ZACHARY CHANDLER BELL** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER COLLINS** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MAXIMO ALVAREZ** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KATHRYN BALLARD** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ERIC CHICKEN** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**VIVIAN DE LAS CUEVAS-DIAZ** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JORGE GONZALEZ** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JUSTIN ROTH** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**BOB SASSER** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN THIEL** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DREW WEATHERFORD** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JIM W HENDERSON** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEBORAH SARGEANT** represented by **ANNA OCCHIPINTI**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES JUSTIN COOPER**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ALEX MARTINS** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**HAROLD MILLS** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TIFFANY ALTIZER** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**BILL CHRISTY** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEFF CONDELLO** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOSEPH CONTE** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DANNY GAEKWAD** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEPHEN KING** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DANIELLA LOPEZ** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CARYL MCALPIN** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN MIKLOS** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL OKATY** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**BEVERLY J SEAY** represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/18/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AFLNDC-7403642.), filed by Marvin Dunn, Dana Thompson Dorsey, LeRoy Pernell, Russell Almond, SHARON WRIGHT AUSTIN, Johana Dauphin, Shelley Park, Jennifer Sandoval. (Attachments: # 1 Levine Summons, # 2 Edge Summons, # 3 Lamb Summons, # 4 Lydecker Summons, # 5 Mateer Summons, # 6 Jordan Summons, # 7 Haddock Summons, # 8 Silagy Summons, # 9 FAMU BOT Summons, # 10 FIU BOT Summons, # 11 FL BOG Summons, # 12 FSU BOT Summons, # 13 Jones Summons, # 14 Stermon Summons, # 15 Diaz Summons, # 16 Gabadage Summons, # 17 Frost Summons, # 18 Corcoran Summons, # 19 Scott Summons, # 20 Cerio Summons, # 21 UCF BOT Summons, # 22 UF BOT Summons, # 23 USF BOT Summons, # 24 Self Summons) (EDWARDS, JERRY) (Entered: 08/18/2022) |
| 08/18/2022 | 2 | CIVIL COVER SHEET. (Attachments: # 1 Other Attorneys Attachment) (EDWARDS, JERRY) (Entered: 08/18/2022) |
| 08/18/2022 | 3 | DOCKET ANNOTATION BY COURT: TO ATTORNEY JERRY EDWARDS Re 1 Complaint. Party names (including aliases) are to be added using all caps and no punctuation. (See "Style Guide for Electronic Case Filing," available on Clerk's website.) The party names will be corrected by the clerk (rcb) (Entered: 08/18/2022) |
| 08/18/2022 | 4 | MOTION to Appear Pro Hac Vice by Laura Moraff.( Filing fee $ 208 receipt number AFLNDC-7403883.) by SHARON WRIGHT AUSTIN, Russell Almond, Johana Dauphin, Marvin Dunn, Shelley Park, LeRoy Pernell, Jennifer Sandoval, Dana Thompson Dorsey. (Attachments: # 1 Certificate of Good Standing) (MORAFF, LAURA) (Entered: 08/18/2022) |
| 08/18/2022 | 5 | ORDER ADMITTING LAURA MORAFF PRO HAC VICE. The 4 motion is GRANTED. (Appointed LAURA BETH MORAFF for RUSSELL ALMOND,LAURA BETH MORAFF for SHARON WRIGHT AUSTIN,LAURA BETH MORAFF for DANA THOMPSON DORSEY,LAURA BETH MORAFF for MARVIN DUNN,LAURA BETH MORAFF for SHELLEY PARK,LAURA BETH MORAFF for LEROY PERNELL,LAURA BETH MORAFF for JENNIFER SANDOVAL) Signed by CHIEF JUDGE MARK E WALKER on 08/18/2022. (rcb) (Entered: 08/18/2022) |
| 08/19/2022 | 6 | MOTION to Appear Pro Hac Vice by Leah Watson.( Filing fee $ 208 receipt number AFLNDC-7407253.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, |

| | | |
|---|---|---|
| | | LEROY PERNELL, JENNIFER SANDOVAL. (WATSON, LEAH) (Entered: 08/19/2022) |
| 08/22/2022 | 7 | ORDER ADMITTING LEAH WATSON PRO HAC VICE. The 6 motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 08/22/2022. (rcb) (Entered: 08/22/2022) |
| 08/23/2022 | 8 | MOTION to Appear Pro Hac Vice by Sarah Hinger.( Filing fee $ 208 receipt number AFLNDC-7409820.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (HINGER, SARAH) (Entered: 08/23/2022) |
| 08/23/2022 | 9 | Summons Issued as to All Defendants. (Attachments: # 1 SUMMONS ISSUED AUBREY EDGE, # 2 SUMMONS ISSUED BRIAN LAMB, # 3 SUMMONS ISSUED CHARLES LYDECKER, # 4 SUMMONS ISSUED CRAIG MATEER, # 5 SUMMONS ISSUED DARLENE L JORDAN, # 6 SUMMONS ISSUED EDWARD HADDOCK, # 7 SUMMONS ISSUED ERIC SILAGY, # 8 SUMMONS ISSUED FAMU BOT, # 9 SUMMONS ISSUED FIU BOT, # 10 SUMMONS ISSUED FL BOARD OF GOV OF THE STATE UNV SYSTEM, # 11 SUMMONS ISSUED FSU BOT, # 12 SUMMONS ISSUED KEN JONES, # 13 SUMMONS ISSUED KENT STERMON, # 14 SUMMONS ISSUED MANNY DIAZ, # 15 SUMMONS ISSUED NIMNA GABADAGE, # 16 SUMMONS ISSUED PATRICIA FROST, # 17 SUMMONS ISSUED RICHARD CORCORAN, # 18 SUMMONS ISSUED STEVEN M SCOTT, # 19 SUMMONS ISSUED TIMOTHY CERIO, # 20 SUMMONS ISSUED UCF BOT, # 21 SUMMONS ISSUED UF BOT, # 22 SUMMONS ISSUED USF BOT, # 23 SUMMONS ISSUED WILLIAM SELF) (rcb) (rcb). Modified on 8/24/2022 (rcb). (Entered: 08/23/2022) |
| 08/23/2022 | 10 | ORDER ADMITTING SARAH HINGER PRO HAC VICE. The 8 motion is GRANTED. Ms. Hinger has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 08/23/2022. (rcb) (Entered: 08/23/2022) |
| 08/24/2022 | 11 | Summons Issued as to ALAN LEVINE. (rcb) (Entered: 08/24/2022) |
| 08/24/2022 | 12 | PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION. (EDWARDS, JERRY) Modified to edit title on 8/25/2022 (rcb). (Entered: 08/24/2022) |
| 08/24/2022 | 13 | MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION. (Attachments: # 1 Pernell Declaration, # 2 Thompson Dorsey Declaration, # 3 Austin Declaration, # 4 Park Declaration, # 5 Sandoval Declaration, # 6 Almond Declaration, # 7 Dunn Declaration, # 8 Dauphin Declaration, # 9 Smith Declaration) (EDWARDS, JERRY) Modified to edit title on 8/25/2022 (rcb). (Entered: 08/24/2022) |
| 08/25/2022 | 14 | ORDER SETTING CONFERENCE SCHEDULE.Plaintiffs shall serve Defendants with a copy of this Order, their Complaint, and their Motion for Preliminary Injunction before the close of business, 5:00 p.m. (ET) on Tuesday, August 30, 2022, so the parties can confer prior to the scheduling conference. The Clerk shall set this matter for a telephonic scheduling conference on Friday,**9/2/2022 02:00 PM. Signed by CHIEF JUDGE MARK E WALKER on 08/25/2022. (rcb) (Entered: 08/25/2022)** |
| 08/25/2022 | 15 | NOTICE OF TELEPHONIC HEARING: Telephonic Scheduling Conference set for **9/2/2022 02:00 PM** before CHIEF JUDGE MARK E WALKER.<br><br>ALL PARTIES are directed to call the AT&T Conference Line (see below)<br><br>Conference Call Information |

| | | |
|---|---|---|
| | | You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is comprised by these devices.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 08/25/2022) |
| 08/25/2022 | 16 | MOTION to Appear Pro Hac Vice by Morenike Fajana.( Filing fee $ 208 receipt number AFLNDC-7413589.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (Attachments: # 1 Exhibit A - CGS) (FAJANA, MORENIKE) (Entered: 08/25/2022) |
| 08/25/2022 | 17 | ORDER ADMITTING MORENIKE FAJANA PRO HAC VICE. The 16 motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 08/25/2022. (rcb) (Entered: 08/25/2022) |
| 08/26/2022 | 18 | MOTION to Appear Pro Hac Vice by Emerson Sykes.( Filing fee $ 208 receipt number AFLNDC-7415908.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (Attachments: # 1 Certificate of Good Standing) (SYKES, EMERSON) (Entered: 08/26/2022) |
| 08/26/2022 | 19 | ORDER ADMITTING EMERSON SYKES PRO HAC VICE. The 18 motion is GRANTED. Mr. Sykes has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 08/26/2022. (rcb) (Entered: 08/26/2022) |
| 08/30/2022 | 20 | NOTICE of Appearance by KATHERINE BLANKENSHIP on behalf of All Plaintiffs (BLANKENSHIP, KATHERINE) (Entered: 08/30/2022) |
| 08/30/2022 | 21 | MOTION to Appear Pro Hac Vice by Isabella Salomo Nascimento.( Filing fee $ 208 receipt number AFLNDC-7420636.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (SALOMAO NASCIMENTO, ISABELLA) (Entered: 08/30/2022) |
| 08/30/2022 | 22 | MOTION to Appear Pro Hac Vice by Jason Leckerman.( Filing fee $ 208 receipt number AFLNDC-7420978.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, LEROY PERNELL, JENNIFER SANDOVAL. (LECKERMAN, JASON) (Entered: 08/30/2022) |
| 08/30/2022 | 23 | SUMMONS Returned Executed by MARVIN DUNN, DANA THOMPSON DORSEY, LEROY PERNELL, RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, SHELLEY PARK, JENNIFER SANDOVAL. All Defendants. (Attachments: # 1 Exhibit Return of Service - Fla. Board of Governors, # 2 Exhibit Return of Service - FIU Board of Trustees, # 3 Exhibit Return of Service - FAMU Board of Trustees, # 4 Exhibit Return of Service - FSU Board of Trustees, # 5 Exhibit Return of Service - UCF Board of Trustees, # 6 Exhibit Return of Service - UF Board of Trustees, # 7 Exhibit Return of Service - USF Board of Trustees, # 8 Exhibit Return of Service - Cerio, # 9 Exhibit Return of Service - Corcoran, # 10 Exhibit Return of Service - Diaz, # 11 Exhibit Return of Service - Edge, # 12 Exhibit Return of Service - Frost, # 13 Exhibit Return of |

| | | |
|---|---|---|
| | | Service - Gabadage, # 14 Exhibit Return of Service - Haddock, # 15 Exhibit Return of Service - Jones, # 16 Exhibit Return of Service - Lamb, # 17 Exhibit Return of Service - Levine, # 18 Exhibit Return of Service - Luccio Jordan, # 19 Exhibit Return of Service - Lydecker, # 20 Exhibit Return of Service - Mateer, # 21 Exhibit Return of Service - Scott, # 22 Exhibit Return of Service - Self, # 23 Exhibit Return of Service - Silagy, # 24 Exhibit Return of Service - Stermon) (EDWARDS, JERRY) (Entered: 08/30/2022) |
| 08/30/2022 | 24 | NOTICE of Appearance by DANIEL BOAZ TILLEY on behalf of RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL (TILLEY, DANIEL) (Entered: 08/30/2022) |
| 08/30/2022 | 25 | ORDER ADMITTING JASON LECKERMAN PRO HAC VICE. The 22 motion is GRANTED. Mr. Leckerman has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 08/30/2022. (rcb) (Entered: 08/30/2022) |
| 08/30/2022 | 26 | ORDER ADMITTING ISABELLA SALOMO NASCIMENTO PRO HAC VICE. The 21 motion is GRANTED. Ms. Nascimento has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 08/30/2022. (rcb) (Entered: 08/30/2022) |
| 08/30/2022 | | Set Deadline- Attorney Admissions for Isabella Salomo Nascimento due by **9/13/2022**. (rcb)**Attorney Admission Email & Letter forwarded** (Entered: 08/30/2022) |
| 08/31/2022 | | Set Deadlines- Answer due by **9/22/2022** for FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY, FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES, FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, UNIVERSITY OF CENTRAL FLORIDA BOARD OF TRUSTEES, TIMOTHY CERIO, RICHARD CORCORAN, MANNYY DIAZ JR, AUBREY EDGE, PATRICIA FROST, NIMMA GABADAGE, EDWARD HADDOCK, KEN JONES, BRIAN LAMB, ALAN LEVINE, DARLENE LUCCIO JORDAN, CHARLES LYDECKER, CRAIG MATEER, STEVEN SCOTT, WILLIAM SELF, ERIC SILAGY & KENT STERMON ******Answer Due by **9/16/2022** for UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES & FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES***** (rcb) Modified to edit docket text per ECF 39 on 9/19/2022 (rcb). (Entered: 08/31/2022) |
| 08/31/2022 | 27 | NOTICE of Appearance by CHARLES JUSTIN COOPER on behalf of All Defendants (COOPER, CHARLES) (Entered: 08/31/2022) |
| 08/31/2022 | 28 | MOTION to Appear Pro Hac Vice by John D. Ohlendorf.( Filing fee $ 208 receipt number AFLNDC-7421874.) by TIMOTHY CERIO, RICHARD CORCORAN, MANNYY DIAZ JR, AUBREY EDGE, FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES, FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY, FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES, FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, PATRICIA FROST, NIMMA GABADAGE, EDWARD HADDOCK, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, ALAN LEVINE, CHARLES LYDECKER, CRAIG MATEER, STEVEN SCOTT, WILLIAM SELF, ERIC SILAGY, KENT STERMON, UNIVERSITY OF CENTRAL FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (OHLENDORF, JOHN) (Entered: 08/31/2022) |
| 08/31/2022 | 29 | MOTION to Appear Pro Hac Vice by Megan M. Wold.( Filing fee $ 208 receipt number AFLNDC-7421891.) by TIMOTHY CERIO, RICHARD CORCORAN, MANNYY |

| | | |
|---|---|---|
| | | DIAZ JR, AUBREY EDGE, FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES, FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY, FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES, FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, PATRICIA FROST, NIMMA GABADAGE, EDWARD HADDOCK, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, ALAN LEVINE, CHARLES LYDECKER, CRAIG MATEER, STEVEN SCOTT, WILLIAM SELF, ERIC SILAGY, KENT STERMON, UNIVERSITY OF CENTRAL FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (WOLD, MEGAN) (Entered: 08/31/2022) |
| 08/31/2022 | 30 | MOTION to Appear Pro Hac Vice by John D. Ramer.( Filing fee $ 208 receipt number AFLNDC-7421900.) by TIMOTHY CERIO, RICHARD CORCORAN, MANNYY DIAZ JR, AUBREY EDGE, FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES, FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY, FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES, FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, PATRICIA FROST, NIMMA GABADAGE, EDWARD HADDOCK, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, ALAN LEVINE, CHARLES LYDECKER, CRAIG MATEER, STEVEN SCOTT, WILLIAM SELF, ERIC SILAGY, KENT STERMON, UNIVERSITY OF CENTRAL FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (RAMER, JOHN) (Entered: 08/31/2022) |
| 08/31/2022 | 31 | ORDER ADMITTING MEGAN WOLD PRO HAC VICE. The 29 motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 08/31/2022. (rcb) (Entered: 08/31/2022) |
| 08/31/2022 | 32 | ORDER ADMITTING JOHN RAMER PRO HAC VICE. The 30 motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 08/31/2022. (rcb) (Entered: 08/31/2022) |
| 08/31/2022 | 33 | ORDER ADMITTING JOHN OHLENDORF PRO HAC VICE. The 28 motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 08/31/2022. (rcb) (Entered: 08/31/2022) |
| 08/31/2022 | 34 | INITIAL SCHEDULING ORDER. Fed.R.Civ.P. 7.1 Corporate Disclosure Statement Deadline set for **9/14/2022**. Rule 26 Meeting Report due by **10/14/2022**. Discovery due by **12/29/2022**. Status Report due by **9/30/2022**. Signed by CHIEF JUDGE MARK E WALKER on 08/31/2022. (rcb) (Entered: 08/31/2022) |
| 09/01/2022 | 35 | MOTION to Appear Pro Hac Vice by Jacqueline Mabatah.( Filing fee $ 208 receipt number AFLNDC-7424235.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (MABATAH, ISIUWA) (Entered: 09/01/2022) |
| 09/01/2022 | 36 | ORDER ADMITTING JACQUELINE MABATAH PRO HAC VICE. The 35 motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 09/01/2022 (rcb) (Entered: 09/01/2022) |
| 09/02/2022 | 37 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 9/2/2022. Parties discuss casestatus and schedule for 12 Motion for Preliminary Injunction hearing. Defendants response to 12 Motion, motion to dismiss/answer and counter witness declarations due **9/22/2022**. |

| | | |
|---|---|---|
| | | Plaintiffs Reply to 12 Motion, response to motion dismiss and rebuttal declarations are due **10/4/2022**. Defendants reply to motion to dismiss due **10/11/2022**. Preliminary injunction hearing set for 9:00 am on 10/13/22. Order to follow (Court Reporter Megan Hague (USDC-Tallahassee)). (vkm) (Entered: 09/02/2022) |
| 09/02/2022 | 38 | NOTICE OF HEARING RE: 12 MOTION for Preliminary Injunction: Preliminary Injunction Hearing set for **10/13/2022 09:00 AM** before CHIEF JUDGE MARK E WALKER. United States Courthouse, **Courtroom 5 West,** 111 North Adams St., Tallahassee, Florida 32301.<br><br>NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as, a hearing impairment that requires a sign language interpreter or a wheelchair restriction that requires ramp access, please contact Victoria Milton McGee at 850-521-3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 09/02/2022) |
| 09/02/2022 | 39 | ORDER SETTING HEARING ON 12 MOTION FOR PRELIMINARY INJUNCTION AND OTHER DEADLINES.The hearing on Plaintiffs' motion for preliminary injunction is set for Thursday, **10/13/2022 09:00 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. Defendants' answer or motion to dismiss, response to Plaintiffs' motion, and any declarations in support of their response, are due on or before **9/22/2022**. Plaintiffs' response to Defendants motion to dismiss, reply in support of their preliminary injunction motion, and any rebuttal declarations are due on or before **10/4/2022**. Finally, Defendants' reply in support of any motion to dismiss is due on or before **10/11/2022**. Signed by CHIEF JUDGE MARK E WALKER on 09/02/2022. (rcb) (Entered: 09/02/2022) |
| 09/06/2022 | 40 | MOTION to Appear Pro Hac Vice by Alexsis M. Johnson.( Filing fee $ 208 receipt number AFLNDC-7427593.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (JOHNSON, ALEXSIS) (Entered: 09/06/2022) |
| 09/06/2022 | 41 | ORDER ADMITTING ALEXSIS M. JOHNSON PRO HAC VICE. The 40 motion is GRANTED. Ms. Johnson has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 09/06/2022. (rcb) (Entered: 09/06/2022) |
| 09/06/2022 | 42 | MOTION to Appear Pro Hac Vice by Santino Coleman.( Filing fee $ 208 receipt number AFLNDC-7428213.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (COLEMAN, SANTINO) (Entered: 09/06/2022) |
| 09/06/2022 | 43 | ORDER ADMITTING SANTINO COLEMAN PRO HAC VICE. The 42 motion is GRANTED. Mr. Coleman has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 09/06/2022. (rcb) (Entered: 09/06/2022) |
| 09/09/2022 | 44 | MOTION to Appear Pro Hac Vice by Jin Hee Lee.( Filing fee $ 208 receipt number AFLNDC-7435154.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (LEE, JIN HEE) (Entered: 09/09/2022) |

| | | |
|---|---|---|
| 09/09/2022 | 45 | ORDER ADMITTING JIN HEE LEE PRO HAC VICE. The 44 motion is GRANTED. Ms. Lee has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 09/09/2022. (rcb) (Entered: 09/09/2022) |
| 09/16/2022 | 46 | ORDER REQUIRING ATTORNEYS TO APPEAR AT TELEPHONIC SCHEDULING CONFERENCE IN RELATED CASE - Given the overlapping issues these two cases present, and that Defendants are represented by the same attorneys in both cases, the attorneys in this case shall appear at the telephonic scheduling conference at 11:00 a.m. (ET) on September 21, 2022, to discuss running the hearing schedules for both cases together. Signed by CHIEF JUDGE MARK E WALKER on 9/16/22. (sjb) (Entered: 09/16/2022) |
| 09/16/2022 | | Set Deadlines/Hearings Scheduling Conference set for **9/21/2022 11:00 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. (sjb) (Entered: 09/16/2022) |
| 09/16/2022 | 47 | NOTICE OF TELEPHONIC HEARING: Telephonic Scheduling Conference set for **9/21/2022 11:00 AM** before CHIEF JUDGE MARK E WALKER.<br><br>ALL PARTIES are directed to call the AT&T Conference Line (see below)<br><br>Conference Call Information<br><br>You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is comprised by these devices.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 09/16/2022) |
| 09/20/2022 | 48 | NOTICE of Appearance by CAROLINE ANDREWS MCNAMARA on behalf of All Plaintiffs (MCNAMARA, CAROLINE) (Entered: 09/20/2022) |
| 09/21/2022 | 49 | **PLEASE DISREGARD THIS ENTRY***DOCKET ANNOTATION BY COURT: ISO PLACED IN JUDGE WALKER'S REFERRAL FOLDER** (rcb) **ISO DOCKETED ON 08/31/2022** (rcb). (Entered: 09/21/2022) |
| 09/21/2022 | 50 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 9/21/2022. Parties discuss case status and schedule for 12 Motion for Preliminary Injunction hearing. Parties will keep the existing schedule for the 12 Motion. Defendants' motion to dismiss (for issues pertaining to 12 Motion) and counter witness declarations due by **9/30/2022**. Preliminary Injunction Hearing set for **10/13/2022 09:00 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER (Court Reporter Megan Hague (USDC-Tallahassee)). (vkm) (Entered: 09/21/2022) |
| 09/22/2022 | 51 | DEFENDANTS' MOTION TO DISMISS. (Internal deadline for referral to judge if response not filed earlier: **10/6/2022)**. (Attachments: # 1 Memorandum in Support) (COOPER, CHARLES) Modified to edit title on 9/23/2022 (rcb). (Entered: 09/22/2022) |
| 09/22/2022 | 52 | DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION. (COOPER, CHARLES) Modified to edit title on |

| | | |
|---|---|---|
| | | 9/23/2022 (rcb). (Entered: 09/22/2022) |
| 09/30/2022 | 53 | STATUS REPORT *Joint Status Report on Discovery* by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (BLANKENSHIP, KATHERINE) (Entered: 09/30/2022) |
| 10/03/2022 | | Set Deadline- Status Report due by **11/2/2022**. (rcb) (Entered: 10/03/2022) |
| 10/04/2022 | 54 | REPLY to Response to Motion re 12 MOTION for Preliminary Injunction filed by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (SYKES, EMERSON) (Entered: 10/04/2022) |
| 10/04/2022 | 55 | RESPONSE in Opposition re 51 MOTION to Dismiss for Lack of Jurisdiction filed by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (FAJANA, MORENIKE) (Entered: 10/04/2022) |
| 10/11/2022 | 56 | JOINT REPORT OF RULE 26(f) CONFERENCE. (MCNAMARA, CAROLINE) Modified to edit title on 10/12/2022 (rcb). (Entered: 10/11/2022) |
| 10/11/2022 | 57 | REPLY to Response to Motion re 51 MOTION to Dismiss for Lack of Jurisdiction filed by TIMOTHY CERIO, RICHARD CORCORAN, MANNYY DIAZ JR, AUBREY EDGE, FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES, FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY, FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES, FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, PATRICIA FROST, NIMMA GABADAGE, EDWARD HADDOCK, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, ALAN LEVINE, CHARLES LYDECKER, CRAIG MATEER, STEVEN SCOTT, WILLIAM SELF, ERIC SILAGY, KENT STERMON, UNIVERSITY OF CENTRAL FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES. (COOPER, CHARLES) (Entered: 10/11/2022) |
| 10/12/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 56 JOINT REPORT OF RULE 26(f) CONFERENCE. (rcb) (Entered: 10/12/2022) |
| 10/12/2022 | 58 | SCHEDULING AND MEDIATION ORDER. Jury Trial set for **9/18/2023 08:15 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. The discovery deadline is extended to **3/31/2023**. The deadline for filing summary-judgment motions is 21 days after the discovery deadline, **4/21/2023**, but the motions should be filed at the earliest appropriate time. Mediation to take place by **4/28/2023**. Mediation Report due by **5/12/2023**. Case referred to mediation. Signed by CHIEF JUDGE MARK E WALKER on 10/12/2022. (rcb) (Entered: 10/12/2022) |
| 10/13/2022 | 59 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Motion Hearing held on 10/13/2022. Court hears argument regarding Plaintiffs' 12 Motion for Preliminary Injunction and Defendants' 51 Motion to Dismiss. Order to follow (Court Reporter Megan Hague (USDC-Tallahassee)). (vkm) (Entered: 10/13/2022) |
| 10/14/2022 | 60 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Preliminary Injunction Proceedings held on 10/13/2022, before Judge Mark E. Walker. Court Reporter/Transcriber Megan A. Hague, Telephone number 850-443-9797.<br><br>*Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* |

| | | |
|---|---|---|
| | | Redaction Request due **10/21/2022**. Release of Transcript Restriction set for **1/19/2023**. (mah) (Entered: 10/14/2022) |
| 10/28/2022 | 61 | STATUS REPORT *Joint Status Report on Discovery* by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (MCNAMARA, CAROLINE) (Entered: 10/28/2022) |
| 11/03/2022 | | Set Deadline- Status Report due by **12/5/2022**. (rcb) (Entered: 11/03/2022) |
| 11/14/2022 | 62 | NOTICE of Appearance by JACQUELINE NICOLE AZIS on behalf of All Plaintiffs (AZIS, JACQUELINE) (Entered: 11/14/2022) |
| 11/17/2022 | 63 | ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR PRELIMINARY INJUNCTION. The Pernell Plaintiffs' motion for a preliminary injunction, ECF No. 12 , in Case No.: 4:22cv304-MW/MAF, is GRANTED in part. Defendants Manny Diaz, Jr.; Brian Lamb; Eric Silagy; Timothy M. Cerio; Richard Corcoran; Aubrey Edge; Patricia Frost; Nimna Gabadage; Edward Haddock; Ken Jones; Darlene Luccio Jordan; Alan Levine; Charles H. Lydecker; Craig Mateer; Steven M. Scott; Deanna Michael; and Kent Stermon-all in their official capacities as members of the Florida Board of Governors of the State University System-must take no steps to enforce the following until otherwise ordered: a. Sections 1000.05(4)(a)(b), Florida Statutes; and b. the Board of Governors's Regulation 10.005(2)(3) and (4)(d). The preliminary injunction binds the above-listed Defendants and their officers, agents, servants, employees, and attorneys-and others in active concert or participation with any of them-who receive actual notice of this injunction by personal service or otherwise. The motion, ECF No. 12 , in Case No.: 4:22cv304-MW/MAF is otherwise DENIED in part as to Defendants the University of Florida Board of Trustees; the University of South Florida Board of Trustees; the Florida International University Board of Trustees; the Florida A&M University Board of Trustees; the Florida State University Board of Trustees; and the University of Central Florida Board of Trustees. The Novoa Plaintiffs' motion for a preliminary injunction, ECF No. 19, in Case No.: 4:22cv324-MW/MAF, is GRANTED in part. Defendants Manny Diaz, Jr.; Brian Lamb; Eric Silagy; Timothy M. Cerio; Richard Corcoran; Aubrey Edge; Patricia Frost; Nimna Gabadage; Edward Haddock; Ken Jones; Darlene Luccio Jordan; Alan Levine; Charles H. Lydecker; Craig Mateer; Deanna Michael; Steven M. Scott; and Kent Stermon-all in their official capacities as members of the Florida Board of Governors of the State University System-must take no steps to enforce the following until otherwise ordered: a. Sections 1000.05(4)(a)1.3., 5., and 7., Florida Statutes, and Section 1000.05(4)(b), Florida Statutes as to those concepts; b. the Board of Governors's Regulation 10.005(2)(3) and (4)(d) as to the first, second, third, fifth, and seventh concepts listed in Regulation 10.005(1)(a)1.3., 5., and 7. Defendants Timothy L. Boaz; Sandra Callahan; Michael Carrere; N. Rogan Donelly; Michael E. Griffin; Oscar Horton; Lauran Monbarren; Nithin Palyam; Shilen Patel; Fredrick Piccolo; Melissa Seixas; Jenifer Jasinski Schneider; and William Weatherford-all in their official capacities as members of the University of South Florida Board of Trustees-must take no steps to comply with the following until otherwise ordered: a. Sections 1000.05(4)(a)1.3., 5., and 7., Florida Statutes, and Section 1000.05(4)(b), Florida Statutes as to those concepts; b. the Board of Governors's Regulation 10.005(2)(3) as to the first, second, third, fifth, and seventh concepts listed in Regulation 10.005(1)(a)1.3., 5., and 7. The preliminary injunction binds the above-listed Defendants and their officers, agents, servants, employees, and attorneys-and others in active concert or participation with any of them-who receive actual notice of this injunction by personal service or otherwise. The motion, ECF No. 19, in Case No.: 4:22cv324-MW/MAF, is otherwise DENIED in part as to: a. Defendants the Florida Board of Governors of the State University System; the University of South Florida |

| | | |
|---|---|---|
| | | Board of Trustees; and Julie Leftheris in her official capacity as the Inspector General of the Board of Governors; and b. The remaining Defendants' enforcement of or compliance with: i. Sections 1000.05(4)(a)4., 6., and 8., Florida Statutes; ii. the Board of Governors's Regulation 10.005 as to the fourth, sixth, and eighth concepts listed in Regulation 10.005(1)(a)4., 6., and 8. Signed by CHIEF JUDGE MARK E WALKER on 11/17/2022. (kjw) (Entered: 11/17/2022) |
| 11/22/2022 | 64 | ORDER ON 51 MOTION TO DISMISS. Defendants' 51 motion is GRANTED in part and DENIED in part. Plaintiffs' claims against the Florida Board of Governors, as an entity, and the various Boards of Trustees, as entities, are barred by the Eleventh Amendment and, thus, DISMISSED without prejudice. Signed by CHIEF JUDGE MARK E WALKER on 11/22/2022. (rcb) (Entered: 11/22/2022) |
| 11/29/2022 | 65 | DEFENDANTS' NOTICE OF APPEAL. ( Filing fee $505 Receipt Number AFLNDC-7578019.) (COOPER, CHARLES) Modified to edit title on 11/30/2022 (rcb). (Entered: 11/29/2022) |
| 11/30/2022 | 66 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 65 Notice of Appeal. (rcb) (Entered: 11/30/2022) |
| 11/30/2022 | | Set Deadlines re 65 Notice of Appeal. Clerk to check status of Appeal on **2/28/2023**. Certificate of Readiness (FRAP 11) due by **12/14/2022**. (rcb) (Entered: 11/30/2022) |
| 11/30/2022 | 67 | STATUS REPORT *Joint Status Report on Discovery* by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (WATSON, LEAH) (Entered: 11/30/2022) |
| 12/01/2022 | | Set Deadline- Status Report due by **1/2/2023**. (rcb) (Entered: 12/01/2022) |
| 12/02/2022 | 68 | MOTION to Appear Pro Hac Vice by Lauren A. Johnson.( Filing fee $ 208 receipt number AFLNDC-7581580.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (JOHNSON, LAUREN) (Entered: 12/02/2022) |
| 12/02/2022 | 69 | ORDER ADMITTING LAUREN JOHNSON PRO HAC VICE. The 68 motion is GRANTED. Ms. Johnson has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 12/02/2022. (rcb) (Entered: 12/02/2022) |
| 12/02/2022 | 70 | MOTION to Amend/Correct *Complaint* by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (MCNAMARA, CAROLINE) (Entered: 12/02/2022) |
| 12/02/2022 | 71 | AMENDED DOCUMENT by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. *Amended Complaint*. (MCNAMARA, CAROLINE) (Entered: 12/02/2022) |
| 12/05/2022 | 72 | ORDER FOR EXPEDITED RESPONSE. Defendants shall file an expedited response to this motion setting out whether they oppose the motion, and if so, why, on or before Friday, **12/9/2022**. Signed by CHIEF JUDGE MARK E WALKER on 12/05/2022. (rcb) (Entered: 12/05/2022) |
| 12/05/2022 | 73 | USCA Acknowledgment #22-13992-J 65 Notice of Appeal (rcb) (Entered: 12/06/2022) |

| | | |
|---|---|---|
| 12/08/2022 | 74 | RESPONSE to Motion re 70 MOTION to Amend/Correct *Complaint* filed by TIMOTHY CERIO, RICHARD CORCORAN, MANNYY DIAZ JR, AUBREY EDGE, PATRICIA FROST, NIMMA GABADAGE, EDWARD HADDOCK, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, ALAN LEVINE, CHARLES LYDECKER, CRAIG MATEER, DEEANA MICHAEL, STEVEN SCOTT, ERIC SILAGY, KENT STERMON. (COOPER, CHARLES) (Entered: 12/08/2022) |
| 12/08/2022 | 75 | ORDER GRANTING 70 LEAVE TO AMEND. Accordingly, Plaintiffs' motion, ECF No. 70 , is GRANTED. Plaintiffs shall file their amended complaint as a separate docket entry on or before Monday,**12/12/2022**. Signed by CHIEF JUDGE MARK E WALKER on 12/08/2022. (rcb) (Entered: 12/09/2022) |
| 12/09/2022 | 76 | FIRST AMENDED COMPLAINT against TIMOTHY CERIO, RICHARD CORCORAN, MANNYY DIAZ JR, AUBREY EDGE, PATRICIA FROST, NIMMA GABADAGE, EDWARD HADDOCK, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, ALAN LEVINE, CHARLES LYDECKER, CRAIG MATEER, DEEANA MICHAEL, STEVEN SCOTT, ERIC SILAGY, KENT STERMON, MORTEZA HOSSEINI, THOMAS G KUNTZ, DAVID L BRANDON, RICHARD P. COLE, CHRISTOPHER T CORR, JAMES W HEAVENER, LAUREN D LEMASTERS, DANIEL T O'KEEFE, RAHUL PATEL, AMANDA J PHALIN, MARSHA D POWERS, FRED S RIDLEY, ANITA G ZUCKER, WILLIAM WEATHERFORD, MICHAEL E GRIFFIN, SANDRA CALLAHAN, MICHAEL CARRERE, N ROGAN DONELLY, OSCAR HORTON, JENIFER JASINSKI SCHNEIDER, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, MELISSA SEIXAS, DEAN C COLSON, ROGELIO TOVAR, CESAR L ALVAREZ, JOSE J ARMAS, DEANNE BUTCHEY, CARLOS A DUART, NATASHA LOWELL, CRISTHOFER LUGO, T GENE PRESCOTT, CHANEL T ROWE, MARC D SARNOFF, CARLOS TRUJILLO, KEVIN LAWSON, KIMBERLY MOORE, ANN MARIE CAVAZOS, THOMAS W DORTCH, JR, OTIS CLIATT, II, MICHAEL DUBOSE, KRISTIN HARPER, BELVIN PERRY, JR, CRAIG REED, KENWARD STONE, NICOLE WASHINGTON, ZACHARY CHANDLER BELL, PETER COLLINS, MAXIMO ALVAREZ, KATHRYN BALLARD, ERIC CHICKEN, VIVIAN DE LAS CUEVAS-DIAZ, JORGE GONZALEZ, JUSTIN ROTH, BOB SASSER, JOHN THIEL, DREW WEATHERFORD, JIM W HENDERSON, DEBORAH SARGEANT, ALEX MARTINS, HAROLD MILLS, TIFFANY ALTIZER, BILL CHRISTY, JEFF CONDELLO, JOSEPH CONTE, DANNY GAEKWAD, STEPHEN KING, DANIELLA LOPEZ, CARYL MCALPIN, JOHN MIKLOS, MICHAEL OKATY, BEVERLY J SEAY, filed by MARVIN DUNN, DANA THOMPSON DORSEY, LEROY PERNELL, RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, SHELLEY PARK, JENNIFER SANDOVAL. (SYKES, EMERSON) (Entered: 12/09/2022) |
| 12/12/2022 | 77 | Pursuant to F.R.A.P. 11(c), #22-13992-J the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 65 Notice of Appeal, Appeal No. 22-13992-J. The entire record on appeal is available electronically. (rcb) (Entered: 12/12/2022) |
| 12/13/2022 | 78 | ELEVENTH CIRCUIT TRANSCRIPT ORDER FORM (OHLENDORF, JOHN) Modified to edit title on 12/14/2022 (rcb). (Entered: 12/13/2022) |
| 12/15/2022 | 79 | ORDER of USCA #22-13992-J as to 65 Notice of Appeal. Your Application to Appear Pro Hac Vice in this appeal has been GRANTED. (rcb) (Entered: 12/15/2022) |
| 12/21/2022 | 80 | MOTION FOR LEAVE TO APPEAR PRO HAC VICE (LUBIN, CATHARINE) Modified to edit docket text and to modify the event type to a motion from notice to appearance on 12/22/2022 (rcb). (Entered: 12/21/2022) |

| | | |
|---|---|---|
| 12/22/2022 | 81 | ORDER ADMITTING CATHARINE LUBIN PRO HAC VICE. The 80 motion is GRANTED. Ms. Lubin has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 12/22/2022. (rcb) (Entered: 12/22/2022) |
| 12/30/2022 | 82 | ANSWER to 76 Amended Complaint,,,,,, by TIFFANY ALTIZER, CESAR L ALVAREZ, MAXIMO ALVAREZ, JOSE J ARMAS, KATHRYN BALLARD, ZACHARY CHANDLER BELL, DAVID L BRANDON, DEANNE BUTCHEY, SANDRA CALLAHAN, MICHAEL CARRERE, ANN MARIE CAVAZOS, TIMOTHY CERIO, ERIC CHICKEN, BILL CHRISTY, OTIS CLIATT, II, RICHARD P. COLE, PETER COLLINS, DEAN C COLSON, JEFF CONDELLO, JOSEPH CONTE, RICHARD CORCORAN, CHRISTOPHER T CORR, VIVIAN DE LAS CUEVAS-DIAZ, MANNYY DIAZ JR, N ROGAN DONELLY, THOMAS W DORTCH, JR, CARLOS A DUART, MICHAEL DUBOSE, AUBREY EDGE, PATRICIA FROST, NIMMA GABADAGE, DANNY GAEKWAD, JORGE GONZALEZ, MICHAEL E GRIFFIN, EDWARD HADDOCK, KRISTIN HARPER, JAMES W HEAVENER, JIM W HENDERSON, OSCAR HORTON, MORTEZA HOSSEINI, KEN JONES, DARLENE LUCCIO JORDAN, STEPHEN KING, THOMAS G KUNTZ, BRIAN LAMB, KEVIN LAWSON, LAUREN D LEMASTERS, ALAN LEVINE, DANIELLA LOPEZ, NATASHA LOWELL, CRISTHOFER LUGO, CHARLES LYDECKER, ALEX MARTINS, CRAIG MATEER, CARYL MCALPIN, DEEANA MICHAEL, JOHN MIKLOS, HAROLD MILLS, LAURAN MONBARREN, KIMBERLY MOORE, DANIEL T O'KEEFE, MICHAEL OKATY, NITHIN PALYAM, RAHUL PATEL, SHILEN PATEL, BELVIN PERRY, JR, AMANDA J PHALIN, FREDRICK PICCOLO, MARSHA D POWERS, T GENE PRESCOTT, CRAIG REED, FRED S RIDLEY, JUSTIN ROTH, CHANEL T ROWE, DEBORAH SARGEANT, MARC D SARNOFF, BOB SASSER, JENIFER JASINSKI SCHNEIDER, STEVEN SCOTT, BEVERLY J SEAY, MELISSA SEIXAS, ERIC SILAGY, KENT STERMON, KENWARD STONE, JOHN THIEL, ROGELIO TOVAR, CARLOS TRUJILLO, NICOLE WASHINGTON, DREW WEATHERFORD, WILLIAM WEATHERFORD, ANITA G ZUCKER. (COOPER, CHARLES) (Entered: 12/30/2022) |
| 12/30/2022 | 83 | STATUS REPORT by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (BLANKENSHIP, KATHERINE) (Entered: 12/30/2022) |
| 12/30/2022 | | Set Deadline - Status Report due by **1/30/2023**. (amm) (Entered: 01/03/2023) |
| 01/06/2023 | 84 | MOTION to Appear Pro Hac Vice by Anna Occhipinti.( Filing fee $ 208 receipt number AFLNDC-7626768.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (OCCHIPINTI, ANNA) (Entered: 01/06/2023) |
| 01/06/2023 | 85 | ORDER ADMITTING ANNA OCCHIPINTI PRO HAC VICE. Granting 84 MOTION to Appear Pro Hac Vice by Anna Occhipinti. Attorney ANNA OCCHIPINTI for RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL, DEBORAH SARGEANT added. Signed by CHIEF JUDGE MARK E WALKER on 1/6/23. (pll) (Entered: 01/06/2023) |
| 01/11/2023 | 86 | MOTION to Compel *COMPLIANCE WITH PRELIMINARY INJUNCTION* by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, |

| | | |
|---|---|---|
| | | JENNIFER SANDOVAL. (Attachments: # 1 Exhibit 1)(HINGER, SARAH) (Entered: 01/11/2023) |
| 01/11/2023 | 87 | ORDER FOR EXPEDITED RESPONSE. Pending before this Court is Plaintiffs' motion to compel compliance with this Court's preliminary injunction. ECF No. 86 . Defendants shall file an expedited response **on or before 5:00 PM (ET) on Thursday, 1/12/2023**. Signed by CHIEF JUDGE MARK E WALKER on 1/11/2023. (kjw) (Entered: 01/11/2023) |
| 01/12/2023 | 88 | DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL. (COOPER, CHARLES) Modified to edit title on 1/13/2023 (rcb). (Entered: 01/12/2023) |
| 01/12/2023 | 89 | ORDER DENYING 86 MOTION TO COMPEL COMPLIANCE WITH PRELIMINARY INJUNCTION. Signed by CHIEF JUDGE MARK E WALKER on 1/12/2023. (vkm) (Entered: 01/12/2023) |
| 01/13/2023 | 90 | STATUS REPORT *Supplemental Joint Status Report on Discovery* by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (BLANKENSHIP, KATHERINE) (Entered: 01/13/2023) |
| 01/13/2023 | 91 | MOTION to Quash *Subpoenas to Non-Party Legislators* by Robert Alexander Andrade, Melony Bell, David Borrero, Juan Fernandez-Barquin, Randy Fine, Randall Scott Maggard, Ralph Massullo, Stan McClain, Tobin Rogers Overdorf, Bobby Payne, Rick Roth, Jason Shoaf, Tyler Sirois, Keith Truenow. (Attachments: # 1 Exhibit subpoena, # 2 Exhibit correspondence, # 3 Exhibit proposed search terms) (XELMAN, DAVID) (Entered: 01/13/2023) |
| 01/17/2023 | | Set Deadline- Status Report due by **2/16/2023**. (rcb) (Entered: 01/17/2023) |
| 01/17/2023 | | Set/Reset Deadlines as to 91 MOTION to Quash *Subpoenas to Non-Party Legislators*. (Internal deadline for referral to judge if response not filed earlier: **1/31/2023)**. (rcb) (Entered: 01/17/2023) |
| 01/17/2023 | 92 | (Construed as a Motion to Amend)STIPULATION TO AMEND SCHEDULING AND MEDIATION ORDER. Modified to edit title on 1/18/2023 (rcb). (Entered: 01/17/2023) |
| 01/18/2023 | 93 | AMENDED SCHEDULING AND MEDIATION ORDER. The motion, ECF No. 92 , is GRANTED. Jury Trial set for **9/18/2023 08:15 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. Discovery due by **6/2/2023**. Dispositive Motions to be filed by **6/23/2023**. Mediation to take place by **6/30/2023**. Mediation Report due by **7/14/2023**. Signed by CHIEF JUDGE MARK E WALKER on 1/18/2023 (rcb) (Entered: 01/18/2023) |
| 01/23/2023 | 94 | MOTION to Appear Pro Hac Vice by Charles McLaurin.( Filing fee $ 208 receipt number AFLNDC-7651237.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (MCLAURIN, CHARLES) (Entered: 01/23/2023) |
| 01/24/2023 | 95 | ORDER ADMITTING CHARLES MCLAURIN PRO HAC VICE. The 94 motion is GRANTED. Mr. McLaurin has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 01/24/2023. (rcb)** (Appointed CHARLES EDWARD MCLAURIN for RUSSELL ALMOND,CHARLES EDWARD MCLAURIN for SHARON WRIGHT AUSTIN,CHARLES EDWARD MCLAURIN for DANA THOMPSON DORSEY,CHARLES EDWARD MCLAURIN for MARVIN |

| | | |
|---|---|---|
| | | DUNN, CHARLES EDWARD MCLAURIN for JENNIFER SANDOVAL)** (Entered: 01/24/2023) |
| 01/27/2023 | 96 | PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE LEGISLATORS' MOTION TO QUASH NON-PARTY SUBPOENAS. (Attachments: # 1 Exhibit Ex. 1 - Email Correspondence) (EDWARDS, JERRY) Modified to edit title on 1/30/2023 (rcb). (Entered: 01/27/2023) |
| 01/31/2023 | | Set Deadlines/Hearings Status Report due by **2/27/2023**. (rcb) (Entered: 01/31/2023) |
| 02/01/2023 | 97 | NOTICE *of Withdrawal as Counsel* by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL (SALOMAO NASCIMENTO, ISABELLA) (Entered: 02/01/2023) |
| 02/06/2023 | 98 | MOTION to Withdraw as Attorney *Lauren Johnson* by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (JOHNSON, LAUREN) (Entered: 02/06/2023) |
| 02/07/2023 | 99 | ORDER GRANTING 98 MOTION TO WITHDRAW AS COUNSEL. This motion is, therefore, GRANTED. The Clerk shall disconnect Ms. Johnson from CM/ECF in this matter. Signed by CHIEF JUDGE MARK E WALKER on 02/07/2023. (rcb) (Entered: 02/07/2023) |
| 02/22/2023 | 100 | ORDER GRANTING IN PART AND DENYING 91 MOTION TO QUASH. The Legislators' motion to quash, ECF No. 91 , is GRANTED in part and DENIED in part. The Legislators shall produce responsive documents subject to the limitations imposed by this Order on or before by **3/8/2023**. Signed by CHIEF JUDGE MARK E WALKER on 02/22/2023. (rcb) (Entered: 02/22/2023) |
| 02/23/2023 | 101 | ORDER of USCA #22-13992 as to 65 Notice of Appeal Appellants motions to exceed the word limitation in their motion to stay and in their replyand Appellees motions to exceed the word count in their opposition to the motion to stay areGRANTED. Appellants motions to extend the time to file their replies is GRANTED.On its own motion, this Court CONSOLIDATES Case Nos. 22-13992 and 22-13994. (rcb) (Entered: 02/23/2023) |
| 02/27/2023 | 102 | STATUS REPORT by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (MCNAMARA, CAROLINE) (Entered: 02/27/2023) |
| 02/28/2023 | | Set Deadline- Status Report due by **3/30/2023**. (rcb) (Entered: 02/28/2023) |
| 02/28/2023 | 103 | NOTICE of Appearance by DANIEL WILLIAM BELL on behalf of Robert Alexander Andrade, Melony Bell, David Borrero, Juan Fernandez-Barquin, Randy Fine, Randall Scott Maggard, Ralph Massullo, Stan McClain, Tobin Rogers Overdorf, Bobby Payne, Rick Roth, Jason Shoaf, Tyler Sirois, Keith Truenow (BELL, DANIEL) (Entered: 02/28/2023) |
| 02/28/2023 | 104 | NOTICE OF APPEAL as to 100 Order,, Set Deadlines/Hearings, by Robert Alexander Andrade, Melony Bell, David Borrero, Juan Fernandez-Barquin, Randy Fine, Randall Scott Maggard, Ralph Massullo, Stan McClain, Tobin Rogers Overdorf, Bobby Payne, Rick Roth, Jason Shoaf, Tyler Sirois, Keith Truenow. ( Filing fee $505 Receipt Number AFLNDC-7732191.) (BELL, DANIEL) (Entered: 02/28/2023) |
| 02/28/2023 | 105 | MOTION TO STAY DISCOVERY ORDER. (BELL, DANIEL) Modified to edit title on 3/1/2023 (rcb). (Entered: 02/28/2023) |

| | | |
|---|---|---|
| 03/01/2023 | | Set/Reset Deadlines as to 105 MOTION TO STAY DISCOVERY ORDER. (Internal deadline for referral to judge if response not filed earlier: **3/15/2023)**. (rcb) (Entered: 03/01/2023) |
| 03/01/2023 | | Set Deadlines re 65 Notice of Appeal. Clerk to check status of Appeal ##22-13992-J on **5/30/2023**. (rcb) (Entered: 03/01/2023) |
| 03/01/2023 | 106 | ORDER GRANTING 105 MOTION TO STAY. Accordingly, the motion, ECF No. 105 , is GRANTED, over Plaintiffs' objection. The Legislators' deadline to produce responsive documents pursuant to this Court's Order, ECF No. 100 , is STAYED pending resolution of the Legislators' appeal. Signed by CHIEF JUDGE MARK E WALKER on 03/01/2023. (rcb) (Entered: 03/01/2023) |
| 03/01/2023 | 107 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 104 Notice of Appeal. (rcb) (Entered: 03/01/2023) |
| 03/01/2023 | | Set Deadlines re 104 Notice of Appeal. Clerk to check status of Appeal on **5/30/2023**. Certificate of Readiness (FRAP 11) due by **3/15/2023**. (rcb) (Entered: 03/01/2023) |
| 03/07/2023 | 108 | ORDER of USCA #22-13992 as to 104 Notice of Appeal. Motion to withdraw as counsel filed by Lauren A. Johnson is GRANTED. (rcb)**No PDF attached to the USCA docket** (Entered: 03/13/2023) |
| 03/14/2023 | 109 | ELEVENTH CIRCUIT TRANSCRIPT ORDER FORM (BELL, DANIEL) Modified to edit title on 3/15/2023 (rcb). (Entered: 03/14/2023) |
| 03/16/2023 | 110 | STATUS REPORT \| *Joint Status Report and Motion to Further Amend Scheduling and Mediation Order* by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (Attachments: # 1 Text of Proposed Order) (LECKERMAN, JASON) (Entered: 03/16/2023) |
| 03/16/2023 | 111 | ORDER of USCA #22-13992 as to 104 Notice of Appeal. Appellants' motions to stay injunction pending appeal are DENIED. The Clerk is DIRECTED to treat any motion for reconsideration of this order as a nonemergency matter. (rcb) (Entered: 03/17/2023) |
| 03/17/2023 | | Set Deadline- Status Report due by **6/15/2023**. (rcb) (Entered: 03/17/2023) |
| 03/17/2023 | 112 | Pursuant to F.R.A.P. 11(c), ##22-13992 the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 104 Notice of Appeal. The entire record on appeal is available electronically. (rcb) (Entered: 03/17/2023) |
| 03/24/2023 | 113 | MOTION to Appear Pro Hac Vice by Emily "Emmy" Parsons.( Filing fee $ 208 receipt number AFLNDC-7783384.) by RUSSELL ALMOND, SHARON WRIGHT AUSTIN, JOHANA DAUPHIN, DANA THOMPSON DORSEY, MARVIN DUNN, SHELLEY PARK, LEROY PERNELL, JENNIFER SANDOVAL. (PARSONS, EMILY) (Entered: 03/24/2023) |
| 03/24/2023 | 114 | ORDER ADMITTING EMILY PARSONS PRO HAC VICE. The 113 motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 03/24/2023. (rcb) (Entered: 03/24/2023) |

| PACER Service Center |
|---|
| **Transaction Receipt** |
| 03/31/2023 16:31:03 |

| | | | |
|---|---|---|---|
| **PACER Login:** | reception | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:22-cv-00304-MW-MAF |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# B

Query Reports Utilities Help Log Out

STAYED,APPEAL

# U.S. District Court
# Northern District of Florida (Tallahassee)
# CIVIL DOCKET FOR CASE #: 4:22-cv-00324-MW-MAF

NOVOA et al v. DIAZ JR et al
Assigned to: CHIEF JUDGE MARK E WALKER
Referred to: MAGISTRATE JUDGE MARTIN A FITZPATRICK
Case in other court: USCA, 22-13994-J
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 09/06/2022
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**ADRIANA NOVOA**

represented by

**ADAM B STEINBAUGH**
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 WALNUT STREET
SUITE 1250
PHILADELPHIA, PA 19106
215-717-3473
Fax: 215-717-3440
Email: adam@thefire.org
*ATTORNEY TO BE NOTICED*

**GREG HAROLD GREUBEL**
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 WALNUT STREET
SUITE 1250
PHILADELPHIA, PA 19106
215-717-3473
Fax: 215-717-3440
Email: greg.greubel@thefire.org
*ATTORNEY TO BE NOTICED*

**JOSHUA TYLER MORRIS**
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 PENNSYLVANIA AVENUE SE
SUITE 340
WASHINGTON, DC 20003
215-717-3473
Email: jt.morris@thefire.org
*ATTORNEY TO BE NOTICED*

**GARY SCOTT EDINGER**
GARY S EDINGER & ASSOCIATES PA - GAINESVILLE FL
305 NE 1ST ST

GAINESVILLE, FL 32601
352-338-4440
Fax: 352-337-0696
Email: gsedinger12@gmail.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAMUEL RECHEK** represented by **ADAM B STEINBAUGH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GREG HAROLD GREUBEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOSHUA TYLER MORRIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GARY SCOTT EDINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA** represented by **ADAM B STEINBAUGH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GREG HAROLD GREUBEL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOSHUA TYLER MORRIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**GARY SCOTT EDINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MANNY DIAZ, JR**
*IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE FLORIDA STATE BOARD OF EDUCATION* represented by **CHARLES JUSTIN COOPER**
COOPER & KIRK PLLC - WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202-220-9600
Email: ccooper@cooperkirk.com
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**

COOPER & KIRK PLLC - WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202-220-9600
Email: johlendorf@cooperkirk.com
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
COOPER & KIRK PLLC - WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202-220-9621
Email: jramer@cooperkirk.com
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
COOPER & KIRK PLLC - WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202-220-9650
Email: mwold@cooperkirk.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**TIMOTHY M CERIO**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**RICHARD CORCORAN**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)

*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

__Defendant__

**AUBREY EDGE**
*IN HER OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

__Defendant__

**PATRICIA FROST**
*IN HER OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

__Defendant__

**NIMNA GABADAGE**
*IN HER OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**EDWARD HADDOCK**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KEN JONES**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DARLENE LUCCIO JORDAN**
*IN HER OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**BRIAN LAMB**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ALAN LEVINE**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHARLES H LYDECKER**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CRAIG MATEER**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEANNA MICHAEL**
*IN HER OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEVEN M SCOTT**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **ERIC SILAGY**<br>*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM* | represented by | **CHARLES JUSTIN COOPER**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D OHLENDORF**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D RAMER**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**MEGAN MARIE WOLD**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **KENT STERMON**<br>*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM* | represented by | **CHARLES JUSTIN COOPER**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D OHLENDORF**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D RAMER**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**MEGAN MARIE WOLD**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **JULIE LEFTHERIS**<br>*IN HER OFFICIAL CAPACITY AS THE INSPECTOR GENERAL OF THE FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM* | represented by | **CHARLES JUSTIN COOPER**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D OHLENDORF**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**JOHN D RAMER**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**MEGAN MARIE WOLD**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES** | represented by | **CHARLES JUSTIN COOPER**<br>(See above for address) |

*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TIMOTHY L BOAZ**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SANDRA CALLAHAN**
*IN HER OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL CARRERE**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**N ROGAN DONELLY**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL E GRIFFIN**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OSCAR HORTON**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)

*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**LAURAN MONBARREN**
*IN HER OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NITHIN PALYAM**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SHILEN PATEL**
*IN HER OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**University of South FREDRICK PICCOLO**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MELISSA SEIXAS**
*IN HER OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JENIFER JASINSKI SCHNEIDER**
*IN HER OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)

*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**University of South WILLIAM WEATHERFORD**
*IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES*

represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/06/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AFLNDC-7429126.), filed by SAMUEL RECHEK, ADRIANA NOVOA, FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA. (Attachments: # 1 Exhibit HB7, # 2 Exhibit Regulations, # 3 Civil Cover Sheet, # 4 Exhibit Summons - Levine, # 5 Exhibit Summons - Edge, # 6 Exhibit Summons - Lamb, # 7 Exhibit Summons - Lydecker, # 8 Exhibit Summons - Mateer, # 9 Exhibit Summons - Jordan, # 10 Exhibit Summons - Michael, # 11 Exhibit Summons - Haddock, # 12 Exhibit Summons - Silagy, # 13 Exhibit Summons - Piccolo, # 14 Exhibit Summons - Schneider, # 15 Exhibit Summons - Leftheris, # 16 Exhibit Summons - Jones, # 17 Exhibit Summons - Stermon, # 18 Exhibit Summons - Monbarren, # 19 Exhibit Summons - Diaz, # 20 Exhibit Summons - Seixas, # 21 Exhibit Summons - Carrere, # 22 Exhibit Summons - Griffin, # 23 Exhibit Summons - Donelly, # 24 Exhibit Summons - Gabadage, # 25 Exhibit Summons - Palyam, # 26 Exhibit Summons - Horton, # 27 Exhibit Summons - Frost, # 28 Exhibit Summons - Corcoran, # 29 Exhibit Summons - Callahan, # 30 Exhibit Summons - Patel, # 31 Exhibit Summons - Scott, # 32 Exhibit Summons - USF Trustees, # 33 Exhibit Summons - Boaz, # 34 Exhibit Summons - Cerio, # 35 Exhibit Summons - Weatherford) (EDINGER, GARY) (Entered: 09/06/2022) |
| 09/06/2022 | 2 | NOTICE *of Related Case* by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK (EDINGER, GARY) (Entered: 09/06/2022) |
| 09/06/2022 | 3 | NOTICE *of Compliance with Local Rule 24.1 (Serve Attorney General)* by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK (EDINGER, GARY) (Entered: 09/06/2022) |
| 09/07/2022 | 4 | MOTION to Appear Pro Hac Vice by Greg H. Greubel.( Filing fee $ 208 receipt number AFLNDC-7432245.) by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH |

| | | |
|---|---|---|
| | | FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK. (Attachments: # 1 Certificate of Good Standing) (GREUBEL, GREG) (Entered: 09/07/2022) |
| 09/07/2022 | 5 | MOTION to Appear Pro Hac Vice by Adam Steinbaugh.( Filing fee $ 208 receipt number AFLNDC-7432250.) by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK. (Attachments: # 1 Certificate of Good Standing) (STEINBAUGH, ADAM) (Entered: 09/07/2022) |
| 09/08/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 4 , 5 MOTION to Appear Pro Hac Vice by Adam Steinbaugh and Greg H. Greubel. Referred to MARTIN A FITZPATRICK. (kdm) (Entered: 09/08/2022) |
| 09/08/2022 | 6 | CIVIL COVER SHEET. (kdm) (Entered: 09/08/2022) |
| 09/08/2022 | 7 | Summons Issued as to CRAIG ATEER, TIMOTHY L BOAZ, SANDRA CALLAHAN, MICHAEL CARRERE, TIMOTHY M CERIO, RICHARD CORCORAN, N ROGAN DONELLY, Manny Diaz, Jr., AUBREY EDGE, PATRICIA FROST, MICHAEL E GRIFFIN, Nimna Gabadage, EDWARD HADDOCK, OSCAR HORTON, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, JULIE LEFTHERIS, ALAN LEVINE, CHARLES H LYDECKER, DEANNA MICHAEL, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, JENIFER JASINSKI SCHNEIDER, STEVEN M SCOTT, MELISSA SEIXAS, ERIC SILAGY, KENT STERMON, THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES, WILLIAM WEATHERFORD. (kdm) (Entered: 09/08/2022) |
| 09/08/2022 | 8 | MOTION to Appear Pro Hac Vice by JT Morris.( Filing fee $ 208 receipt number AFLNDC-7434717.) by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK. (Attachments: # 1 Certificate of Good Standing) (MORRIS, JOSHUA) (Entered: 09/08/2022) |
| 09/09/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 8 MOTION to Appear Pro Hac Vice by JT Morris. Referred to MARTIN A FITZPATRICK. (kdm) (Entered: 09/09/2022) |
| 09/09/2022 | 9 | WAIVER OF SERVICE Returned Executed by SAMUEL RECHEK, ADRIANA NOVOA, FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA. TIMOTHY M CERIO waiver sent on 9/9/2022, answer due 11/8/2022; RICHARD CORCORAN waiver sent on 9/9/2022, answer due 11/8/2022; AUBREY EDGE waiver sent on 9/9/2022, answer due 11/8/2022; PATRICIA FROST waiver sent on 9/9/2022, answer due 11/8/2022; NIMNA GABADAGE waiver sent on 9/9/2022, answer due 11/8/2022; EDWARD HADDOCK waiver sent on 9/9/2022, answer due 11/8/2022; KEN JONES waiver sent on 9/9/2022, answer due 11/8/2022; DARLENE LUCCIO JORDAN waiver sent on 9/9/2022, answer due 11/8/2022; BRIAN LAMB waiver sent on 9/9/2022, answer due 11/8/2022; JULIE LEFTHERIS waiver sent on 9/9/2022, answer due 11/8/2022; ALAN LEVINE waiver sent on 9/9/2022, answer due 11/8/2022; CHARLES H LYDECKER waiver sent on 9/9/2022, answer due 11/8/2022; CRAIG MATEER waiver sent on 9/9/2022, answer due 11/8/2022; DEANNA MICHAEL waiver sent on 9/9/2022, answer due 11/8/2022; STEVEN M SCOTT waiver sent on 9/9/2022, answer due 11/8/2022; ERIC SILAGY waiver sent on 9/9/2022, answer due 11/8/2022; KENT STERMON waiver sent on 9/9/2022, answer due 11/8/2022. (EDINGER, GARY) (Entered: 09/09/2022) |
| 09/09/2022 | 10 | ORDER. Accordingly, it is ORDERED that the motion for leave to appear pro hac vice, ECF No. 8 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 09/09/2022. (rcb) **J T MORRIS appointed as counsel for FIRST |

| | | |
|---|---|---|
| | | AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK** (Entered: 09/10/2022) |
| 09/09/2022 | 11 | ORDER. Accordingly, it is ORDERED that the motion for leave to appear pro hac vice, ECF No. 5 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 09/09/2022. (rcb) **ADAM B STEINBAUGH appointed as counsel for FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK** (Entered: 09/10/2022) |
| 09/09/2022 | 12 | ORDER. Accordingly, it is ORDERED that the motion for leave to appear pro hac vice, ECF No. 4 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 09/09/2022. (rcb) **GREG HAROLD GREUBEL appointed as counsel for FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK** (Entered: 09/10/2022) |
| 09/12/2022 | 13 | WAIVER OF SERVICE Returned Executed by SAMUEL RECHEK, ADRIANA NOVOA, FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA. MANNY DIAZ, JR waiver sent on 9/12/2022, answer due 11/14/2022. (EDINGER, GARY) (Entered: 09/12/2022) |
| 09/13/2022 | 14 | NOTICE of Appearance by CHARLES JUSTIN COOPER on behalf of TIMOTHY L BOAZ, SANDRA CALLAHAN, MICHAEL CARRERE, TIMOTHY M CERIO, RICHARD CORCORAN, MANNY DIAZ, JR, N ROGAN DONELLY, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, MICHAEL E GRIFFIN, EDWARD HADDOCK, OSCAR HORTON, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, JULIE LEFTHERIS, ALAN LEVINE, CHARLES H LYDECKER, CRAIG MATEER, DEANNA MICHAEL, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, JENIFER JASINSKI SCHNEIDER, STEVEN M SCOTT, MELISSA SEIXAS, ERIC SILAGY, KENT STERMON, THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES, WILLIAM WEATHERFORD (COOPER, CHARLES) (Entered: 09/13/2022) |
| 09/14/2022 | 15 | MOTION to Appear Pro Hac Vice by John D. Ohlendorf.( Filing fee $ 208 receipt number AFLNDC-7443285.) by TIMOTHY L BOAZ, SANDRA CALLAHAN, MICHAEL CARRERE, TIMOTHY M CERIO, RICHARD CORCORAN, MANNY DIAZ, JR, N ROGAN DONELLY, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, MICHAEL E GRIFFIN, EDWARD HADDOCK, OSCAR HORTON, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, JULIE LEFTHERIS, ALAN LEVINE, CHARLES H LYDECKER, CRAIG MATEER, DEANNA MICHAEL, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, JENIFER JASINSKI SCHNEIDER, STEVEN M SCOTT, MELISSA SEIXAS, ERIC SILAGY, KENT STERMON, THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES, WILLIAM WEATHERFORD. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (OHLENDORF, JOHN) (Entered: 09/14/2022) |
| 09/14/2022 | 16 | MOTION to Appear Pro Hac Vice by Megan M. Wold.( Filing fee $ 208 receipt number AFLNDC-7443306.) by TIMOTHY L BOAZ, SANDRA CALLAHAN, MICHAEL CARRERE, TIMOTHY M CERIO, RICHARD CORCORAN, MANNY DIAZ, JR, N ROGAN DONELLY, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, MICHAEL E GRIFFIN, EDWARD HADDOCK, OSCAR HORTON, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, JULIE LEFTHERIS, ALAN LEVINE, CHARLES H LYDECKER, CRAIG MATEER, DEANNA MICHAEL, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, JENIFER JASINSKI SCHNEIDER, STEVEN M SCOTT, MELISSA SEIXAS, ERIC SILAGY, KENT STERMON, THE UNIVERSITY OF SOUTH FLORIDA BOARD OF |

| | | |
|---|---|---|
| | | TRUSTEES, WILLIAM WEATHERFORD. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (WOLD, MEGAN) (Entered: 09/14/2022) |
| 09/14/2022 | 17 | MOTION to Appear Pro Hac Vice by John D. Ramer.( Filing fee $ 208 receipt number AFLNDC-7443333.) by TIMOTHY L BOAZ, SANDRA CALLAHAN, MICHAEL CARRERE, TIMOTHY M CERIO, RICHARD CORCORAN, MANNY DIAZ, JR, N ROGAN DONELLY, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, MICHAEL E GRIFFIN, EDWARD HADDOCK, OSCAR HORTON, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, JULIE LEFTHERIS, ALAN LEVINE, CHARLES H LYDECKER, CRAIG MATEER, DEANNA MICHAEL, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, JENIFER JASINSKI SCHNEIDER, STEVEN M SCOTT, MELISSA SEIXAS, ERIC SILAGY, KENT STERMON, THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES, WILLIAM WEATHERFORD. (Attachments: # 1 Exhibit A - Certificate of Good Standing) (RAMER, JOHN) (Entered: 09/14/2022) |
| 09/15/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 15 MOTION to Appear Pro Hac Vice by John D. Ohlendorf.( Filing fee $ 208 receipt number AFLNDC-7443285.), 16 MOTION to Appear Pro Hac Vice by Megan M. Wold.( Filing fee $ 208 receipt number AFLNDC-7443306.), 17 MOTION to Appear Pro Hac Vice by John D. Ramer.( Filing fee $ 208 receipt number AFLNDC-7443333.). Referred to MARTIN A FITZPATRICK. (sjb) (Entered: 09/15/2022) |
| 09/15/2022 | 18 | ORDER FOR REASSIGNMENT. Signed by JUDGE ALLEN C WINSOR on 9/15/2022. Because this case and Pernell raise the same issue and challenge the same provision, I direct that this case be reassigned to the judge presiding over the earlier-filed case, Case No. 4:22-cv-304-MW. (kdm) (Entered: 09/15/2022) |
| 09/15/2022 | | CHIEF JUDGE MARK E WALKER added. JUDGE ALLEN C WINSOR no longer assigned to case - per 18 ORDER FOR REASSIGNMENT. (kdm) (Entered: 09/15/2022) |
| 09/15/2022 | 19 | MOTION for Preliminary Injunction *and Supporting Memorandum of Law* by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK. (Attachments: # 1 Affidavit Declaration of Adam Steinbaugh, # 2 Exhibit 1 to Declaration of Adam Steinbaugh, # 3 Exhibit 2 to Declaration of Adam Steinbaugh, # 4 Exhibit 3 to Declaration of Adam Steinbaugh, # 5 Exhibit 4 to Declaration of Adam Steinbaugh, # 6 Exhibit 5 to Declaration of Adam Steinbaugh, # 7 Exhibit 6 to Declaration of Adam Steinbaugh, # 8 Exhibit 7 to Declaration of Adam Steinbaugh, # 9 Exhibit 8 to Declaration of Adam Steinbaugh, # 10 Exhibit 9 to Declaration of Adam Steinbaugh, # 11 Exhibit 10 to Declaration of Adam Steinbaugh, # 12 Exhibit 11 to Declaration of Adam Steinbaugh, # 13 Exhibit 12 to Declaration of Adam Steinbaugh, # 14 Exhibit 13 to Declaration of Adam Steinbaugh, # 15 Exhibit 14 to Declaration of Adam Steinbaugh, # 16 Exhibit 15 to Declaration of Adam Steinbaugh, # 17 Exhibit 16 to Declaration of Adam Steinbaugh, # 18 Exhibit 17 to Declaration of Adam Steinbaugh, # 19 Exhibit 18 to Declaration of Adam Steinbaugh, # 20 Exhibit 19 to Declaration of Adam Steinbaugh, # 21 Exhibit 20 to Declaration of Adam Steinbaugh, # 22 Exhibit 21 to Declaration of Adam Steinbaugh, # 23 Exhibit 22 to Declaration of Adam Steinbaugh, # 24 Exhibit 23 to Declaration of Adam Steinbaugh, # 25 Exhibit 24 to Declaration of Adam Steinbaugh, # 26 Exhibit 25 to Declaration of Adam Steinbaugh, # 27 Exhibit 26 to Declaration of Adam Steinbaugh, # 28 Exhibit 27 to Declaration of Adam Steinbaugh, # 29 Exhibit 28 to Declaration of Adam Steinbaugh, # 30 Exhibit 29 to Declaration of Adam Steinbaugh, # 31 Affidavit Declaration of Adriana Novoa, # 32 Exhibit A to Declaration of Adriana Novoa, # 33 Exhibit B to Declaration of Adriana Novoa, # 34 Exhibit C to Declaration of Adriana Novoa, # 35 Exhibit D to Declaration of Adriana Novoa, # 36 Exhibit E to Declaration of Adriana Novoa, # 37 Exhibit F to |

| | | |
|---|---|---|
| | | Declaration of Adriana Novoa, # 38 Text of Proposed Order)(GREUBEL, GREG) (Entered: 09/15/2022) |
| 09/15/2022 | 20 | NOTICE TO PARTIES - Accordingly, this Court provides notice that no action will be taken on Plaintiffs' preliminary injunction demand until it is made by separate motion with the required legal argument. Signed by CHIEF JUDGE MARK E WALKER on 9/15/22. (sjb) (Entered: 09/16/2022) |
| 09/15/2022 | 21 | ORDER ADMITTING JOHN D. OHLENDORF PRO HAC VICE - The 15 motion is GRANTED. Mr. Ohlendorf has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Defendants. Signed by CHIEF JUDGE MARK E WALKER on 9/15/22. (sjb) (Entered: 09/16/2022) |
| 09/15/2022 | 22 | ORDER ADMITTING JOHN D. RAMER PRO HAC VICE - The 17 motion is GRANTED. Mr. Ramer has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Defendants. Signed by CHIEF JUDGE MARK E WALKER on 9/15/22. (sjb) (Entered: 09/16/2022) |
| 09/15/2022 | 23 | ORDER ADMITTING MEGAN M. WOLD PRO HAC VICE - The 16 motion is GRANTED. Ms. Wold has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Defendants. Signed by CHIEF JUDGE MARK E WALKER on 9/15/22. (sjb) (Entered: 09/16/2022) |
| 09/16/2022 | 24 | ORDER SETTING CONFERENCE SCHEDULE - The Clerk shall set this matter for a telephonic scheduling conference on Wednesday, September 21, at 11:00 a.m. (ET). If this time does not work for the parties, this Court can reset the scheduling conference for another time next weekhowever, this conference must occur before the end of the day on Friday, September 23, 2022. Signed by CHIEF JUDGE MARK E WALKER on 9/16/22. (sjb) (Entered: 09/16/2022) |
| 09/16/2022 | | Set Deadlines/Hearings Scheduling Conference set for **9/21/2022 11:00 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. (sjb) (Entered: 09/16/2022) |
| 09/16/2022 | 25 | DOCKET ANNOTATION BY COURT: 4 USB drives containing Exhibits 12-15 from 19 Motion received in TLH; They are being stored in the back at the Tallahassee Office. (sjb) (Entered: 09/16/2022) |
| 09/16/2022 | 26 | NOTICE OF TELEPHONIC HEARING: Telephonic Scheduling Conference set for **9/21/2022 11:00 AM** before CHIEF JUDGE MARK E WALKER.<br><br>ALL PARTIES are directed to call the AT&T Conference Line (see below)<br><br>Conference Call Information<br><br>You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is comprised by these devices.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 09/16/2022) |
| 09/21/2022 | 27 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 9/21/2022. Parties discuss case status and |

| | | |
|---|---|---|
| | | schedule for 19 Motion for Preliminary Injunction hearing. Parties will keep the existing schedule for the 12 Motion in 4:22cv304. The schedule in 4:22cv324 is as follows: Defendants' response to 19 Motion, motion to dismiss (for issues pertaining to 12 & 19 Motions) and counter witness declarations due **9/30/2022**. Plaintiffs' reply to 19 Motion, response to motion dismiss and rebuttal declarations are due **10/7/2022**. Preliminary injunction hearing for both cases set for 9:00 am on 10/13/22. Order to follow (Court Reporter Megan Hague (USDC-Tallahassee)). (vkm) (Entered: 09/21/2022) |
| 09/21/2022 | 28 | NOTICE OF HEARING RE: 19 MOTION for Preliminary Injunction: Preliminary Injunction Hearing set for **10/13/2022 09:00 AM** before CHIEF JUDGE MARK E WALKER. United States Courthouse, **Courtroom 5 West,** 111 North Adams St., Tallahassee, Florida 32301.<br><br>NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as, a hearing impairment that requires a sign language interpreter or a wheelchair restriction that requires ramp access, please contact Victoria Milton McGee at 850-521-3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 09/21/2022) |
| 09/21/2022 | 29 | ORDER SETTING HEARING ON 19 MOTION FOR PRELIMINARY INJUNCTION AND OTHER DEADLINES. The hearing on Plaintiffs' motion for preliminary injunction is set for Thursday, **10/13/2022 09:00 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER, at 9:00 a.m. (ET). Defendants motion to dismiss pertaining to issues implicating the motion for preliminary injunction, response to Plaintiffs motion for preliminary injunction, and any declarations in support of their response, are due on or before **9/30/2022**. Plaintiffs' response to Defendant's motion to dismiss, reply in support of their preliminary injunction motion, and any rebuttal declarations are due on or before **10/7/2022**. Signed by CHIEF JUDGE MARK E WALKER on 09/21/2022. (rcb) (Entered: 09/21/2022) |
| 09/23/2022 | 30 | SUMMONS Returned Executed by SAMUEL RECHEK, ADRIANA NOVOA, FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA. TIMOTHY L BOAZ served on 9/21/2022, answer due 10/12/2022; SANDRA CALLAHAN served on 9/21/2022, answer due 10/12/2022; MICHAEL CARRERE served on 9/21/2022, answer due 10/12/2022; N ROGAN DONELLY served on 9/21/2022, answer due 10/12/2022; MICHAEL E GRIFFIN served on 9/21/2022, answer due 10/12/2022; OSCAR HORTON served on 9/21/2022, answer due 10/12/2022; LAURAN MONBARREN served on 9/21/2022, answer due 10/12/2022; NITHIN PALYAM served on 9/21/2022, answer due 10/12/2022; SHILEN PATEL served on 9/21/2022, answer due 10/12/2022; FREDRICK PICCOLO served on 9/21/2022, answer due 10/12/2022; JENIFER JASINSKI SCHNEIDER served on 9/21/2022, answer due 10/12/2022; MELISSA SEIXAS served on 9/21/2022, answer due 10/12/2022; THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES served on 9/21/2022, answer due 10/12/2022; WILLIAM WEATHERFORD served on 9/21/2022, answer due 10/12/2022. (EDINGER, GARY) (Entered: 09/23/2022) |
| 09/26/2022 | 31 | Corporate Disclosure Statement/Certificate of Interested Persons by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK. (GREUBEL, GREG) (Entered: 09/26/2022) |
| 09/27/2022 | 32 | DOCKET ANNOTATION BY COURT: Re 14 Notice of Appearance. (rcb)**ISO PLACED IN JUDGE WALKER'S REFERRAL FOLDER** (Entered: 09/27/2022) |

| | | |
|---|---|---|
| 09/30/2022 | 33 | MOTION to Dismiss by TIMOTHY L BOAZ, SANDRA CALLAHAN, MICHAEL CARRERE, TIMOTHY M CERIO, RICHARD CORCORAN, MANNY DIAZ, JR, N ROGAN DONELLY, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, MICHAEL E GRIFFIN, EDWARD HADDOCK, OSCAR HORTON, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, JULIE LEFTHERIS, ALAN LEVINE, CHARLES H LYDECKER, CRAIG MATEER, DEANNA MICHAEL, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, JENIFER JASINSKI SCHNEIDER, STEVEN M SCOTT, MELISSA SEIXAS, ERIC SILAGY, KENT STERMON, THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES, WILLIAM WEATHERFORD. (Internal deadline for referral to judge if response not filed earlier: **10/14/2022**). (Attachments: # 1 Memorandum in Support) (COOPER, CHARLES) (Entered: 09/30/2022) |
| 09/30/2022 | 34 | MEMORANDUM in Opposition re 19 MOTION for Preliminary Injunction *and Supporting Memorandum of Law* , RESPONSE in Opposition filed by TIMOTHY L BOAZ, SANDRA CALLAHAN, MICHAEL CARRERE, TIMOTHY M CERIO, RICHARD CORCORAN, MANNY DIAZ, JR, N ROGAN DONELLY, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, MICHAEL E GRIFFIN, EDWARD HADDOCK, OSCAR HORTON, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, JULIE LEFTHERIS, ALAN LEVINE, CHARLES H LYDECKER, CRAIG MATEER, DEANNA MICHAEL, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, JENIFER JASINSKI SCHNEIDER, STEVEN M SCOTT, MELISSA SEIXAS, ERIC SILAGY, KENT STERMON, THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES, WILLIAM WEATHERFORD. (COOPER, CHARLES) (Entered: 09/30/2022) |
| 10/05/2022 | 35 | INITIAL SCHEDULING ORDER. Fed.R.Civ.P. 7.1 Corporate Disclosure Statement Deadline set for **10/19 /2022**. Rule 26 Meeting Report due by **11/18/2022**. Discovery due by **1/25/2023**. Status Report due by **11/4/2022**. Signed by CHIEF JUDGE MARK E WALKER on 10/05/2022. (rcb) (Entered: 10/05/2022) |
| 10/06/2022 | 36 | MOTION for Leave to File Excess Pages by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK. (STEINBAUGH, ADAM) (Entered: 10/06/2022) |
| 10/06/2022 | 37 | ORDER GRANTING LEAVE TO EXCEED WORD LIMIT. Plaintiffs' motion, ECF No. 36 , is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 10/06/2022. (rcb) (Entered: 10/06/2022) |
| 10/07/2022 | 38 | RESPONSE in Opposition re 33 MOTION to Dismiss filed by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK. (Attachments: # 1 Text of Proposed Order) (GREUBEL, GREG) (Entered: 10/07/2022) |
| 10/07/2022 | 39 | REPLY to Response to Motion re 19 MOTION for Preliminary Injunction *and Supporting Memorandum of Law* filed by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK. (GREUBEL, GREG) (Entered: 10/07/2022) |
| 10/13/2022 | 40 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER:Motion Hearing held on 10/13/2022. Court hears argument regarding Plaintiffs' 19 Motion for Preliminary Injunction and Defendants' 33 Motion to Dismiss. Order to follow (Court Reporter Megan Hague (USDC-Tallahassee)). (vkm) (Entered: 10/13/2022) |
| 10/14/2022 | 41 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Preliminary Injunction Proceeding held on 10/13/2022, before Judge Mark E. Walker. Court Reporter/Transcriber Megan A. Hague, Telephone number 850-443-9797. |

| | | |
|---|---|---|
| | | *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* <br><br> Redaction Request due **10/21/2022**. Release of Transcript Restriction set for **1/19/2023**. (mah) (Entered: 10/14/2022) |
| 11/04/2022 | 42 | JOINT STATUS REPORT ON DISCOVERY. (GREUBEL, GREG) Modified to edit title on 11/7/2022 (rcb). (Entered: 11/04/2022) |
| 11/07/2022 | | Set Deadline- Status Report due by **12/7/2022**. (rcb) (Entered: 11/07/2022) |
| 11/10/2022 | 43 | Joint Report of Rule 26(f) Conference. (GREUBEL, GREG) Modified to edit title on 11/14/2022 (rcb). (Entered: 11/10/2022) |
| 11/15/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 43 Joint Report of Rule 26(f) Conference (rcb) (Entered: 11/15/2022) |
| 11/17/2022 | 44 | ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR PRELIMINARY INJUNCTION. The Pernell Plaintiffs' motion for a preliminary injunction, ECF No. 12, in Case No.: 4:22cv304-MW/MAF, is GRANTED in part. Defendants Manny Diaz, Jr.; Brian Lamb; Eric Silagy; Timothy M. Cerio; Richard Corcoran; Aubrey Edge; Patricia Frost; Nimna Gabadage; Edward Haddock; Ken Jones; Darlene Luccio Jordan; Alan Levine; Charles H. Lydecker; Craig Mateer; Steven M. Scott; Deanna Michael; and Kent Stermon-all in their official capacities as members of the Florida Board of Governors of the State University System-must take no steps to enforce the following until otherwise ordered: a. Sections 1000.05(4)(a)(b), Florida Statutes; and b. the Board of Governors's Regulation 10.005(2)(3) and (4)(d). The preliminary injunction binds the above-listed Defendants and their officers, agents, servants, employees, and attorneys-and others in active concert or participation with any of them-who receive actual notice of this injunction by personal service or otherwise. The motion, ECF No. 12, in Case No.: 4:22cv304-MW/MAF is otherwise DENIED in part as to Defendants the University of Florida Board of Trustees; the University of South Florida Board of Trustees; the Florida International University Board of Trustees; the Florida A&M University Board of Trustees; the Florida State University Board of Trustees; and the University of Central Florida Board of Trustees. The Novoa Plaintiffs' motion for a preliminary injunction, ECF No. 19 , in Case No.: 4:22cv324-MW/MAF, is GRANTED in part. Defendants Manny Diaz, Jr.; Brian Lamb; Eric Silagy; Timothy M. Cerio; Richard Corcoran; Aubrey Edge; Patricia Frost; Nimna Gabadage; Edward Haddock; Ken Jones; Darlene Luccio Jordan; Alan Levine; Charles H. Lydecker; Craig Mateer; Deanna Michael; Steven M. Scott; and Kent Stermon-all in their official capacities as members of the Florida Board of Governors of the State University System-must take no steps to enforce the following until otherwise ordered: a. Sections 1000.05(4)(a)1.3., 5., and 7., Florida Statutes, and Section 1000.05(4)(b), Florida Statutes as to those concepts; b. the Board of Governors's Regulation 10.005(2)(3) and (4)(d) as to the first, second, third, fifth, and seventh concepts listed in Regulation 10.005(1)(a)1.3., 5., and 7. Defendants Timothy L. Boaz; Sandra Callahan; Michael Carrere; N. Rogan Donelly; Michael E. Griffin; Oscar Horton; Lauran Monbarren; Nithin Palyam; Shilen Patel; Fredrick Piccolo; Melissa Seixas; Jenifer Jasinski Schneider; and William Weatherford-all in their official capacities as members of the University of South Florida Board of Trustees-must take no steps to comply with the following until otherwise ordered: a. Sections 1000.05(4)(a)1.3., 5., and 7., Florida Statutes, and Section 1000.05(4)(b), Florida Statutes as to those concepts; b. the Board of Governors's Regulation 10.005(2)(3) as to the first, second, third, fifth, and seventh concepts listed in Regulation 10.005(1)(a)1.3., 5., and 7. The preliminary injunction binds |

| | | |
|---|---|---|
| | | the above-listed Defendants and their officers, agents, servants, employees, and attorneys-and others in active concert or participation with any of them-who receive actual notice of this injunction by personal service or otherwise. The motion, ECF No. 19 , in Case No.: 4:22cv324-MW/MAF, is otherwise DENIED in part as to: a. Defendants the Florida Board of Governors of the State University System; the University of South Florida Board of Trustees; and Julie Leftheris in her official capacity as the Inspector General of the Board of Governors; and b. The remaining Defendants' enforcement of or compliance with: i. Sections 1000.05(4)(a)4., 6., and 8., Florida Statutes; ii. the Board of Governors's Regulation 10.005 as to the fourth, sixth, and eighth concepts listed in Regulation 10.005(1)(a)4., 6., and 8. Signed by CHIEF JUDGE MARK E WALKER on 11/17/2022. (kjw) (Entered: 11/17/2022) |
| 11/22/2022 | 45 | ORDER ON 33 MOTION TO DISMISS. Defendants' motion is GRANTED in part and DENIED in part. Accordingly, Count Seven is DISMISSED as barred by the Eleventh Amendmentbut even if Count Seven was not barred by the Eleventh Amendment, this Court would decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(1). Similarly, Plaintiffs' claims against the University of South Florida Board of Trustees, as an entity, are DISMISSED as barred by the Eleventh Amendment. Plaintiffs' remaining official-capacity claims may proceed. (rcb) Modified to edit language on 11/28/2022 (rcb). (Entered: 11/22/2022) |
| 11/29/2022 | 46 | NOTICE OF APPEAL as to 44 Order on Motion for Preliminary Injunction,,,,,,,,,,,,,, by TIMOTHY L BOAZ, SANDRA CALLAHAN, MICHAEL CARRERE, TIMOTHY M CERIO, RICHARD CORCORAN, MANNY DIAZ, JR, N ROGAN DONELLY, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, MICHAEL E GRIFFIN, EDWARD HADDOCK, OSCAR HORTON, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, ALAN LEVINE, CHARLES H LYDECKER, CRAIG MATEER, DEANNA MICHAEL, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, JENIFER JASINSKI SCHNEIDER, STEVEN M SCOTT, MELISSA SEIXAS, ERIC SILAGY, KENT STERMON, WILLIAM WEATHERFORD. ( Filing fee $505 Receipt Number AFLNDC-7578130.) (COOPER, CHARLES) (Entered: 11/29/2022) |
| 11/30/2022 | 47 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 46 Notice of Appeal. (rcb) (Entered: 11/30/2022) |
| 11/30/2022 | | Set Deadlines re 46 Notice of Appeal. Clerk to check status of Appeal on **2/28/2023**. Certificate of Readiness (FRAP 11) due by **12/14/2022**. (rcb) (Entered: 11/30/2022) |
| 12/05/2022 | 48 | STATUS REPORT *on Discovery* by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK. (GREUBEL, GREG) (Entered: 12/05/2022) |
| 12/06/2022 | | Set Deadline- Status Report due by **1/6/2023**. (rcb) (Entered: 12/06/2022) |
| 12/06/2022 | 49 | USCA Acknowledgment # 22-13994-J 46 Notice of Appeal. (rcb) (Entered: 12/08/2022) |
| 12/13/2022 | 50 | ELEVENTH CIRCUIT TRANSCRIPT ORDER FORM-ALL TRANSCRIPTS ALL NECESSARY TRANSCRIPTS ALREADY ON FILE (OHLENDORF, JOHN) Modified to edit title on 12/14/2022 (rcb). (Entered: 12/13/2022) |
| 12/14/2022 | 52 | ORDER of USCA #22-13994 as to 46 Notice of Appeal. Motion for extension to file response to motion filed by Appellees Adriana Novoa, Samuel Rechek and First Amendment Forum at University of South Florida is GRANTED by clerk 10 . (rcb)***PDF NOT AVAILABLE ON THE USCA WEBSITE** (Entered: 12/20/2022) |
| 12/20/2022 | 51 | Pursuant to F.R.A.P. 11(c), #22-13994-J the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 46 |

| | | |
|---|---|---|
| | | Notice of Appeal. The entire record on appeal is available electronically. (rcb) (Entered: 12/20/2022) |
| 01/03/2023 | 53 | Joint MOTION to Stay All Proceedings Pending Appeal by TIMOTHY L BOAZ, SANDRA CALLAHAN, MICHAEL CARRERE, TIMOTHY M CERIO, RICHARD CORCORAN, MANNY DIAZ, JR, N ROGAN DONELLY, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, MICHAEL E GRIFFIN, EDWARD HADDOCK, OSCAR HORTON, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, JULIE LEFTHERIS, ALAN LEVINE, CHARLES H LYDECKER, CRAIG MATEER, DEANNA MICHAEL, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, JENIFER JASINSKI SCHNEIDER, STEVEN M SCOTT, MELISSA SEIXAS, ERIC SILAGY, KENT STERMON, WILLIAM WEATHERFORD. (OHLENDORF, JOHN) Modified title on 1/3/2023 (amm). (Entered: 01/03/2023) |
| 01/04/2023 | 54 | STATUS REPORT *on Discovery* by FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, ADRIANA NOVOA, SAMUEL RECHEK. (GREUBEL, GREG) (Entered: 01/04/2023) |
| 01/04/2023 | 55 | ORDER GRANTING JOINT MOTION TO STAY PROCEEDINGS 53 : All proceedings in this case are STAYED pending resolution of Defendants' appeal. Signed by CHIEF JUDGE MARK E WALKER on 1/4/2023. (amm) (Entered: 01/04/2023) |
| 02/23/2023 | 56 | ORDER of USCA #22-13992 as to 46 Notice of Appeal. (rcb) (Entered: 02/28/2023) |
| 03/03/2023 | | Set Deadlines re 46 Notice of Appeal. Clerk to check status of Appeal # 22-13992 on **6/1/2023**. (rcb) (Entered: 03/03/2023) |

---

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 03/31/2023 16:28:34 | | | |
| **PACER Login:** | reception | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:22-cv-00324-MW-MAF |
| **Billable Pages:** | 27 | **Cost:** | 2.70 |

1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

LEROY PERNELL, DANA THOMPSON DORSEY, SHARON AUSTIN, SHELLEY PARK, JENNIFER SANDOVAL, RUSSELL ALMOND, MARVIN DUNN, and JOHANA DAUPHIN,

*Plaintiffs*,

v.

Case No.: 4:22-cv-304

FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM, BRIAN LAMB, ERIC SILAGY, TIMOTHY M. CERIO, RICHARD CORCORAN, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, EDWARD HADDOCK, KEN JONES, DARLENE LUCCIO JORDAN, ALAN LEVINE, CHARLES H. LYDECKER, CRAIG MATEER, STEVEN M. SCOTT, WILLIAM SELF, AND KENT STERMON, in their official capacities as members of the Florida Board of Governors of the State University System, MANNY DIAZ JR., in his official capacity as the Commissioner of the Florida State Board of Education, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES, FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES, FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES, FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, and UNIVERSITY OF CENTRAL FLORIDA BOARD OF TRUSTEES,

*Defendants*.

## VERIFIED COMPLAINT

Plaintiffs LeRoy Pernell, Dana Thompson Dorsey, Sharon Austin, Marvin Dunn, Shelley Park, Jennifer Sandoval, Russell Almond, and Johana Dauphin, (collectively, "Plaintiffs"), by their undersigned counsel, bring this action against the Florida Board of Governors of the State University System; Brian Lamb, Eric Silagy, Timothy M. Cerio, Richard Corcoran, Aubrey Edge, Patricia Frost, Nimna Gabadage, Edward Haddock, Ken Jones, Darlene Luccio Jordan, Alan Levine, Charles H. Lydecker, Craig Mateer, Steven M. Scott, William Self, and Kent Stermon, in their official capacities as members of the Florida Board of Governors of the State University System; Manny Diaz Jr., in his official capacity as the Commissioner of the Florida State Board of Education; the University of Florida Board of Trustees; the University of South Florida Board of Trustees; the Florida International University Board of Trustees; the Florida A&M University Board of Trustees; the Florida State University Board of Trustees; and the University of Central Florida Board of Trustees (collectively, "Defendants"). For their Complaint against Defendants, Plaintiffs allege as follows:

## I. INTRODUCTION

1. Instructors and students at Florida colleges and universities bring this challenge to House Bill 7 ("H.B. 7"), known as the Stop Wrongs Against Our Kids and Employees ("Stop W.O.K.E.") Act (hereinafter the "Stop W.O.K.E. Act"),

which prohibits instructors and students from expressing viewpoints disfavored by the Florida legislature on a range of topics, including systemic racism and sexism.

2. The Stop W.O.K.E. Act is racially motivated censorship that the Florida legislature enacted, in significant part, to stifle widespread demands to discuss, study, and address systemic inequalities, following the nationwide protests that provoked discussions about race and racism in the aftermath of the murder of George Floyd.

3. As the United States Supreme Court has recognized, "No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). This is especially "true in the social sciences"—the area of scholarship most directly impacted by the Act—"where few, if any, principles are accepted as absolutes." *Id.* Thus, it is imperative that students and instructors alike "always remain free to inquire, to study, and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.*

4. Rather than allow these important issues to be debated and explored in public discourse, the Florida legislature—spurred on by Governor Ronald DeSantis—has endeavored to impose its own viewpoints in public higher

education. By enacting the Stop W.O.K.E. Act, the legislature sought to cut these discussions off by inaccurately defining certain viewpoints that it disfavors as discriminatory under the Florida Education Equity Act, Fla. Stat. § 1000.05. The Stop W.O.K.E Act allows for those viewpoints to be denounced—as they have been by leading state officials—while prohibiting those very same viewpoints from being supported. Not only does the law prohibit instructors from teaching the legislature's disfavored viewpoints in the manner dictated by their disciplines, but its vague terms generate uncertainty about when and how the law will apply, thus creating an even greater chilling effect on academic expression.

5. The Stop W.O.K.E. Act's title makes no attempt to hide its unconstitutional purpose. "Woke" speech is defined as "alert to racial or social discrimination or injustice,"[1] and has been characterized by the legislature as speech concerned with civil rights, "privilege" and "oppression," and even more broadly, "systemic racism."[2] Governor DeSantis claimed that the Act was necessary to create a "woke-free state of Florida."[3] The Act's proponents also

---

[1] *Woke*, Oxford English Dictionary (3d ed. 2017).

[2] *See, e.g.*, *2/1/22 House State Affairs Committee* at 01:02:00—01:02:29.070, (Feb. 1, 2022), https://thefloridachannel.org/videos/2-1-22-house-state-affairs-committee.

[3] Press Release, Gov. Ron DeSantis, *Gov. DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations.

singled out certain topics to be excluded from the classroom, including Critical Race Theory,[4] a recognized academic theory and body of legal scholarship originated by legal scholars in the 1970s to identify and challenge the perpetuation of racial inequalities in social institutions and the law;[5] the 1619 Project,[6] a critically-acclaimed, award-winning journalistic work about the legacy of slavery in America; the pervasiveness of white privilege; and the goals of anti-racism.[7]

6. To further signal their disapproval of "woke" speech, the Stop W.O.K.E. Act imposes harsh penalties, up to and including withholding of funding for state colleges and universities, allowing for enforcement by both state officials and private individuals against instructors who teach the viewpoints disfavored by the legislature.

7. The Stop W.O.K.E. Act casts a pall over higher education in Florida. In place of free and open academic inquiry and debate, instructors fear teaching

---

[4] *See, e.g.*, Press Release, Gov. Ron DeSantis, *Gov. Ron DeSantis Signs Legislation to Protect Floridians from Discrimination and Woke Indoctrination* (Apr. 22, 2022), https://www.flgov.com/2022/04/22/governor-ron-desantis-signs-legislation-to-protect-floridians-from-discrimination-and-woke-indoctrination/.

[5] *Race, Reform & Retrenchment Revisited: Can States Ban Learning About Our Full History?* AFRICAN AM. POLICY FORUM (Feb. 2, 2022), https://www.americanbar.org/content/dam/aba/administrative/crsj/webinar/february-2022/aapf-crt-resources-feb2022.pdf.

[6] Dec. 15, 2021 Press Release, Gov. Ron DeSantis, *supra* n.3; *The 1619 Project*, NEW YORK TIMES MAGAZINE, https://www.nytimes.com/interactive/2019/08/14/magazine/1619-america-slavery.html (last visited Aug. 17, 2022).

[7] *2/1/22 House State Affairs Committee* at 00:53:59, *supra* n.2.

topics of oppression, privilege, and race and gender inequalities with which the legislature disagrees and feel compelled to curtail their course offerings and classroom discussions to avoid punishment. The Stop W.O.K.E. Act explicitly threatens race and gender-based speech, impacting a wide array of courses, in the humanities and beyond. As a result, students are either denied access to knowledge altogether or receive incomplete or inaccurate information from instructors that is steered toward the legislature's own views. These restrictions are particularly invidious because they target instructors and students from marginalized communities, especially Black instructors and students.

8. Not surprisingly, in the wake of the Act's passage, universities across the State of Florida took down public-facing statements that espoused anti-racist principles and canceled anti-racist trainings, creating a climate of increased racial hostility and harassment on campus by stigmatizing racial justice and its proponents and generating fear among Plaintiffs and other Black instructors and students who teach or take coursework in which the viewpoints disfavored by the legislature are likely to be discussed. Moreover, the law's vague terms and private enforcement mechanism chill speech and expression, including by narrowing campus discourse and gutting academic freedom; encourage a culture of surveillance to watch, scrutinize, and submit complaints for every act of instruction

that references viewpoints disfavored by the legislature; and invite arbitrary and discriminatory enforcement against these same instructors.

9. The Stop W.O.K.E. Act therefore violates a number of core provisions of the United States Constitution. It unconstitutionally abridges First Amendment freedoms by imposing viewpoint-based restrictions on the speech of instructors and the receipt of information by students in college classrooms. It violates the Due Process Clause's prohibition against vagueness because it is difficult, if not impossible, for instructors to determine what is, and is not, prohibited by its terms. And it violates the Equal Protection Clause because it was enacted with the intent to discriminate against Black instructors and students and those who align with them. For each of these reasons, the Stop W.O.K.E. Act should be declared unconstitutional and enjoined.

## II. PARTIES

### A. Plaintiffs

10. Plaintiff LeRoy Pernell is a Black man and a Professor of Law at Florida A&M University College of Law ("FAMU Law"), a law school at a historically Black university. He teaches primarily in the areas of criminal procedure, torts, juvenile law, and race and the law. Dr. Pernell previously served as Dean of FAMU law.

11. This fall, Dr. Pernell will teach Constitutional Law II and Torts at FAMU Law. In the spring semester of 2023, he will likely teach Criminal Procedure: Pre-Trial Procedure, as well as Advanced Topics in Criminal Procedure: The Role of Race in Criminal Procedure. In each course, Dr. Pernell instructs on topics related to race and racial disparities.

12. Dr. Pernell believes that his teaching methods cannot comport with the Stop W.O.K.E Act because he would not be permitted to endorse the view that concepts like "neutrality, objectivity, and racial colorblindness" may have racist origins. To comply with the Act, however, would directly conflict with a core tenet of his pedagogy: the idea that the legal system is not, and has never been, race-neutral. Across his courses, Dr. Pernell asks his students to consider ways that the legal system is color-conscious and promotes privilege based on race. He thus fears that the Act will restrict his ability to effectively teach his courses and foster discussion on important topics—like systemic racism in the legal system—and to prepare his students to be successful lawyers and advocates.

13. Plaintiff Dana Thompson Dorsey is a Black woman and an Associate Professor of Educational Leadership and Policy Studies, with tenure, at the University of South Florida ("USF"). From 2020 to 2022, she served as the Endowed Chair and Director of the David C. Anchin Center for the Advancement of Teaching at USF.

14. Dr. Thompson Dorsey will teach two graduate level courses in the 2022-23 school year, School Law and Critical Race Studies: Research, Policy, and Praxis ("Critical Race Studies"). School Law is a required graduate level course in USF's College of Education for students pursuing a Master of Education degree specializing in Educational Leadership. In this course, students review court decisions affecting American education with an emphasis on U.S. and state constitutional provisions and Florida state statutes. Critical Race Studies is an elective course for USF doctoral students that focuses on the development of Critical Race Theory and other race-conscious research frameworks; their treatment of race, racism, and racial justice and injustice; and their contributions to education policy, practice, and leadership praxis.

15. Dr. Thompson Dorsey believes that she will not be able to teach her courses in the same manner under the Stop W.O.K.E. Act. Her courses center on topics and viewpoints that are prohibited by the Act, including the systemic nature of racism, the origins of Critical Race Theory, and how Critical Race Theory addresses issues such as race, racism, and power in our country. In her courses, students learn that racism is deeply embedded in American society, and Critical Race Theory is an important lens to analyze case law, policy, and the world around them. Dr. Thompson Dorsey fears that these discussions may now be prohibited.

16. Plaintiff Sharon Austin is a Black woman and a tenured Professor of Political Science at the University of Florida ("UF"). She teaches courses in African American politics, minority politics, American government, public law, and public policy.

17. Dr. Austin will teach four courses in the 2022-23 school year: Politics of Race at UF, Urban Politics, Black Horrors and Social Justice, and African American Politics and Policy. Dr. Austin created the Politics of Race course following a request from UF's Provost Office and after she received a social justice grant from UF in the wake of the murder of George Floyd and the nationwide political unrest that ensued.

18. Dr. Austin believes that the Stop W.O.K.E. Act will impact her ability to teach all of her courses in the upcoming academic year because they involve instruction and discussion of viewpoints disfavored by the legislature. Dr. Austin regularly uses Critical Race Theory as a framework when teaching. She discusses ideas such as, people of different races carry different unconscious biases; that white people carry certain privileges that Black and Latino people do not; and that racial "colorblindness" can be a tool to oppress people of color. Dr. Austin believes that the Stop W.O.K.E. Act will prevent students from hearing the truth about racism.

19. Plaintiff Shelley Park is a white woman and a tenured Professor of Philosophy and Cultural Studies at the University of Central Florida ("UCF"). She is also Affiliated Faculty in the Women and Gender Studies Program.

20. Dr. Park will teach four courses in the 2022-23 school year: Feminist Theories, Theories of Sex and Gender in the Humanities ("Theories of Sex and Gender"), Race & Technology, and Introduction to Philosophy.

21. Dr. Park's courses study structural oppression, how it operates, and how to imagine and create alternative social structures. They do not question whether heterosexism, sexism, or racism exist because there is already consensus in her discipline(s). Likewise, there is longstanding consensus in her field that notions of merit, objectivity, and colorblindness, among other concepts, function to solidify systems of oppression—disguising biased standards as ones that are allegedly neutral. Thus, Dr. Park's students learn to critically interrogate such concepts at the macro-level.

22. Dr. Park does not know how she can meet the instructional standards of her discipline without violating the law. She cannot teach her courses comprehensively without discussing systemic inequalities, a baseline presumption of the scholarship she produces, reads, and teaches. She was specifically trained to identify the ways that the notion of objectivity frequently reflects dominant white, straight, male values. To ignore the origins and functions of concepts such as these

in her teaching would require Dr. Park to fail to teach the history of ideas accurately. And to ignore the ways in which these concepts function today to privilege some forms of thought over others would also be unethical.

23. Plaintiff Jennifer Sandoval is a Latina woman and a tenured Associate Professor at the Nicholson School of Communication and Media at UCF. She is also the Assistant Director of Inclusive Culture at UCF. She teaches courses in interpersonal, intercultural, and gender communication. This semester, she will teach a graduate seminar called Intercultural Communication.

24. Dr. Sandoval believes that significant portions of her course curricula may be prohibited under the Stop W.O.K.E. Act. When teaching her students about why people of color are underrepresented in the field of communications—in part because of historical discrimination by white academics—students who feel uncomfortable might interpret her instruction as espousing the view that they bear responsibility for, and should feel guilty because of, historical discrimination by white people. As a result, students or others who hear about her class may raise complaints that she is promoting such views with her students.

25. Plaintiff Russell Almond is a white man and an Associate Professor of Measurement & Statistics in the Department of Educational Psychology and Learning Systems at Florida State University ("FSU") in Tallahassee, Florida, where he has been on the faculty since 2010. In the upcoming 2022-23 school

year at FSU, Dr. Almond will teach Basic Descriptive and Inferential Statistics Applications, Missing Data Analysis, Bayesian Data Analysis, and Educational Psychology Colloquium. In addition, Dr. Almond currently serves as a director on the board of the Florida Educational Research Association.

26. Dr. Almond typically uses a number of studies that explore race as a variable in social science studies and instructs his students to be aware of the research surrounding race and its effect on educational and other economic outcomes.

27. The Stop W.O.K.E. Act impairs Dr. Almond's ability to use social science studies that discuss how race impacts educational outcomes. For example, prior to the Act's passage, Dr. Almond would regularly introduce studies that criticize "colorblind" educational policies, or argue that concepts like "merit, excellence and hard work" are not helpful assessment tools for evaluating groups and have racist origins. Group differences in achievement are better explained by differences in resources due to past patterns of discrimination. He feels constrained from doing so under the Act's requirement that he not endorse the view that these concepts may have racist origins or outcomes. Further, because Dr. Almond created his own handout on race in statistics, he does not know how he will be able to use this document going forward without "endorsement" of its content.

28. Plaintiff Marvin Dunn is a Black man and a Professor Emeritus at Florida International University ("FIU") in Miami, Florida. During his tenure at FIU, Dr. Dunn started a Black history bus tour of Miami, funded by FIU, which he continues to lead despite his retirement. Prior to his retirement, Dr. Dunn taught psychology, with a focus on racial and ethnic minority communities, at FIU for 34 years.

29. On Dr. Dunn's Miami tour, he brings FIU students and staff to areas of importance for Black Miami residents and teaches about the county's history of racial violence and discrimination, as well as institutional racism that continues to this day. Dr. Dunn—who grew up in Florida during the Jim Crow era and has personally experienced the effects of segregation and anti-Black violence—features his own story and firsthand perspective throughout the tour.

30. The Stop W.O.K.E. Act impacts Dr. Dunn's ability to instruct on institutionalized racism and historical events because he fears that the discussions about his past experiences of discrimination with white colleagues could fall under the Act's prohibition against endorsing the viewpoint that anyone should be made to feel guilty because of their race. Further, and among other concerns, Dr. Dunn feels that he must now self-censor due to the law's requirement that instructors be "objective" when discussing certain topics related to race, as it is unclear what it

means to be "objective" when discussing one's own lived experience with racism and racial inequality.

31. Plaintiff Johana Dauphin is a Black woman and a senior at FSU, where she majors in International Affairs with a concentration in Urban and Regional Planning.

32. This fall, Ms. Dauphin is enrolled in two courses at FSU—Race & Minority Relations and Religion, Race, and Ethnicity—that she fears will be negatively affected by the Stop W.O.K.E. Act. Ms. Dauphin signed up for the courses because she endeavors to learn more about racial justice and take classes that include the perspectives of people of color. She believes that the Stop W.O.K.E. Act will result in the denial of her ability to receive information and instruction, particularly regarding race, racial disparities, and structural inequities, that will stymie her educational enrichment and post-graduate future, and minimize and/or ignore her lived experience as a Black woman. She further believes that she will be deprived of the opportunity to fully explore certain views and modes of analyses within these courses because her professors are now prohibited from endorsing concepts that had previously been central to coursework, such as white privilege, that suggest a person's status as privileged is determined by their race. Ms. Dauphin therefore believes that she will be denied information and instruction

essential for her educational enrichment, which could make her a less competitive candidate for law school and a less employable lawyer.

33. Ms. Dauphin also fears that the Stop W.O.K.E. Act will cause professors to avoid discussing race and racial disparities altogether, resulting in her perspective and lived experiences—as a Black female student—being minimized or ignored.

**B. Defendants**

34. Defendant Florida Board of Governors of the State University System ("Board of Governors") has the authority to "operate, regulate, control, and be responsible for the management of the whole State University System." Fla. Stat. § 20.155(4)(a). The Board of Governors has enforcement authority under the Stop W.O.K.E. Act.

35. Defendant Brian Lamb is the Chair of the Board of Governors. As Chair, Defendant Lamb is the official spokesperson of the Board and is authorized to "exercise such other powers and duties that inure to the office of Chair of a body corporate." Operating Procedures, art. IV, § D(4).[8] Defendant Lamb is sued in his official capacity as Chair.

[8] Operating Procedures of the Board of Governors of the State University System of Florida art. IV, § D(4), https://www.flbog.edu/wp-content/uploads/Draft-Board-of-Governors-Operating-Procedures-2020_01_30-Updated.pdf.

36. Defendant Eric Silagy is the Vice Chair of the Board of Governors. As Vice Chair, Defendant Silagy performs the duties of the Chair and has the same power and authority as the Chair in the absence or disability of the Chair. Operating Procedures, art. IV, § E. Defendant Silagy is sued in his official capacity as Vice Chair.

37. Defendants Timothy M. Cerio, Richard Corcoran, Aubrey Edge, Patricia Frost, Nimna Gabadage, Edward Haddock, Ken Jones, Darlene Luccio Jordan, Alan Levine, Charles H. Lydecker, Craig Mateer, Steven M. Scott, William Self, and Kent Stermon are being sued in their official capacities as members of the Board of Governors.

38. The members of the Board of Governors have authority to determine when institutions of higher learning have "a substantiated violation of s. 1000.05(4)(a)," the provision of the Stop W.O.K.E. Act challenged here. Such a finding means that institution "shall be ineligible to receive performance funding during the next fiscal year following the year in which the violation is substantiated." Fla. Stat. § 1001.92(5).

39. The Board of Governors also has rulemaking authority to "implement this section [Fla. Stat. § 1000.05] as it relates to state universities." Fla. Stat. § 1000.05(6)(b).

40. The day the Stop W.O.K.E. Act became effective, July 1, 2022, the Board of Governors began exercising that rulemaking authority by issuing a Notice of Board of Governors Proposed New Regulation 10.005, entitled "Prohibition of Discrimination in University Training or Instruction" to "implement recent amendments to section 1000.05(4)" enacted in the Stop W.O.K.E. Act. Under the Proposed New Regulation, if the Board determines that there was a knowing and willful violation of the law, "the university will be ineligible for performance funding for the next fiscal year."[9] Board of Governors Proposed New Regulation 10.005(4)(d). The Proposed Regulation remains pending during the multi-month process for adopting rules under Florida law.

41. Defendant Manny Diaz, Jr. is the Florida Commissioner of Education and a member of the Board of Governors. He is responsible for submitting "recommendations for a coordinated Early learning–20 education budget that estimates the expenditures for the Board of Governors," and all boards "under the general supervision of the Board of Governors or the State Board of Education for the ensuing fiscal year." Fla. Stat. § 1001.10(6)(g). He is also "responsible for

---

9 *Board of Governors Notice of Proposed New Regulation* (July 1, 2022) at 1 & § 4(d), https://www.flbog.edu/wp-content/uploads/2022/07/10.005NoticeofNewProposedRegulationJune2022.pdf.

giving full assistance to the State Board of Education in enforcing compliance with the mission and goals of the Early Learning-20 education system, except for the State University System." Fla. Stat. § 1001.10(1). Defendant Diaz is sued in his official capacity as Commissioner of Education.

42. Defendant University of Florida Board of Trustees is a corporate body established by Florida law that serves as the governing body of UF, which is part of the State University System of Florida. The UF Board of Trustees sets policy for the university and is responsible for implementing and maintaining high-quality education consistent with UF's mission.

43. Defendant University of South Florida Board of Trustees is a corporate body established by Florida law that serves as the governing body of USF, which is part of the State University System of Florida. The USF Board of Trustees sets policy for the university and is responsible for implementing and maintaining high-quality education consistent with USF's mission.

44. Defendant Florida International University Board of Trustees is a corporate body established by Florida law that serves as the governing body of FIU, which is part of the State University System of Florida. The FIU Board of Trustees sets policy for the university and is responsible for implementing and maintaining high-quality education consistent with FIU's mission.

45. Defendant Florida A&M University Board of Trustees is a corporate body established by Florida law that serves as the governing body of FAMU, which is part of the State University System of Florida. The FAMU Board of Trustees sets policy for the university and is responsible for implementing and maintaining high-quality education consistent with FAMU's mission.

46. Defendant Florida State University Board of Trustees is a corporate body established by Florida law that serves as the governing body of FSU, which is part of the State University System of Florida. The FSU Board of Trustees sets policy for the university and is responsible for implementing and maintaining high-quality education consistent with FSU's mission.

47. Defendant University of Central Florida Board of Trustees is a corporate body established by Florida law that serves as the governing body of UCF, which is part of the State University System of Florida. The UCF Board of Trustees sets policy for the university and is responsible for implementing and maintaining high-quality education consistent with UCF's mission.

## III. JURISDICTION AND VENUE

48. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

49. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and (e).

## FACTUAL ALLEGATIONS

### I. THE STOP W.O.K.E. ACT & ENFORCEMENT REGULATIONS

50. Contradicting the State University System's stated commitment to free expression, the legislature enacted the Stop W.O.K.E. Act, which unconstitutionally chills instruction in college classrooms regarding viewpoints disfavored by the legislature, including the existence of systemic racism and sexism.

51. Section 2(4)(a) of the Stop W.O.K.E. Act amends the Florida Educational Equity Act ("FEEA"), § 1000.05, and provides:

> (4)(a): It shall constitute discrimination on the basis of race, color, national origin, or sex under this section to subject any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:
>
> > 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.
> >
> > 2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
> >
> > 3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

> 4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.
>
> 5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.
>
> 6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.
>
> 7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.
>
> 8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.
>
> (4)(b): Paragraph (a) may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.

52. The Stop W.O.K.E. Act provides that the list of banned concepts may be presented in an objective manner without endorsement, but the law provides no

explanation of what it would mean to give instruction in "an objective manner" or "without endorsement." For example, it is unclear whether characterizing a study as "methodologically sound" constitutes "endorsement." Similarly, when describing various approaches as valid, an instructor does not know whether "endorsement" requires prioritization. And there is no guidance as to whether an "endorsement" occurs when instructors distinguish between fact and misinformation, as generally recognized within their discipline.

53. Instructors in higher education regularly provide—indeed are often expected to provide—"endorsement" or other normative positions on the subjects of their expertise which they were hired by the State University System to teach to their students. To uphold the standard of their disciplines, instructors must identify and teach foundational, widely accepted principles, even when those viewpoints are disfavored by the legislature. Instructors endorse conclusions through their own scholarship as well. Asking higher education instructors to avoid "endorsement" of ideas within their fields of instruction puts them in an impossible situation, forcing them to choose between guessing what might violate the law and providing students with the perspective on academic consensus and debate necessary for their studies and to be fully prepared for their chosen profession.

54. For example, Professor Pernell is the author of textual materials he assigns to law students as part of his Criminal Procedure classes. His students may

interpret discussions of his scholarship on the lack of race neutrality in the legal system in the text as an endorsement of the view that the concept of colorblindness is racist.

55. As a feminist philosopher and cultural studies theorist, Dr. Park must teach students to build upon widely accepted foundational principles. The existence of sexism, heterosexism, racism, and other forms of oppression and privilege has been well-documented with several decades of empirical research and is the starting place for her courses. Queer studies and feminist scholars understand and have been trained to view the normative construction of masculinity (e.g. as dominant, as heterosexual, as white) as inherently harmful. Dr. Park's identification of these concepts as foundational for disciplinary study may be perceived as an endorsement of a view prohibited by the Stop W.O.K.E. Act.

56. The FEEA already prohibits "[d]iscrimination on the basis of race, color, national origin, sex, disability, religion, or marital status against a student or an employee in the state system of public K-20 education." Fla. Stat. § 1000.05(2)(a). Subsection (2) includes further protection against exclusion from participation, restricting access in criteria for admissions, and unavailability of classes to all students. Subsection (3) prohibits discrimination "on the basis of sex" in athletic programs.

57. The FEEA also authorizes enforcement of anti-discrimination provisions in schools. Section 1000.05 contains a broad enforcement provision for private lawsuits, directs the State Board of Education to compel compliance, and authorizes the Board of Governors to implement anti-discrimination measures in state universities.

58. The Stop W.O.K.E. Act adds to this enforcement regime by creating a new category of discrimination codified in section 1000.05(4). As described above, this new category of "discrimination" does not actually regulate discriminatory conduct, it is a state-mandated prohibition on the expression of certain viewpoints disfavored by the Florida legislature.

59. Put simply, as a result of the Stop W.O.K.E. Act, which the Board of Governors can enforce by removing performance funding for the following academic year, instructors could be fired or otherwise disciplined for expressing prohibited viewpoints. Not only do these provisions chill the speech of instructors due to fear of loss of employment or state funding, but individual state universities now are effectively forced to fire or otherwise discipline faculty who might violate the vague and undefined strictures of the Stop W.O.K.E. Act.

### A. The Stop W.O.K.E. Act's Restriction of Speech and Actions that Promote Racial Equity in Florida

60. The Stop W.O.K.E. Act follows a long history of anti-Black violence, harassment, discrimination and neglect, and the suppression of Black activism and speech about those racial injustices in Florida.

61. For example, during the 1950s and 1960s, white civilians and police officers suppressed student protests of racial segregation in Florida. In May 1956, police officers in Tallahassee arrested two Black students who were protesting racial segregation on city buses. In 1960, during an attack known as Ax Handle Saturday, 200 white men used wooden ax handles to beat Black people in response to lunch-counter demonstrations in Jacksonville.[10]

62. Three years later, in 1963, hundreds of Black students from FAMU protested racial segregation of a local movie theater. The students were attacked by white police officers who beat them with nightsticks and dragged them into police wagons. Hundreds of students continued the protests at the county jail and were later convicted of trespass under Florida law.

63. In response to FAMU Law students' demonstrations protesting racial segregation, then Governor W. Haydon Burns collaborated with the Florida

---

[10] *"Ax Handle Saturday," a story*, AFRICAN AM. REGISTRY, https://aaregistry.org/story/ax-handle-saturday-a-brief-story/ (last visited Aug. 15, 2022).

legislature to strip FAMU Law of its funding in 1965. The funds were used to establish a law school at formerly all-white Florida State University in 1966. After graduating its last students in 1968, FAMU Law remained closed for over 30 years until it reopened in 2002.

64. In 1973, in a case brought by Black principals, teachers, aides, and coaches of previously all-Black schools who were passed over for jobs in the integrated school system, U. S. District Judge Charles Scott ruled that, in the early 1970s, the Lake County school system's personnel decisions were "tainted by a racially discriminatory intent to, at least temporarily, shut out [B]lack school principals and assistant principals."[11] Indeed, Lake County had a documented history of racially charged harassment directed at Black residents, and was also the home of a Ku Klux Klan grand wizard in the 1980s.

65. In 1982, the U. S. Civil Rights Commission issued a report concerning unrest in Miami's Liberty City neighborhood in May 1980. The report documented decades of "neglect of the [B]lack community in housing, jobs, business, politics, education and the criminal justice system."[12]

---

[11] Ramsey Campbell, *Blacks Taking Long, Painful Road To True Equality, Justice*, Orlando Sentinel (Jul. 1, 1993), https://www.orlandosentinel.com/news/os-xpm-1993-07-01-9306240432-story.html

[12] David Hoffman, *Racial Isolation Caused Miami Riots, Panel Says*, WASH. POST (June 8, 1982),

Con't)

66. Not until 1992, after 130 years, did public officials change the racially charged names of a marsh and a bygone Civil War-era shanty town on official maps of Highlands County, located in south-central Florida.

67. In 1996, a white police officer fatally shot an unarmed Black teenager in St. Petersburg, after pulling him over for speeding. The killing eerily echoes other well documented killings in recent years, as witnesses disputed the officer's account of the events that led to the officer firing several shots.

68. That same year, there were a number of burnings of Black churches in Florida, which were widely blamed on white extremist groups.

69. In 1999, two pipe bombs were detonated on FAMU's campus. After each bombing, local television stations received violent, racist calls. A federal jury determined that "the bombings were motivated by racial prejudice."[13]

70. In recent years, activists in Florida have continued to press the state to not only acknowledge this history of anti-Black violence and repression, but also to promote a more racially just society.

https://www.washingtonpost.com/archive/politics/1982/06/08/racial-isolation-caused-miami-riots-panel-says/a99115c4-00e6-4ebc-a490-42dea34dd223/.

[13] Press Release, Department of Justice, U.S. Attorney's Office, *N.D. Fla., Convicted Pipe Bomber Sentenced to 33 More Years in Federal Prison* (Nov. 19, 2020), https://www.justice.gov/usao-ndfl/pr/convicted-pipe-bomber-sentenced-33-more-years-federal-prison.

### B. Demands for Racial Justice from Black Activists and Black-Led Organizations in Florida Over the Past Decade

71. Since 2012, beginning with the killing of Trayvon Martin in Florida, Black-led organizations, schools, and students have engaged in protests and other actions to encourage discussions about race, racial justice, systemic racism, and white privilege.

72. Both the National Association for the Advancement of Colored People ("NAACP") and local Florida NAACP branches organized marches across the State of Florida, joined by thousands, to protest Martin's death and condemn anti-Black violence. Rallies were also organized by student groups like the Black Law Students Association of FAMU Law.

73. Following the killings of George Floyd, Breonna Taylor, and Ahmaud Arbery in 2020, Floridians and Americans—of all races—across the country increased their calls for advancing racial justice throughout all sectors of society. A multiracial coalition of millions of people engaged in racial justice demonstrations, often organized under the banner of Black Lives Matter, making the 2020 protests one of the most significant mass movements in the country's history. Across Florida, thousands of peaceful protestors marched for racial justice in Tallahassee, Miami, Ft. Lauderdale, Tampa, Orlando, Gainesville, Jacksonville, and many other cities.

74. In the summer of 2020, the UF chapter of the NAACP, the UF Black Effort, the UF Black Student Union (BSU), and the UF Black Graduate Student Organization worked with other community groups to organize racial justice protests and calls to action in Gainesville.[14]

75. That fall, the UF NAACP, BSU, and African Student Union helped organize a public protest calling for the university to rename "J. Wayne Reitz Student Union,"[15] due to Reitz's history as an ardent segregationist who denied Black students entry to UF.[16]

76. These calls for racial justice reflected a larger shift across the country. According to a 2020 study conducted by Monmouth University, a newfound majority of Americans agreed that: "racism and discrimination is a 'big problem,'" and "there's a lot of discrimination against [B]lack Americans in society."[17]

---

[14] *2020 Black Lives Matter Protests*, UNIV. OF FLA. UNIV. ARCHIVES, https://universityarchives.uflib.ufl.edu/explore-our-projects/2020-black-lives-matter-protests/ (last visited Aug. 15, 2022).

[15] Lianna Hubbard, *Students, employees protest Reitz Union name*, THE ALLIGATOR (Oct. 7, 2020), https://www.alligator.org/article/2020/10/students-employees-protest-reitz-union-name.

[16] Rajel Wolcoff, *UF Students Hold Protest Demanding Name Change For The Reitz Union*, WUFT (Oct. 7, 2020), https://www.wuft.org/news/2020/10/07/uf-students-hold-protest-demanding-name-change-for-the-reitz-union/; Monique Miquel, *Opinion: Renaming the Reitz Union*, FLA. POLITICAL REVIEW (Oct. 18, 2020), http://www.floridapoliticalreview.com/renaming-the-reitz-union/.

[17] Nate Cohn & Kevin Quealy, *How Public Opinion Has Moved on Black Lives Matter*, N.Y. TIMES (June 10, 2020), https://www.nytimes.com/interactive/2020/06/10/upshot/black-lives-matter-attitudes.html.

77. These social and legal shifts popularized discussions about how to dismantle racism and sexism and how to increase inclusivity, mainstreaming concepts such as "structural," "systemic," or "institutional" racism, and "racial privilege" or "white privilege."

78. Instead of heeding calls for racial justice, the Florida legislature passed the Stop W.O.K.E. Act to exclude these discussions and sentiments from classrooms.

### C. Activism of Black Instructors and Students During and After the Summer 2020 Racial Reckoning and Responsive Actions of Florida's Colleges and Universities

79. In the summer of 2020, Black instructors and students publicly called upon Florida's higher educational institutions to engage in more meaningful anti-racist work and make campus climates more inclusive. These instructors and students were joined by allies of all races seeking to push their institutions to act.

80. In June 2020, 33 Black faculty members at FSU released a public letter in which they voiced support for FSU's Black students, denounced recent anti-Black violence, and recognized "the toll institutional and structural racism" takes on students of color.[18] In this letter, Black faculty also declared their commitment to address systemic racism in academia and "to deconstruct the present system and to begin to rebuild an academic space that is rooted in anti-

[18] Letter from Dr. Cameron Beatty, et al., *to Black Students at FSU* (June 4, 2020), https://myweb.fsu.edu/jelsner/Letter_to_Black_Students_From_Black_Faculty.pdf.

racist ideology." These Black faculty members also committed to holding the FSU administration accountable for addressing the campus's racial climate, calling on university leadership to enact ten reforms to address historical injustices, promote anti-racism on campus, and better support Black students, faculty, and staff.

81. In June 2020, UF's BSU created a petition asking UF to better protect the safety and well-being of Black students at UF.[19] The petition called for UF to implement mandatory diversity trainings for faculty and staff, increase the number of Black instructors and administrators, and re-open an investigation into racial harassment in November 2019, when a group of Black students were called the N-word by a white student.[20]

82. In June 2020, a group of Black students, alumni, and allies sent a separate call-to-action letter to the Dean and leadership at UF's College of Education in June 2020 regarding their concerns about "the state of Black Life in society and more locally, within our college."[21] Leadership at the College of Education responded by creating the Collective for Black Student Advancement.

---

[19] UF Black Student Union, *Improve Race Relations Here at the Univ. of Fla.*, CHANGE.ORG, https://www.change.org/p/president-w-kent-fuchs-improve-race-relations-here-at-the-university-of-florida (last visited Aug. 15, 2022).

[20] *Id.*; Ana Escalante, *Black students called racial slurs in SNAP van*, THE ALLIGATOR (Nov. 17, 2019), https://www.alligator.org/article/2019/11/black-students-called-racial-slurs-in-snap-van.

[21] Collective for Black Student Advancement, UF COLLEGE OF EDUC., https://education.ufl.edu/cbsa/ (last visited Aug. 15, 2022).

The Collective has among its goals to "create an inclusive academic- and working-environment, in which best practices for addressing social justice, diversity, and anti-racism on behalf of students, staff, and faculty are emphasized;" and "[d]evelop curricular and extra-curricular experiences that delve into the intersections of race, racial history, and the field of education."[22] As part of these efforts, the Collective proposed a new doctoral concentration called Critical Study of Race, Ethnicity and Culture in Education.[23] This concentration was approved by the College in the summer of 2021.[24]

83. In the fall of 2021, two instructors at UF published "A Way Forward: UF Scholars on Support, Obstacles and the Need for Institutional Engagement."[25] Based on interviews with 39 faculty members across UF, the report identified and called upon UF to "more effectively support faculty whose work focuses on race or anti-racism."[26]

---

22 *See id.*

23 *See* Emma Pettit, *He Accused the University of Florida of Violating His Academic Freedom. The Provost Disagrees*, THE CHRONICLE OF HIGHER EDUC. (May 2, 2022), https://www.chronicle.com/article/he-accused-the-university-of-florida-of-violating-his-academic-freedom-the-provost-disagrees.

24 *Id.*

25 Dr. Katheryn Russell-Brown & Dr. Ryan Morini, *A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement* (Univ. of Fla. Fall 2021), https://www.law.ufl.edu/law/wp-content/uploads/UFRaceScholarshipReport-2021.pdf.

26 *Id.* at 2.

84. Many Florida colleges and universities responded to these demands by expanding discussions about systemic racism, equity, and inclusion in their curricula.

85. For example, the president of UF committed to placing a "focus on the Black experience, racism and inequity" for the 2020-2021 academic year, with each of the university's colleges "featur[ing] speakers, seminars and courses" on the subject.[27]

86. At the University of North Florida, psychology faculty announced plans to "critically evaluate our curriculum and be intentional about including activities within courses that will target dismantling racism… includ[ing] discussing the history of structural and systemic anti-Black racism in psychological science as well as the ways in which racism continues in our field today."[28]

87. Universities also made strides to address legacies of racism on their campuses. On August 24, 2020, UF removed the memorial of William Loring, a

[27] Letter from W. Kent Fuchs, *UF Anti-Racism Initiative* (June 18, 2020), https://cdo.ufl.edu/strategy/uf-anti-racism-initiative/#:~:text=The%202020%2D21%20academic%20year,our%20curriculum%2C%20including%20UF%20Quest.

[28] UNF Department of Psychology Addressing Racism & Promoting Diversity and Inclusion Committee, *Statement on Anti-Black Racism*, UNIV. OF N. FLA. (last visited Aug. 17, 2022), https://www.unf.edu/coas/psychology/Anti-Black_Racism_Statement.aspx.

Confederate general, as part of its anti-racism initiative to "remove monuments or naming that UF controls that celebrate the Confederacy or its leaders."[29]

88. On July 6, 2020, in response to recommendations from Black faculty, the president of FSU, John Thrasher, announced the creation of a Task Force on Anti-Racism, Equity & Inclusion in order to "identify racial and ethnic disparities on campus" and "implement a range of initiatives, such as developing mandatory diversity and inclusivity training for all campus employees and students and fostering the recruitment and retention of students, faculty and staff from underserved groups."[30] This task force was led by Black faculty and administrators. In January 2021, Thrasher accepted the task force's recommendations to permanently remove a statue of slave owner Frances W. Eppes from display on campus and to remove Eppes' name from a university building.[31]

---

29 *Central Initiatives: History, Symbolism and Demonstrating Behaviors Consistent with Our Values*, ANTI-RACISM UNIVERSITY OF FLORIDA, https://antiracism.ufl.edu/central-initiatives/history/ (last visited Aug. 17, 2022).

30 *President's Task Force on Anti-Racism, Equity & Inclusion*, FLA. STATE UNIV., https://president.fsu.edu/taskforce/ (last visited Aug. 16, 2022).

31 *FSU President agrees to remove Francis Eppes name from College of Criminology*, WTXL (Jan. 26, 2021), https://www.wtxl.com/news/local-news/fsu-president-agrees-to-remove-francis-eppes-name-from-college-of-criminology.

89. University leaders across Florida also released public statements in which they committed to prioritizing anti-racism, equity, and inclusion on their campuses moving forward.

90. For example, in June of 2020 the president of UCF, Alexander N. Cartwright, declared the university's commitment "to not merely celebrate our diversity, but to be actively anti-racist."[32] UCF leaders also spoke of the "need to be comfortable with the discomfort born from honest, difficult dialogues about race and culture."[33]

91. Leaders at dozens of other Florida higher education institutions echoed these anti-racist sentiments, in recognition of the widespread desire among students and staff for increased action to combat racism and racial injustice.

92. This anti-racist work at Florida's colleges and universities also followed persistent complaints from Black students and other students of color about racial isolation, microaggressions, and racial harassment.[34]

---

[32] UCF Pres. Alexander N. Cartwright, *Our Future Is Inclusion*, UCF TODAY (June 2, 2020), https://www.ucf.edu/news/now-is-our-time-to-be-actively-anti-racist/.

[33] S. Kent Butler, *Now Is Our Time to be Actively Anti-Racist*, UCF TODAY (May 29, 2020), https://www.ucf.edu/news/now-is-our-time-to-be-actively-anti-racist/.

[34] JJ Burton & Rochelle Alleyne, *Local leaders, students want St. Pete Catholic school dean removed over alleged racist comments*, ABC ACTION NEWS (Feb. 1, 2022), https://www.abcactionnews.com/news/region-pinellas/local-leaders-students-want-st-pete-catholic-school-dean-removed-over-alleged-racist-
Con't)

**D. The Florida Legislature's Response to Anti-Racist Activism**

93. The sequence of events surrounding the Stop W.O.K.E. Act's introduction and subsequent enactment reveals that it was enacted to suppress speech about systemic racism, white privilege, and "Critical Race Theory," a term that the Act's proponents misused and misconstrued as a catch-all term for all manner of race-conscious concepts with which the legislature and Governor DeSantis disagree. The Act's proponents repeatedly criticized these concepts and the multiracial coalition that called for increased commitments to addressing racism across Florida. Although members of the legislature were put on notice of the Stop W.O.K.E. Act's likely effect on anti-racist speech, including the disparate impact on Black instructors and students, the legislature went on to enact the Stop W.O.K.E. Act specifically because of these harmful effects.

94. On March 17, 2021, Governor DeSantis distorted, and dismissed, anti-racist teachings designed to encourage students to grapple with concepts like racial privilege, saying, "[t]here is no room in our classrooms for things like Critical

comments; David Williams, *A Florida school district promises a swift investigation after six middle school students are seen spelling out a racial slur in a photo*, CNN (May 18, 2022), https://www.cnn.com/2022/05/18/us/florida-middle-school-racial-slur-photo/index.html; Marlene Sokol, *Student petition: Combat racism in Pinellas schools*, TAMPA BAY TIMES (June 19, 2020) https://www.tampabay.com/news/gradebook/2020/06/19/student-petition-combat-racism-in-pinellas-schools/.

Race Theory. Teaching kids to hate their country and to hate each other is not worth one red cent of taxpayer money."[35]

95. In April 2021, in direct response to protests for racial justice, and at the urging of Governor DeSantis, the legislature enacted House Bill 1, which created criminal penalties for protesters, increased criminal penalties for various protest activities, and essentially allowed Governor DeSantis to override a municipality's decision to reduce the operating budget of its police department. *See Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052 (N.D. Fla. 2021). That same month, the legislature enacted Senate Bill 90, a restrictive voting law that was challenged by several non-profit groups, including the Florida NAACP, who alleged the law sought to curtail the very voting methods used most by Black Floridians. *See League of Women Voters of Fla., Inc. v. Lee*, No. 4:21CV186-MW/MAF, 2022 WL 969538, at *53 (N.D. Fla. Mar. 31, 2022).

96. On May 28, 2021, Governor DeSantis referred to "Critical Race Theory" as "race essentialism" that "teaches people to view [race] as the most important characteristic. And obviously if you're certain races, Caucasian and what not, they view that in a negative fashion. That's not something appropriate for

---

[35] Brooke Singman, *DeSantis condemns critical race theory, says it won't be taught in Florida classrooms*, FOX NEWS (Mar. 18, 2021), https://www.foxnews.com/politics/desantis-critical-race-theory-florida-classrooms.

schools." When stating "they," Governor DeSantis appears to refer to scholars, such as Plaintiffs, who use critical race studies in their coursework.

97. A few days later, on June 6, 2021, Governor DeSantis vowed to turn his "political apparatus" against Republican school board candidates that support "Critical Race Theory."

98. On June 10, 2021, Governor DeSantis appeared via video at a meeting of the Florida Board of Education, minutes before the Board was due to vote on a rule that would ban Critical Race Theory and the 1619 Project in K-12 schools. He explained that "C[ritical] R[ace] T[heory]" will "cause a lot of divisions… [and] cause people to think of themselves more as a member of a particular race based on skin color, rather than based on the content of their character and based on their hard work and what they're trying to accomplish in life."[36] The Board of Education voted to adopt the rule, over strong objection of the Florida Education Association, a union which includes over 150,000 public K-12 instructors in Florida.

99. On June 22, 2021, Governor DeSantis signed House Bill 233 (H.B. 233) into law. H.B. 233 requires public universities and colleges to distribute an "intellectual diversity" survey to students and faculty, threatening budget cuts for

[36] Robbie Gaffney, *State Board of Education Bans Critical Race Theory From Florida Classrooms*, WFSU (June 10, 2021), https://news.wfsu.org/state-news/2021-06-10/state-board-of-education-bans-critical-race-theory-from-florida-classrooms.

institutions found to be "indoctrinating" students. *See Link v. Corcoran*, 21-cv-271 (N.D. Fl. Jul. 1, 2021). At H.B. 233's bill signing conference, Governor DeSantis lamented the current state of higher education, saying: "Unfortunately, now the norm is, [university campuses] are more intellectually repressive environments. You have orthodoxies that are promoted, and other viewpoints are shunned or even suppressed. [Florida's universities] are basically hotbeds for stale ideology. That's not worth tax dollars and that's not something we're going to be supporting going forward."[37]

100. Governor DeSantis's use of the terms "orthodoxies" and "stale ideology" refer to race-conscious speech and related viewpoints, as he later described H.B. 233 as building on his prior initiatives to ban teaching of "Critical Race Theory" and the 1619 Project.[38] Moreover, later in the bill signing conference, a sponsor of H.B. 233 stated that the law was necessary due to the fact that universities were "placing a premium" on promoting racial and gender diversity.[39]

---

[37] First Coast News, *Gov. Ron DeSantis signs 3 education bills focused on civic literacy at Fort Myers middle school at* 05:57—7:01 YOUTUBE (June 22, 2021), https://www.youtube.com/watch?v=sDIEJztGNXI.

[38] *Id.* at 07:40—7:50.

[39] *Id.* at 20:57—21:19.

101. The Governor's crusade against race-conscious speech and related viewpoints culminated on December 15, 2021, with the rollout of the Stop W.O.K.E. Act—the legislative proposal that ultimately became H.B. 7.

102. This proposal, which promised to be "the strongest legislation of its kind," lays out five objectives:

> Codifies the Florida Department of Education's prohibition on teaching critical race theory in K-12 schools;
>
> Prohibits school districts, colleges and universities from hiring "woke C[ritical] R[ace] T[heory]" consultants;
>
> Protects employees against a hostile work environment due to critical race theory training;
>
> Provides employees, parents and students a private right of action; and
>
> Strengthens enforcement authority of the Florida Department of Education.[40]

103. During a press conference announcing the Stop W.O.K.E. Act that same day, Governor DeSantis warned of "pernicious ideologies," like "Critical Race Theory," explaining that the state's educational institutions did not need terms like "equity."[41] His office also described the proposal as the state's latest

[40] *Stop W.O.K.E. Act Handout*, https://www.flgov.com/wp-content/uploads/2021/12/Stop-Woke-Handout.pdf.

[41] First Coast News, *Gov. DeSantis introduces "Stop WOKE Act" to combat critical race theory in FL schools* at 07:40, YOUTUBE (Dec. 15, 2021), https://www.youtube.com/watch?v=kWUgjZrBkNY&t=352s.

effort to thwart race-conscious initiatives in schools, and again took the opportunity to gratuitously criticize "Critical Race Theory" and the 1619 Project.[42]

104. The day after the press conference, in a nationally televised appearance, anti-CRT activist Christopher Rufo described himself as "aiding" Governor DeSantis in preparing the Stop W.O.K.E. proposal.[43] He went on to call race-conscious teachings "toxic," "disgusting," and "absurd."[44]

105. On its face, the Stop W.O.K.E. proposal is designed to thwart "wokeness"—a term originated by Black Americans, dating back to at least the early twentieth century.[45]

106. Early usage of the term signaled the concept of being "well-informed" or "up-to-date,"[46] as described by Harlem novelist Melvin Kelley in a 1962 *New York Times* Op-Ed about slang in urban Black American communities.[47] The term has evolved to describe someone who is "alert to racial or social discrimination and injustice."[48]

---

42 Dec. 15, 2021 Press Release, Gov. Ron DeSantis, *supra* n.3.

43 Yael Halon, *DeSantis's 'Stop W.O.K.E.' legislation would make teaching CRT in Florida classrooms 'illegal': Rufo*, FOX NEWS (Dec. 16, 2021), https://www.foxnews.com/media/desantis-stop-woke-legislation-crt-florida-illegal-rufo.

44 *See id.*

45 *See Woke adjective earlier than 2008*, Oxford English Dictionary; *Woke up*, Oxford English Dictionary (3d ed. 2017).

46 *Woke*, Oxford English Dictionary (3d ed. 2017).

47 *Id.*

48 *Id.*

107. Use of the term "woke" was popularized through its association with the Civil Rights Movement and, more recently, has been associated with the Black Lives Matter movement and calls for racial justice.[49]

108. In adherence to the Governor's priorities and his repeated criticism of "wokeness,"—i.e., calls for racial and social justice—the Florida legislature took up the Stop W.O.K.E. Act in the 2022 legislative session.

109. Within a month of Governor DeSantis's December 15, 2021 press conference, Representative Bryan Avila, the Republican Speaker pro tempore, introduced H.B. 7 in the House on January 11, 2022.

110. The same day, then-Senator Diaz filed Senate Bill 148 ("S.B. 148"), a companion bill to H.B. 7, in the Senate. At the close of the legislative session, Governor DeSantis appointed Senator Diaz as the Commissioner of the Florida Department of Education.

111. H.B. 7's definitions of prohibited concepts mirror those included in Executive Order 13950 on "Combatting Race and Sex Stereotyping," issued by former President Trump on September 22, 2020. The Order specifically banned what it called "divisive concepts."[50] In December 2020, a federal court issued a

---

49 *See id.*

50 The "divisive concepts" were as follows: "the concept that (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex,
Con't)

nationwide injunction enjoining enforcement of the "divisive concepts" ban, finding, among other things, that the Order constituted an unconstitutional restriction on speech that was "so vague that it is impossible… to determine what conduct is prohibited."[51]

112. Nonetheless, eight of the nine "divisive concepts" in the Executive Order, which was enjoined by federal court order, are included, nearly verbatim, in the Stop W.O.K.E. Act.[52]

---

is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilty, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as hard work ethic are racist or sexist, or were created by a particular race to oppress another race." *Combating Race and Sex Stereotyping*, Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020).

[51] *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020).

[52] *Compare supra* n.50 *with* the Stop W.O.K.E. Act: "identifying the following divisive concepts as: (1) [m]embers of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex; (2) [a] person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (3) [a] person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex; (4) [m]embers of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex; (5) [a] person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be
Con't)

113. During the course of the legislative session, Representative Avila and Senator Diaz made clear to the legislature that H.B. 7 and S.B. 148 were designed to suppress speech about systemic racism, diversity, equity, and inclusion—the very speech championed by higher educational institutions, students, and faculty during and after the 2020 racial reckoning.

114. Representative Avila singled out concepts such as “white privilege,” “systemic racism,” and “affinity groups,” arguing that there was no place for discussion of such concepts in schools or workplaces in Florida.[53]

115. During debate before the House State Affairs Committee on February 1, 2022, Representative Avila explained that an acquaintance studying to become a math teacher was “learning how to identify ‘white privilege’” and “[t]hat to me, is

discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex; (6) [a] person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion; (7) [a] person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex; and (8) [s]uch virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to suppress members of another race, color, national origin, or sex.” Fla. Stat. § 1000.05(4)(a).

[53] *2/1/22 House State Affairs Committee* at 01:01:41—01:02:47, *supra* n.2.

not whatsoever something that should be allowed…. Certainly that is not relevant, I would say, to the teaching of math to elementary students."[54]

116. Representative Avila identified "blatant" examples of the kinds of materials that would not align with H.B. 7 during the February 8, 2022 House Education and Employment Committee session, including Layla Saad's *Me and White Supremacy*, Peggy McIntosh's *White Privilege: Unpacking the Invisible Knapsack*, Robin DiAngelo's *White Fragility: Why It's So Hard for White People to Talk About Racism*, and a video about systemic racism, anti-racism, and white privilege.[55] Representative Avila later referred to these race-conscious materials as "absolutely un-American."[56]

117. Representative Avila spoke to the sweeping reach of H.B. 7 during its second reading on the House floor on February 22, 2022, stating: "All material has to be in line with the principles that are set forth in this bill. If that material in any way, shape, or form, does not align with the principles in this bill, then that material would certainly not be permissible within a classroom."[57]

---

[54] *Id.* at 00:53:59—00:55:00.

[55] *2/8/22 House Education and Employment Committee* at 00:33:48—00:35:14, THE FLORIDA CHANNEL (Feb. 8, 2022), https://thefloridachannel.org/videos/2-8-22-house-education-employment-committee/.

[56] *Id.* at 00:50:45.

[57] *2/22/22 House Session* at 01:38:49—01:39:05, THE FLORIDA CHANNEL (Feb. 22, 2022), https://thefloridachannel.org/videos/2-22-22-house-session/.

118. In the same discussion, Representative Avila characterized H.B. 7 as an effort to expand civil rights protections from being distorted by "movements," continuing that "some movements threaten to take us backward, asking us to consider people not as individuals but as groups, assigning certain groups and experiences to people based on the group they fit into and not their individual experience" and "[t]hese movements confuse and muddle important history and civics lessons that should be taught."[58]

119. In debate on the House floor on February 24, 2022, Republican Representative Ralph E. Massullo spoke in support of H.B. 7, specifically promoting the ideology of colorblindness in saying that young children "don't seem to see race or sex or ethnicity" which is what is needed "to make our country a better place."[59]

120. Later that day, Republican Representative Robert Alexander Andrade also spoke in support of H.B. 7, stating that it was not "an oppressive bill or even really a bill about civil rights necessarily," rather it was a "free market bill."[60] Representative Andrade characterized concern around H.B. 7 as "fear that the market cornered on victimhood is suddenly being jeopardized."[61]

---

[58] *Id.* at 00:37:41—00:38:05.

[59] *2/24/22 House Session Part 1* at 00:35:15—00:35:38, THE FLORIDA CHANNEL (Feb. 24, 2022), https://thefloridachannel.org/videos/2-24-22-house-session-part-1/.

[60] *Id.* at 01:24:43—01:24:57

[61] *Id.* at 01:25:01—1:25:14

121. H.B. 7 passed the Florida House by a vote of 74-41, along party lines, on February 24, 2022. Of the 20 Black House members who voted on the bill, only one voted for its passage.

122. When the Senate took up H.B. 7 the following week, Senator Diaz repeated Representative Avila's criticisms of the concept of white privilege. After Senator Diaz was asked whether discussions of "white privilege" would be off-limits, he responded: "I would say that there are some very specific topics listed including not imposing privilege or oppression on any particular individual based on race."[62]

123. When asked why H.B. 7 singles out discussions of race, color, sex, and national origin, Senator Diaz responded that these statuses are "historically accorded the highest protection," as compared to religion and disability status, and that this justified their inclusion.[63]

124. Although Senator Diaz initially said that H.B. 7 was developed after "parents' concerns [were] brought forward," when asked directly whether he had spoken to any Black parents as part of this process, he replied without qualification: "I have not."[64]

---

62 *3/9/22 Senate Session* at 04:15:52—04:16:04, THE FLORIDA CHANNEL (Mar. 9, 2022), https://thefloridachannel.org/videos/3-9-22-senate-session/.

63 *Id.* at 03:59:20—03:59:24.

64 *Id.* at 03:49:46—03:50:34.

125. In the Senate Committee on Rules Hearing on March 1, 2022, when asked how racial colorblindness fits into H.B. 7, Senator Diaz explained, "I think the aspirational goal is the ideology that posits the best way to end discrimination is by treating individuals equally without regard to race, culture, ethnicity, sex…."[65]

126. On March 10, 2022, H.B. 7 passed the Senate by a vote of 24-15, on a strict party-line vote. Of the 40 state Senators, not a single Black Senator voted for H.B. 7's passage.

127. At the same time, Florida GOP lawmakers involved in crafting the state budget added last-minute language making certain types of funding to public colleges and universities contingent upon compliance with H.B. 7.

128. Governor DeSantis signed H.B. 7 into law at a press conference on April 22, 2022, while standing shoulder to shoulder with Rufo.[66] In a press release issued the same day, he championed H.B. 7 as a tool for preventing the "the far-left woke agenda" from "tak[ing] over our schools and workplaces," and thanked Rufo and former Senator Diaz for their roles in helping to codify the Stop W.O.K.E. Act.[67]

---

65 *3/1/22 Senate Committee on Rules* at 4:35:08—4:35:18, The Florida Channel (Mar. 1, 2022), https://thefloridachannel.org/videos/3-1-22-senate-committee-on-rules/.

66 *4/22/22 Signing of HB 7- Individual Freedom* at 00:28, THE FLORIDA CHANNEL (Apr. 22, 2022), https://thefloridachannel.org/videos/4-22-22-signing-of-hb-7-individual-freedom/.

67 Apr. 22, 2022 Press Release, Gov. Ron DeSantis, *supra* n.4.

### E. The Florida Legislature's Deviation from Normal Substantive Procedures

129. The legislature lifted the language of the "divisive concepts" from former President Trump's Executive Order 13950, even though these definitions were ruled unconstitutional over a year before H.B. 7 was introduced. When asked, Senator Diaz could not explain why the use of these same definitions was warranted.[68]

130. Though "anti-indoctrination" was touted as one of the key justifications, H.B. 7's proponents could not provide any evidence of indoctrination in classroom discussions or university lectures in Florida. As Senator Diaz explained, "There are a number of materials that were brought to me across the nation that go into that, go forward into that perspective and that's why we put that [prohibited concept] in there…."[69] Moreover, H.B. 7 does not achieve this end, given that it promotes indoctrination of the legislature's preferred viewpoints.

131. Instructors—the most obvious subject matter experts for H.B. 7—repeatedly testified that the bill would make their jobs harder, not easier; that the legislature failed to identify a pedagogically sound rationale for the restrictions; that H.B. 7 fundamentally misunderstands how students learn; and that the bill was

---

68 *3/9/22 Senate Session* at 04:58:27.840-05:00:32.820, *supra* n.62.
69 *Id.* at 04:00:10—04:00:21, *supra* n.62.

not needed. Importantly, the Florida legislature declined to formally consult with any instructors throughout the bill drafting process.

132. Instead, the legislature and Governor DeSantis's office consulted with Rufo, a Senior Fellow of the Manhattan Institute, a conservative think tank focused on domestic policy and urban affairs. Rufo describes himself as having "led the fight against critical race theory in American institutions,"[70] and has published several articles on the alleged dangers of teaching "Critical Race Theory," which he has described as an existential threat to the United States due to its purported attack on core American values.

133. Rufo has advised multiple state legislatures on crafting legislative proposals that restrict speech on systemic racism and inequality.[71] His stated goal is to give the term "Critical Race Theory" a "toxic" connotation and associate it with "the entire range of cultural constructions that are unpopular with Americans."[72]

---

70 *See A little about me*, Christopher_Rufo, https://christopherrufo.com/about/ (last visited Aug. 16, 2022).

71 Benjamin Wallace-Wells, *How a Conservative Activist Invented the Conflict Over Critical Race Theory*, THE NEW YORKER (June 18, 2021), https://www.newyorker.com/news/annals-of-inquiry/how-a-conservative-activist-invented-the-conflict-over-critical-race-theory.

72 *See id.*

134. Rufo is not an educator or education specialist.[73] Nor does he have any specific expertise on Florida's education system.

135. In a rushed process during the last few weeks of the session, the legislature added language to a budget appropriation bill, declaring that universities would be ineligible for performance funding in the subsequent fiscal year if there is "a substantiated violation" of the restrictions in H.B. 7.[74] This punitive addition substantially changed the impact of H.B. 7, making the economic survival of public educational institutions contingent upon the suppression of speech on race and racism. Furthermore, this addition, as it relates to H.B. 7, allows the legislature itself to determine whether any entity has violated the bill, giving outsized power to the legislature with respect to higher education.

## II. THE STOP W.O.K.E. ACT'S VIEWPOINT DISCRIMINATION

136. Section 1000.05(4)(a) prohibits instructors from providing "instruction" to students that "promotes" or "advances" certain concepts, while allowing them to provide instruction that denounces those same concepts.

137. The Act not only targets certain viewpoints in a manner that is discriminatory and disparately impacts people of color, but it also prohibits teaching subjects that are pedagogically appropriate because they are grounded in

---

73 *See supra* n.70.
74 2022 Fla. Sess. Law Serv. Ch. 2022-154, § 9.

reputable and widely accepted scholarship, such as case law, academic research, or well-recognized analytical frameworks.

138. For example, Section 1000.05(4)(a)8 prohibits instruction that promotes or advances that "racial colorblindness [is] racist," but does not prohibit a professor or student from espousing the viewpoint that racial colorblindness is not racist. This provision would ban large portions of Prof. Pernell's case book, *Cases and Materials on Combatting Racism in Criminal Procedure*, which promotes the view that the legal system has race-conscious and racist origins even if it presently purports to be colorblind. It also limits Dr. Park's instruction that colorblindness perpetuates systems of oppression, despite longstanding consensus among feminist philosophers and critical race theorists.

139. At the same time, the Stop W.O.K.E. Act allows an instructor to teach that the legal system is not race-conscious and that colorblind approaches work to remedy past and present racism, despite ample evidence to the contrary.[75]

140. Similarly, Section 1000.05(4)(a)8 prohibits instruction that promotes or advances that notion of neutrality or objectivity are racist or sexist, but would

[75] *See, e.g.*, H.A. Neville, M.E. Gallardo, & D.W. Sue (Eds.), *The Myth of Racial Color Blindness: Manifestations, Dynamics, and Impact* (Am. Psychological Assoc. 2016), https://doi.org/10.1037/14754-000 (collecting and explaining the major flaws in the doctrine of racial colorblindness and its harmful impact on the lives of people of color); Cheryl I. Harris, *Whiteness as Property*, 106 Harv. L. Rev. 1709 (1993) (demonstrating how colorblindness is a form of race subordination in that it denies the historical context of white domination and Black subordination).

not prohibit a professor or student from espousing the opposite viewpoint. Dr. Park instructs her students on the ways that concepts of neutrality and objectivity reinforce racism and sexism. There is widespread agreement within her field that objectivity is a value extending from Eurocentric, colonial thinking that only recognized white, European men of upper classes as capable of reason. It would be unethical for Dr. Park to teach her students that these concepts are not racist or sexist, as required by the Stop W.O.K.E. Act.

141. The Stop W.O.K.E. Act also permits certain viewpoints regarding what "privilege" means and how it operates, while banning other perspectives. For example, under Section 1000.05(4)(a)3, an instructor could not express the view that white men enjoy a "status as… privileged" when walking around unarmed in public areas because, for example, they are significantly less likely to be murdered by police than Black men.[76] In Plaintiff Park's Feminist Theory class, students read bell hooks' classic text, *Feminist Theory from Margin to Center* and have the

---

[76] *See, e.g.*, Reed T. DeAngelis, *Systemic Racism in Police Killings: New Evidence From the Mapping Police Violence Database, 2013–2021*, Race and Justice (SAGE Journals. Oct. 2021), https://journals.sagepub.com/doi/full/10.1177/21533687211047943 (finding that Black victims of police killings are overrepresented and white victims are underrepresented, relative to the general U.S. population); Josiah Bates, *Police Killings Happen Far More Often Than What's Widely Reported. Here's Why the Numbers Are Off by So Much*, TIME (Oct. 1, 2021), https://time.com/6102324/study-police-killings-significantly-underreported/ ("Black Americans were as much as 3.5 times more likely to die from police violence than white Americans").

option to answer various questions about their privileges (or lack thereof) related to race, sex, class, and ability. They move around the classroom with each answer, providing a visual illustration of how privileges shape their own lives and the experiences of others. Under the Stop W.O.K.E. Act, both lessons would likely be banned as espousing the concept that one's status as privileged or oppressed is determined by race or sex. But one could teach that white privilege does not exist, that Black men and white men are never treated differently on account of their race, or that there is no correlation between race or sex and privilege or oppression. This sort of viewpoint discrimination is prohibited by the First Amendment.

142. The Act also prohibits instructors from teaching content "that… promotes… the… concept[] [that]… [a] person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a)5. For Plaintiff Dunn, this subsection of the Act will inhibit his ability to teach his students about his own personal experiences of racism, as students may perceive his recounting of personal instances where white individuals discriminated against him to be an endorsement of the view that white people today bear responsibility for these past actions. However, Section 1000.05(4)(a)5 of the Act would permit instruction that denounces or denies these same

historical— and lived—experiences and concepts. This is an example of the state making an authoritative selection as to which ideas are permissible, and which must be censored due to the state's disagreement with the viewpoint they espouse.

143. The Act also may prohibit teaching about scientific studies that reach conclusions that the Florida legislature finds disagreeable. For example, the law may implicate research testing the hypothesis that Black applicants for a job are less likely to be hired than white applicants with the same qualifications.[77] To test this hypothesis, researchers developed a methodology, gathered data, analyzed the data, and then published a study explaining whether the data supports a conclusion that the hypothesis is true or false. If an instructor believes that each of those steps was conducted reliably and soundly, then the instructor would logically believe the conclusion and promote its truth to students, just as instructors teach every other scientific principle. However, under the Act, whether the instructor is allowed to teach such scientific principles arguably depends on which viewpoint the research supports. If a study finds that Black applicants are equally likely to be hired as white applicants, then the study can be taught. If, all else being equal, another study finds that Black applicants are less likely to be hired than white applicants on

---

[77] Patrick M. Kline, Evan K. Rose, & Christopher R. Walters, *Systemic Discrimination Among Large U.S. Employers* (Univ. of Chicago 2021), https://bfi.uchicago.edu/wp-content/uploads/2021/08/BFI_WP_2021-94.pdf (finding that recognizably Black names are statistically measurably less likely to by contacted by potential employers for job interviews).

account of their race, then the study likely cannot be taught, because doing so could compel students to believe that "[a] person's… status as either privileged or oppressed is necessarily determined by his or her race[.]" Fla. Stat. § 1000.05(4)(a)3. And, if either the original researcher or the instructor recommended some type of affirmative action remedy that would make it more likely that Black applicants would be hired, then the instruction on the study could be seen as espousing the concept that "[a] person, by virtue of his or her race…should… receive adverse treatment to achieve diversity, equity, or inclusion." Fla. Stat. § 1000.05(4)(a)6.

## III. THE STOP W.O.K.E. ACT'S VIEWPOINT-BASED RESTRICTION ON STUDENTS' RIGHT TO RECEIVE INFORMATION

144. The Act's viewpoint-based restrictions not only have a chilling effect on instructors, but also interfere with university students' "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)).

145. Because instructors are prohibited from advancing particular viewpoints in the course of instruction, as discussed above, students are denied the right to learn from those viewpoints or engage in free, open, and robust discussion or even debate on the Act's disfavored viewpoints. Without comprehensive instruction in their discipline, Florida students will be disadvantaged when applying to graduate school or participating in the workforce.

146. For example, Ms. Dauphin believes that Stop W.O.K.E. Act may cause her professors to sugar-coat discussions about race, and avoid discussing Black perspectives in class. She has taken courses in the past that delve into issues of systemic racism and unconscious bias and she believes such discussions are crucial for contextualizing her own experiences and preparing her to be an effective lawyer in the future. For example, she took a Race and Biology class that included research showing that Black and Latina women are stereotyped as having histrionic personalities, therefore causing doctors to be less likely to take their pain seriously. If instructors feel they cannot espouse the concept that individuals have unconscious biases, then they cannot fully educate students on all the nuances of, and biases within, professional systems.

147. Dr. Park shares Johana's concerns. Withholding instruction about structures of oppression disadvantages students. Without such instruction, students from dominant racial, gender, and sexuality groups will not understand the impact of those systems. Students from vulnerable populations will lack the analytic skills necessary to process their experiences. The value of student degrees in affected disciplines will decrease, making students in this field less marketable to future schools or jobs.

148. Another example of students being deprived of their constitutional right to receive information comes from Dr. Dunn's experience. During his tenure

at FIU, Dr. Dunn started a half-day Black history bus tour, where he takes his students to areas of importance to Black Miami residents. He discusses historical incidents of anti-Black violence, and a significant part of his instruction, through the presentation of these historical events, is on institutional racism. Dr. Dunn even provides firsthand anecdotes as examples, as he grew up in Florida during the era of segregation.

149. Dr. Dunn believes that, due to the Act, he cannot teach about his own lived experiences of segregation or racial discrimination because he recognizes that it could make white students feel sad or ashamed of the conduct of other, past white people. Dr. Dunn's ability to share his own experiences is censored by the Stop W.O.K.E. Act because he fears that a student will file a complaint against him or FIU will withhold his funding. Because of his fears, Dr. Dunn's students will inevitably be deprived of critical parts of his instruction and the free flow of information and ideas.

150. Given the Supreme Court's historic and recent recognition that learning how to tolerate speech of all kinds is part of learning to live in a pluralistic society, an essential character trait to a tolerant citizenry, *see Kennedy v. Bremerton Sch. Dist.*, 26142 S. Ct. 2407, 2415 (2022); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967), state officials should be deeply concerned about denying students access to information in a viewpoint-discriminatory manner.

## IV. PROVISIONS OF THE STOP W.O.K.E. ACT ARE UNCONSTITUTIONALLY VAGUE

151. There are two independent reasons a statute may be void for vagueness: (1) if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; and (2) if it authorizes or even encourages arbitrary and discriminatory enforcement. Section 1000.05(4) fails on both fronts.

152. First, the law includes ambiguous language that instructors could interpret in multiple ways. For example, Section 1000.05(4)(a)4 includes the following prohibited concept: “Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.” The meaning of this language is indecipherable.

153. Section 2(4)(b) is also impermissibly vague. It states that the list of banned concepts “may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.” The law provides no further explanation or definition of the terms “objective manner” or “endorsement.” As such, instructors, including Plaintiffs, are confused about what it means to teach the concepts “in an objective manner without endorsement,” and must curtail their instruction lest it be interpreted as non-objective or as an endorsement. Fla. Stat. §1000.05(4)(b).

154. Although the University of Florida published guidance for instructors that includes recommendations for how to comply with the Act, the guidance does not define what it means to teach a concept "without endorsement," and assumes that it will be interpreted differently by different instructors, who should "review their curriculum and presentations to determine if the way the material is currently written or presented could be interpreted as 'espousing, promoting, advancing, inculcating or compelling belief' in any of the concepts."[78]

155. Professor Pernell, for example, does not know how he can discuss the viewpoints offered in texts he has authored without students perceiving this as endorsement.

156. Dr. Park does not know how to identify foundational principles of her discipline as widely accepted when they contradict the concepts in the Stop W.O.K.E. Act. She also does not know how the provisions apply to students engaged in classroom discussion. For example, her students may build classroom glossaries or provide examples to illustrate concepts. Can the class adopt a definition that conflicts with a concept prohibited by the Stop W.O.K.E. Act? What does the law require of Dr. Park if a student provides an example of privilege that

---

[78] *Introduction to H.B.7 FAQs: Does the University have any guidance for instructors who want to discuss the concepts objectively and without endorsement?*, Univ. of Fla. Office of the Chief Diversity Officer, https://cdo.ufl.edu/hb-7/ (last visited Aug. 16, 2022).

is based on race or sex, as opposed to class or ability? Dr. Park does not know if the Stop W.O.K.E. Act limits her instruction to formal lecturing so classroom discussions do not venture into prohibited concepts.

157. Second, Section 1000.05(4) encourages discriminatory enforcement based on both its plain language and public statements contemporaneous with its passage. The Act's title itself encourages enforcement against instructors who "embrace [] progressive activism."[79] When Governor DeSantis announced the legislative proposal that became the Stop W.O.K.E. Act, he stated that the purpose of the law was to create a "woke-free state of Florida," and listed several examples of views that the Stop W.O.K.E. Act would outlaw, including the distorted views "that the education system is guilty of 'spirit murder' against Black children" and that "'all white people' perpetuate systemic racism."[80]

158. Lieutenant Governor Jeanette Nuñez also confirmed that the Stop W.O.K.E. Act would "put an end to wokeness that is permeating our schools and workforce."[81] After its passage, she touted the Stop W.O.K.E. Act as the "first in the nation to end corporate wokeness and Critical Race Theory in our schools…

[79] Michael Ruiz, *What does "woke" mean?*, FOX NEWS (Dec. 7, 2021), https://www.foxnews.com/us/what-does-woke-mean.
[80] Dec. 15, 2021 Press Release, Gov. Ron DeSantis, *supra* n.3.
[81] *Id.*

prioritizing education not indoctrination," vowing to "always fight to protect our children and parents from this Marxist-inspired curriculum."[82]

159. The Stop W.O.K.E. Act was designed to, and in fact does, prohibit instructors from advancing those views, including views that the legislature distorts and mischaracterizes, and other viewpoints that address the past and present examples of systemic racism in the United States. The law is intended to silence professors who promote viewpoints deemed too "woke" for the legislature's liking.

## V. THE FLORIDA LEGISLATURE'S INTENT TO DISCRIMINATE AGAINST RACE-RELATED INSTRUCTION

160. The legislators who passed the Stop W.O.K.E. Act were motivated by their desire to erase "woke" instruction, or critiques of white supremacy and analyses of systemic racism and sexism, from classrooms. The Act comes after years of robust advocacy for the very speech the Act seeks to suppress.

161. Throughout the 2022 legislative session, the legislature failed to justify the need for the Stop W.O.K.E. Act. Indeed, as Senator Lori Berman stated during a Senate session debating H.B. 7's counterpart S.B. 148: "By my count, we are at least on round four of bills that address a problem that does not exist."[83] Senator Shevrin D. Jones, echoed Senator Berman's sentiment when he stated: "No one, nowhere has

---

[82] Apr. 22, 2022 Press Release, Gov. Ron DeSantis, *supra* n.4.

[83] *3/10/22 Senate Session Part 1* at 00:34:04—00:34:12.129, THE FLORIDA CHANNEL (Mar. 10, 2022), https://thefloridachannel.org/videos/3-10-22-senate-session-part-1/.

ever said that any white person in this room is responsible for what happened in the past. Nowhere. No one. It is all a farce that we are sitting in this room. Wasting precious time."[84]

162. Other well-established provisions in state and federal law exist to protect against compelled speech and race discrimination, including but not limited to the Florida Civil Rights Act of 1992, Fla. Stat. §§ 760. 01 *et seq*. and 509.092, which prohibits discrimination because of, *inter alia*, one's race, color, religion, sex, or national origin.

163. Moreover, although there were at least ten (10) proposed amendments that would have been less restrictive, legislators chose to enact the most restrictive provisions in H.B. 7. For example, Representative Angela Nixon sponsored Amendment 161453, which removed lines 211-331 of the Bill that provided a private cause of action and prohibitory language about teaching diversity and inclusion in schools. The other proposed amendments[85] removed (i) employer

---

[84] *Id.* at 00:39:49—00:40:16.

[85] Representative Kristen Arrington sponsored Amendment 982331, which removed lines 49-331 of H.B. 7, which allowed employees to sue businesses if they felt uncomfortable as a result of participating in training that may touch on diversity, equity, and inclusion. In addition, Representative Dotie Joseph sponsored two amendments, Nos. 728883 & 135269, which removed references to objective instruction and feelings of guilt, anguish, or other forms of psychological distress. Relatedly, Representative Kevin Chambliss sponsored Amendment 487075, which removed lines from the Bill concerning how instructors could use curricula to address unjust laws.

liability; (ii) the requirement to teach about race "objective[ly]"; and (iii) language related to indoctrinating school children.

164. The House rejected the amendments, and legislators chose to enact the most restrictive provisions in H.B. 7 despite hearing testimony from their colleagues and community members about the impact the Bill would have on people of color, particularly Black people, in the state.

## VI. HARM FROM THE STOP W.O.K.E. ACT'S RESTRICTIONS ON RACE-RELATED SPEECH DISFAVORED BY THE FLORIDA LEGISLATURE

165. Florida's universities and colleges have already begun restricting access to the viewpoints and speech the Stop W.O.K.E. Act is designed to suppress. For example, UCF's English Department retracted a statement on its commitment to anti-racism due to concerns that it violated the Stop W.O.K.E. Act.

166. The statement read, in part, "There has never been a more important time for us to tackle these issues together, with long-standing inequities and discrimination made more visible by the pandemic and recent horrific violence further illuminating the systemic racism plaguing our society and impacting so many… Unconscious bias and white fragility are pervasive throughout society, and we recognize that they also exist among faculty. We have many students of color

in our department, but we recognize that we have not systemically made sure they feel welcome. We have work to do."[86]

167. The UCF English Department issued a disclaimer on June 28, 2022, that: "As of July 1, 2022, the statement is suspended as it violates Florida law."[87] By mid-afternoon on July 7, 2022, the disclaimer had been removed from the UCF English Department website. On July 13, 2022, the UCF English Department's anti-racist statement was removed altogether from the site.

168. UCF's Anthropology Department, Philosophy Department, and Physics Department, among others, removed similar statements regarding anti-racism at the same time. Each of these department statements were published in 2020 and 2021, as part of UCF's commitment to promoting a more inclusive and racially aware environment for students, faculty, and staff in the wake of the murder of George Floyd.

169. Upon learning that UCF's English Department rescinded this statement, Governor DeSantis's office responded: "The UCF English Department 'Anti-Racism Statement' is mostly nonsensical Marxist drivel, but troubling in

---

[86] Brandon Wolf (@bjoewolf), Twitter (Jul. 07, 2022, 1:22 PM), https://twitter.com/bjoewolf/status/1545095875906732032?s=20&t=UkSJ1S9MVZ5myT01PUtS7g.

[87] Annie Martin, *UCF Department Briefly Scraps Anti-racism Policy Amid Concerns about New State Law*, Orlando Sentinel (Jul. 07, 2022), (Jul. 07, 2022), https://www.orlandosentinel.com/news/education/os-ne-ucf-english-anti-racism-20220707-gtigoknfnbgybgxseezxpuvyae-story.html.

areas that suggest intent to treat students/faculty differently based on skin color."[88] DeSantis's office then said concepts such as "white fragility" and the term "Latinx," both included in the former statement, are "evidence-free ideological constructs," and that they welcome any institution who wishes to remove similar statements or initiatives to identify and address discrimination.[89]

170. The Stop W.O.K.E. Act has a chilling effect on instructors and students who are enrolled in race-related coursework. Plaintiffs and other instructors who use social science research and data when discussing race are faced with an impossible dilemma—run afoul of the Act or fail to teach ethically by presenting "both sides" in contradiction of widely accepted, research-supported conclusions in their field, such as, the fact that our legal system perpetuates historical racial disparities and that colorblind approaches cannot fully remedy these disparities. Endorsing that colorblind approaches are inadequate and have racist origins, however, is prohibited by the Stop W.O.K.E. Act.

171. For example, as Dr. Almond describes, the Stop W.O.K.E. Act "put me in the position of being forced to choose between my professional obligation to fully teach these standards to my students in order to prepare them for their careers and my obligation as a citizen to comply with Florida law." Race is a necessary

---

88 *Id.*
89 *See id.*

component of Dr. Almond's course instruction, and the Stop W.O.K.E. Act limits his ability to train his psychometric students on certain required aspects of the American Psychological Association, American Educational Research Association, and National Council on Measurement in Education joint standards. This could lead to his students not only misunderstanding concepts that are necessary for their course of study, but further, not being not competitive in future courses of study or upon entering the workforce.

172. Dr. Almond discusses his own experiences with white privilege, which may be interpreted to violate the Act's prohibition against endorsement of the concept that an individual's "status as either privileged or oppressed is necessarily determined by his or her race."

173. In his courses, Dr. Almond teaches about potential inequities in school resources available to students from traditionally disadvantaged groups. His instruction includes discussions of the racist origins of concepts such as "merit" and how they contribute to educational disparities such as test scoring. Furthermore, Dr. Almond created a handout that discusses race as a variable in the field of statistics. The handout includes information about the role of race in colonialism and eugenics and the appropriateness of analyzing race in statistics. Dr. Almond feels limited in his ability to fully and openly discuss these issues

because of the Stop W.O.K.E. Act's prohibitions. Additionally, he fears that he could face punishment if a student raises concerns about the content of his courses.

174. Similarly, FAMU Law Professor Pernell feels compelled by the Stop W.O.K.E. Act to change how he teaches certain topics by modifying his course material. He worries that he can no longer assign and discuss the casebook he authored about racism in the criminal legal system.

175. In each of his courses, which include Constitutional Law II, Torts, and Criminal Procedure, Professor Pernell "ask[s] students to look critically at the legal system from the perspective that the system is very color-conscious and promotes race privilege." Instruction on these topics may lead a student to accuse Professor Pernell of endorsing the idea that individuals have certain privileges on account of their race, which the Stop W.O.K.E. Act prohibits. The Act hamstrings Professor Pernell's ability to fully and accurately present these nuanced and complex issues, as he is concerned that the state government will strip FAMU Law of funding if he continues to teach students in the manner that he had prior to the Act's enactment.

176. Dr. Thompson Dorsey's School Law and Critical Race Studies courses build upon the understanding that racism is embedded in American society, a position widely accepted and supported by research in her field. In School Law, Dr. Thompson Dorsey teaches students how to recognize and counter manifestations of racism in schools. She cannot continue to identify systemic

racism and sexism in schools, and train students to do the same, if she censors the concepts listed in the Stop W.O.K.E. Act. Dr. Thompson Dorsey teaches Critical Race Theory in her Critical Race Studies course and uses this approach to trace issues of race, racism, and power. She cannot maintain this pedagogical approach and not endorse Critical Race Theory as an appropriate lens.

177. Dr. Austin shares similar concerns about the ability to use Critical Race Theory in her courses next year. In particular, Dr. Austin worries about how she can continue to use this framework to discuss ideas regarding unconscious biases that people carry based on their race and sex, and critiques of "colorblindness" as a concept that was created to perpetuate racial inequities, given that the Stop W.O.K.E. Act prohibits endorsing these very ideas. She fears she will no longer be able to use the Critical Race Theory framework in her courses about race and politics, and that her students will be exposed to fewer ideas as a result.

178. Dr. Park teaches that notions of colorblindness, gender neutrality, and objectivity reinforce racism and sexism in the status quo, principles widely accepted in her disciplines for 30-40 years. The fields in which she works largely concur that objectivity is an outgrowth of Eurocentric, colonial thinking that accorded this capacity (a function of reason) solely to white, European men of the upper classes. To present colorblindness, gender neutrality, or objectivity to her

students as undisputed virtues, as the Stop W.O.K.E. Act suggests, would require Dr. Park to abandon her scholarly and ethical integrity.

179. Dr. Sandoval's course on Intercultural Communication includes a unit on whiteness, in which she will teach that people of color are underrepresented in her field, in part because of historical discrimination by white academics. Students who feel uncomfortable—perhaps because they believe they benefit from the tendency to hire and promote white academics—might decide to complain about her for espousing the view that they bear responsibility for and should feel guilty because of historical discrimination by white people. Dr. Sandoval fears that, because of the Stop W.O.K.E. Act, the consequences of those complaints could be dire.

180. FIU Professor Emeritus of Psychology, Dr. Dunn is concerned that the Stop W.O.K.E. Act curtails his ability to truthfully speak about institutionalized racism and his experiences growing up under Jim Crow laws because one cannot speak about their own experiences objectively, as the Stop W.O.K.E. Act requires.

181. FSU student Johana Dauphin is enrolled in Race & Minority Relations and Religion, Race and Ethnicity for the Fall semester. Race is a central theme in both classes. Because of the Stop W.O.K.E. Act, Ms. Dauphin is concerned that she will not receive the same instruction as students who took these courses before the law passed. Ms. Dauphin worries that, because the Stop

W.O.K.E. Act bans instruction that advances the concept that a person's status as privileged or oppressed is determined by race, she will be deprived of relevant information about how race affects people's perceived or actual status in various contexts.

182. What's more, Dr. Sandoval has spoken to many UCF professors, a majority of whom are Black or Latinx, who have expressed their concerns about continuing to teachi Critical Race Theory, or courses with a Critical Race Theory component, without being fired or losing job propects. This fear also extends to tenured professors who are concerned that the enforcement of the Stop W.O.K.E. Act will affect their five-year reviews.

## VII. THE STOP W.O.K.E. ACT'S DISPARATE HARM ON BLACK INSTRUCTORS AND STUDENTS

183. First, the Stop W.O.K.E. Act specifically targets speech about "race, color, sex, or national origin"; "an individual's… status as either privileged or oppressed"; and "diversity, equity [and] inclusion." Fla. Stat. § 1000.05(4)(a).

184. Because of this, instructors who teach Critical Race Theory, race studies, ethnic studies, or otherwise discuss systemic racism, and gender and sex discrimination will be restricted in their ability to teach. Their instruction necessitates discussions of the prohibited concepts, causing them to fear that any reference may be construed as a violation of the Act. Instructors do not know

where the line is between presenting ideas and endorsing them, given that lectures are dynamic conversations during which multiple sides of an issue are discussed.

185. Second, Black instructors within Florida's State University System are more likely to teach courses on race studies, Critical Race Theory, ethnic studies, and other courses that involve the viewpoints that the Stop W.O.K.E. Act is designed to suppress. Plaintiffs Professors Dunn, Thompson Dorsey, Pernell, and Austin are all Black professors who teach on these topics.

186. Departments of African American Studies at FSU, FIU, and UF, where discussions of race, white privilege, systemic inequality, and other viewpoints disfavored by the legislature will predictably occur, are predominantly staffed by Black instructors.

187. Third, the Stop W.O.K.E. Act will exacerbate existing racial disparities and inequalities for Black instructors by exposing them to retaliation and adverse treatment and putting their professions at risk.

188. Black instructors are less likely to be tenured than their white counterparts.[90] Black instructors who are suspected of violating the Stop W.O.K.E. Act may lose their jobs at an even higher rate.

---

[90] *See, e.g.*, J. Nathan Matias, et al., *Universities Say They Want More Diverse Faculties. So Why Is Academia Still So White?*, FiveThirtyEight (Sept. 7, 2021), https://fivethirtyeight.com/features/universities-say-they-want-more-diverse-faculties-so-why-is-academia-still-so-white/ (citing that Black instructors made up Con't)

189. Black instructors spend more out of classroom time engaged in diversity, equity, and inclusion work—the very type of work that the Stop W.O.K.E. Act seeks to restrict.[91]

190. When teaching the same material, Black instructors are criticized more harshly by students than white instructors.[92] It is therefore more likely that Black instructors' discussions of topics related to the prohibited concepts will be negatively received, and that students, parents and other aggrieved parties will be more likely to file complaints against them based on perceived violations of the Stop W.O.K.E. Act.

---

only 11% of tenured and tenure-track faculty, and that white instructors made up 74% in 2019); Jalelah Abdul-Raheem, *Faculty Diversity and Tenure in Higher Education* (Journal of Cultural Diversity 2016), https://pubmed.ncbi.nlm.nih.gov/27439231/ ("Faculty members of color and women face several barriers that effect tenure and promotion and are important resources for changing society and advocating for equity.").

[91] Selena A. Carrion, *Pay BIPOC Educators for Their DEI Labor*, LEARNING FOR JUSTICE (July 23, 2021), https://www.learningforjustice.org/magazine/pay-bipoc-educators-for-their-dei-labor.

[92] Kerry Chavez & Kristina M.W. Mitchell, *Exploring Bias in Student Evaluations: Gender, Race, and Ethnicity* (Cambridge Univ. Press 2019), https://www.cambridge.org/core/journals/ps-political-science-and-politics/article/exploring-bias-in-student-evaluations-gender-race-and-ethnicity/91670F6003965C5646680D314CF02FA4.

191. Black instructors are already under-represented in higher education.[93] Enforcement of the Stop W.O.K.E. Act against Black instructors will only compound this disparity, as instructors are disciplined, fired, and forced out.

192. Fourth, the Stop W.O.K.E. Act will expose Black students to more discrimination because of the suppression of the viewpoints disfavored by the law, their inability to discuss and hear these viewpoints, and the resulting impact on the school environment.[94]

193. Instruction about race, and student awareness of racism, reduce the likelihood that students will engage in racial harassment and that students of color will experience school-based discrimination and related academic and mental health consequences.[95]

---

93 *Race/ethnicity of college faculty*, NAT'L CTR. FOR EDUC. STATISTICS, https://nces.ed.gov/fastfacts/display.asp?id=61 (last visited Aug. 16, 2022) (only four percent of full-time faculty were Black female, and three percent were Black males).

94 Christy Byrd, *Does Culturally Relevant Teaching Work? An Examination from Student Perspectives*, 6 SAGE OPEN 1, 5 (July-Sept. 2016), https://journals.sagepub.com/doi/pdf/10.1177/2158244016660744.

95 *Id.* at 4-5; *see also* Tabbye M. Chavous, et al., *Racial Identity and Academic Attainment Among African American Adolescents*, 74 CHILD DEV. 1076 (2003); Oseela Thomas, et al., *Promoting Academic Achievement: The Role of Racial Identity in Buffering Perceptions of Teacher Discrimination on Academic Achievement among African American and Caribbean Black Adolescents*, 101 J. EDUC. PSYCH. 420 (2009); Thomas S. Dee & Emily K. Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, (Nat'l Bureau of Econ. Rsch. 2016), https://www.nber.org/papers/w21865; Ellen Kisker, et al., *The Potential of a Culturally Based Supplemental Mathematics Curriculum to*
Con't)

194. The converse is also true—removing this instruction increases the likelihood that students of color will experience increased racial harassment and discrimination.[96]

195. As such, by restricting student access to discussions and information about race, racism, systemic inequality, white privilege, and other topics disfavored by the legislature, the Stop W.O.K.E. Act will expose Plaintiff Dauphin and other Black students to more discrimination.

## VIII. THE FLORIDA LEGISLATURE'S KNOWLEDGE OF THE RACIALLY DISPARATE HARM OF THE STOP W.O.K.E. ACT

196. First, the Stop W.O.K.E. Act's bill sponsors made clear they intended to censor conversations about systemic racism, inclusion, and equality, particularly among *groups* of people of color.

---

*Improve the Mathematics Performance of Alaska Native and Other Students*, 43 J. RSCH. IN MATHEMATICS EDUC. 78, 100 (2012); Nolan L. Cabrera, et al., *Missing the (Student Achievement) Forest for All the (Political) Trees: Empiricism and the Mexican American Studies Controversy in Tucson*, 51 AM. EDUC. RSCH. J. 1084, 1102 (2014); Tyrone Howard & Clarence L. Terry, *Culturally Responsive Pedagogy for African American Students: Promising Programs and Practices for Enhanced Academic Performance*, 22 TEACHING EDUC. 345 (2011).

[96] Sheretta T. Butler Barnes, et al., *Promoting Resilience Among African-American Girls: Racial Identity as a Protective Factor*, 89 Child Dev. 552 (2018), https://pubmed.ncbi.nlm.nih.gov/29154406/.

197. As described above, Representative Avila and Senator Diaz were squarely focused on suppressing the use of terms like "white privilege" and "systemic racism," specifically when discussed among "affinity groups."[97]

198. Representative Avila also criticized "movements" that discuss "experiences [] based on the group they fit into," a thinly veiled reference to the Black Lives Matter movement and similar activists who have emphasized the collective experiences of Black people.[98]

199. Second, members of the public and the Stop W.O.K.E. Act's opponents put the legislature on notice that it would have a disparate impact on Black students and instructors.

200. During public testimony before the House Education & Employment Committee on February 8, 2022, Plaintiff Dauphin, a student activist at Florida State University, said "Your kids are not as colorblind as you think. You are more concerned about them feeling guilty than Black kids being terrorized by racist kids who don't know any better because they were raised by people like you who do things like this." Plaintiff Dauphin also testified: "When I think of my experience in your public schools, all I think of is discomfort. I sat through a classmate

---

97 *2/1/22 House State Affairs Committee* at 01:01:52.040, *supra* n.2.

98 Scott Powers, *Freedom from discomfort or a knowledge ban? 'Individual freedom' bill covering schools, businesses moves in House*, Florida Politics (Jan. 26, 2022), https://floridapolitics.com/archives/489834-freedom-from-discomfort-or-a-knowledge-ban-stop-w-o-k-e-act-moves-in-house/.

arguing in our debate class that Black people are inherently inferior, blaming us for the effects of institutionalized racism. But you don't seem to care about that. Due to the sheer amount of racism I've experienced and the experiences of most Black people you can ask, you guys are clearly failing to teach the values of racial progress that the bill claims to uphold."[99]

201. Anna Gavalda, with the Florida Student Power Network, testified: "I also want to name something that is very interesting to me that this bill is being passed today on the first day of Black History Month. What is the message that you're sending to our Black youth? What is the message that you're sending to our LGBTQ youth? What is the message that you're sending to our immigrant youth in this state? And the message is that their lives don't matter that their identities don't matter."[100] Ms. Gavalda also testified: "We strongly oppose H.B. 7 because we know that this bill would take away the right from all students to learn and understand systemic discrimination, racism, and the real history of this country and state. Black, Brown, and LGBTQ+ youth are impacted by systemic discrimination every day and they experience it through their daily lives. And students who do not face these experiences still have the right to learn and understand how their peers go through and navigate the world…. This bill will push for children to be silent

---

[99] *2/8/22 House Education and Employment Committee* at 01:58:19—01:58:54, *supra* n.55.

[100] *2/1/22 House State Affairs Committee* at 01:45:01-01:45:23, *supra* n.2.

and their own experiences and to be shunned in the system that should be teaching about our real history and where children can share and discuss with each other and grow through those learnings and also our teachers are not punished."[101]

202. Mary Elizabeth Estrada, a recent graduate and organizer for the Florida Student Power Network, Florida testified: "This country was built on racism on oppression, murder and other atrocities. History repeats itself, and if we water down historical facts to make it more comfortable for white children, we will never evolve and we will never remove systemic racism."[102]

203. During debate before the House State Affairs Committee on February 1, 2022, Representative Joseph said: "Some people can't and won't acknowledge that Black people in this country are disproportionately harmed by all sorts of things. And there was commentary about individualism versus the systems and practices that perpetuate the racist results. The fact is this history, the fact of history is that the US Constitution counted Black people as 3/5 of a person. That is a fact, that is structural…. The only way to not repeat the past is to educate ourselves and learn the lessons that we need to learn to fix the systems and practices that perpetuate racially unjust results. Racism exists. History in which

[101] *Id.* at 01:42:53.450-01:43:58.779.
[102] *Id.* at 01:46:44.630-01:47:06.010.

people have killed or discriminated against should make people uncomfortable or feel guilty. That should happen. That should be a thing."[103]

204. The ACLU of Florida submitted written testimony in opposition to H.B. 7, stating that, among other things, H.B. 7 would censor public schools and instructors from teaching their students in K-20 schools (including public colleges and universities) about race, national origin, and the impacts of slavery. In addition, the ACLU further testified that the bill would make it unlawful to provide instruction or trainings in K-20 schools on the same topics.[104]

205. "Banning the right of educators and employers to initiate conversations about race and gender and the long-term impacts of slavery and patriarchy on current social, economic, and political realities, would not only censor employers and educators, but would negate the lived experiences of marginalized groups in classrooms and workplaces. H.B. 7/S.B. 148 essentially seek to erase the factual history of the U. S. from being discussed and acknowledged in workplaces and schools and prevent employees and students

---

103 *Id*. at 02:16:47-02:18:09.

104 Letter from Kara Gross, Legislative Director & Sr. Policy Counsel of ACLU Florida to Chair Erin Grall, Judiciary Committee (Jan. 26, 2022), https://www.aclufl.org/sites/default/files/aclu_fl_written_testimony_in_opposition-_hb_7_government_censorship_of_race_gender_discussions_judiciary_1.25.22.pdf.

from receiving informative trainings that could improve the culture and habits of workplace and classroom environments."[105]

206. Third, the legislature was on notice of a Tennessee law with very similar language to the Stop W.O.K.E. Act, that is currently being challenged on constitutional grounds. The initial complaints filed under that law were based on discussions of anti-racist ideas. As Senator Lori Berman explained: "Tennessee was one of the first states to pass similar legislation and it didn't take long for a complaint to be filed under the law for a school that was teaching about Martin Luther King and his March on Washington. They said that Martin Luther King and his teachings were divisive, anti-American and anti-White. Is that where we are today as a society vilifying a monumental figure of American history?"[106]

207. The Florida legislature enacted the Stop W.O.K.E. Act despite powerful testimony from the public about the importance of instruction on systemic racism and the experiences of Black people, as well as the central role such education has in promoting discussions and awareness that lead to a more just society.

208. Enacting legislation that stifles those discussions exhibits a hostility to Black people because it suppresses speech and ideas that help Black people

---

105 *Id.*
106 *3/10/22 Senate Session Part 1* at 00:35:34-00:36:02, *supra* n.83.

achieve equality and full citizenship. Indeed, remedying racial inequalities was the driving force behind the surge in discussions and initiatives designed to confront this country's history of racial injustice following the killings of George Floyd, Breonna Taylor, and others.

209. As noted earlier, the suppression of Black activism and speech in Florida throughout the 1950s and 1960s was a rejection of calls for racial justice. Often times, past efforts to prevent racial justice through the suppression of Black activism and speech were the result of actions from state officials, including the Florida legislature, as demonstrated by its shuttering of FAMU Law School in the wake of Black student protests in the 1960s.

210. The enactment of the Stop W.O.K.E. Act therefore follows a regrettable decades-old pattern by the Florida legislature to suppress racial justice efforts. The Stop W.O.K.E. Act does so by infringing upon the constitutional rights of Florida's instructors and students.

## CLAIMS FOR RELIEF

## COUNT ONE

### First Amendment to the U. S. Constitution – Right to speak free from viewpoint-based discrimination

211. All prior paragraphs are incorporated here by reference.

212. The First Amendment binds the State of Florida pursuant to the incorporation doctrine of the Fourteenth Amendment. In all of the following

paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

213. Viewpoint-based discrimination is presumptively unconstitutional in any setting. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). But the dangers of viewpoint-based restrictions are magnified in the university setting, because they interfere with academic freedom principles that have long been recognized by the Supreme Court, the Eleventh Circuit Court of Appeals, and Florida's colleges and universities. *Keyishian*, 385 U.S. at 603; *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n. 6 (11th Cir. 2022).[107]

214. All instructors on college campuses have the First Amendment right to speak free from viewpoint-based restrictions. Instructors include—but are not limited to—professors, lecturers, guest speakers, student teaching assistants, and anyone participating in leading and providing classroom instruction.

215. Instructors understand the Stop W.O.K.E. Act to prohibit them from providing instruction that advances students' belief in certain concepts, while allowing them to provide instruction that denounces those concepts.

---

[107] *See also* State Univ. Sys. Free Expression Stmt. (Apr. 15, 2019), https://www.flbog.edu/2019/04/15/state-university-system-free-expression-statement/.

216. The Stop W.O.K.E. Act prohibits instructors from teaching students about scientific studies that reach conclusions that contradict its banned concepts.

217. The Stop W.O.K.E. Act imposes unconstitutional viewpoint-based restrictions on instructors' speech and is contrary to the principle of academic freedom.

218. Instructors can no longer say anything in class that might be perceived as "woke," as that term is understood by the legislature, without reasonably fearing official consequences.

## COUNT TWO

### First Amendment to the U.S. Constitution –
### Right to receive information free from viewpoint-based discrimination

219. All prior paragraphs are incorporated here by reference.

220. The First Amendment protects the right to receive information and ideas as well as the right to disseminate ideas. *Stanley*, 394 U.S. at 564.

221. By prohibiting instructors from advancing particular viewpoints in the course of instruction, the Stop W.O.K.E. Act denies college and graduate students the right to learn from those viewpoints.

222. The "chief mission [of universities] is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First*, 32 F.4th at 1128.

223. Students can only be prepared for civic and political participation if they are "trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603 (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)).

224. As a result of the Stop W.O.K.E. Act, students only have access to censored classrooms, and have a significantly impaired ability to learn the full scope of their discipline, including ascertainment of academic consensus and debate on issues disfavored by the legislature.

225. The Stop W.O.K.E. Act infringes on students' right to receive information in college and graduate classrooms, uninhibited by State-imposed viewpoint-based restrictions.

## <u>COUNT THREE</u>

### Fourteenth Amendment – Vagueness

226. All prior paragraphs are incorporated here by reference.

227. A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or

even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

228. The Stop W.O.K.E. Act is unconstitutionally vague on its face because it fails to provide fair notice of what college professors, student teaching assistants, and other instructors can and cannot say in their courses, and because it invites arbitrary and discriminatory enforcement.

229. For example, instructors do not know what it means to teach concepts "in an objective manner without endorsement." Fla. Stat § 1000.05(4)(b).

230. Instructors also are uncertain what it means to not be allowed to teach that one "cannot or should not attempt to treat others without respect to race, color, national origin, or sex." Fla. Stat § 1000.05(4)(a)(4).

231. The "Stop W.O.K.E" title, text, and legislative history encourages discriminatory enforcement against instructors who embrace progressive activism.

232. Instructors of color and those who are vocal about or teach social justice or race or gender issues are more likely to be targeted for enforcement than their colleagues.

## <u>COUNT FOUR</u>

### Fourteenth Amendment – Equal Protection

233. All prior paragraphs are incorporated here by reference.

234. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that: “No State shall… deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const. amend. XIV, § 1.

235. An official action taken for the purpose of discriminating on account of race has no legitimacy under the United States Constitution. *City of Richmond, Va. v. United States*, 422 U.S. 358, 378-79 (1975).

236. The Stop W.O.K.E. Act was enacted for a racially discriminatory purpose.

237. Demonstrating intentional discrimination “does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes.” *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Instead, as is the case with the Stop W.O.K.E. Act, the discriminatory purpose must have been a motivating factor, rather than the primary or sole purpose. *Id.* at 265-66.

238. “Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.” *Id.* at 266.

239. Recognizing that legislation motivated by a discriminatory purpose historically has often been crafted so that it “appears neutral on its face,” the U.S.

Supreme Court articulated several non-exhaustive factors to inform an analysis of discriminatory intent, including: (1) evidence that defendants' decision bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or report[s]." *Id.* at 266-68.

240. Applying the *Arlington Heights* factors, the Stop W.O.K.E. Act was enacted, at least in part, with the purpose of discriminating against Black instructors and students by chilling and suppressing their speech about race and inequality. The law explicitly targets concepts related to race and racism. As such, the law's impact will bear particularly heavily on Black instructors, who are more likely to teach on these topics, and on Black students, who are most likely to benefit from discussions on these topics. By limiting this speech, the law will also expose Black students and other students of color to increased harassment and discrimination.

241. The history surrounding the adoption of the Stop W.O.K.E. Act, along with the unusual events leading up to its signing, and substantive departures from the normal legislative process that resulted in its enactment, further demonstrate its discriminatory purpose. Moreover, statements made by the bill's sponsors and

proponents make clear that the Stop W.O.K.E. Act targets the elimination of curriculum, instruction, and conversations designed to improve the educational, social, and civic experiences of Black people and other historically marginalized groups.

242. The known and reasonably foreseeable discriminatory impact of the Stop W.O.K.E. Act and the tenuousness of the stated justifications for the new law, among other factors, raise a strong inference of a discriminatory purpose in violation of the Equal Protection Clause of the Fourteenth Amendment.

## PRAYER FOR RELIEF

**WHEREFORE**, in light of the foregoing facts and arguments, Plaintiffs respectfully request that this Court:

A. Issues preliminary and permanent injunctive relief restraining Defendant and its employees, agents, and successors in office from enforcing the Act;

B. Declare the Stop W.O.K.E. Act facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

C. Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1998; and

D. Grant such additional relief as the interests of justice may require.

Respectfully Submitted,

/s/ Jerry C. Edwards
Jerry Edwards
Fla. Bar No. 1003437
ACLU Found. of Fla.
933 Lee Road, Suite 102
Orlando, FL 32810
(786) 363-1107
jedwards@aclufl.org

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA, INC.**

/s/ Daniel B. Tilley
Daniel B. Tilley
Florida Bar No. 102882
Katherine H. Blankenship
Florida Bar No. 1031234
Caroline McNamara**
4343 West Flagler Street, Suite 400
Miami, Florida 33134
(786) 363-2707
dtilley@aclufl.org
kblankenship@aclufl.org
cmcnamara@aclufl.org

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

/s/ Leah Watson
Leah Watson*
Emerson Sykes*
Sarah Hinger*
Laura Moraff*
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
lwatson@aclu.org
esykes@aclu.org
shinger@aclu.org
lmoraff@aclu.org

**NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.**

/s/ Morenike Fajana
Morenike Fajana*
40 Rector Street, 5th Floor
New York, NY 10006
(212) 217-1690
mfajana@naacpldf.org

**BALLARD SPAHR LLP**

/s/ Jason Leckerman
Jason Leckerman*
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 864-8266
leckermanj@ballardspahr.com

Jin Hee Lee*
Santino Coleman*
700 14th Street, Ste. 600
Washington, D.C. 20005†
(202) 682-1300
jlee@naacpldf.org
scoleman@naacpldf.org

Charles Tobin (Fla. Bar No. 816345)
1909 K Street NW, 12th Floor
Washington, D.C. 20006
(202) 661-2200
tobinc@ballardspahr.com

Jacqueline Mabatah*
201 South Main Street, Suite 800
Salt Lake City, UT 84111-2221
(801) 531-3063
mabatahj@ballardspahr.com

Isabella Salomão Nascimento*
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
(612) 371-3281
salomaonascimentoi@ballardspahr.com

†Mailing address *only* (licensed in and working remotely from South Carolina)

*(motion for admission *pro hac vice* forthcoming)

**(Florida Bar admission pending)

*Attorneys for Plaintiffs*

1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

ADRIANA NOVOA, SAMUEL RECHEK, and the FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA,

*Plaintiffs,*

v.

MANNY DIAZ, JR., in his official capacity as the Commissioner of the Florida State Board of Education; TIMOTHY M. CERIO, RICHARD CORCORAN, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, EDWARD HADDOCK, KEN JONES, DARLENE LUCCIO JORDAN, BRIAN LAMB, ALAN LEVINE, CHARLES H. LYDECKER, CRAIG MATEER, DEANNA MICHAEL, STEVEN M. SCOTT, ERIC SILAGY, and KENT STERMON in their official capacities as members of the Florida Board of Governors of the State University System; JULIE LEFTHERIS in her official capacity as the Inspector General of the Florida Board of Governors of the State University System; THE UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES; and TIMOTHY L. BOAZ, SANDRA CALLAHAN, MICHAEL CARRERE,

Civil Action No.: ____________

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

N. ROGAN DONELLY, MICHAEL E. GRIFFIN, OSCAR HORTON, LAURAN MONBARREN, NITHIN PALYAM, SHILEN PATEL, FREDRICK PICCOLO, MELISSA SEIXAS, JENIFER JASINSKI SCHNEIDER, and WILLIAM WEATHERFORD in their official capacities as members of the University of South Florida Board of Trustees,

*Defendants*.

GREG HAROLD GREUBEL*
PA. Bar No. 321130; NJ No. 171622015
ADAM STEINBAUGH*
PA. Bar No. 326475
JT MORRIS*
TX Bar No. 2409444
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street; Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (215) 717-3440
greg.greubel@thefire.org
adam@thefire.org
jt.morris@thefire.org

**Pro Hac Vice* Motions Forthcoming

GARY S. EDINGER, ESQUIRE
Fla. Bar No.: 0606812
BENJAMIN, AARONSON, EDINGER & PATANZO, P.A.
305 N.E. 1st Street
Gainesville, Florida 32601
Tel: (352) 338-4440
Fax: (352) 337-0696
GSEdinger12@gmail.com

# TABLE OF CONTENTS

INTRODUCTION ........ 1

JURISDICTION AND VENUE ........ 3

THE PARTIES ........ 4

FACTUAL ALLEGATIONS ........ 9

I. Despite Florida's Statutory Commitment to Free Expression on Campus, It Passes Law Banning "Instruction" on Specific Viewpoints in Higher Education. ........ 9

A. The Campus Free Expression Act Protects Access to Information. ........ 9

B. Lawmakers Nationwide Move to Suppress "Divisive Concepts." ........ 10

C. Florida Political Leaders Introduce the "Stop WOKE Act" Following K–12 Ban. ........ 11

D. The Stop WOKE Act Expands Florida's Discrimination Law to Ban Viewpoints. ........ 12

E. The Stop WOKE Act's Sponsors Explain Its Intent: Eradicate Ideology, Personal Beliefs, or Materials Offering "Unique Perspectives." ........ 17

F. The Board of Governors Adopts Regulations Implementing the Stop WOKE Act. ........ 22

G. USF Ignores Constitutional Concerns and Issues 'Stop WOKE' Guidance to Faculty. ........ 24

H. Other Florida Universities and Colleges Issue Guidance on the Stop WOKE Act. ........ 27

II. Violating the Stop WOKE Act Risks Severe Penalties. ........ 31

A. Violations Risk Millions of Dollars in Annual Funding. ........ 31

B. Faculty Members Said to Violate the Stop WOKE Act Are Subject to Discipline and Exposed to Litigation. .......... 34

C. The Stop WOKE Act's Ambiguous Application to "Instruction" Chills Introduction of Written Materials and Guest Speakers. .......... 35

III. The Stop WOKE Act Infringes on Plaintiffs' Constitutional Rights. .......... 37

A. Professor Novoa's Instruction of Course Materials and Classroom Discussions Would Violate the Stop WOKE Act. .......... 37

B. Professor Novoa's Instruction in Her Science in Cultural Context Course and Its Assigned Materials Violate the Stop Woke Act. .......... 40

C. Professor Novoa's Instruction in Her History of Sports Course and Its Assigned Materials Violate the Stop WOKE Act. .......... 44

D. Professor Novoa's Instruction in Her Modern Latin America Course and Its Assigned Materials Violate the Stop WOKE Act. .......... 50

E. If Not Enjoined, the Stop WOKE Act Prohibits Professor Novoa's Instruction and Jeopardizes USF Funding. .......... 53

F. The Stop WOKE Act Is Currently Imposing the "Pall of Orthodoxy" on Rechek and Members of the First Amendment Forum. .......... 56

CAUSES OF ACTION .......... 60

FIRST CAUSE OF ACTION
Violation of the First Amendment .......... 60

SECOND CAUSE OF ACTION
Violation of the First Amendment—
Viewpoint Discrimination .......... 65

THIRD CAUSE OF ACTION
Violation of First Amendment—
Prior Restraint .......... 67

FOURTH CAUSE OF ACTION
Violation of First Amendment—
Right to Receive Information and Ideas .......... 71

FIFTH CAUSE OF ACTION
Violation of the First Amendment—
Facial Overbreadth .......... 74

SIXTH CAUSE OF ACTION
Violation of Due Process—
Vagueness .......... 77

SEVENTH CAUSE OF ACTION
Violation of the Campus Free Expression Act .......... 82

PRAYER FOR RELIEF .......... 85

VERIFICATION OF ADRIANA NOVOA .......... 87

VERIFICATION OF SAMUEL RECHEK .......... 88

## INTRODUCTION

1. Plaintiffs—a professor of history, an undergraduate student, and a student organization founded to foster the free exchange of ideas on campus—bring this constitutional challenge to the higher education provisions of Florida's "Stop WOKE Act."[1]

2. In flagrant disregard of our Supreme Court's admonition that academic freedom in higher education is a "special concern" of the First Amendment, the Stop WOKE Act prohibits "instruction" on eight specific "concepts" related to "race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a). In a clause that has engendered much confusion, the law then vaguely purports to allow instruction on those blacklisted topics if it is given in "an objective manner without endorsement."

3. Worse, the Stop Woke Act's enforcement provisions encourage anyone to report individuals "advancing" opinions on the blacklisted topics to state authorities and defunds institutions if a violation is deemed to have occurred.

[1] Although introduced in the legislature as the "Individual Freedom" law, the law's proponents have publicly branded it as the "Stop the Wrongs to Our Kids and Employees (W.O.K.E.) Act." Plaintiffs refer to it using the name identified by its proponents and recognized by the public: the "Stop WOKE Act."

4. In dictating to faculty and students what ideas are true and false, Florida runs headlong into the Bill of Rights. More than a half-century ago, the Supreme Court of the United States recognized that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom," where "truth" is discovered not by "authoritative selection," but "out of a multitude of tongues." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (cleaned up). This is because professor and student alike "must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die." *Keyishian*, 385 U.S. at 603 (quoting, in part, *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)). But today, Florida's "Stop WOKE" clampdown imposes precisely the "pall of orthodoxy" that the Supreme Court warned about decades ago. *Id.*

5. In addition to the First Amendment's strong medicine against state orthodoxy, the Stop WOKE Act is also irreconcilable with a law Florida adopted just one year earlier—the Campus Free Expression Act. That law obligates public universities to refrain from "shield[ing] students" from "access to, or observation of, ideas and opinions"—expressly including "faculty research, lectures, writings, and commentary"—on the basis that

the ideas may be "uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. § 1004.097(2)(f), (3)(a), (3)(f).

6. Plaintiffs bring this lawsuit to vindicate the constitutional and statutory rights of faculty and students in college classrooms to engage in debate uninhibited by state orthodoxy.

## JURISDICTION AND VENUE

7. This action arises under the First and Fourteenth Amendments to the United States Constitution; 42 U.S.C. §§ 1983 and 1988; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. Accordingly, this Court has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343.

8. Additionally, this Court has supplemental jurisdiction over the claims alleged in the Sixth Cause of Action for violation of the Campus Free Expression Act, Fla. Stat. § 1004.097(4)(a). These state law claims are so related to the federal claims that they form part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district.

## THE PARTIES

### *Plaintiffs*

10. Plaintiff Adriana Novoa grew up under a dictatorship in Argentina before immigrating to the United States. Professor Novoa is an associate professor of history at the University of South Florida (USF), where she has taught as a professor since 2001.

11. Professor Novoa teaches several undergraduate courses at USF, including **Science in Cultural Context**, **History of Sports from National to Global Contexts**, and **Modern Latin America**.

12. Professor Novoa's instruction in each of these three courses (and others) involves "advancing" concepts prohibited by the Stop Woke Act.

13. The Stop WOKE Act has had (and will continue to have) a chilling effect on Professor Novoa. The first moment she endorses a prohibited viewpoint or advances a student's argument on a prohibited concept—which she has done before and intends to do this academic year—she will expose herself to disciplinary action and liability for attorney's fees and will expose her university to the loss of approximately $73 million in annual funding.

14. Plaintiff Samuel Rechek is an undergraduate student enrolled at USF. Rechek will take Professor Novoa's **Science in Cultural Context** in the Spring 2023 semester, which covers the Stop WOKE Act's prohibited concepts.

15. In class, he desires to engage in debate with Professor Novoa and his fellow students on the Stop WOKE Act's prohibited concepts.

16. Rechek is also the president of Plaintiff First Amendment Forum at University of South Florida, which has been a registered student organization at USF since 2020. The organization's mission is to ensure that "[e]ach student has the right to speak their mind," recognizing that "[o]n a large and diverse campus, the academic value of the First Amendment . . . cannot be understated." The group has "civil discussions about hot-button issues, advocate[s] for student rights policy reform, host[s] events and workshops to involve the student body with their rights, and help[s] cultivate a community that embraces the merit of the First Amendment." The organization has five members on its executive committee, each an undergraduate student enrolled at USF.

17. The Stop WOKE Act's prohibitions also deprive Rechek and other members of the First Amendment Forum of access to education free from the "pall of orthodoxy" imposed by Florida's political leaders.

*Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). That limitation limits students' ability to hear from—and chills students' willingness to ask questions of—faculty whose views may be contrary to those of the State of Florida. Rechek and the First Amendment Forum sue to preserve students' right to information unfiltered by state orthodoxy.

***Defendants***

18. Defendant Manny Diaz, Jr. was a principal sponsor of the Stop WOKE Act when he served previously as a member of the Florida Senate. Currently, he serves as the Commissioner of the Department of Education. As Commissioner, Diaz has oversight over the Chancellor of the Florida College System. By statute, Defendant Diaz, as the Commissioner of Education, is also a member of the Florida Board of Governors of the State University System. Fla. Stat. § 1001.70(1). Defendant Diaz is sued only in his official capacities as the Commissioner of the Department of Education and as a member of the Board of Governors.

19. The Board of Governors is endowed with the responsibility to govern the state university system and has the authority to adopt rules for implementing and enforcing the Stop WOKE Act. Fla. Const. art. IX § 7(b); Fla. Stat. §§ 20.155(4)(a), 1000.05(6)(b).

20. The Board of Governors has the additional authority to revoke tens of millions of dollars in annual funding if it finds that a violation of the Stop WOKE Act has occurred at a constituent university. Fla. Stat. § 1001.92(5).

21. The Board of Governors is headquartered in Tallahassee, Florida.

22. Fourteen of the seventeen members of the Board of Governors are appointed by the Governor of Florida.

23. Defendant Brian Lamb is a member and officer of the Board of Governors, serving as its Chair. In that capacity, Lamb presides over meetings of the Board of Governors and exercises all of the "powers and duties that inure to the office of Chair of a body corporate." Bd. of Govs. Op. Procedures, Art. IV, § D. Defendant Lamb is sued only in his official capacity.

24. Defendant Eric Silagy is a member and officer of the Board of Governors, serving as its Vice Chair. In that capacity, Silagy possesses "the same power and authority in the absence or disability of the Chair." Bd. of Govs. Op. Procedures, Art. IV, § E. Defendant Silagy is sued only in his official capacity.

25. Defendants Timothy M. Cerio, Richard Corcoran, Aubrey Edge, Patricia Frost, Nimna Gabadage, Edward Haddock, Ken Jones, Darlene Luccio Jordan, Alan Levine, Charles H. Lydecker, Craig Mateer, Deanna Michael, Steven M. Scott, and Kent Stermon are the remaining members of the Board of Governors. They are sued only in their official capacities.

26. Defendant Julie Leftheris is the Inspector General of the Board of Governors. Under the Board of Governors' regulations implementing the Stop WOKE Act, the Office of Inspector General is required to conduct investigations into universities' compliance with the Stop WOKE Act. Bd. of Govs. Reg. No. 10.005(4)(a), (b). Defendant Leftheris is sued only in her official capacity.

27. Defendant The University of South Florida Board of Trustees is a corporate body established by the State of Florida with the capacity to be sued. *See* Fla. Stat. §§ 1001.72(1), 1004.097(4).

28. The University of South Florida Board of Trustees sets policy for and serves as the legal owner and final authority for the University of South Florida. Univ. of S. Fla. Bd. of Trs. Op. Procedures, Art. I, § (D).

29. Defendants Timothy L. Boaz, Sandra Callahan, Michael Carrere, N. Rogan Donelly, Michael E. Griffin, Oscar Horton, Lauran Monbarren, Nithin Palyam, Shilen Patel, Fredrick Piccolo, Melissa Seixas, Jenifer

Jasinski Schneider, and William Weatherford are members of the USF Board of Trustees. They are sued only in their official capacities.

30. At all relevant times to the Complaint, Defendants and their agents were, and are, acting under color of state law.

## FACTUAL ALLEGATIONS

31. "Recently, Florida has seemed like a First Amendment upside down." *Honeyfund.com, Inc. v. DeSantis*, No. 4:22-cv-227, 2022 WL 3486962, at *1 (N.D. Fla. Aug. 18, 2022). In 2021, Florida amended the Campus Free Expression Act to bolster the rights of students and faculty under the First Amendment. Fla. Stat. § 1004.097. One year later, Florida would blatantly endorse censorship on campus by passing the Stop WOKE Act.

### I. Despite Florida's Statutory Commitment to Free Expression on Campus, It Passes Law Banning "Instruction" on Specific Viewpoints in Higher Education.

#### *A. The Campus Free Expression Act Protects Access to Information.*

32. The Campus Free Expression Act obligates public universities and colleges to refrain from "shield[ing] students" from "access to, or observation of, ideas and opinions"—expressly including "faculty research, lectures, writings, and commentary"—on the basis that the ideas may be

"uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. § 1004.097(2)(f), (3)(a), (3)(f).

33. In adopting the Campus Free Expression Act, Florida recognized—as does the First Amendment—that students have a right to access ideas, opinions, and concepts unhampered by orthodoxy.

34. Despite recognizing the need to affirm the importance of free and robust debate on campus in 2018, Florida legislators in 2021 moved to strip the right to free speech on campus away.

### *B. Lawmakers Nationwide Move to Suppress "Divisive Concepts."*

35. Between 2021 and 2022, lawmakers in at least 36 states introduced some 191 bills restricting discussion of race, gender, sexuality, and American history in public schools, universities, and colleges.

36. These bills were overwhelmingly partisan: Of the 137 bills introduced in 2022, only one had attracted a single Democratic co-sponsor.

37. These proposals were patterned after a federal Executive Order on "Combatting Race and Sex Stereotyping," which banned nine "divisive concepts," or viewpoints, from government-contractor trainings. Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020).

38. President Trump issued Executive Order 13950 on September 22, 2020, in response to "people . . . pushing a different vision of America,"

a "destructive ideology . . . grounded in misrepresentations of our country's history." *Id.*

39. Although a federal court issued a nationwide injunction enjoining enforcement of Executive Order 13950 on the grounds that it unconstitutionally restricted speech,[2] Florida proceeded to introduce its own version of the law banning nearly identical viewpoints in public educational institutions from kindergarten through graduate education.

### *C. Florida Political Leaders Introduce the "Stop WOKE Act" Following K–12 Ban.*

40. In June 2021, at the request of Gov. Ron DeSantis, Florida's Department of Education adopted a provision prohibiting teaching that is not "factual and objective," seeks to "suppress or distort significant historical events," or "define[s] American history as something other than the creation of a new nation based largely on the universal principles stated in the Declaration of Independence." FLA. ADMIN. CODE 6A-1.094124(3)(b).

41. In a speech promoting the effort, Defendant Corcoran said textbook "publishers are just infested with liberals" and his goal was to "keep all the crazy liberal stuff out."

---

[2] *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 540–50 (N.D. Cal. 2020).

42. In December 2021, Gov. DeSantis held a press conference and issued a press release announcing the Stop WOKE Act. The press release described the Act as a "legislative proposal . . . to fight back against woke indoctrination" that "builds on actions Governor DeSantis has already taken to ban Critical Race Theory and the New York Times' 1619 Project in Florida's schools."

43. Gov. DeSantis's press release was accompanied by a handout promising "CONSEQUENCES" in the form of a "private right of action."

### *D. The Stop WOKE Act Expands Florida's Discrimination Law to Ban Viewpoints.*

44. The Stop WOKE Act amended the Florida Educational Equity Act (FEEA), which prohibits public universities and colleges from subjecting students to discrimination in an "education program or activity" on the basis of certain characteristics, including race, color, national origin, or sex. Fla. Stat. § 1000.05.

45. The STOP Woke Act expands the FEEA by creating a new category of purported "discrimination"—"instruction" in a public university or college that "espouses, promotes, advances, inculcates, or compels" a student "to believe" any viewpoint contained on an enumerated blacklist. Fla. Stat. § 1000.05(4)(a).

46. The Stop WOKE Act does not provide a definition for "instruction."

47. The Stop WOKE Act does not provide a definition for "espouses."

48. Ordinary definitions of "espouse" include "to take up and support as a cause."

49. The Stop WOKE Act does not provide a definition for "promotes."

50. Ordinary definitions of "promote" include "to contribute to the growth or prosperity of" or to "further."

51. The Stop WOKE Act does not provide a definition for "advances."

52. Ordinary definitions of "advance" include "to bring forward for notice, consideration, or acceptance," to "propose," and "to accelerate the growth or progress of."

53. The Stop WOKE Act does not provide a definition for "inculcates."

54. Ordinary definitions of "inculcate" include "to teach."

55. At present, the STOP Woke Act prohibits the following viewpoints:

1) Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex;

2) A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

3) A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex;

4) Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex;

5) A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex;

6) A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion;

7) A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex; or

8) Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

Fla. Stat. § 1000.05(4)(a)(1)-(8).

56. The "concepts" prohibited by the Stop WOKE Act are nearly identical to those banned by President Trump's Executive Order.

57. Far from regulating discriminatory conduct, the Stop WOKE Act bans expression of specific viewpoints, much like Executive Order 13950.

58. Although the Stop WOKE Act purports to include a limitation on the reach of the viewpoint-based categories, stating that the statute is "not to be construed to prohibit discussion of the concepts . . . as part of a larger course of training or instruction," if the "instruction is given in an objective manner without endorsement of the concepts," the Act fails to define "objective manner" or "endorsement." Fla. Stat. § 1000.05(4)(b).

59. This language does not significantly narrow the enormous scope of the statute or limit its censorial effect.

60. "[F]ew terms are as loaded and contested as 'objective.'" *Honeyfund.com, Inc. v. DeSantis*, No. 4:22-cv-227, 2022 WL 3486962, at *13 (N.D. Fla. Aug. 18, 2022).

61. The Stop WOKE Act does not provide a definition for the ambiguous term "objective manner." The provision is intended to prohibit faculty from including their "emotions," "beliefs," "opinions," or "points of

view" when discussing any material, content, or lectures that could be read to "advance" or "promote" a prohibited concept.

62. The Stop WOKE Act also fails to define "endorsement of the concepts."

63. The sponsors of the bill have interpreted the "endorsement" clause to, among other things:

(a) Prohibit faculty members from sharing their own views about a given concept;

(b) Prohibit faculty from taking a feigned, "devil's advocate" position to spur discussion;

(c) Require faculty to censor guest lecturers whose views might be interpreted as supporting a banned concept; and

(d) Prohibit the introduction of textbooks, articles, videos, or other materials that argue in favor of a prohibited concept.

64. University administrations tasked with interpreting and enforcing the Stop WOKE Act have similarly struggled to define "objective" or "endorsement".

65. Consequently, educators in Florida, including Professor Novoa, have reasonably refrained—and will continue to refrain—from teaching prohibited subjects out of fear of violating the Stop WOKE Act.

66. House Bill 7 (HB 7)—the bill creating the Stop WOKE Act—asserts that the bill contains "legislative findings" in support of the law.

67. HB 7 contains no "legislative findings" pertaining to higher education, much less findings that would substantiate a need for or identify the purpose of the Stop WOKE Act. A copy of HB 7 is attached as Exhibit 1 to this Complaint.

68. The Stop WOKE Act does not contain a savings clause under the First Amendment, like that applied to other provisions of the FEEA. *See* Fla. Stat. § 1000.05(8)(c) (pertaining to definitions of anti-Semitism, such as "a certain perception of the Jewish people, which may be expressed as hatred[.]").

69. On its face, the Stop WOKE Act even prohibits commentary concerning the wisdom or constitutionality of the law itself, since such statements could be viewed as subjective endorsement or advocacy for the racial and social concepts censored by the Act.

### ***E. The Stop WOKE Act's Sponsors Explain Its Intent: Eradicate Ideology, Personal Beliefs, or Materials Offering "Unique Perspectives."***

70. Florida's legislature held four committee hearings on the Stop WOKE Act and substantively discussed the bill on four separate occasions on the House and Senate floors.

71. Before the committee votes and the House votes on the Stop WOKE Act, Representative Avila explained the intent and meaning of the legislation and answered other members' questions.

72. Rep. Avila explained the general purpose of the Stop WOKE Act:

(a) Preventing instructors from offering "any sort of ideology or personal beliefs when presenting" materials, or otherwise "insert[ing] their opinion, or their belief, or their take on" events such as the Holocaust or slavery.

(b) Ensuring that no student "feels uncomfortable because they feel that the instructor is not being objective."

(c) "[E]nsur[ing] that absolutely no student feels as if they are being blamed for something that occurred in our nation's history [or] a sense of guilt because they're a part of a particular group, race or sex."

(d) Allowing educators to "teach any subject area they choose in a way that upholds the American belief that all people are created equally."

73. Asked to identify specific examples of what the Stop WOKE Act would "eradicate or accomplish," Rep. Avila identified:

(a) A discussion in which participants "discuss their 'privilege'";

(b) A training program that argued that "America is a system of white supremacy";

(c) A training arguing that "capitalism is fundamentally racist" and asking participants to "deconstruct their racial and sexual identities and then rank themselves on a hierarchy of 'privilege'";

(d) Specific books, articles, and a video concerning race, which Rep. Avila said were "obviously egregious and obviously extremely offensive" materials the Stop WOKE Act was intended to address:

*i.* Adam Serwer, *America's Racial Contract Is Killing Us*, The Atlantic, May 8, 2020, *available at* https://bit.ly/3wAEgjJ;

*ii.* Peggy McIntosh, *White Privilege: Unpacking the Invisible Knapsack*, Peace & Freedom Mag., July/Aug. 1989 at pp.10–12, *available at* https://bit.ly/38waXqz;

*iii.* Layla Saad, *Me and White Supremacy: Combat Racism, Change the World, and Become a Good Ancestor*;

*iv.* Robin DiAngelo, *White Fragility: Why It's So Hard for White People to Talk About Racism*; and

*v.* A video pertaining to anti-racism.

74. During the hearings and Floor debate, Rep. Avila repeatedly explained that the Stop WOKE Act reached both in-class statements and the materials presented:

(a) In his prepared remarks during the second reading of the bill, Rep. Avila explained: "Teachers may teach any subject area they choose in a way that upholds the American belief that all people are created equally, using education materials consistent with this shared value."

(b) Rep. Avila was asked about whether the "specific assignments" of "materials" staking out a particular view to facilitate classroom discussion of those would violate the Stop WOKE Act. Rep. Avila responded: "All material has to be in line with the principles that are set forth in this bill and if that material in any way, shape, or form does not align with the principles in this bill, then that

material would certainly not be permissible within a classroom."

(c) Rep. Avila explained that under the Stop WOKE Act, teachers could not introduce materials offering "unique perspectives" on history and should instead "stick to those core American principles that really are the bedrock of our society."

75. During the hearings and Floor debate, Rep. Avila repeatedly explained that the intent of the "objective manner without endorsement of the concepts" language was to prevent educators from making their personal views known to students. Rep. Avila explained that it was intended to "ensure that a teacher does not," in class discussions; "insert their personal belief or take"; "inject any sort of ideology or personal beliefs"; "insert[] their opinion, or their belief, or their take on" historic events; or "inject" their "personal point of view into the discussion."

76. As a state senator and sponsor of the Stop WOKE Act, Defendant Diaz, speaking in support of his bill during his closing speech before the Florida Senate, echoed Rep. Avila, arguing that students "should *never* know" an instructor's "politics" and "*never* know where [they] stand on those issues." Defendant Diaz made the same point during debate on the Senate Floor, arguing that "students should not know your perspective or your point of view on a specific thing," as that would "impose your personal view on a student."

77. During the March 1, 2022 hearing of the Senate Rules Committee, Defendant Diaz—then a state senator and sponsor of the Stop WOKE Act—echoed Rep. Avila, arguing that "Students come to the school with the values that are instilled by their families, and it is not for a teacher or professor to change those views."

78. After the Stop WOKE Act received a favorable vote by the House Judiciary Committee on January 26, 2022, Speaker Chris Sprowls issued a press release pledging that under the Stop WOKE Act, "lessons and textbooks" would have to "uphold the shared principles of individual freedom and not indoctrinate students with a particular point of view."

79. In a February 25, 2022 article written by Rep. Avila for the Family Research Council, he wrote that the intent of the Stop WOKE Act was to ensure that teachers do not teach "divisive ideologies."

80. The Florida House of Representatives passed HB 7 in a strictly party-line vote on February 24, 2022. The Florida Senate also passed the bill in a strictly party-line vote on March 10, 2022.

81. Gov. DeSantis signed the bill into law on April 22, 2022. In a contemporaneous speech, Gov. DeSantis said that the bill was intended to prevent the "use [of] your tax dollars to teach our kids to hate this country or to hate each other."

82. After advocacy groups criticized the law's impact on higher education, Gov. DeSantis' spokesperson argued that the law sought to prevent "indoctrinating students with CRT-inspired discriminatory ideology."

### *F. The Board of Governors Adopts Regulations Implementing the Stop WOKE Act.*

83. On June 30, 2022, the Board of Governors issued a public notice that it intended to adopt regulations implementing the Stop WOKE Act.

84. On August 26, 2022, the Board of Governors adopted the regulations without debate or amendment. A copy of the regulations is attached as Exhibit 2 to this Complaint.

85. The regulations define "instruction," which was not defined by the Stop WOKE Act, to mean: "the process of teaching or engaging students with content about a particular subject by a university employee or a person authorized to provide instruction . . . within a course." Bd. of Govs. Reg. No. 10.005(1)(c).

86. But the regulations, like the Stop WOKE Act, make no effort to define "objective manner without endorsement."

87. The regulations require that each university adopt its own regulations effectuating the Stop WOKE Act and establishing a method for submitting complaints. Bd. of Govs. Reg. No. 10.005(2)(a).

88. The regulations do not require that a complainant be a student, faculty, or employee of the institution. Consequently, complaints may be made by any person, including members of the public with no connection to the institution.

89. The regulations require that each university conduct investigations into "credible complaints that identify . . . instruction that espouses, promotes, advances, inculcates, or compels a student . . . to believe any of the concepts." Bd. of Govs. Reg. No. 10.005(3)(a).

90. If an "instruction . . . is inconsistent with university regulation," it must be reported to "the Board of Governors through the Office of the Inspector General[,]" and the university must "take prompt action to correct the violation by mandating" that the offending professor "modify" their teaching "to be consistent" with the Stop WOKE Act. Bd. of Govs. Reg. 10.005(3)(c). The university, "where appropriate," must issue "disciplinary measures" and "remove, by termination if appropriate," faculty members who fail or refuse "to comply with the mandate." *Id.*

91. If a university fails to comply with these directives, the Inspector General is required to initiate an investigation to determine whether a university "failed to correct a violation[.]" Bd. of Govs. Reg. No. 10.005(4)(a).

92. If the members of the Board of Governors determine that the corrective measures implemented by a university were not sufficiently "appropriate," the university will not be eligible for performance funding during the next fiscal year. Bd. of Govs. Reg. No. 10.005(4)(d).

93. As a result, universities have a strong incentive to terminate faculty members to ensure that the Board of Governors will determine that the corrective measure was "appropriate."

### *G. USF Ignores Constitutional Concerns and Issues 'Stop WOKE' Guidance to Faculty.*

94. On April 22, 2022, the Foundation for Individual Rights and Expression (FIRE) sent letters to each of Florida's public institutions of higher education, warning their leadership that the law was unconstitutional and calling on them to refuse to enforce the law in violation of the First Amendment rights of their faculty. FIRE did not receive a response from USF.

95. Instead, on July 1, 2022, the University of South Florida's Office of General Counsel issued "Initial Guidance" concerning the Stop WOKE Act, before the Board of Governors issued its proposed regulations.

96. On August 30, 2022, following the Board of Governors' final adoption of regulations implementing the Stop WOKE Act, the University of South Florida's Office of General Counsel updated its guidance.

97. Each version of the USF Office of General Counsel guidance:

(a) Admits uncertainty about "how broadly" the Stop WOKE Act must be interpreted;

(b) Acknowledges uncertainty about the "extent" to which "discussing" the forbidden concepts will be "held to be 'endorsing' those concepts";

(c) Relies on dictionary definitions of "objectivity" to caution that discussion of prohibited concepts, in order to be "objective," must be "uninfluenced by the instructor's emotions, and without the instructor showing subjective favoritism, approval, or personal bias in favor of any of those concepts";

(d) Warns faculty that the law prohibits "urg[ing] a student to believe a particular concept";

(e) Urges faculty to add disclaimers to "class materials" that discussions are "intended to be objective"; and

(f) Urges faculty to refrain from disclosing their own views during discussions and, if students ask about their own views, to respond: "my own conclusions and beliefs are not part of the discussion."

98. On August 26, 2022, USF revised Policy USF10.200, concerning personnel matters, to commit that USF "will comply with the most current laws regarding" the Stop WOKE Act and directed "[c]omplaints regarding possible violations of" the Stop WOKE Act to the USF Office of Ethics and Compliance.

99. USF Policy USF0-007 requires administrators and faculty to comply with Florida's anti-discrimination law, including the Stop WOKE Act.

100. Under Policy USF0-007, all "members of the faculty" are "supervisory employees" required to "promptly report . . . allegations, reports, or instances of discrimination/harassment by . . . any USF employee(s)" on pain of disciplinary action.

101. As a result, all USF faculty members are required to report colleagues to USF's administration if they learn of mere "allegations" that the faculty member has introduced a concept prohibited by the Stop WOKE Act.

102. On or about August 26, 2022, the USF Office of Ethics and Compliance website was updated to admonish that "[s]tudents, staff, and faculty are strongly encouraged to report discrimination . . . including

violations of" the Stop WOKE Act—including "known or suspected" violations—using a provided form.

### *H. Other Florida Universities and Colleges Issue Guidance on the Stop WOKE Act.*

103. The administrations of other Florida universities and colleges also began distributing guidance to faculty members and students before and after the Board of Governors issued its proposed regulations.

104. **North Florida College.** On August 11, 2022, faculty at North Florida College were required to attend a presentation by the college's attorney. The presentation warned faculty that:

(a) The Stop WOKE Act prohibits faculty members from attempting to "persuade students to a particular viewpoint inconsistent with" the law;

(b) Faculty cannot endorse "any opinion unless you are endorsing an opinion issued by the Department of Education";

(c) The Stop WOKE Act requires that "no group . . . be labeled as oppressors or oppressed based solely on the group's race, national origin, gender, or color";

(d) "Classes in History, Sociology, and Law are the most likely to be directly impacted by" the Stop WOKE Act;

(e) A faculty member teaching a class on U.S. History and Jim Crow laws could not tell students the historical fact that "white people were responsible for enacting" Jim Crow laws;

(f) Classroom and reading materials "including news articles, movies, books, and other items may not meet the requirements of" the Stop WOKE Act;

(g) While faculty are "still free to open a classroom for discussion," they should preface the discussion with a disclaimer that "the opinions stated by your fellow students do not reflect those of the College"; and

(h) Faculty teaching science, technology, engineering, and mathematics classes should "avoid using race, national origin, sex, or color as a defining characteristic in word problems."

105. **Florida A&M University.** While the Stop WOKE Act was still pending before the state legislature, Florida A&M's Government Relations team sent periodic updates to the campus community about the bill and hearings on the bill. These updates indicate that the university interpreted the Stop WOKE Act to "ban books and other supporting materials," and warned that the bill required that "instructional materials" be "consistent with the principle of individual freedom."

106. On May 3, 2022, Florida A&M University's Chief Compliance and Ethics Officer distributed guidance intended to "support compliance" with the Stop WOKE Act. That guidance cautioned that:

(a) the "objective manner" language required faculty to avoid "indicat[ing] a preference for a particular concept";

(b) "the University, or you personally, could face civil litigation and financial penalties"; and

(c) the university could be rendered ineligible for performance-based funding.

107. **University of Florida.** In May 2022, the University of Florida issued preliminary guidance consisting of a video message from the university's president and a slideshow warning faculty that a violation of the Stop WOKE Act could result in "large financial penalties." UF's administration followed that guidance with a website providing "recommendations about how to remain within the law's requirements." UF's guidance, among other things:

(a) Asserts that guest speakers in classes are subject to the Stop WOKE Act;

(b) Directs faculty members to provide speakers with a copy of the law and ask whether "their presentation and materials are consistent" with the Stop WOKE Act;

(c) Directs faculty members to cancel guest speakers whose presentations or materials are not consistent with the Stop WOKE Act; and

(d) Commits to following the material provisions of the Board of Governors' proposed regulations, including the requirements that offenses be reported to the Board of Governors and that the university take disciplinary action against faculty members "where appropriate."

108. **St. Petersburg College.** Training provided by an attorney in advance of the 2022–2023 school year cautioned that the Stop WOKE Act "does not limit who could be sued," suggesting individual faculty members may be exposed to legal liability for violating the law.

109. **Florida State University.** On July 29, 2022, FSU issued a proposed regulation mirroring that of the Board of Governors. FSU also warned that the law applies to "class content" including "assigned materials") and "guest lecturers or speakers brought in by" a faculty member.

110. **Florida Polytechnic University.** On August 15, 2022, FPU issued guidance interpreting "objective manner and without endorsement" to require that faculty lectures be "uninfluenced by the instructor's emotions[.]" FPU's Vice Provost of Academic Affairs cautioned that faculty members may discuss a prohibited concept so long as nobody "perceive[s] they should feel guilty or responsible in some way."

111. **Valencia College.** On July 28, 2022, Valencia College issued guidance to its faculty. Like FSU, it warned that the law applies to "class content" including "assigned materials." The college warned that the Stop WOKE Act's use of double negatives rendered it "difficult to know what is prohibited." For example, the guidance surmised that the Act's statement that "[m]embers of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex" "appears to be about colorblindness," and thus warned that

any "critique of colorblindness or insistence on identity consciousness could constitute discrimination."

## II. Violating the Stop WOKE Act Risks Severe Penalties.

112. A violation of the Stop WOKE Act creates significant legal exposure to both the university as an institution and the instructor as a private person.

### *A. Violations Risk Millions of Dollars in Annual Funding.*

113. After the Stop WOKE Act was introduced, the Florida legislature adopted—and Gov. DeSantis signed—a separate enforcement measure that provides: If a "court of law, a standing committee of the Legislature, or the Board of Governors" determines that there has been any "substantiated violation" of the Stop WOKE Act, the entity "*shall* be ineligible to receive performance funding during the next fiscal year[.]" Fla. Stat. § 1001.92(5) (emphasis added).

114. Performance funding represents a significant part of the amount of state funding received by USF each year. Since 2017–2018, USF has received between $73,009,247 and $84,603,488 annually in performance funding. These allocations represent approximately 15–22% of the total state appropriations received by USF each year.

115. The Stop WOKE Act is violated upon the first introduction of "instruction" that "espouses, promotes, [or] advances" student belief in any one of the prohibited "concepts," unless the training is (1) part of a larger course of instruction which (2) is given in an objective manner without endorsement of the concept.

116. Under the Stop WOKE Act, the law may be violated upon the first mention of one of the prohibited "concepts" in "instruction," even if the concept is not pervasive within the broader course of instruction or offensive to any student, if the instruction is not given in an "objective" manner or endorses the concept.

117. Because a university will be ineligible for a substantial amount of state funding if the Stop WOKE Act is violated and because the law is violated on the first introduction of a prohibited concept, educational institutions have a strong incentive to avoid offering courses in which a faculty member or guest speaker *might* discuss the prohibited topics or something even tangential to them.

118. The Board of Governors' proposed regulations would compound this risk by rendering a university ineligible for performance funding if its members subjectively deem a response to a violation of the

Stop WOKE Act insufficiently "appropriate." Bd. of Govs. Reg. No. 10.005(4)(d).

119. As a result, universities have a strong incentive to discipline and terminate any faculty member's violation of the law in order to avoid a response that the appointed members of the Board of Governors may see as too weak to be "appropriate."

120. In addition to the possibility of action by the Board of Governors, the standing committees of the Florida legislature are authorized to make a "finding" that the Stop WOKE Act has been violated and render the institution ineligible for performance funding. Fla. Stat. § 1001.92(5).

121. Neither the Stop WOKE Act nor the provision authorizing cutting of performance funding provide any guidance to the legislature's standing committees about the vague and confusing prohibitions in the Stop WOKE Act.

122. Nor are the standing committees bound by the Board of Governors' regulations.

123. Neither the Stop WOKE Act nor Section 1001.92(5) require the legislature's standing committees to provide faculty members with an opportunity to be heard before making a "finding" against their institutions.

124. Faculty members like Professor Novoa have a strong incentive to avoid the risk of exposing their institutions to a loss of tens of millions of dollars in revenue.

### *B. Faculty Members Said to Violate the Stop WOKE Act Are Subject to Discipline and Exposed to Litigation.*

125. In addition to the institutional consequences, violations of the Stop WOKE Act expose faculty members to significant personal consequences.

126. Because faculty members accused of introducing prohibited "instruction" are subject to a lawsuit under Fla. Stat. § 1000.05(9), even the unintentional introduction of a prohibited viewpoint exposes faculty to the cost, stress, and other burdens that come with defending against a lawsuit.

127. Faculty members found by a state court to have violated the ambiguous provisions of the Stop WOKE Act are exposed not only to the cost of their own attorney's fees, but may also be ordered to pay for the plaintiff's attorney's fees under Fla. Stat. § 1000.05(9).

128. Because of the possibility of losing substantial amounts of funding, institutions have an incentive to impose professional sanctions on —including termination of—on a faculty member for even incidental or unintentional violations of the Stop WOKE Act.

129. Faculty members who are thought to have introduced written materials containing prohibited concepts or are suspected of having discussed prohibited concepts in their courses, risk an investigation and finding by a legislative committee that they have violated the law.

130. Because a violation of the Stop WOKE Act occurs on the first introduction of prohibited "instruction," no matter how brief or incidental, the weight of potential consequences will—as intended—result in self-censorship.

131. To put it starkly, under the Stop WOKE Act and its enforcement provisions, faculty members can cost their institutions tens of millions of dollars with two words in response to a student's expression of a prohibited viewpoint: "I agree."

### *C. The Stop WOKE Act's Ambiguous Application to "Instruction" Chills Introduction of Written Materials and Guest Speakers.*

132. The Stop WOKE Act's uncertain and ambiguous application to "instruction" is now chilling and will continue to chill faculty members' willingness to continue using written materials or guest speakers that may be perceived as endorsing a prohibited viewpoint.

133. Universities and colleges offering authoritative guidance to faculty members have cautioned that written materials and guest speakers may themselves violate the Stop WOKE Act.

134. One such institution went so far as to enlist faculty members in censoring guest speakers if the speaker's lecture would endorse a viewpoint prohibited by the Stop WOKE Act.

135. These institutions' authoritative interpretations are consistent with the express intent of the sponsors of the Stop WOKE Act—voiced at press conferences, in public statements, and in legislative debates— to prohibit written materials that offer "unique" perspectives.

136. As a result of the Stop WOKE Act's intent and ambiguity in its use of the term "instruction," faculty members—including Professor Novoa—are being chilled from introducing written materials and guest lecturers out of concern that the Stop WOKE Act prohibits them from so doing.

137. This chilling effect has considerable ramifications for faculty members and students alike because it threatens critical pedagogical tools. In order to confront viewpoints some may consider odious, faculty and students alike must be able to evaluate arguments that may be best articulated by primary source documents, unobjective argument in support

of a prohibited concept, or a guest speaker who resolutely believes and endorses a prohibited viewpoint.

## III. The Stop WOKE Act Infringes on Plaintiffs' Constitutional Rights.

### *A. Professor Novoa's Instruction of Course Materials and Classroom Discussions Would Violate the Stop WOKE Act.*

138. Professor Novoa immigrated to the United States in 1989 from Argentina—which had been governed by a military junta between 1976 and 1983.

139. Professor Novoa earned the equivalent of a bachelor's degree from the University of Buenos Aires in 1987. She was in the process of obtaining a master's degree from the Instituto Torcuato Di Tella in 1989 when she was admitted to the doctoral program at University of California, San Diego, where she earned a master's degree and also earned her Ph.D. in History in 1998.

140. In 2001, Professor Novoa first began teaching at University of South Florida.

141. After a brief visiting position teaching at Lehigh University, Professor Novoa resumed her appointment as Assistant Professor at USF in 2005.

142. Since 2005, Professor Novoa has continuously served on USF's faculty.

143. Professor Novoa's expertise covers, among other things, race and gender in Latin America, the history of science and Darwinism in Latin America, Latin American film, modern Argentine society and history, and global history.

144. Professor Novoa has co-authored two books: *¡Darwinistas! The Creation of Evolutionary Thought in Argentina, 1870–1910*, published in 2012, and *From Man to Ape: Darwinism in Argentina, 1870–1920*, published in 2010.

145. As described more fully below, because Professor Novoa is a cultural historian by training, all of her courses deal with modern culture, race, ethnicity, racism, gender, and race in one way or another.

146. Consequently, in analyzing any culture in the nineteenth and twentieth centuries she must "advance" concepts prohibited by the Stop WOKE Act.

147. Professor Novoa regularly teaches undergraduate or graduate-level classes at USF, including:

(a) **Science in Cultural Context**—introducing students to science studies through engagement with scientific texts considered from a variety of historical, philosophical, and cultural views;

(b) **History of Sports**—analyzing the development of modern sports in the Americas, including discussion of the meaning of sports in modern culture from the end of the nineteenth century to globalization; and

(c) **Modern Latin America**—exploring how students' worldviews are shaped by personal values, identity, cultural rules, and biases as they explore the foundation of Latin American societies defined by social inequity, poverty, racism, and violence, and review how intellectuals and artists reflected on national identity.

148. Since early July 2022, Professor Novoa has been reviewing her syllabi from each of her courses to determine if the Stop WOKE Act prohibits any assigned materials or lecture topics.

149. Professor Novoa has found several assigned readings and lecture topics that must be removed to comply with the Stop WOKE Act.

150. Without judicial intervention, Professor Novoa will be forced to remove assigned readings and lecture topics from her courses to comply with the Stop WOKE Act.

151. The Stop WOKE Act chills Professor Novoa's ability to discuss the subjects of each of these classes, as the content of her lectures and class materials violate the Stop WOKE Act.

### *B. Professor Novoa's Instruction in Her Science in Cultural Context Course and Its Assigned Materials Violate the Stop Woke Act.*

152. Professor Novoa has taught **Science in Cultural Context** at USF since 2020. She expects to teach the class during the Spring 2023 semester.

153. Registration for Spring 2023 courses opens to undergraduate USF students on October 31, 2022. As discussed in greater detail below, Plaintiff Rechek intends to enroll in Professor Novoa's Science in Cultural Context class.

154. To prepare this course for the Spring 2023 semester, Professor Novoa is currently designing the course and selecting the materials for use in the class. This process is conducted, in part, through a graduate-level course in which graduate students and Professor Novoa discuss the concepts covered in the planned Science in Cultural Context course.

155. Due to the Stop WOKE Act, Professor Novoa must remove materials she assigned in previous iterations of the course and revise her lecture topics accordingly.

156. Professor Novoa has determined that her instruction in previous iterations of the course, if repeated, would violate the Stop WOKE Act.

157. The Science in Cultural Context course is a general education course satisfying mandatory curricular requirements for earning an undergraduate degree.

158. In Science in Cultural Context, Professor Novoa teaches students about the historical development of science as a source of authoritative knowledge, with the goal of the class being to "understand the complicated ways in which science and the cultures in which it is embedded interact and shape each other."

159. This course discusses race and the way in which Darwin's theory of natural selection was used by individuals such as Herbert Spencer to "promote" Social Darwinism—effectively using "scientific processes" to justify the perceived inferiority of indigenous peoples vis-à-vis European society.

160. Professor Novoa also teaches that the history of science is replete with examples of individuals' national origin, color, or race determining their "status as . . . privileged[.]"

161. For example, Professor Novoa will assign her book, *From Man to Ape: Darwinism in Argentina, 1870–1920*, in which she and her co-author "propose to study the vibrant scientific interaction between Europe and Latin America from the perspective of the latter. On the whole,

treatments of this relationship tend to assume a strict vertical hierarchy in the flow of scientific knowledge, relegating Latin American scientists to the *status of derivative thinkers*" (emphasis added).

162. As this quote from her book makes clear, Professor Novoa "advances" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race, color, [or] national origin" in violation of Florida Statutes § 1000.05(4)(a)(3).

163. Professor Novoa's *From Man to Ape: Darwinism in Argentina, 1870-1920* is an academic work that is pedagogically relevant to the Science in Cultural Context course.

164. In assigning her book, Professor Novoa necessarily endorses the viewpoints she advances and promotes in the book.

165. But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would assign and provide "instruction" on *From Man to Ape: Darwinism in Argentina, 1870–1920* in the Science in Cultural Context course.

166. In the class, Professor Novoa also assigns a book by Nancy Stepan, *Picturing Tropical Nature,* in which Stepan argues that American and European intellectuals created the concept of "tropical" and examines the impact of this construction on modern culture.

167. *Picturing Tropical Nature* is an academic work that is pedagogically relevant to the Science in Cultural Context course.

168. In *Picturing Tropical Nature*, Stepan argues that "our idea of tropical nature as a particular kind of place or space, with its own characteristic ensembles of plants and animals . . . is fundamentally a modern one, belonging, that is, to our post-Enlightenment era."

169. Stepan focuses on "three areas of knowledge [that] were especially important to the emerging definition of tropical nature in European thought": (1) natural history, (2) the new human sciences, and (3) medicine.

170. Stepan describes the "new human sciences" as "aimed at ordering all varieties of humankind into a single natural hierarchy of difference and similarity. It was in the new anthropology that racial differences between human groups became a chief means by which the human world was mapped."

171. In the book, Stepan "advances" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[]" in certain cultures.

172. In engaging students in discussion, reflection, and debate, Professor Novoa intends to "advance" the arguments made in *Picturing Tropical Nature* that violate the Stop WOKE Act as described above.

173. But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would again assign and provide "instruction" on *Picturing Tropical Nature* in the Science in Cultural Context course.

### *C. Professor Novoa's Instruction in Her History of Sports Course and Its Assigned Materials Violate the Stop WOKE Act.*

174. Professor Novoa has taught **History of Sports from National to Global Contexts** each year since 2015 and is expected to offer it again this coming academic year.

175. "History of Sports" is one of the most popular history courses offered by Professor Novoa's department.

176. In the class, Professor Novoa has historically assigned an academic article by Adrian Burgos, Jr., *Left Out: Afro-Latinos, Black Baseball, and the Revision of Baseball's Racial History* (*Left Out*).

177. *Left Out* argues that the historical narrative of racial integration in Major League Baseball frames "well-intentioned white folks" as the benevolent actors who ended segregation. It argues that popular historical narratives focus on players who did not complain about segregation, as this

narrative allows white people to avoid feeling guilt or responsibility for Jim Crow. *Left Out* does so by contrasting the outrage at the "snubbing" of Buck O'Neil from the National Baseball Hall of Fame against the "more muted reaction" to the omission of Afro-Latino Orestes 'Minnie' Miñoso, arguing that the "popular narratives about black baseball history" ultimately "minimize[] the impact on, and contributions of, Afro-Latinos."

178. *Left Out* "advances," "promotes," or "espouses" several viewpoints prohibited by the Stop WOKE Act:

(a) In arguing that figures like Buck O'Neil are elevated in discourse about segregation because they offer "absolution" to (and "assuage the guilt" of) white people, *Left Out* "promotes" or "advances" the concept, prohibited by Florida Statutes § 1000.05(4)(a)(7), that a person "bears personal responsibility for and must feel guilt [or] anguish . . . because of actions, in which the person played no part, committed in the past by other members of the same race, color, [or] national origin[.]"

(b) In arguing that "revisionist history" casts Miñoso as "the foreign Latino [perceived] as having traveled a less precarious path, due primarily to his Cuban ethnicity," *Left Out* "advances" the viewpoint, prohibited by Florida Statutes § 1000.05(4)(a)(3), that Miñoso's "status as . . . privileged is necessarily determined by his . . . race [or] national origin[.]"

(c) In arguing that Afro-Latino players are not "recognized as black, due to their origins from different" nations, *Left Out* violates Florida Statutes § 1000.05(4)(a)(3) because it "promotes" the concept that a person's "status as . . . oppressed is necessarily determined by his or her . . . national origin."

(d) In rejecting the "understanding of integration [of baseball] as a redemption . . . enacted by whites" and endorsing an analysis that "invalidates the invocation of white privilege . . . while seeking absolution for the wrongs of a segregated society viewed as existing in only the distant past," *Left Out* violates Florida Statutes § 1000.05(4)(a)(3) because it "promotes" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[.]"

179. In her teaching, Professor Novoa advances concepts in *Left Out*.

180. In her lectures, Professor Novoa uses *Left Out* to advance the arguement that Afro-Latino baseball players, despite coming from different backgrounds and cultures, were reduced to their perceived racial identity. In so doing, Professor Novoa provides "endorsement" of the concept, prohibited by Florida Statutes § 1000.05(4)(a)(3), that a person's "status as . . . oppressed is necessarily determined by his or her race [or] color[.]"

181. *Left Out* is pedagogically relevant to the course because it offers an argument as to the role race and national origin played in the color barrier and how its elimination is perceived today.

182. But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would again assign and provide "instruction" on *Left Out* in the History of Sports course.

183. In her History of Sports course, Professor Novoa also assigns a reading by Peter Dreier, *Jackie Robinson's Legacy: Baseball, Race, and Politics*.

184. In *Jackie Robinson's Legacy*, Dreier argues that despite making progress on racial issues, the United States remains segregated by race. After highlighting statistics supporting the argument that America largely remains segregated by race, Dreier writes:

> Even when black people move to the suburbs, they are likely to live in segregated areas—not because they prefer to do so, but because of persistent (though subtle) racial bias by banks and real estate brokers. As a result of residential segregation, our public schools are still segregated by race as well as income. Blacks and Latinos still feel the sting of discrimination in the workplace and by the police and the criminal justice system.

185. Dreier's *Jackie Robinson's Legacy* also posits that the "essence of America's troubled race relations" is that "corporate America has learned to live with affirmative action and laws against racial discrimination, but it steadfastly opposes policies to promote full employment, universal health care, and affordable housing for all"—policies that "challenge the foundation of the business elite's power and profits."

186. In teaching this class, Professor Novoa has historically advanced arguments in *Jackie Robinson's Legacy*.

187. If she continued to teach it in that manner, Professor Novoa's use of Dreier's *Jackie Robinson's Legacy* would violate Florida Statutes § 1000.05(4)(a)(3) in that it "promotes" or "advances" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[.]"

188. *Jackie Robinson's Legacy* is pedagogically relevant to the class because it covers the topic of race in baseball.

189. In engaging students in discussion, reflection, and debate, Professor Novoa intends to "advance" the arguments made in *Jackie Robinson's Legacy* that violate the Stop WOKE Act as described above.

190. But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would again assign and provide "instruction" on *Jackie Robinson's Legacy* in the History of Sports course.

191. In her History of Sports course, Professor Novoa also assigns a book by Gerald R. Gems, *The Athletic Crusade, Sports and American Cultural Imperialism*.

192. In *The Athletic Crusade, Sports and American Cultural Imperialism*, Gems argues that modern American sports are the product of American imperialism.

193. Gems argues that white Americans have historically been privileged to the detriment of non-white groups (which Gems refers to as "subordinate groups"), and that sports have perpetuated the privileged status of whites, while also giving "subordinate groups" the opportunity to "challenge whiteness, Social Darwinism, and cultural hegemony by establishing their own physical prowess, claiming a measure of esteem, and creating a greater sense of national identity."

194. In Novoa's teaching of *The Athletic Crusade, Sports and American Cultural Imperialism*, she violates Florida Statutes § 1000.05(4)(a)(3) by promoting or advancing the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[.]"

195. *The Athletic Crusade, Sports and American Cultural Imperialism* is pedagogically relevant to the class because it discusses the role American-dominated sports play in other countries.

196. But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would again assign and provide "instruction" on *The Athletic Crusade, Sports and American Cultural Imperialism* in the History of Sports course.

### *D. Professor Novoa's Instruction in Her Modern Latin America Course and Its Assigned Materials Violate the Stop WOKE Act.*

197. In **Modern Latin America**, Professor Novoa teaches history of "oppression" of certain groups by other, more "privileged" groups.

198. Professor Novoa regularly teaches Modern Latin America about "[t]he period that followed the end of the independence movements [that] . . . set the foundation of societies defined by social inequality, poverty, racism, and violence."

199. In Professor Novoa's first module, "From Colonies to Nations," she covers the clashes of civilizations and subsequent subjugations of conquered peoples that characterized the colonial period using texts such as "Civilization and Barbarism; Views of Latin America, 1810–1860" and "Race in Latin America."

200. In Professor Novoa's second module, "The Crisis of the Liberal Order & New Revolutionary Cycle," she discusses how societal tensions which resulted from colonialism caused violent revolutions.

201. In Professor Novoa's third module, "State Terrorism, Neoliberalism & Globalization," she explores how socioeconomic dynamics that exist throughout Latin America today reflect decisions made to confront uncomfortable aspects of these legacies.

202. In this course, Professor Novoa also teaches about the concept of collective guilt.

203. In one reading entitled *Collective Guilt and the Crucifixion* by Geoffrey Turner, students learn that the "idea of collective guilt . . . asks us to believe that a person may share the guilt of others who have committed a crime by being a member of the same 'collective', the same social group."

204. *Collective Guilt and the Crucifixion* and the concept of collective guilt are pedagogically relevant to Professor Novoa's course because they help provide context for Modern Latin America societies.

205. In the course of her teaching on collective guilt, Professor Novoa must "advance" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[]" in certain cultures to explain how societies have experienced collective guilt based on race, color, and national origin.

206. Similarly, Professor Novoa's teaching on collective guilt "advances" the concept that "[a] person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex[.]"

207. As an example, Professor Novoa teaches about the case of Damiana-Kryygi, an indigenous member of the Aché community, an indigenous people of Paraguay. A group of European explorers killed Damiana-Kryygi's parents, kidnapped her as a small child, and took her to live in Buenos Aires, Argentina, where she was a maid of a famous physician. After she died, Damiana-Kryygi's head was severed and sent to Berlin for phrenological and other pseudoscientific studies because it was believed that her "race" was extinguishing.

208. Recently, the descendants of the Aché sued the museums for the return of Damiana-Kryygi's head and other remains to give them proper burial.

209. Professor Novoa teaches about Damiana-Kryygi and speaks about the collective responsibility that Argentina had in the treatment and extermination of indigenous peoples.

210. Professor Novoa uses Damiana-Kryygi's story to illustrate the dangers of racism, but the Stop WOKE Act prohibits her from stating that race continues to play a role in establishing social order in Argentine society.

211. In teaching this example, Professor Novoa "advances" the idea that, by virtue of her Argentine national origin, she "bears personal

responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which [she] played no part, committed in the past by other members of the same . . . national origin[.]"

212. As this example makes clear, the Stop WOKE Act prohibits Professor Novoa from advancing the pedagogically relevant concept of collective guilt as a part of her course instruction.

213. Professor Novoa teaches this course on a rotation every year and a half.

214. But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would again assign and provide "instruction" on *Collective Guilt and the Crucifixion* and on Damiana-Kryygi's story in the Modern Latin America course.

### *E. If Not Enjoined, the Stop WOKE Act Prohibits Professor Novoa's Instruction and Jeopardizes USF Funding.*

215. Professor Novoa intends to engage in expressive activity proscribed by the Stop WOKE Act.

216. The State of Florida, Board of Governors, and USF intend to enforce the law, violations of which carry severe consequences for Professor Novoa, her colleagues, and her institution.

217. Because Professor Novoa cannot determine whether (a) her teaching will, as USF's guidance cautions, be interpreted as "uninfluenced by [her] emotions"; (b) her discussions or course materials will not be interpreted by a student as showing "favoritism, approval, or personal bias in favor of" a given concept; or (c) whether her discussions or course materials will be interpreted to "endorse" a given concept, Professor Novoa will be forced to choose between teaching her students to the best of her abilities or face catastrophic—and collective—punishment for herself, her colleagues, and her institution.

218. Given Professor Novoa's commitment to teaching her students about the subject matter of her assigned courses and given the Defendants' commitment to quashing and censoring these same concepts, there is no question that:

(a) Much of Professor Novoa's teaching implicates the Stop WOKE Act; and

(b) The Defendants will discipline Professor Novoa and USF if she teaches the same subject matter she has taught in prior years and intends to teach this school year and in coming years.

219. A faculty member of ordinary firmness would be chilled from teaching the material for fear the Stop WOKE Act will be enforced against them and their institution.

220. Florida's enactment, implementation, and preparations to enforce the Stop WOKE Act have caused and, unless enjoined, will continue to cause irreparable harm to the constitutional rights of Professor Novoa under the First and Fourteenth Amendments.

221. Specifically, Professor Novoa will be forced to remove all assigned reading materials that "promote," "advance," or otherwise support any concept prohibited by the Stop WOKE Act, such as *From Man to Ape: Darwinism in Argentina, 187–1920*; *Picturing Tropical Nature*; *Left Out*; *Jackie Robinson's Legacy: Baseball, Race, and Politics*; *The Athletic Crusade, Sports and American Cultural Imperialism*; and *Collective Guilt and the Crucifixion*.

222. Professor Novoa will also be forced to revise her lectures to remove any subject matter that would lead her to "promote" or "advance" a concept prohibited by the Stop WOKE Act, such as discussing the role of science in creating societies where an individual's race established their place in a social order, the role of racism in modern baseball, the roots of racism in Latin America, and the phenomena of collective guilt in modern cultures such as Argentina and the United States.

223. Professor Novoa will also be forced to self-censor during debates amongst students, prohibiting her from engaging in the free exchange of ideas that is the hallmark of a successful debate.

224. This chilling effect is consistent with other contemporaneous reports from Florida's public universities and colleges.

225. For example, the president of St. Petersburg College candidly told a journalist that the law had already had a chilling effect on faculty, "especially those who teach history and American government," who are in a "tough spot" and asking whether they should "scratch [material] out of the books" used in their classes.

### *F. The Stop WOKE Act Is Currently Imposing the "Pall of Orthodoxy" on Rechek and Members of the First Amendment Forum.*

226. When registration for the Spring 2023 semester opens on October 31, 2022, Plaintiff Rechek intends to enroll in Professor Novoa's Science in Cultural Context class.

227. As adults, college students are free to consider the views advanced by Professor Novoa and the materials in her courses and decide for themselves whether they have merit.

228. Rechek is an adult capable of determining for himself whether the viewpoints advanced in Professor Novoa's class are defensible.

229. To know whether the viewpoints advanced in Professor Novoa's class are defensible, Rechek must first have an opportunity to encounter them.

230. Professor Novoa is a willing speaker and Rechek is a willing listener. They desire to engage in academic discussion concerning topics prohibited by the Stop WOKE Act in the **Science in Cultural Context** course.

231. As students enrolled at USF, Rechek and the members of the First Amendment Forum benefit from a learning environment in which academic freedom is uninhibited by the "pall of orthodoxy."

232. Other members of the First Amendment Forum are also interested in taking Professor Novoa's courses, as well as other courses offered by USF, free from the censorship imposed by the Stop WOKE Act.

233. The First Amendment Forum exists to protect and advance access to civil discussions concerning matters of public and academic concern, recognizing that the academic value of the First Amendment is crucial at diverse institutions like USF.

234. The rights of the members of the First Amendment Forum are in jeopardy because the Stop WOKE Act currently imposes an express "pall

of orthodoxy" over the courses and lectures available to them as students enrolled at USF.

235. The interests that the First Amendment Forum seeks to protect—access to information and the ability to engage in a broad range of discussion, unfettered by the "pall of orthodoxy," about matters of scholarly and public concern—are germane to its purpose. Its members cannot engage in a full and frank discussion of contested matters—race and its role in both history and modern society are among the most fraught issues in the United States—if they fear that a professor's response to their questions may be reported to administrators, an Inspector General, or state lawmakers for disciplinary action.

236. The First Amendment Forum's asserted claims and requested relief do not require the participation of its individual members.

237. Florida's enactment and implementation of the Stop WOKE Act have caused and, unless enjoined, will continue to cause irreparable harm to the constitutional rights of Plaintiffs Rechek and the First Amendment Forum under the First Amendment.

238. In particular, Plaintiffs Rechek and the First Amendment Forum's injuries under the Stop WOKE Act include:

(a) The prohibition of engaging in a historical debate with Professor Novoa on the topics prohibited by the Stop WOKE Act;

(b) The Stop WOKE Act chills the ability of Rechek and other students to access information unfettered by ideologically-driven filters imposed by political officials, causing harm that cannot be quantified or redressed through monetary damages; and

(c) Rechek and other students fear that if they raise concepts prohibited by the Stop WOKE Act during a class discussion, they will risk contributing to or soliciting "instruction" that violates the law and jeopardizes their institution's funding.

239. The speech rights of each of the Plaintiffs has been chilled now and will be chilled in the future, as the Stop WOKE Act infringes on their First Amendment rights (and threatens Novoa's livelihood) if they continue to engage in the kind of expression forbidden by the law.

240. Unless the actions, policies, and practices of Defendants are enjoined by this Court, all of the Plaintiffs will suffer the continuing loss of their constitutional rights.

241. All of the Plaintiffs have suffered irreparable injury and continue to suffer irreparable injury as a result of the Stop WOKE Act and the Defendants' efforts to enforce it.

242. None of the Plaintiffs has a plain, adequate or complete remedy to protect their constitutional rights and to redress the wrongs and illegal acts complained of, other than preliminary and continuing injunctive relief.

243. None of the Plaintiffs has an adequate remedy at law. Deprivation of rights guaranteed under the Constitution is an irreparable injury for purposes of injunctive relief. In cases involving the loss of First Amendment rights, such as in this case, damages are both inadequate and unascertainable.

244. The public interest would be served by the granting of injunctive relief. In fact, the public interest is disserved by laws, such as the Stop WOKE Act, which interfere with the public's rights guaranteed under the First and Fourteenth Amendments.

245. Plaintiffs have retained FIRE and Benjamin, Aaronson, Edinger & Patanzo, P.A. as their attorneys to represent them in this action. Defendants are obligated to pay for the cost of Plaintiffs' reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of the First Amendment
### (42 U.S.C. § 1983)
### (All Plaintiffs against all Defendants)

246. Plaintiffs re-allege and incorporate paragraphs 1-7 and 9-245 of this Complaint.

247. At public universities and colleges, faculty members' speech related to scholarship or teaching, or classroom speech related to matters of public concern, is protected by the First Amendment.

248. Each of the concepts prohibited by the Stop WOKE Act addresses matters of public concern, regardless of whether some find those concepts uncomfortable, unwelcome, disagreeable, or offensive.

249. In this way, the Stop WOKE Act prospectively limits the content of faculty members' speech—like Professor Novoa's—about the prohibited concepts in any class or other form of "instruction" at any public university or college in Florida, no matter the subject matter of the class or even if the "instruction" occurs outside the classroom.

250. The Act also prospectively limits the protected right of students (like Recheck and members of the First Amendment Forum) and the public to receive information on matters of public concern.

251. Thus, the Stop WOKE Act is a content-based and direct regulation of speech at Florida's institutions of higher education, triggering strict scrutiny.

252. Under strict scrutiny, content-based laws like the Stop WOKE Act "are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

253. The Stop WOKE Act fails strict scrutiny.

254. First, the State of Florida lacks any compelling interest for restricting speech on the basis of content at the State's public colleges and universities.

255. The State of Florida has no compelling interest in prohibiting disfavored, politicized "concepts" from discussion in college classrooms.

256. In adopting the Campus Free Expression Act, the State has disclaimed any interest in shielding college students from ideas they might find deeply offensive. Fla. Stat. §§ 1004.097(2)(f), (3)(f). Florida's political leaders cannot selectively abandon this principle when they themselves find the ideas "uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. § 1004.097(2)(f).

257. In contrast, by adopting the Stop WOKE Act, the State has picked winners and losers in the "marketplace of ideas" as the statute makes eight specific viewpoints off limits and unlawful.

258. Second, the Stop Woke Act fails strict scrutiny because it is far from being the least restrictive means of satisfying any state interest.

259. For example, and without limitation, existing anti-discrimination measures—provided by Title VI of the Civil Rights Act of 1964, Title IX of the Educational Amendments of 1972, the Florida

Educational Equity Act, Florida Board of Governors Regulation 2.003, and policies promulgated by each educational institution—adequately address any state interest in preventing and remedying discriminatory harassment or conduct.

260. Further, terminating a faculty member for speaking out on matters of public concern or defunding the institution that employs that faculty member are not the least restrictive means of regulation.

261. Third, the Stop WOKE Act also fails strict scrutiny because it is not narrowly tailored. By targeting speech about a host of ideas on matters of public concern, the Stop WOKE Act suppresses far more speech than necessary to meet any state interest.

262. The Stop WOKE Act fails strict scrutiny and is unconstitutional under the First Amendment (as incorporated against the states under the Fourteenth Amendment), both facially and as-applied to the Plaintiffs.

263. Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

264. As a direct and proximate result of the Stop WOKE Act and its enforcement, Plaintiffs will suffer irreparable injury from the violation of their constitutional rights.

265. Plaintiffs are entitled to preliminary and permanent injunctive relief, including but not limited to, an order enjoining all Defendants from enforcing the Stop WOKE Act.

266. Unless Defendants are enjoined from enforcing the Stop WOKE Act, Plaintiffs will continue suffering irreparable harm.

267. Plaintiffs have no other adequate remedy by which to prevent or minimize the continuing irreparable harm to their rights under the First and Fourteenth Amendments.

268. Plaintiffs are also entitled to declaratory relief. An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their rights under the United States Constitution.

269. Plaintiffs desire a judicial determination of their First Amendment rights and legal relations against Defendants as they pertain to their rights to speak or to receive information unfettered by the "pall of orthodoxy" imposed by legislative decree.

270. Without declaratory and injunctive relief from this Court, Defendants' unconstitutional actions will continue, and Plaintiffs will suffer irreparable harm indefinitely.

**SECOND CAUSE OF ACTION**
**Violation of the First Amendment—**
**Viewpoint Discrimination**
**(42 U.S.C. § 1983)**
**(Prof. Novoa against all Defendants)**

271. Plaintiffs re-allege and incorporate paragraphs 1-7 and 9-245 of this Complaint.

272. At public universities and colleges, faculty members' speech related to scholarship or teaching, or classroom speech related to matters of public concern, is protected by the First Amendment. *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021).

273. Each of the concepts prohibited by the Stop WOKE Act addresses matters of public concern, regardless of whether some find those concepts uncomfortable, unwelcome, disagreeable, or offensive.

274. The Stop WOKE Act's prohibition against "endorsement" of a concept is viewpoint-discriminatory and therefore, presumptively unconstitutional. In particular, the Act prohibits those viewpoints which advocate, endorse, or advance the eight suspect categories of ideas.

275. Because it is viewpoint-discriminatory, the prohibition limits classroom discussion, depriving faculty—including Professor Novoa—of important pedagogical tools in classroom teaching, including the ability to

feign a position to encourage discussion and critical thinking, such as devil's advocacy or Socratic dialogue.

276. The Stop WOKE Act's requirement that prohibited concepts be discussed only in an "objective manner without endorsement" is viewpoint-discriminatory and therefore, presumptively unconstitutional.

277. The Stop WOKE Act's "objective manner without endorsement" requirement fails strict scrutiny.

278. The Stop WOKE Act's higher education provisions do not advance, nor are they narrowly tailored to serve, any compelling interest.

279. Professor Novoa intends to engage in conduct proscribed by the Stop WOKE Act. Unless it is enjoined, the Stop WOKE Act requires Professor Novoa to revise curriculum for three of her classes: (1) Science in Cultural Context; (2) History of Sports; and (3) Modern Latin America.

280. Unless the Stop WOKE Act is enjoined, Professor Novoa will be precluded from debating and interacting with her students with regard to the prohibited concepts and ideas which make up the core of her curriculum.

281. Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

282. Professor Novoa is entitled to preliminary and permanent injunctive relief, including but not limited to, an order enjoining all Defendants from enforcing the Stop WOKE Act.

283. Unless Defendants are enjoined from enforcing the Stop WOKE Act, Professor Novoa will continue suffering irreparable harm.

284. Professor Novoa is also entitled to a declaration under 28 U.S.C. § 2201 that the Stop WOKE Act unlawfully favors one viewpoint and violates the First and Fourteenth Amendments to the United States Constitution.

285. Without declaratory and injunctive relief from this Court, Defendants' viewpoint discrimination against Professor Novoa's freedom of speech will continue, and Professor Novoa will suffer irreparable harm indefinitely.

**THIRD CAUSE OF ACTION**
**Violation of First Amendment—Prior Restraint**
**(42 U.S.C. § 1983)**
**(Prof. Novoa against all Defendants)**

286. Plaintiffs re-allege and incorporate paragraphs 1-7, 9-245, and 247-249 of this Complaint.

287. The Stop WOKE Act is an unconstitutional blanket restriction on college and university faculty's speech on matters of public concern.

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995); *Barrett v. Thomas*, 649 F.2d 1193 (5th Cir. 1981).

288. The Stop WOKE Act imposes a legislative prior restraint on faculty like Professor Novoa before judicial review of particular speech and without preserving the status quo, all in violation of *Freedman v. State of Md.*, 380 U.S. 51 (1965).

289. Prior restraints on speech are "the most serious and the least tolerable infringement on" freedom of expression. *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976).

290. The Stop WOKE Act restricts faculty before speaking by prohibiting them from speaking in a way "that espouses, promotes, advances, inculcates, or compels [any] student . . . to believe" one of the prohibited issues stated in the Act, even though each of those prohibited issues bear on a matter of public concern.

291. By restricting faculty speech on those issues to "objective" speech, the Act also restricts faculty before speaking on campus to only those viewpoints on matters of public concern approved by the State.

292. A blanket prior restraint on faculty speaking on matters of public concern cannot survive unless it "furthers some vital government

end by a means that is least restrictive" of free speech. *Barrett*, 649 F.2d at 1200 (quotations omitted).

293. Defendants can point to no vital government end that requires faculty to refrain from speaking out about the prohibited topics of public concern in the way the Stop WOKE Act requires them to. In essence, the Stop WOKE Act demands faculty "toe the prescribed political line." *Id.*

294. The impact of the speech prospectively limited by the Stop WOKE Act does not outweigh the interests in free speech and debate of the vast number of students and faculty (both current and future) at Florida's institutions of higher education to engage in or hear such speech.

295. Students and faculty have a well-established interest in preserving the classroom as a marketplace of ideas unfettered by the authoritative selection of Florida's political leaders.

296. In adopting the Campus Free Expression Act, the State has recognized students' unfettered right to access ideas and opinions. Fla. Stat. § 1004.097(2)(f), (3)(a), (3)(f).

297. These interests do not only inure to the benefit of Professor Novoa or faculty, but also include students and the the broader public, as the right of unfettered discourse "is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603.

298. To the contrary, the Stop WOKE Act's limits on teaching undermine the university's "chief mission" to "equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022).

299. Unless it is enjoined, the Stop WOKE Act will force Professor Novoa to refrain from speaking about those prohibited matters of public concern.

300. Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

301. Professor Novoa is entitled to preliminary and permanent injunctive relief, including but not limited to, an order enjoining Defendants from enforcing the Stop WOKE Act.

302. Unless Defendants are enjoined from enforcing the Stop WOKE Act, Professor Novoa will continue suffering irreparable harm.

303. Professor Novoa is also entitled to a declaration under 28 U.S.C. § 2201 that the Stop WOKE is a blanket prior restraint against the right to speak on matters of public concern that violates the First and Fourteenth Amendments to the United States Constitution.

304. Without declaratory and injunctive relief from this Court, Defendants' restriction of Professor Novoa's freedom of speech will continue, and Professor Novoa will suffer irreparable harm indefinitely.

**FOURTH CAUSE OF ACTION**
**Violation of First Amendment—Right to Receive Information and Ideas**
**(42 U.S.C. § 1983)**
**(Plaintiffs Rechek & First Amendment Forum against all Defendants)**

305. Plaintiffs re-allege and incorporate paragraphs 1-7 and 9-245 of this Complaint.

306. As students enrolled in a public institution of higher education, Rechek and the members of the First Amendment Forum have an interest in learning and debating the views of the faculty members they pay to teach them, including—but not limited to—those courses taught by Professor Novoa.

307. The First Amendment protects the right of university students to "receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

308. The First Amendment protects the right—of Rechek and the members of the First Amendment Forum—to access to information

unfettered by a legislated "pall of orthodoxy." *Keyishian*, 385 U.S. at 603 (1967).

309. The interests of Plaintiffs Rechek and the members of the First Amendment Forum are commensurate with the "chief mission" of the university: "to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First*, 32 F.4th at 1128.

310. The Stop WOKE Act imposes a content-based, ideologically-driven barrier to accessing information and ideas, declaring some ideas permissible and the "endorsement" of others prohibited. Yet, "[u]nder the First Amendment, there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974).

311. The State of Florida lacks any compelling interest in enforcing the Stop WOKE Act to suppress the flow of information and ideas on matters of public concern to students in its public colleges and universities.

312. Because the Act suppresses information and ideas on a broad range of public issues, it is neither narrowly tailored nor the least restrictive means for meeting any state interest.

313. In sum, the Stop WOKE Act is depriving and will keep depriving Rechek and First Amendment Forum of their constitutional right to receive information and ideas on matters of public concern.

314. Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

315. Rechek and First Amendment Forum are entitled to preliminary and permanent injunctive relief, including but not limited to, an order enjoining Defendants from enforcing the Stop WOKE Act.

316. Unless Defendants are enjoined from enforcing the Stop WOKE Act, Rechek and First Amendment Forum will continue suffering irreparable harm.

317. Rechek and First Amendment Forum are also entitled to a declaration under 28 U.S.C. § 2201 that the Stop WOKE Act unlawfully restricts their right to receive information and ideas on matters of public concern and thus violates the First and Fourteenth Amendments to the United States Constitution.

318. Without declaratory and injunctive relief from this Court, Defendants' infringement on Rechek and First Amendment Forum's First Amendment rights will continue, and they will suffer irreparable harm indefinitely.

## FIFTH CAUSE OF ACTION
## Violation of the First Amendment—Facial Overbreadth
## (42 U.S.C. § 1983)
## (Prof. Novoa against all Defendants)

319. Plaintiffs re-allege and incorporate paragraphs 1-7, 9-245, and 247-249 of this Complaint.

320. The STOP Woke Act "prohibits a substantial amount of protected expression." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 237 (2002).

321. First, it prohibits a sweeping amount of protected speech related to scholarship or teaching, or classroom speech over matters of public concern. The First Amendment protects that speech regardless of whether some find those concepts uncomfortable, unwelcome, disagreeable, or offensive.

322. What's more, the Stop WOKE Act's prohibition on any "instruction that espouses, promotes, advances, inculcates, or compels [any] student . . . to believe" a forbidden concept reaches a real and substantial range of protected expression, including much of Professor Novoa's curriculum.

323. First, in repeatedly referencing "[a] person" in the prohibited concepts, the Stop WOKE Act reaches discussion of a concept in relation to

*any* "person" and is not limited to a "student or employee"—language the legislature had at its disposal and did not use—in the classroom. Thus, the Stop WOKE Act restricts speech about potentially any person related to a host of public issues beyond the campus boundaries—even though "[s]peech on matters of public concern is . . . at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (citation and internal quotation marks omitted).

324. Second, in employing the operative terms "espouses, promotes, advances, inculcates, or compels," the Stop WOKE Act reaches any speech which merely supports, furthers, contributes to the growth of, or simply brings forward for consideration, even if that result is only an incidental effect and not the express intent or purpose of the instruction.

325. The Stop WOKE Act contains no definitions or other meaningful limiting principles that might constrain these terms that restrict a wide range of speech on matters of public concern. Nor does the Act does not even seem to require that a faculty member to specifically intend that his or her speech fulfill one or more of the enumerated prohibitions.

326. The requirement that each concept be discussed only in an "objective" manner is no such limiting principle—the Act fails to define

"objective." At the same time, it is a content-based limitation on speech reaching a real and substantial range of protected expression on matters of public concern. Under this ill-defined requirement, even the teaching of well-accepted ideas are censored by the Stop WOKE Act's broad scope.

327. The Stop WOKE Act serves no objective other than prohibiting a substantial amount of protected expression. *See United States* v. *Stevens*, 559 U.S. 460, 473 (2010). This renders the Stop WOKE Act facially unconstitutional, as the substantial protected expression the Act prohibits is well beyond any possible "plainly legitimate sweep" of the Act. *See Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

328. The "likelihood that the statute's very existence will inhibit free expression" by "inhibiting the speech of third parties who are not before the Court" also shows why the Stop WOKE Act is facially overbroad. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799, 800 (1984). These parties include the thousands of faculty members at Florida's colleges and universities who must consider self-censorship because of the Stop WOKE Act's sweeping prohibitions on matters of public concern.

329. The Court should preliminarily and permanently enjoin the Stop WOKE Act because it is facially overbroad and chills a substantial amount of protected speech.

330. Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

331. Unless Defendants are enjoined from enforcing the Stop WOKE Act, Professor Novoa and other faculty will continue suffering irreparable harm to their First Amendment rights.

332. Professor Novoa is also entitled to a declaration under 28 U.S.C. § 2201 that the Stop WOKE Act is facially overbroad.

333. Without declaratory and injunctive relief from this Court, the chilling effects from the Act's sweeping overbreadth will only deepen, and exacerbate the irreparable harm suffered by Professor Novoa, university faculty, and their students.

**SIXTH CAUSE OF ACTION**
**Violation of Due Process—Vagueness**
**(42 U.S.C. § 1983)**
**(Prof. Novoa against all Defendants)**

334. Plaintiffs re-allege and incorporate paragraphs 1-7, 9-245, and 247-249 of this Complaint.