Nos. 22-13992-J & 22-13994-J

# In the United States Court of Appeals for the Eleventh Circuit

---

LEROY PERNELL, ET AL.,
*Plaintiffs–Appellees*,

v.

BRIAN LAMB, ET AL.,
*Defendants–Appellants*.

---

ADRIANA NOVOA, ET AL.,
*Plaintiffs–Appellees*,

v.

MANNY DIAZ, JR., ET AL.,
*Defendants–Appellants*.

---

## ANSWER BRIEF OF APPELLEES ADRIANA NOVOA, SAMUEL RECHEK, AND THE FIRST AMENDMENT FORUM AT THE UNIVERSITY OF SOUTH FLORIDA

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
4:22-CV-324-MW-MAF

---

GREG HAROLD GREUBEL
ADAM STEINBAUGH
JT MORRIS
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel:    (215) 717-3473
Fax:    (267) 573-3073
greg.greubel@thefire.org
adam@thefire.org
jt.morris@thefire.org

GARY S. EDINGER
BENJAMIN, AARONSON, EDINGER & PATANZO,
    P.A.
305 N.E. 1st Street
Gainesville, Florida 32601
Tel:    (352) 338-4440
Fax:    (352) 337-0696
GSEdinger12@gmail.com

*Counsel for Plaintiffs-Appellees Adriana Novoa, Samuel Rechek, and
the First Amendment Forum at University of South Florida*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule No. 26.1(a)(6), Plaintiff-Appellees Adriana Novoa, Samuel Rechek, and the First Amendment Forum at the University of South Florida certify that the following persons have an interest in the outcome:[1]

1. Almond, Russell, *Plaintiff-Appellee*

2. American Civil Liberties Union of Florida, *Attorney firm for Plaintiffs-Appellees*

3. American Civil Liberties Union of New York, *Attorney firm for Plaintiffs-Appellees*

4. Austin, Sharon Wright, *Plaintiff-Appellee*

5. Azis, Jacqueline Nicole, *Attorney for Plaintiffs-Appellees*

6. Ballard Spahr LLP, *Attorney firm for Plaintiffs-Appellees*

7. Benjamin, Aaronson, Edinger & Patanzo, P.A., *Attorney firm for Plaintiffs-Appellees*

8. Blankenship, Katherine, *Attorney for Plaintiffs-Appellees*

9. Boaz, Timothy, *Defendant-Appellant*

10. Burgess, Tiffani, *Attorney for Plaintiffs-Appellees*

---

[1]     This certificate includes parties involved in the related appeal of *Pernell v. Lamb*, No. 22-13992.

C-1 of 6

11.  Callahan, Sandra, *Defendant-Appellant*

12.  Carrere, Michael, *Defendant-Appellant*

13.  Cerio, Timothy, *Defendant-Appellant*

14.  Coleman, Santino, *Attorney for Plaintiffs-Appellees*

15.  Cooper & Kirk, PLLC, *Attorney firm for Defendants-Appellants*

16.  Cooper, Charles J., *Attorney for Defendants-Appellants*

17.  Corcoran, Richard, *Defendant-Appellant*

18.  Dauphin, Johana, *Plaintiff-Appellee*

19.  Diaz, Jr., Manny, *Defendant-Appellant*

20.  Donnelly, N. Rogan, *Defendant-Appellant*

21.  Dorsey, Dana Thompson, *Plaintiff-Appellee*

22.  Dunn, Marvin, *Plaintiff-Appellee*

23.  Edge, Aubrey, *Defendant-Appellant*

24.  Edinger, Gary. S., *Attorney for Plaintiffs-Appellees*

25.  Edwards, Jerry Crawford, *Attorney for Plaintiffs-Appellees*

26.  Fajana, Morenike, *Attorney for Plaintiffs-Appellees*

27.  First Amendment Forum at University of South Florida, *Plaintiff-Appellee*

28. Fitzpatrick, Martin A., *Magistrate Judge, U.S. District Court for the Northern District of Florida*

29. Florida A & M University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

30. Florida Board of Governors of the State University System, *Defendant (Dismissed on Nov. 22, 2022)*

31. Florida International University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

32. Florida State University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

33. Foundation for Individual Rights and Expression, *Attorney Firm for Plaintiffs-Appellees*

34. Frost, Patricia, *Defendant-Appellant*

35. Gabadage, Nimna, *Defendant-Appellant*

36. Gary S. Edinger & Associates PA — Gainesville, FL, *Attorney for Plaintiffs-Appellees*

37. Greubel, Greg, *Attorney for Plaintiffs-Appellees*

38. Griffin, Michael, *Defendant-Appellant*

39. Haddock, Edward, *Defendant-Appellant*

40. Hinger, Sarah Ann, *Attorney for Plaintiffs-Appellees*

41. Horton, Oscar, *Defendant-Appellant*

42. Johnson, Alexsis Marie, *Attorney for Plaintiffs-Appellees*

43. Jones, Ken, *Defendant-Appellant*

44. Jordan, Darlene Luccio, *Defendant-Appellant*

45. Lamb, Brian, *Defendant-Appellant*

46. Leckerman, Jason Allen, *Attorney for Plaintiffs-Appellees*

47. Lee, Jin Hee, *Attorney for Plaintiffs-Appellees*

48. Leftheris, Julie, *Defendant-Appellant*

49. Levine, Alan, *Defendant-Appellant*

50. Lubin, Catharine E., *Attorney for Plaintiffs-Appelees*

51. Lydecker, Charles, *Defendant-Appellant*

52. Mabatah, Isiuwa, Jacqueline, *Attorney for Plaintiffs-Appellees*

53. Mateer, Craig, *Defendant-Appellant*

54. McLaurin, Charles, *Attorney for Plaintiffs-Appellees*

55. McNamara, Carline A., *Attorney for Plaintiffs-Appellees*

56. Michael, Deanna, *Defendant-Appellant*

57. Monbarren, Lauran, *Defendant-Appellant*

58. Moraff, Laura Beth, *Attorney for Plaintiffs-Appellees*

59. Morris, Joshua T. (JT), *Attorney for Plaintiffs-Appellees*

60. NAACP Legal Defense & Education Fund, *Attorney firm for Plaintiffs-Appellees*

61. Nascimento, Isabella Salomao, *Attorney for Plaintiffs-Appellees*

62. Novoa, Adriana, *Plaintiff-Appellee*

63. Ohlendorf, John David, *Attorney for Defendants-Appellants*

64. Palyam, Nithin, *Defendant-Appellant*

65. Park, Shelley, *Plaintiff-Appellee*

66. Patel, Shilen, *Defendant-Appellant*

67. Pernell, Leroy, *Plaintiff-Appellee*

68. Piccolo, Fredrick, *Defendant-Appellant*

69. Ramer, John, *Attorney for Defendants-Appellants*

70. Rechek, Samuel, *Plaintiff-Appellee*

71. Sandoval, Jennifer, *Plaintiff-Appellee*

72. Schneider, Jenifer, *Defendant-Appellant*

73. Scott, Steven, *Defendant-Appellant*

74. Seixas, Melissa, *Defendant-Appellant*

75. Self, William, *Defendant-Appellant*

76. Silagy, Eric, *Defendant-Appellant*

77. Steinbaugh, Adam, *Attorney for Plaintiffs-Appellees*

78. Stermon, Kent, *Defendant-Appellant*

79. Sykes, Emerson James, *Attorney for Plaintiffs-Appellees*

80.    Tilley, Daniel Boaz, *Attorney for Plaintiffs-Appellees*

81.    Tobin, Charles David, *Attorney for Plaintiffs-Appellees*

82.    University of Central Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

83.    University of Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

84.    University of South Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

85.    Walker, Mark E., *District Judge, U.S. District Court for the Northern District of Florida*

86.    Watson, Leah Monique, *Attorney for Plaintiffs-Appellees*

87.    Weatherford, William, *Defendant-Appellant*

88.    Wold, Megan M., *Attorney for Defendants-Appellants*


Dated:      June 16, 2023

                                        Respectfully submitted,

                                        /s/  Greg  H.  Greubel
                                        Greg H. Greubel

                                        *Counsel for Plaintiff-Appellees Adriana Novoa, Samuel Rechek, and First Amendment Forum at University of South Florida*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This case raises important questions about the constitutionality of a state statute that restricts the viewpoints public university faculty express in classroom discussions relevant to the courses they teach. Plaintiffs-Appellees believe oral argument would help the Court decide these important issues.

Plaintiffs-Appellees request oral argument under 11th Cir. R. 28-1(c).

# <u>TABLE OF CONTENTS</u>

**Page:**

STATEMENT REGARDING ORAL ARGUMENT ..................................... i

TABLE OF CITATIONS ............................................................ v

STATEMENT OF THE ISSUES ..................................................... 1

STATEMENT OF THE CASE ........................................................ 2

    Factual Background ............................................................ 2

        The Stop WOKE Act imposes vague and viewpoint-based restrictions on campus speech, with severe penalties for violations ............................................ 2

        Florida passed the Stop WOKE Act to restrict viewpoints in higher education with no findings to support its need ............................................ 5

        Florida institutions have construed the ambiguous Stop WOKE Act against open expression—as its framers intended ............................................ 6

        The Stop WOKE Act chills Professor Novoa from introducing viewpoints necessary to teaching her courses ............................................ 8

        The Stop WOKE Act limits members of the First Amendment Forum from accessing information and ideas ............................................ 12

    Prior Proceedings: The District Court Enjoins the Stop WOKE Act ............................................ 13

    Standard of Review ............................................ 14

    SUMMARY OF THE ARGUMENT ............................................ 15

ARGUMENT .......................................................................... 19

    I.    The District Court Correctly Held Plaintiffs Have Standing. ................................................................... 19

    II.   The District Court Correctly Found the Act Fails Scrutiny Under *Bishop*'s Balancing Test............................ 25

        A.   The Stop WOKE Act fails *Bishop*'s balancing test because it is viewpoint-discriminatory. ...................... 26

        B.   The district court correctly applied the "context" and employment factors of the *Bishop* balancing test................................................................. 31

        C.   The district court correctly applied the third *Bishop* factor weighing "countervailing" academic freedom. ......................................................... 34

    III.  Because the Stop WOKE Act Broadly Censors Protected Speech, *NTEU* Demands the State Prove the Law Directly Alleviates a Real Harm............................ 36

    IV.  The First Amendment Protects Academic Expression by University Faculty. .............................................. 39

        A.   Every circuit considering *Garcetti* has rejected its application to academic expression in higher education. ....................................................... 40

        B.   Like the district court, this Court should reject the notion that college faculty classroom speech is government speech. ..................................................... 46

        C.   The State waived its government-funding theory, which is also inapplicable because Florida cannot restrict expression within the university "sphere." .... 50

    V.   The District Court Correctly Ruled that the Act is Unconstitutionally Vague..................................................... 51

VI.    The Stop WOKE Act's Vague Objectivity Without
       Endorsement Clause is not Severable. ................................ 56

VII.   Plaintiffs Successfully Satisfied the Remaining
       Preliminary Injunction Factors............................................. 58

CONCLUSION ......................................................................................... 59

CERTIFICATE OF COMPLIANCE ....................................................... 61

CERTIFICATE OF SERVICE ................................................................ 62

## <u>TABLE OF CITATIONS</u>

### Cases

*Access Now, Inc. v. Sw. Airlines Co.,*
    385 F.3d 1324 (11th Cir. 2004) ....................................................... 51

*Adams v. Trs. of the Univ. of N.C.-Wilmington,*
    640 F.3d 550 (4th Cir. 2011) .................................................... 42, 44

*Amalgamated Transit Union Loc. 85 v. Port Auth. of*
    *Allegheny Cnty.,*
    39 F.4th 95 (3d Cir. 2022) ............................................................. 29

*Arce v. Douglas,*
    793 F.3d 968 (9th Cir. 2015) ......................................................... 29

*Arnett v. Kennedy,*
    416 U.S. 134 (1974) ....................................................................... 51

*Bd. of Regents of the Univ. of Wis. Sys. v. Southworth,*
    529 U.S. 217 (2000) ....................................................................... 41

*Bethel Sch. Dist. v. Fraser,*
    478 U.S. 675 (1986) ....................................................................... 30

**\****Bishop v. Aronov,*
    926 F.2d 1066 (11th Cir. 1991) ............................................... passim

*Bob Jones Univ. v. United States,*
    461 U.S. 574 (1983) ....................................................................... 33

*Boring v. Buncombe Cnty. Bd. of Educ.,*
    136 F.3d 364 (4th Cir. 1998) ......................................................... 27

*Brooks v. Auburn Univ.,*
    296 F. Supp. 188 (M.D. Ala. 1969) ............................................... 28

*Buchanan v. Alexander,*
    919 F.3d 847 (5th Cir. 2019) ......................................................... 42

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) ........................................................................ 34

*DeJohn v. Temple Univ.*,
    537 F.3d 301 (3d Cir. 2008)................................................. 28, 34, 46

*Demers v. Austin*,
    746 F.3d 402 (9th Cir. 2014) ........................................................ 42

*Edwards v. Cal. Univ. of Pa.*,
    156 F.3d 488 (3d Cir. 1998)............................................................ 43

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................................ 58

*FCC v. Fox TV Stations, Inc.*,
    567 U.S. 239 (2012) ........................................................................ 52

*Fla. Dep't. of State, Div. of Elections v. Martin*,
    916 So.2d 763 (Fla. 2005)............................................................... 57

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ........................................................... 39, 41, 42

*Gay & Lesbian Students Ass'n. v. Gohn*,
    850 F.2d 361 (8th Cir. 1988) ........................................................ 29

*Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*,
    186 F. App'x 885 (11th Cir. 2006).................................................. 44

*Gonzalez v. Governor of Ga.*,
    978 F.3d 1266 (11th Cir. 2020) ......................................... 15, 16, 25

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ........................................................................ 41

*Hardy v. Jefferson Cmty. Coll.*,
    260 F.3d 671 (6th Cir. 2001) .................................................. 33, 44

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) .......................................................................... 46

*Hawkins v. Sarasota Cnty. Sch. Bd.*,
   322 F.3d 1279 (11th Cir. 2003) ..................................................... 46

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988) ............................................................... 26, 27

*Healy v. James*,
   408 U.S. 169 (1971) ............................................................... 29, 40

*Hill v. Colorado*,
   530 U.S. 703 (2000) ..................................................................... 51

*Honeyfund.com, Inc. v. DeSantis*,
   622 F. Supp. 3d 1159 (N.D. Fla. 2022) ......................................... 54

*Iancu v. Brunetti*,
   139 S. Ct. 2294 (2019) ................................................................. 28

*Janus v. AFSCME, Council 31*,
   138 S. Ct. 2448 (2018) ................................................................. 38

***Keyishian v. Bd. of Regents*,**
   385 U.S. 589 (1967) .......................................................... passim

*KH Outdoor, LLC v. City of Trussville*,
   458 F.3d 1261 (11th Cir. 2006) ..................................................... 59

*Kolender v. Lawson*,
   460 U.S. 352 (1983) ..................................................................... 51

*Leavitt v. Jane L.*,
   518 U.S. 137 (1996) ..................................................................... 56

*Mahoney v. Hankin*,
   593 F. Supp. 1171 (S.D.N.Y 1984) ............................................... 50

*Mailloux v. Kiley*,
   323 F. Supp. 1387 (D. Mass. 1971) .............................................. 49

*Matal v. Tam*,
   137 S. Ct. 1744 (2017) ................................................................. 47

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
    474 F.3d 477 (7th Cir. 2007) .......................................................... 44

*McCauley v. Univ. of the V.I.*,
    618 F.3d 232 (3d Cir. 2010).......................................................... 30

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ............................................. 42, 44, 45

*Molpus v. Fortune*,
    432 F.2d 916 (5th Cir. 1970) .......................................................... 28

*O'Laughlin v. Palm Beach Cnty.*,
    30 F.4th 1045 (11th Cir. 2022) ...................................................... 51

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968) .......................................................... 26, 27, 37

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ...................................................................... 50

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ...................................................................... 27

*Reno v. ACLU*,
    521 U.S. 844 (1997) ................................................................ 52, 56

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ................................................... 28, 29, 31, 41

*Rust v. Sullivan*,
    500 U.S. 173 (1990) ...................................................................... 50

*Searcey v. Harris*,
    888 F.2d 1314 (11th Cir. 1989) .................................................... 28

*Shelton v. Tucker*,
    364 U.S. 479, 487 (1960) .......................................................... 2, 40

*Shurtleff v. City of Boston*,
    142 S. Ct. 1583 (2022) ............................................................ 48, 49

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) .................................... 20, 21, 27, 40

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ......................................................... 20, 21

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) ......................................................... 19, 48

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622, 664 (1994) ................................................... 37

**\*United States v. Nat'l Treasury Emps. Union*,
    513 U.S. 454 (1995) ........................................................ passim

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ........................................................... 45

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................... 58

*Wolfe v. Barnhart*,
    446 F.3d 1096 (10th Cir. 2006) ....................................... 29

*Wollschlaeger v. Governor of Fla.*,
    848 F.3d 1293 (11th Cir. 2014) ................................... 20, 52

*Yates v. United States*,
    574 U.S. 528 (2015) ........................................................... 54

**Statutes**

Fla. Stat. § 1000.05(4)(a) ........................................... 2, 3, 14, 22

Fla. Stat. § 1000.05(4)(b) ................................................... 4, 52

Fla. Stat. § 1000.05(9) ............................................................ 5

Fla. Stat. § 1001.706(13)(b) ................................................. 49

Fla. Stat. § 1001.92(5) ..................................................... 5, 31

Fla. Stat. § 1003.41 ............................................................... 49

Fla. Stat. § 1003.42 ............................................................... 49

Fla. Stat. § 1003.421 ............................................................. 49

Fla. Stat. § 1003.44 ............................................................... 49

## Other Authorities

1 G. Santayana, The Life of Reason (1905) ............................. 23

American Ass'n of Univ. Profs., *1940 Statement of Principles on Academic Freedom and Tenure* (rev. Apr. 1970) .......................... 33

Fla. Bd. of Govs., *State University System Free Expression Statement* (Apr. 15, 2019), STATE UNIV. SYS. OF FLA. ...................................... 49

Fla. Dep't of Educ., *Policies & Procedures Specifications for the Florida Instructional Materials Adoption* (effective Aug. 18, 2020) .................................................................................. 49

Hannah Arendt, "Eichmann in Jerusalem: A Report on the Banality of Evil" (1963) ................................................................ 24

Karl Jaspers, "The Question of German Guilt" (1965) .......................... 24

*Pattern Jury Instructions, Civil Cases*, Eleventh Circuit (2013 rev.) 4.19 ............................................................................... 55

*Pattern Jury Instructions, Civil Cases*, Eleventh Circuit (2013 rev.) 4.22 ............................................................................... 55

Stanford Classical Liberalism Initiative, *Stanford Classical Liberalism – Keith Whittington and Christopher Rufo – 5 3 23*, YOUTUBE (May 5, 2023) at 50:00, https://youtu.be/xLHrony2mns?t=2999 ......................................... 48

**Regulations**

Fla. Bd. of Govs. Reg. No. 10.005(1)(c) ..................................................... 3

Fla. Bd. of Govs. Reg. No. 10.005(3)(c) ................................................... 56

Fla. Bd. of Govs. Reg. No. 10.005(4)(d) ................................................... 5

## STATEMENT OF THE ISSUES

(1)    The First Amendment bars the government from imposing viewpoint-based restrictions on speech related to scholarship or teaching, reflecting the need for academic debate in higher education. The Stop WOKE Act's blacklisting of particular viewpoints in university classrooms prevents Professor Novoa from teaching her courses. Did the district court correctly enjoin the Stop WOKE Act, finding that the Act likely violates the First Amendment and injures Plaintiffs?

(2)    Four sister circuits have rejected the argument, raised by Defendants, that state officials have unfettered authority to control speech related to scholarship or teaching of public professors, and no circuit has held to the contrary. Yet Defendants insist that Florida has limitless authority to dictate a lecturer's every word, claiming that faculty members are government speakers. Did the district court correctly rule, like the four circuits to have considered the question, that speech related to scholarship or teaching is not government speech?

(3)    A law restricting expression is unconstitutionally vague if it invites discriminatory enforcement and fails to provide adequate notice of what it prohibits. The Stop WOKE Act is inherently contradictory

because it places a condition on professors' ability to be "objective," permitting criticism of the prohibited concepts but making "endorsement" *per se* discriminatory harassment. Did the district court correctly hold that the Stop WOKE Act is unconstitutionally vague?

## STATEMENT OF THE CASE

Professor Adriana Novoa teaches history at the University of South Florida (USF). She is joined by members of the First Amendment Forum at USF, a student organization dedicated to fostering the diverse exchange of ideas on their campus. All oppose the Stop WOKE Act stifling their right to discuss various viewpoints at USF, where the "vigilant protection of constitutional freedoms is nowhere more vital[.]" *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).

**Factual Background**

> ***The Stop WOKE Act imposes vague and viewpoint-based restrictions on campus speech, with severe penalties for violations.***

Section 1000.05 of the Florida Statutes—the Stop WOKE Act—adds a new category of discrimination to the Florida Educational Equity Act (FEEA): "instruction" that "espouses, promotes, advances, inculcates, or compels" a student "to believe" any of eight enumerated viewpoints. Fla. Stat. § 1000.05(4)(a). Each viewpoint (which the Act deems

"concepts") references "[m]embers of one race," "[a] person," or certain "virtues." *Id.*

The Act's implementing regulations provide that "instruction" encompasses anything within "the process of teaching or engaging students with content about a particular subject . . . within a course." *See id.* § 1000.05(6)(b); Fla. Bd. of Govs. Reg. No. 10.005(1)(c). It makes no distinction between the professor, an unpaid guest speaker, or an assigned reading—anything within "the process of teaching or engaging students with content" by an "employee or a person authorized to provide" that engagement is "instruction." Fla. Bd. of Govs. Reg. No. 10.005(1)(c); Doc. 19-1 at 2, ¶ 6; Doc. 19-6 at 5.[2]

The Act does not require intent or distinguish a professor's sincerely offered viewpoint from devil's advocacy or Socratic dialogue. It does not require that "instruction" be evaluated for whether it constituted actionable discrimination under existing law, which is narrowly limited to severe and pervasive conduct. Without this limit, any promotion of a prohibited viewpoint is *per se* discriminatory harassment.

---

[2] Except where otherwise noted, all references to "Doc." are docket entries in the *Novoa v. Diaz* matter, Case No. 4:22-cv-324-MW/MAF (N.D. Fla.).

3

The Stop WOKE Act does not define its most important provisions. It purports to permit "discussion of the concepts" only if "part of a larger course of training or instruction" and "given in an objective manner without endorsement of the concepts." Fla. Stat. § 1000.05(4)(b). It fails to define "objective manner"—its framers purported to prohibit faculty from ever revealing their personal view, but expressly prohibited only "endorsement" of a concept—and contains no saving clause urging narrow interpretation. *Id.*; Doc. 19-1 at 4–9, ¶¶ 10, 13, 14; Doc. 19-13 at 51:13, 59:18, 1:18:44; Doc. 19-15 at 43:49, 55:00; Doc. 19-16 at 6:07:07.

A professor who knowingly or unknowingly violates these restrictions—which may be reported by students, colleagues, or the general public[3]—faces institutional consequences ranging from an administrative directive that they "modify" their discussion to termination.

The Act and its implementing regulations incentivize institutions to impose the stiffest consequences for a professor's violation, whether

---

[3] USF provides a public complaint form and urges that "[s]tudents, staff, and faculty are strongly encouraged to report" even "suspected" violations of the Stop WOKE Act. Doc. 19-1 at 11, ¶ 24; Doc. 19-29 at 3. USF policy obligates faculty to report colleagues' violations. Doc. 19-1 at 11, ¶ 23; Doc. 19-28 at 5 (all "members of the faculty" are "supervisory employees" required to "promptly report" even "allegations" of harassment).

intentional or unintentional. If a court, the Board of Governors, or a legislative committee determines that there has been any "substantiated violation" of the Act, the university "*shall* be ineligible" for annual performance funding. Fla. Stat. § 1001.92(5) (emphasis added). The Act's implementing regulations provide that if political appointees to the Board of Governors believe that an institution's response was not "appropriate," the institution will be ineligible for annual performance funding. Fla. Bd. of Govs. Reg. No. 10.005(4)(d). For USF, a single professor's violation—by uttering the words "I think that affirmative action has merit"—risks an annual loss of some $80,000,000. Doc. 19-1 at 10, ¶ 20; Doc. 19-24 at 2; Doc. 19-25 at 2.

In addition to action by administrators, regulators, or legislators, individual faculty members face potential lawsuits from any person "aggrieved" by their course instruction. Fla. Stat. § 1000.05(9).

### *Florida passed the Stop WOKE Act to restrict viewpoints in higher education with no findings to support its need.*

The Legislature did not identify any harm or need addressed by the Act. The prefatory language of the bill announced that it was "providing legislative findings," but did not provide findings relating to higher education. Doc. 1 at 17, ¶ 67; Doc. 1-1 at 2. Florida Governor Ron

DeSantis proclaimed the purpose of the Act as "build[ing] on" his efforts to "ban Critical Race Theory and the New York Times' 1619 Project." Doc. 19-1 at 3, ¶ 7; Doc. 19-11 at 2. When he signed the bill, Governor DeSantis said it was to prevent the use of "Florida tax dollars" for "teaching our kids to hate our country or to hate each other." Doc. 19-1 at 3, ¶ 7; Doc. 19-11 at 2. After advocacy groups criticized the law's impact on higher education, the Governor's office said the law's purpose was to prevent "indoctrinating students with CRT-inspired discriminatory ideology." Doc. 19-1 at 10, ¶ 18; Doc. 19-22 at 3.

### *Florida institutions have construed the ambiguous Stop WOKE Act against open expression—as its framers intended.*

Institutions enforcing the Act have construed its provisions to reach a vast range of academic expression. They have directed faculty to avoid suggesting that "white people were responsible for enacting" Jim Crow laws, offering any "critique of colorblindness," or mentioning a protected characteristic in "word problems" in science courses. Doc. 19-1 at 2–3, ¶ 6; Doc. 19-9 at 7; Doc. 19-10 at 8, 15. Universities and colleges have warned faculty that they may be sued and that they may jeopardize their institution's funding. *See, e.g.*, Doc. 19-1 at 2, ¶ 6; Doc. 19-5 at 4; Doc. 19-6 at 7.

Institutions have understood the Act's "objective manner and without endorsement" mandate to prohibit any attempt to "persuade" students or "indicate a preference for a particular concept," and to require that faculty be "uninfluenced by emotions." Doc. 19-1 at 2–3, ¶ 6; Doc. 19-5 at 4; Doc. 19-8 at 30; Doc. 19-10 at 4. One college's attorney directed faculty not to endorse "any opinion unless [it is] an opinion issued by the Department of Education." Doc. 19-1 at 2–3, ¶ 6; Doc. 19-10 at 11.

University administrators also interpret the Act's application to "instruction" to reach not only a professor's oral lectures, but also the written material used in classes and volunteer guest speakers. Administrators have warned faculty to place disclaimers on course materials, cautioned that "assigned materials" could violate the Act, and instructed them to cancel guest lecturers if the inviting faculty member is concerned that their presentations or materials *may* violate the Act. Doc. 19-1 at 2–3, ¶ 6; Doc. 19-6 at 5–6; Doc. 19-7 at 2; Doc. 19-9 at 13; Doc 19-10 at 14.

Given that a single violation of the Act imperils millions of dollars in annual funding, institutional leaders have strong incentives to construe every ambiguity against open expression. To give just one

example of its impact on teaching, some faculty are asking their college's president whether they must "scratch [material] out of the books" in their classes. Doc. 19-1 at 10, ¶ 19; Doc. 19-23 at 4.

### *The Stop WOKE Act chills Professor Novoa from introducing viewpoints necessary to teaching her courses.*

The Stop WOKE Act prohibits Plaintiffs from engaging in uninhibited academic discussion, including topics Professor Novoa teaches. Novoa's courses draw on her expertise in race and gender in Latin America and the history of science. Doc. 1 at 3, ¶ 10, 38, 43, ¶ 143. Novoa has also co-authored two books, including *From Man to Ape: Darwinism in Argentina, 1870–1920*. Doc. 1 at 38, ¶ 144. Because Novoa is a cultural historian by training, her courses deal with modern culture, ethnicity, gender, and race. Doc. 1 at 38, ¶ 145. Novoa's lectures and written materials include the endorsement of "concepts" the Stop WOKE Act prohibits. *Id.* ¶ 146. To "instruct" her students on any culture in the nineteenth and twentieth centuries, Novoa must "advance" concepts prohibited by the Act. *Id.*

After the Stop WOKE Act passed, Novoa scrutinized her syllabi to determine whether the law prohibits assigned materials or lecture topics. Doc. 1 at 43, ¶ 148. She concluded that some assigned readings and

lectures would violate the Act when included in these classes, which she regularly teaches: (1) Science in Cultural Context, (2) History of Sports, and (3) Modern Latin America. Doc. 1 at 38, ¶ 147.

***Science in Cultural Context.*** Novoa has taught the course Science in Cultural Context since 2020. Doc. 1 at 40–41, ¶¶ 152, 157. She covers issues like (i) the historical development of science to "understand the complicated ways in which science and the cultures in which it is embedded interact and shape each other[,]" Doc. 1 at 41, ¶ 158, and (ii) how race and the theory of natural selection have been used to "promote" Social Darwinism, including the perceived inferiority of indigenous peoples. Doc. 1 at 41, ¶¶ 158–59.

Novoa also assigns her book, *From Man to Ape: Darwinism in Argentina, 1870–1920*, which discusses how Latin American scientists are relegated "to the *status of derivative thinkers*" when compared to European scientists. Doc. 1 at 41–42, ¶¶ 161, 163 (emphasis added); Doc. 19-31 at 2, ¶ 6; Doc. 19-36 at 4. Novoa treats "the existence of racial privilege as a given" in the course. Doc. 44 at 66. In engaging students in discussion and debate on racial privilege and its ongoing implications, Novoa intends to "advance" viewpoints prohibited by the Stop WOKE

Act. Doc. 1 at 38–44, ¶¶ 146, 155–56, 164–65, 171–72. Her coursework contains examples from the history of science illustrating how a person's status as privileged or oppressed is necessarily determined by their race, color, national origin, or sex—and how those considerations continue to shape our world today. Doc. 44 at 48.

*History of Sports.* Novoa has taught History of Sports since 2015. Doc. 1 at 44, ¶ 174. In these classes, Novoa assigns an article, *Left Out: Afro-Latinos, Black Baseball, and the Revision of Baseball's Racial History* (*Left Out*). Doc. 1 at 44, ¶ 176; Doc. 19-31 at 1, ¶ 2; Doc. 19-32. In lectures, Novoa uses *Left Out* to "advance" the argument that Afro-Latino baseball players, despite coming from different backgrounds and cultures, were reduced to their perceived racial identity. Doc. 1. at 46, ¶ 180. Moreover, Novoa regularly assigned a reading that argues "despite making progress on racial issues, the United States remains segregated by race." Doc. 1 at 47, ¶ 182. Further, Novoa promotes a reading that asserts "white Americans have historically been privileged to the detriment of non-white" or "subordinate groups[.]" Doc. 1 at 49, ¶ 193.

*Modern Latin America.* In this course, Novoa teaches the history of "oppression" of certain groups by other, more "privileged" groups.

Doc. 1 at 50, ¶ 197. Novoa regularly teaches about "[t]he period that followed the end of the independence movements [that] . . . set the foundation of societies defined by social inequality, poverty, racism, and violence." Doc. 1 at 50, ¶ 198. She also teaches students about the notion of "collective guilt," which requires her to "advance" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[]" in certain cultures. Doc. 1 at 51–52, ¶¶ 202, 205, 207.

Novoa discusses the case of Damiana-Kryygi to illustrate the concept. Doc. 1 at 52, ¶ 207. Damiana-Kryygi was a member of Paraguay's indigenous Aché community. *Id.* European explorers killed Damiana-Kryygi's parents, kidnapped her, and took her to live in Buenos Aires, where she worked as a maid of a famous physician. *Id.* After her death, Damiana-Kryygi's head was severed and sent to Berlin for phrenological and other pseudoscientific studies because it was believed that her "race" was being extinguished. *Id.*

The Stop WOKE Act prohibits Novoa from stating that race has continuing ramifications for social order in Argentine society. Doc. 1 at 52, ¶ 210. This is because Novoa's teaching on the subject of collective guilt could be interpreted to invite students to consider whether one

national origin (Aché) is "morally superior" to another national origin (Argentine).

### *The Stop WOKE Act limits members of the First Amendment Forum from accessing information and ideas.*

Rechek enrolled in Novoa's Science in Cultural Context class for the Spring 2023 semester, and members of his organization—the First Amendment Forum at USF—intend to take Novoa's courses and want to do so without the viewpoint-discriminatory constraints of the Stop WOKE Act. Doc. 1 at 40, ¶ 153; Doc. 1 at 56–57, ¶¶ 226, 232.

The members of First Amendment Forum are adults and capable of determining for themselves the merits of Novoa's views on race and other matters. Doc. 1 at 56, ¶¶ 227–28. But they cannot assess Professor Novoa's viewpoints unless they are allowed to hear them. Doc. 1 at 57, ¶ 229. Novoa and members of the First Amendment Forum—a willing speaker and willing listeners—want to engage in academic discussion about the pedagogically-relevant topics in Novoa's courses. Doc. 1 at 57, ¶¶ 230–32.

The Stop WOKE Act prohibits academic discourse between consenting adults. It narrows the range of viewpoints available to members of the First Amendment Forum and prevents them from

benefitting from robust debate. *See* Doc. 1 at 57–59, ¶¶ 234–35, 238. The First Amendment Forum's members cannot engage in a full and frank discussion of matters prohibited by the law—like issues over race and its historic and modern roles—if they fear a professor's response to their questions could be reported to administrators, the Inspector General, or lawmakers. Doc. 1 at 58–59, ¶¶ 235, 238(c). More broadly, the Act chills students' access to information unfettered by ideological filters imposed by political officials. Doc. 1 at 58–59, ¶ 238(b).

## Prior Proceedings: The District Court Enjoins the Stop WOKE Act.

On September 6, 2022, Plaintiffs filed a verified complaint and a motion for a preliminary injunction against the Act. Doc. 1; Doc. 19. The district court heard argument on Plaintiffs' motion and a motion for a preliminary injunction in a related matter, and on November 17, 2022, resolved both in a single opinion.[4] Doc. 44.

The district court granted, in part, the motions for a preliminary injunction. The district court enjoined the *Novoa* Defendants from

---

[4] By agreement of the parties, the State's arguments in the related matter, *Pernell v. Fla. Bd. of Governors of the State Univ. Sys*, No. 4:22cv304-MW/MAF (N.D. Fla. Aug. 18, 2022), were incorporated by reference into its responses to the *Novoa* plaintiffs' complaint and motion for preliminary injunction. This Court consolidated the cases on its own motion on February 23, 2023. (11th Cir. Doc. 23).

enforcing concepts 1, 2, 3, 5, and 7 of section 4(a) of the Act,[5] section 4(b) of the Act as to those concepts, and Board of Governors Regulations 10.005(2)–(3) and 4(d) as to the enjoined concepts. Doc. 44 at 137–38. The district court enjoined the *Pernell* defendants from enforcing the remaining concepts. *Id.* at 136. The Court held that Plaintiffs were likely to succeed on their claims that the Stop WOKE Act violated their First Amendment rights and determined that the entirety of the Act was impermissibly vague in violation of the Fourteenth Amendment. *Id.* at 107–08, 130.

Defendants appealed (Doc. 46) and asked this Court to stay the preliminary injunction (11th Cir. Doc. 7), which was denied. Order, *Pernell v. Comm'r of the Fla. State Bd. of Educ.*, No. 22-13992 (Doc. 43), 2023 WL 2543659 (11th Cir. Mar. 16, 2023).

**Standard of Review**

This Court reviews "the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any

---

[5]   These concepts are: 1) moral superiority of one group over another; 2) conscious or unconscious bias due to membership in a group; 3) status as privileged or oppressed due to membership in a group; 5) responsibility for or should be treated adversely due to membership in a group; and 7) responsibility for and should feel guilt due to others' past actions. Fla. Stat. § 1000.05(4)(a).

14

findings of fact for clear error." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020). Applying a "very narrow" and "deferential" standard, this Court will find a district court abused its discretion if it "applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *See id.*

## SUMMARY OF THE ARGUMENT

Our Nation's marketplace of ideas depends on public universities. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). In barring legislated "pall[s] of orthodoxy" over the college classroom, the Supreme Court recognized that faculty and students discover "truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Id*. Florida replaces that "robust exchange of ideas" with unabashed censorship, commanding that public university faculty toe the party line by not advancing eight blacklisted viewpoints.

The Stop WOKE Act is a sweeping, viewpoint-driven speech code imposed on every graduate and undergraduate class, no matter how relevant the view may be to the course's subject matter. It does so without

regard for whether anyone was harmed, serving no purpose other than state censorship. The district court rightly enjoined this "positively dystopian" law as a violation of the First Amendment. Doc. 44 at 2.

Plaintiffs have standing to challenge the Act. Professor Novoa's verified allegations show her classroom speech would arguably violate five blacklisted concepts, like the view that "status as either privileged or oppressed is necessarily determined by . . . race[.]" Doc. 1 at 41–51, ¶¶ 160, 162, 171, 178(b)–(d), 180, 187, 194, 205. That meets Article III's standing requirement for a pre-enforcement challenge, especially when the State's zeal to enforce the Act will reach Novoa's teaching—which uses past events to discuss how race *currently* affects scientific research.

The Stop WOKE Act violates the First Amendment because it fails this Court's holding in *Bishop v. Aronov*, which applies a balancing test to evaluate whether a university's interests are sufficient to overcome faculty members' First Amendment rights in classroom discussion. 926 F.2d 1066 (11th Cir. 1991). Although the State agrees that this is the correct legal standard, it cannot show that the district court's careful weighing of *Bishop*'s factors was "unreasonable or incorrect[.]" *Gonzalez*, 978 F.3d at 1270. The State instead seeks to strip *Bishop* of its balancing

test by replacing it with a bright-line rule: that faculty are government speakers without *any* First Amendment protection.

The State is wrong: *Bishop's* balancing test necessarily recognizes that the First Amendment protects faculty expression, and in carefully applying the *Bishop* factors to a nakedly viewpoint-based ban on ideas, the district court rightly held that the Act violates the First Amendment.

That is all the more so because the Stop WOKE Act is a sweeping restraint on thousands of faculty members speaking to thousands of students, tipping the scale in *Bishop*—which considered *post hoc* action tailored to a single professor's discussions of dubious relevance to his course—even further. Under the Supreme Court's post-*Bishop* decision in *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*"), the State carries a heavier evidentiary burden to justify broad speech codes reaching vast groups of speakers addressing a wide audience, as the Stop WOKE Act does, because they "chill[] potential speech before it happens." *Id.* at 468. But the State has identified no actual harm the Act alleviates—let alone summoned any evidence to support its fears.

17

Because *Bishop* and four other circuits' decisions establish that the First Amendment protects faculty academic speech, the Court should reject the State's claim that faculty speech is instead government speech. The district court is in good company by rejecting the authoritarian notion that scholars are state spokespersons: Each circuit court to have considered the question has held that the First Amendment protects scholarship and teaching in higher education. *See* p. 42, n.19, *infra*.

Unable to point to a decision holding otherwise, the State spins up scenarios about Nazi sympathizers and racists. But unlike the State's imagined hypotheticals, the Stop WOKE Act imposes actual censorship. It foists serious consequences on faculty for unintentional or trivial violations, and imperils millions of dollars of their institutions' budgets for a single professor's remark. A lionhearted lecturer might risk their own job to utter the words "I agree with affirmative action" (one of the banned concepts, as the State conceded[6]), but only a foolish professor would risk their colleagues' livelihood.

The law's vagueness exacerbates its danger to free expression. It demands "objectivity *without endorsement*," and *only* for the prohibited

---

[6]    Doc. 41, Tr. of Oral Arg. 91:1–3.

18

concepts. This mechanism imposes a viewpoint-discriminatory filter over the classroom. As the district court correctly observed, appellants' "construction redefines the notions of both 'objectivity' and 'criticism,'" suggesting that "'speech *condemning* a viewpoint is objective, but *approving* a viewpoint renders the teaching unobjective.'" Doc. 44 at 117 (emphasis in original). Because the Act's vague "objectively without endorsement" requirement renders the entire challenged statute unconstitutionally vague, the Court should refuse Defendants' invitation to sever the requirement.

As the Supreme Court observed, the "essentiality of freedom in the community of American universities is almost self-evident." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). The Court should uphold that essential freedom and affirm.

## ARGUMENT

## I.    The District Court Correctly Held Plaintiffs Have Standing.

The District Court correctly found Plaintiffs have standing to bring a pre-enforcement challenge against the Stop WOKE Act. Plaintiffs demonstrated (1) an intent to "engage in a course of conduct arguably" protected by the First Amendment; (2) that the Act arguably proscribes

that conduct; and (3) that there is a credible threat of enforcement. *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (quoting, in part, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014)); *see also Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119–20 (11th Cir. 2022) (applying *Driehaus* in pre-enforcement challenge to university's "bias-related incidents" policy); Doc. 44 at 68, 82–85. The State does not challenge whether this is the operative test, or that there is a credible threat of enforcement, but asserts only that the Plaintiffs "never even *claimed*" that Novoa's teaching would violate most of Stop WOKE's eight "concepts." Appellants' Br. 21. This is incorrect.

To begin with, Professor Novoa specifically identified in her Complaint and prior briefing that the third and seventh concepts forbidden by the Stop WOKE Act affect her coursework, Doc. 1 at 45–46, ¶¶ 178–80; Doc. 1 at 51, ¶¶ 202–06, and the State even admitted that Novoa has "standing to challenge concept number Seven[.]" Doc. 33-1 at 6. Based on the allegations in her Verified Complaint, the district court held that her instruction on race consciousness and collective guilt arguably violated the first, second, third, fifth, and seventh concepts barred by the Act, and that she reasonably self-censored her teaching as

20

a result. Doc. 44 at 67–68. Appellants' assertions that Plaintiffs failed to allege that Novoa's expression potentially violates the Act simply misreads the record and misapplies the law. It also illustrates that the Act's vagueness invites arbitrary and discriminatory enforcement untethered to any bona fide interest in addressing discriminatory conduct.

The State's cramped view of standing would require Plaintiffs to name all of the affected courses, together with the associated professors and full roster of registered students, as a condition for standing. Appellants' Br. 20–23. But the *Driehaus* standard, acknowledging the need to avoid chilling effects that arise even before a law is enforced, only requires Novoa to show that her teaching "*arguably*" violated the Stop WOKE Act. *Speech First, Inc.*, 32 F.4th at 1119–20 (quoting *Driehaus*, 573 U.S. at 159 (emphasis added)). In this regard, the district court correctly observed that Novoa's teaching on collective guilt implicates the first, second, third, fifth, and seventh concepts of the Stop WOKE Act because her teaching on "collective guilt could cause students to believe that their moral character is determined by their race, sex, or national origin," that "they bear their own form of collective responsibility and

'must feel anguish,'" that "they are 'inherently racist, sexist, or oppressive,'" or "that they bear responsibility for 'actions committed in the past by other members of the same race, color, national origin, or sex[.]'" Doc. 44 at 67–68 n.34 (citing Fla. Stat. § 1000.05(4)(a)1–3, 5, & 7).

These sound conclusions are amply supported by the record. In her Sciences in Cultural Context course, Novoa treats "the existence of racial privilege as a given[.]" Doc. 44 at 65–66 (citing Doc. 1 at 41–43, ¶¶ 161, 170). The State believes that Novoa "misunderstood [concept three] to mean that it covered mere descriptions of instances of *past* historical racism." Appellants' Br. 21 (citing Doc. 33-1 at 4–14). But Novoa's instruction does not simply acknowledge historical understandings of race. Rather, it uses past historical events to help analyze how race continues to play a role in the attainment of knowledge in science today.[7] Novoa does not teach that the impact of these racial hierarchies suddenly stopped—she teaches that its manifested impacts are ongoing. Thus, in engaging students in discussion, reflection, and debate on these books

---

[7] For example, in *Picturing Tropical Nature*, the author argues that "racial differences between human groups became a chief means by which the human world was mapped" in the modern world. Doc. 1 at 43, ¶ 170. In *From Man to Ape: Darwinism in Argentina, 1870–1920*, Professor Novoa and her coauthor argue that Latin American scientists have been regarded as "derivative thinkers" based on their national origin. Doc. 1 at 41–42, ¶ 161.

and the concept of racial privilege, Novoa's instruction in Sciences in Cultural Context endorses concept three. Doc. 44 at 65–66.

In her class History of Sports, Novoa also violates the third prohibited concept by instructing her students on the concept of racial privilege and its impact on today's sports' landscape. Doc. 1 at 46–49, ¶¶ 179, 180, 184, 186, 193. Novoa's instruction on *Left Out* "is pedagogically relevant to the course because it offers an argument as to the role race and national origin played in the color barrier and how its elimination is perceived today." Doc. 1 at 46, ¶ 181 (emphasis added). Novoa instructs students that the author of *Jackie Robinson's Legacy* "argues that despite making progress on racial issues, the United States *remains* segregated by race." Doc. 1 at 47, ¶ 184 (emphasis added). "Novoa promotes these arguments through her lectures . . . which arguably implicates IFA's concept three." Doc. 44 at 66.

Ultimately, the State misunderstands the degree to which Novoa, as a cultural historian, seeks to teach students about the *current* state of society based on lessons learned from the past. As the saying goes, "[t]hose who cannot remember the past are condemned to repeat it."[8] Yet

---

[8]   1 G. Santayana, The Life of Reason (1905).

23

the State, eager to declare victory over centuries of strife over race and gender, seeks to prohibit Novoa—and all historians teaching in Florida's institutions of higher education—from frankly discussing the historical development of certain ideas and their ongoing effect on today's world.

In her class Modern Latin America, Novoa's teaching regarding the concept of collective guilt could compel students to believe that one national origin (Aché) is "morally superior" to another national origin (Argentine), which is ultimately for students to decide for themselves. Doc. 1 at 52–53, ¶¶ 209—11. For example, if a German student heard the lecture and felt bad about his country's role in the Second World War, then Professor Novoa's instruction would violate the Stop WOKE Act. The German student might then be shocked to learn that Florida considers discussion of collective guilt—the subject of much debate since World War II by renowned thinkers such as Karl Jaspers and Hannah Arendt—to be *verboten*.[9]

Based on these examples from the complaint and briefing, the district court correctly reasoned that Novoa's classroom discussion of

---

[9]    Karl Jaspers, "The Question of German Guilt" (1965); Hannah Arendt, "Eichmann in Jerusalem: A Report on the Banality of Evil" (1963).

privilege and collective guilt arguably violated five concepts proscribed by the Stop WOKE Act. There is little doubt the Stop WOKE Act targets those ideas: Florida legislators made clear they believe such notions might "teach [our] kids to hate this country or to hate each other." Doc. 19-1 at 3, ¶ 7; Doc. 19-11 at 2.

Simply claiming that the district court engaged in "judicial intervention" that was "the plainest of errors" does not make it so. Appellants' Br. 22. The State does not argue that the district court misidentified the controlling legal standard, cannot show that its application of the standard to the facts was unreasonable, and does not identify any finding of fact it claims to be "clearly erroneous." *Gonzalez*, 978 F.3d at 1270. Accordingly, the Court should affirm the district court's holding on standing.

## II. The District Court Correctly Found the Act Fails Scrutiny Under *Bishop*'s Balancing Test.

The district court correctly applied the factors this Court identified in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), to find the Act violates the First Amendment. To that end, the district court rightly rejected the State's invitation to ignore *Bishop* and, in its place, adopt a new theory: that academic speech is government speech over which

legislators and college administrators have unfettered authority to promulgate lists of prohibited viewpoints. This Court should reject that incorrect and Orwellian view of the First Amendment and affirm.

*Bishop* crafted a "case-by-case" balancing test, derived from *Pickering v. Board of Education*, 391 U.S. 563 (1968), to evaluate the First Amendment protection of public university faculty members' curricular speech. *Bishop,* 926 F.2d at 1072, 1074–75. Taking as its "polestar" the concern for the school's "basic educational mission" set forth in *Kuhlmeier*, *Bishop* authorized only "reasonable restrictions" for in-class speech. *Bishop*, 926 F.2d at 1072, 1074 (quoting, in part, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272–73 (1988)). As part of the case-by-case analysis, *Bishop* instructs courts to balance (1) the overall "context" of the regulation; (2) the extent to which a public university may reasonably restrict the rights of employees; and (3) "the strong predilection for academic freedom as an adjunct . . . of the First Amendment." *Id.* at 1074–75. The Stop WOKE Act fails this test.

## A. The Stop WOKE Act fails *Bishop*'s balancing test because it is viewpoint-discriminatory.

The Eleventh Circuit's reliance on *Kuhlmeier*'s concern for the "basic educational mission" of schools does not permit carte blanche

approval for the state to dictate curricular speech based on viewpoint in higher education.[10] Conducting the *Pickering* balancing test in *Rankin v. McPherson*, the Supreme Court cautioned that "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987); *accord Pickering*, 391 U.S. at 574.

The State argues that *Bishop* permits viewpoint discrimination in higher education so long as those viewpoint restrictions are "reasonable." Appellants' Br. 43–44. This Court, however, has already explained that the "prohibition against viewpoint discrimination" remains "firmly embedded" in First Amendment analyses, and thus it "will continue to

---

[10]    The Supreme Court recognized the context of *Kuhlmeier* as a student speech case that evaluated the "emotional maturity" of "elementary" through "high school" students. *Kuhlmeier*, 484 U.S. at 272–73. In seeking to extend *Kuhlmeier* to the circumstances here, the State infantilizes adult students, demonstrating why the *Tinker* line of K–12 student speech cases is not appropriate for application to collegiate speech generally, and particularly collegiate faculty speech. *See, e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022); *Boring v. Buncombe Cnty. Bd. Of Educ.*, 136 F.3d 364, 373 (4th Cir. 1998) (*Kuhlmeier*'s "test for evaluating restrictions on student speech within curricular activities" is inapplicable to "*teacher* speech *through* the curriculum itself") (Luttig, J., concurring) (emphasis in original).

require" that curricular decisions be "viewpoint neutral." *Searcey v. Harris*, 888 F.2d 1314, 1325 (11th Cir. 1989). Reasonable restrictions do not include viewpoint discrimination, which is "poison to a free society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828–29 (1995). That is especially so in higher education, where freedom of expression "is of critical importance because it is the lifeblood of academic freedom." *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008).

This echoes *Keyishian*'s holding that legislatures cannot limit the range of ideas available in higher education. *Keyishian*, 385 U.S. at 603. For decades, courts have rejected viewpoint discrimination at public universities, rebuffing attempts to restrict ideas by limiting who may teach,[11] who may be invited to speak,[12] which publications may be

---

[11]    *Keyishian*, 385 U.S. at 603 (loyalty oaths for university faculty).

[12]    *Molpus v. Fortune*, 432 F.2d 916, 917 (5th Cir. 1970) (university speaker bans); *Brooks v. Auburn Univ.*, 296 F. Supp. 188, 196 (M.D. Ala. 1969) (holding that the "State of Alabama cannot . . . regulate the content of the ideas students may hear" as it is "unconstitutional censorship in its rawest form.").

funded,[13] and what organizations may be recognized or funded.[14] It also tracks decisions on public employment generally. *See, e.g.*, *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d Cir. 2022); *Wolfe v. Barnhart*, 446 F.3d 1096, 1108–09 (10th Cir. 2006) (collecting cases).

Ignoring the great weight of authority affording breathing room to debate in higher education, the State relies on *Arce v. Douglas*, an out-of-circuit case considering the "primary legitimate purpose" of a statute intended to teach "pupils" in K-12 schools "to treat and value" others. 793 F.3d 968, 986 (9th Cir. 2015). That case, however, does not supply a legitimate, much less compelling, interest that would justify broad restrictions on pedagogically relevant material and discussion among adults. *Id.* The pedagogical concerns in educating children are profoundly different from those in higher education. In K-12, instilling community values in children may be a valid concern. *See Bethel Sch. Dist. v. Fraser*,

---

[13]    *Rosenberger*, 515 U.S. at 825–29 (1995) (denial of funding to Christian student newspaper).

[14]    *Healy v. James*, 408 U.S. 169 (1971) (denial of recognition to student political group); *Gay & Lesbian Students Ass'n. v. Gohn*, 850 F.2d 361, 363–67 (8th Cir. 1988) (refusal of funding to student gay rights group following state legislature's resolution).

478 U.S. 675, 681 (1986). But in higher education, that concern gives way to the preeminent need for adult students to have unfettered exposure to divergent views. *Keyishian*, 385 U.S. at 603. Unlike secondary school pupils, the "desire to protect the listener cannot be convincingly trumpeted as a basis for censoring speech for university students." *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 248–49 (3d Cir. 2010) (distinguishing First Amendment cases in secondary schools due to the age and maturity of students).

Here, there is no question that the Stop WOKE Act discriminates based on viewpoint and does so to shield students from ideas that lawmakers dislike. The State conceded in the district court that each prohibited concept itself represents a viewpoint. Doc. 41, Tr. of Oral Arg. 86:17–87:2. They maintain as much now. Appellants' Br. 6 (defending the prohibition of "viewpoints contrary to the Individual Freedom Act"). The State boldly embraces this discrimination, proclaiming "Florida's public-university instructors are . . . prohibited from endors[ing]" any of the eight concepts. Appellants' Br. 52. Yet, nothing in the Act addresses discriminatory conduct or hostile environments; it only restricts

viewpoints the State abhors. And the stakes for endorsing anything but the State's prescribed views are quite high.[15]

The Stop WOKE Act regulates speech specifically "because of its message." It is therefore "presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. The State can offer no justification to overcome this strong presumption, and the district court did not apply an incorrect legal standard in reasoning—as the State boasts—that the Act is viewpoint-discriminatory or in considering the Act's viewpoint discrimination in *Bishop*'s 'context' factor. Doc. 44 at 93–96.

## B. The district court correctly applied the "context" and employment factors of the *Bishop* balancing test.

The district court properly considered the pedagogical relevance of the speech regulated by the Act and the sweeping scope of the regulation at issue—a viewpoint-discriminatory speech code imposed on thousands of faculty at public institutions across the state. Doc. 44 at 93–96. It likewise considered *Bishop*'s important recognition of the risk of coercion

---

[15] The law conditions millions in funding on institutions' willingness to penalize any professor who introduces a banned viewpoint—to the subjective satisfaction of state regulators or a committee of the Florida Legislature. Fla. Stat. § 1001.92(5) (any "substantiated violation" of the Act means a university "shall be ineligible" for annual performance funding).

within the meaning of the Establishment Clause—a risk not addressed by the Act. *Id*.

On its facts, *Bishop* involved different issues and interests than the Act. The former involved the response by a university—not a legislature—tailored to address "particular conduct" by one professor offering personal religious views with little (if any) connection to the course subject matter, physiology. *Bishop*, 926 F.2d at 1069–71.

In contrast, the Act is a categorical, viewpoint-discriminatory speech code restricting thousands of faculty before their expression. And where the university in *Bishop* sought to limit comments with uncertain relevance to a single course, the Act has not "prescribed" a curriculum. Appellants' Br. 26. Instead, it is a speech code applicable to *any* course, restricting viewpoints no matter how pedagogically relevant to the discussion.

First, the district court was correct to weigh pedagogical relevance in evaluating the context of the regulation. Doc. 44 at 94–96. Academic freedom would not protect a professor who consistently introduced

32

controversial, but irrelevant, subject matter in her classes.[16] Such speech can be regulated not because of its viewpoint, but because of its relevance. Conversely, the First Amendment protects teaching viewpoints that, "however repugnant," are "germane to the classroom subject matter." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 683 (6th Cir. 2001).

Second, *Bishop* was concerned with the university's weighty constitutional interests in avoiding coercion within the meaning of the Establishment Clause. *Bishop*, 926 F.2d at 1069. While the State asserts that its "interest in preventing invidious racial discrimination . . . is embodied in our highest law," even that interest must be addressed through "less restrictive means." Appellants' Br. 44 (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983)). That's why, as the district court recognized, restrictions on pure speech in academia—including those designed to address hostile environment harassment—must be cabined to speech which meets a "severe, pervasive, and objectively offensive" standard, to provide "shelter for core protected

---

[16]    *See, e.g.*, American Ass'n of Univ. Profs., *1940 Statement of Principles on Academic Freedom and Tenure* (rev. Apr. 1970), https://www.aaup.org/report/1940-statement-principles-academic-freedom-and-tenure   [https://perma.cc/RH7Y-FS7Q] ("Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching controversial matter which has no relation to their subject.").

speech." Doc. 44 at 43 (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *DeJohn*, 537 F.3d at 317–18). The Act, by declaring certain viewpoints *de facto* harassment, does an end-run around the narrowing features the Constitution requires to provide breathing room for speech in hostile-environment laws. Doc. 44 at 98–99.

Third, the district court correctly recognized that the scope of the State's regulation—a prophylactic measure prohibiting speech by thousands of faculty members—requires the State to meet the "heavier" burden imposed by *NTEU*, which is addressed in Section III below. Doc. 44 at 93. A "case-by-case" analysis of a university's response to a given incident is not applicable because the Act is a broad ban on speech.

**C.    The district court correctly applied the third *Bishop* factor weighing "countervailing" academic freedom.**

The third factor of the *Bishop* balancing test is the "countervailing" factor of our constitutional system's "strong predilection for academic freedom as an adjunct of . . . the First Amendment." *Bishop*, 926 F.2d at 1075. The State claims that "academic freedom is a right of institutional, rather than individual, autonomy." Appellants' Br. 38. That conflicts with *Bishop* and, as discussed fully in Section IV, with all other circuits that have considered the question. The district court considered—as

34

*Bishop* required—Novoa's and the other plaintiff-professors' interests in academic freedom. The district court correctly recognized that the professors are not "attempting to alter the permitted curriculum," but are interested in the academic freedom to engage in discussion of pedagogically relevant ideas free from the "pall of orthodoxy." Doc. 44 at 105–06 (quoting *Keyishian*, 385 U.S. at 603).

The district court was correct. The Act would do irreparable damage to faculty members' academic freedom, which provides breathing room to navigate controversial, pedagogically relevant subject matter. In higher education, faculty often teach by feigning endorsement of a position—that is, devil's advocacy—or by inviting a guest speaker (even one rebutted by another guest speaker) who may endorse a prohibited viewpoint.[17] Or they may present written material ("instruction" within the meaning of the Act) that advances a prohibited viewpoint—not because they agree with it, but because students may learn best by grappling with difficult material. And in Professor Novoa's classes, she

---

[17]    *See*, Doc. 41, Tr. of Oral Arg. 79:11–81:15 (conceding that a guest speaker's endorsement of a prohibited viewpoint violates the Act and cannot be rendered "objective" by rebuttal).

inescapably advances prohibited viewpoints by providing instruction on racial privilege and collective guilt.

The district court correctly concluded that the Stop WOKE Act fails the *Bishop* balancing test. The Act also fails the more stringent test required by *NTEU*.

## III.    Because the Stop WOKE Act Broadly Censors Protected Speech, *NTEU* Demands the State Prove the Law Directly Alleviates a Real Harm.

Bound by *Bishop*, the district court suggested that the State may have to justify the Stop WOKE Act under the "heavier" burden of *NTEU*. Doc. 44 at 93–95. This Court should affirm that *NTEU* applies to blanket restrictions on faculty speech.

In *NTEU*, the Court reviewed a law broadly prohibiting federal employees from accepting honoraria for delivering speeches or writing articles, even if the employees' speech or article did not relate to their job duties. *NTEU*, 513 U.S. at 457. In reviewing the honoraria policy, the Court distinguished between "a post hoc analysis of one employee's speech and its impact on that employee's public responsibilities . . . [and an analysis of a] wholesale deterrent to a broad category of expression by a massive number of potential speakers." *Id.* at 467. Although courts

apply *Pickering* to the former cases, the government bears a greater burden in the latter cases involving broad prohibitions on employee speech. *Id.*

Under the heavier burden, a public employer must "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering,* 391 U.S. at 571). To meet this "heavy" burden, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU,* 513 U.S. at 475 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)).

The Supreme Court recently reaffirmed the heightened burden on public employers under the *NTEU* test for broad prohibitions curtailing employees' speech on matters of public concern. In *Janus v. AFSCME, Council 31*, the Court emphasized that while it has "sometimes looked to *Pickering* in considering general rules that affect broad categories of employees, we have acknowledged that the standard *Pickering* analysis

requires modification . . . ." when a policy broadly impacts employees' speech. 138 S. Ct. 2448, 2472 (2018) (citing *NTEU*, 513 U.S. at 466–68).

Although the State conceded at oral argument that *NTEU* would apply if the court applied a balancing test, the State claims that no balance is necessary because "*Bishop already balanced* the First Amendment interests in this precise context . . . ."[18] Appellants' Br. 26. Yet the State ignores that the Supreme Court's *NTEU* decision came four years *after* Bishop.

More to the point, *Bishop* concerned an *ad hoc* determination over one professor's speech decided before the Supreme Court's ruling in *NTEU. Bishop*, 926 F.2d at 1074. By contrast, the Stop WOKE Act is a broad prohibition on public-employee speech. Under both *Bishop* and *NTEU,* it fails First Amendment scrutiny.

Plaintiffs urge the Court to affirm that *NTEU* applies to broad public-employee speech restrictions like the Stop WOKE Act. The State

---

[18] Appellants' argument against *NTEU* is based solely on their overall theory: professor speech is government speech. Appellant Br. 45. Thus, if this Court agrees with the Fourth, Fifth, Sixth, and Ninth Circuits that professors' speech on matters of public concern is protected speech and not government speech, then Appellants' argument against *NTEU* holds no weight.

cannot satisfy the higher burden established by *NTEU* because it has not shown that the law directly alleviates a real harm.

## IV. The First Amendment Protects Academic Expression by University Faculty.

Aware that the Act cannot survive contact with the First Amendment, the State seeks shelter in the government-speech doctrine. The State asks this Court to be the first to rule that faculty members' academic speech is subject to unfettered state control, envisioning a world in which truth is discovered not from the "multitude of tongues," *Keyishian*, 385 U.S. at 603, but from the vote of the legislature. The State's novel theory is dangerous and wrong. That's why the Fourth, Fifth, Sixth, and Ninth Circuits have rejected it. This Court should also reject it and adopt the reasoning of the Fourth, Fifth, Sixth, and Ninth Circuits. Doing so does not require a great leap of fate because *Bishop*, decided before *Garcetti v. Ceballos*, 547 U.S. 410 (2006), already recognizes that the First Amendment protects faculty classroom speech. Finally, the State waived its newfound "government-funding" theory by failing to raise it in the district court.

**A.    Every circuit considering *Garcetti* has rejected its application to academic expression in higher education.**

The State's assertion that *Garcetti* strips faculty members' classroom discussions of protection under the First Amendment is not only inconsistent with *Bishop*, but at odds with every circuit to have considered the argument. Appellants' Br. 28–30.

When the government acts as an employer, its regulation of employee speech is evaluated under the *Pickering* test. *NTEU*, 513 U.S. at 466; *Bishop*, 926 F.2d at 1072. "Nowhere is free speech more important than in our leading institutions of higher learning." *Speech First, Inc.*, 32 F.4th at 1128. For faculty at public universities, where the "vigilant protection of constitutional freedoms is nowhere more vital," the ability to speak free from State censorship is critical. *Healy*, 408 U.S. at 180–81 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) and "reaffirming this Nation's dedication to safeguarding academic freedom").

*Garcetti* did not change this calculus. If anything, it suggests that the government-speech doctrine *does not* limit First Amendment protection for academic speech. In his dissent, Justice Souter expressed concern that the *Garcetti* majority opinion would depart from the Court's

commitment to academic freedom by reaching "even the teaching of a public university professor," who "necessarily speak[s] and write[s] 'pursuant to . . . official duties.'" *Garcetti*, 547 U.S. at 438 (Souter, J., dissenting). Justice Souter emphasized the Court's longstanding recognition that universities "occupy a special niche in our constitutional tradition" in light of the "expansive freedoms of speech and thought associated with the university environment." *Id.* at 438–39 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003)). The *Garcetti* majority, answering Justice Souter's concern that its reasoning would "imperil First Amendment protection of academic freedom in public colleges and universities," expressly left open whether its analysis would reach "classroom instruction" by faculty at public universities, recognizing the "important ramifications for academic freedom . . . as a constitutional value." *Id.* at 425 (majority opinion); *Garcetti*, 547 U.S. at 438 (Souter, J., dissenting).

Neither *Rosenberger* nor *Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 217 (2000), both predating *Garcetti*, subvert this analysis. If the *Garcetti* majority—citing *Rosenberger* throughout its majority opinion—believed either decision

foreclosed Justice Souter's concern, it would have said so. Instead, the Court acknowledged that "classroom instruction" may implicate "additional constitutional interests"—and expressly left the question open. *Garcetti*, 547 U.S. at 425.

Just as the *Garcetti* majority treated *Rosenberger*'s offhand reference to curricula as *dicta*, the district court correctly rejected the State's attempt to "cherry-pick[] language, devoid of context" from *Rosenberger* and *Garcetti* to suggest that the Supreme Court endorsed the authority to engage in wholesale viewpoint discrimination over faculty speech. Doc. 44 at 19–20.

Every circuit that has considered *Garcetti*'s open question—the Fourth, Fifth, Sixth, and Ninth—ultimately concluded that academic speech, including in the classroom, is *not* government-speech subject to *Garcetti*.[19] Doc. 44 at 25. Instead, faculty speech is protected by the First

---

[19] *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 562–63 (4th Cir. 2011) (holding professor speech related to scholarship or teaching is analyzed under *Pickering*); *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) (same); *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019) (same); *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) (same).

Amendment and analyzed under the *Pickering* balancing test (and, in the case of broad restrictions, *NTEU*).[20]

Despite these holdings, the State claims that "several circuits . . . have recognized that the government speech doctrine applies to in-class instruction by state-employed educators." Appellants' Br. 29. But a review of the cases the State relies on reveals why that argument is misplaced.

First, the State cites then-Judge Alito's Third Circuit decision in *Edwards v. California University of Pennsylvania*, a case concluding "that a public university professor does not have a First Amendment right to decide what will be taught in the classroom." 156 F.3d 488, 491 (3d Cir. 1998). As the district court observed, "Judge Alito distinguished his holding from the Eleventh Circuit's opinion in *Bishop*, describing the Eleventh Circuit as 'finding that a public university's restrictions on a professor's in-class speech 'implicated First Amendment freedoms.'" Doc. 44 at 28. Next, this Court's unpublished decision in *Gilder-Lucas* and the Seventh Circuit's decision in *Mayer* involved the speech of K-12

---

[20] Plaintiffs urge this Court to hold, like its sister circuits, that *Garcetti* does not apply to faculty speaking as private citizens on matters of public concern.

teachers, which does not raise the same constitutional concerns as viewpoint restrictions in higher education. *See*, *Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*, 186 F. App'x 885, 887 (11th Cir. 2006) (involving speech of a high school teacher); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 478 (7th Cir. 2007) (involving speech of elementary school teacher). Finally, the Fourth and Sixth Circuit have explicitly rejected the State's argument that the speech of public professors is government speech. *See Adams*, 640 F.3d at 562–63; *Meriwether*, 992 F.3d at 505.

In *Meriwether v. Hartop*, for example, the Sixth Circuit held that the First Amendment protected faculty members—there, a professor who refused to use a student's preferred gender pronouns in class—when "engaged in core academic functions, such as teaching and scholarship[.]" 992 F.3d at 505. Because the professor was speaking on matters of public concern, the Sixth Circuit applied the *Pickering* balancing test, considering the "robust tradition of academic freedom in our nation's universities and colleges. *Id.* at 509 (quoting *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d at 680).

As the Sixth Circuit warned in *Meriwether*, stripping faculty of First Amendment rights would embolden censors left and right:

> If professors lacked free-speech protections when
> teaching, a university would wield alarming power
> to compel ideological conformity. A university
> president could require a pacifist to declare that
> war is just, a civil rights icon to condemn the
> Freedom Riders, a believer to deny the existence of
> God, or a Soviet émigré to address his students as
> "comrades." That cannot be. "If there is any fixed
> star in our constitutional constellation, it is that
> no official, high or petty, can prescribe" such
> orthodoxy.

*Id.* at 506 (quoting, in part, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

The State's theory invites "ideological conformity." In the district court, the State conceded that if Florida's legislature changed hands, the State "could prohibit the instruction on American exceptionalism because it alienates people of color and minorities because it suggests . . . that America doesn't have a darker side that needs to be qualified." Doc. 41, Tr. of Oral Arg. 42:10–42:16. If officials can disseminate lists of views that are *per se* discrimination, expression on matters of public concern will be limited to the political whims of lawmakers and administrators.

The State clings to the argument that the Stop WOKE Act is meant to target Nazi sympathizers and racists, insisting that the district court's opinion will open up classrooms to vile discrimination. Appellants' Br. 41.

45

The statements of the Act's drafters betray the State's hypothetical justifications. *See* pp. 7-8, *supra*. What's more, the First Amendment requires restrictions designed to address harassment to meet a "severe, pervasive, and objectively offensive" standard in order to provide "shelter for core protected speech." Doc. 44 at 98–99 (quoting *DeJohn*, 537 F.3d at 317–18). The State's purported need to prevent discriminatory conduct is already well served by a panoply of existing federal and state laws. And *Bishop* can balance the rights of a university against a professor teaching factually wrong versions of history, like the professor imagined by the State who teaches that "the Holocaust is a hoax and Nazis were the good guys."[21] Appellants' Br. 41.

### B. Like the district court, this Court should reject the notion that college faculty classroom speech is government speech.

Having admitted that the Stop WOKE Act censors speech based on its viewpoint, the State has only one path: inviting this Court to be the first to hold that public university faculty speech is government speech.

---

[21] *See, e.g., Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (noting that Title VII prohibits discriminatory conduct that is severe or pervasive); *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1286 (11th Cir. 2003) ("Florida has enacted the 'Florida Educational Equity Act,' . . . which is patterned after Title IX and prohibits discrimination based on" membership in a protected class "in the state system of public education.").

Like the district court, this Court should decline the invitation. Doc. 44 at 25.

As noted above, *Bishop* forecloses the State's argument. In *Bishop*, the Eleventh Circuit considered not *whether* faculty have First Amendment rights, but "*to what degree* a school may control classroom instruction" without violating those First Amendment rights. *Bishop*, 926 F.2d at 1073 (emphasis added). Because the First Amendment limits the extent to which faculty classroom speech may be regulated, the government-speech doctrine does not apply.

Importing the government-speech doctrine into public university classrooms would be fundamentally at odds with the purpose of higher education and our national commitment to academic freedom. Faculty are hired to speak from their academic expertise, not—as the district court observed—to "all read from the same music." Doc. 44 at 9. If the divergent viewpoints that faculty use to educate students in public university classrooms constitute *government* speech, then Florida's government "is babbling prodigiously and incoherently," expressing at once "contradictory views." *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017).

Indeed, none of the factors identified in *Shurtleff v. City of Boston* support finding that faculty are government speakers. *See* 142 S. Ct. 1583, 1589–92 (2022) (identifying and applying factors to determine "whether the government intends to speak for itself or" instead regulate others' expression). On the first factor, the "history of the expression at issue," *id.*, the Supreme Court has long recognized as "self-evident" the need to avoid state-imposed "strait jacket[s]" on academic speech. *Sweezy*, 354 U.S. at 250. Faculty have historically been employed to speak for themselves as one of "a multitude of tongues" providing "wide exposure to [the] robust exchange of ideas"—not as government mouthpieces. *Keyishian*, 385 U.S. at 603.

On the second *Shurtleff* factor, the "public's likely perception as to who . . . is speaking," the public understands that faculty speak independently.[22] *Shurtleff*, 142 S. Ct. at 1589. The State fosters this perception, urging that the availability of "divergent ideas, opinions and philosophies, new and old," even if "abhorrent," is a "fundamental

---

[22] Even Christopher Rufo, vocal proponent of the Stop WOKE Act, concedes that it was a mistake to expand K-12 teaching restrictions to the college classroom, where debate should be uninhibited. Stanford Classical Liberalism Initiative, *Stanford Classical Liberalism – Keith Whittington and Christopher Rufo – 5 3 23*, YOUTUBE (May 5, 2023) at 50:00, https://youtu.be/xLHrony2mns?t=2999.

48

purpose" of universities.[23] And in its statutes, Florida requires surveys of "intellectual freedom" to gauge whether "competing ideas and perspectives are presented and . . . faculty . . . feel free to express *their* beliefs and viewpoints on campus *and in the classroom*." Fla. Stat. § 1001.706(13)(b) (emphasis added).

On the third *Shurtleff* factor, faculty at the undergraduate and graduate level are not subject to the "active control[]" indicative of government speech. *Shurtleff*, 142 S. Ct. at 1592.[24] University faculty have "independent traditions," "broad discretion as to teaching methods," and "intellectual qualifications" beyond those typically found in primary and secondary schools. *Mailloux v. Kiley*, 323 F. Supp. 1387, 1392 (D. Mass. 1971).[25] Faculty in higher education are regulated by academic officers and are hired to design and teach their classes according to their

---

[23] Fla. Bd. of Govs., *State University System Free Expression Statement* (Apr. 15, 2019), STATE UNIV. SYS. OF FLA., https://www.flbog.edu/2019/04/15/state-university-system-free-expression-statement [https://perma.cc/KGQ2-DH3F].

[24] *See, e.g.*, Fla. Dep't of Educ., *Policies & Procedures Specifications for the Florida Instructional Materials Adoption* (effective Aug. 18, 2020), https://www.fldoe.org/core/fileparse.php/5574/urlt/PoliciesandProceduresSpecifications.pdf [https://perma.cc/S4TB-GFYN].

[25] Contrast the traditional *laissez faire* approach to the exchange of ideas in higher education with the State's tight control of K–12 instruction (*e.g.*, Fla. Stat. §§ 1003.41–.42), where the State specifies the number of hours students spend studying freedom's blessings (Fla. Stat. § 1003.421) and what material of "patriotic nature" may be displayed (Fla. Stat. § 1003.44).

professional competency, even where administrators may "establish the parameters of focus and general subject matter of curriculum." *Bishop*, 926 F.2d at 1073 (quoting *Mahoney v. Hankin*, 593 F. Supp. 1171, 1174 (S.D.N.Y 1984)).

### C. The State waived its government-funding theory, which is also inapplicable because Florida cannot restrict expression within the university "sphere."

The State asks this Court to "consider the Supreme Court's government-funding cases." Appellants' Br. 27. But the State didn't raise that theory below. The district court never mentioned *Rust* because the State's briefing never mentioned *Rust*, and referenced *Pleasant Grove* only once, for the unremarkable proposition that government-speech cases involve private speakers. Doc. 34 at 6 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), but not *Rust v. Sullivan*, 500 U.S. 173 (1990)). Likewise, the State cited *Walker* only for the general principle that the Free Speech Clause doesn't apply to government speech. *Id.*; Doc. 52 in *Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, No. 4:22-cv-304 (N.D. Fla. Sept. 22, 2022) at 10–11, 13. By failing to raise a government-funding theory in the district court, the State has waived the argument. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th

Cir. 2004) ("This court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.") (cleaned up).

## V.  The District Court Correctly Ruled that the Act is Unconstitutionally Vague.

Florida's arguments highlight the Stop WOKE Act's muddled meaning and its failure to notify "ordinary persons using ordinary common sense" of the conduct it prohibits. Appellants' Br. 46–47.[26]

The vagueness standard encompasses two crucial concerns: (1) fair notice of the conduct prohibited; and (2) protection against arbitrary and discriminatory enforcement. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). These considerations are especially important in the First Amendment context, where "rigorous adherence to those requirements is necessary to ensure

---

[26] The State contends that a "more lenient" standard governs vagueness analyses in the public employment context. Appellants' Br. 46. In support of this argument, it relies primarily on dicta in cases devoid of any actual vagueness analysis or on cases outside the higher education context. *See, e.g.*, *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (declining to address vagueness claim where plaintiffs failed to adequately raise issue); *Arnett v. Kennedy*, 416 U.S. 134, 158–162 (1974) (plurality) (upholding regulation permitting termination of Civil Service employees "for such cause as will promote the efficiency of the service"). If anything, restrictions on speech within the higher education context should be subject to an even more stringent standard than usual in order to facilitate the "robust exchange of ideas." *Keyishian*, 385 U.S. at 603.

that ambiguity does not chill protected speech." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253–54 (2012); *see also, Wollschlaeger*, 848 F.3d at 1320 (quoting and paraphrasing *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) ("The vagueness of [content-based regulations of speech] . . . raise[s] special First Amendment concerns because of its obvious chilling effect on free speech.").

Florida contends that the Act's provision permitting "discussion of the concepts . . . in an objective manner without endorsement of the concepts" is not vague. Appellants' Br. 50 (citing Fla. Stat. § 1000.05(4)(b)). Citing *Merriam-Webster*'s definition*,* Florida asserts that to discuss something in an objective manner "obviously" means "to discuss it 'without distortion by personal feelings, prejudices, or interpretations.'" Appellants' Br. 50. After pointing to the *Merriam-Webster* definition of the term "objective," the State concedes that the Act does not actually prevent faculty from discussing the viewpoints "without distortion by personal feelings, prejudices, or interpretations," so long as they do not "*express[] approval*" of any of the viewpoints. Appellants' Br. 51. That, the district court rightly noted, "allows for only one side of the debate in Florida's public universities—or for no debate at all." Doc. 44

52

at 119. In doing so, the State "redefined 'objectivity'" such that it is divorced from "common sense." *Id.* at 120.

The State's constructive interpretation also invites arbitrary enforcement. Whether a discussion is conducted in "an objective manner without endorsement" hinges on the interpretation of audiences inside and outside the classroom about whether a faculty member's explanation amounts to "endorsement." That is especially true when the instruction touches upon hotly-contested issues fraught with emotion. Under these circumstances, faculty will rationally self-censor, even from devil's advocacy or the Socratic method, if a student's subjective perception of the discussion's "objectiv[ity]" or "endorsement" will be used by a legislative committee or regulators to forfeit millions in annual funding.[27]

Florida's other attempts to demonstrate the Act is not vague also fail. First, as the State acknowledges, the fact that the Act uses "'plain, everyday language'" found in a common dictionary "does not magically extinguish vagueness concerns." Doc. 44 at 113. A statute that uses

---

[27] The State's construction of the meaning of the "objective manner without endorsement" mirrors the intent of the Act's architects. As the district court noted, the Act's sponsor asserted that the clause was intended to prevent the introduction of any "personal point of view into the discussion"—unless that point of view is to condemn the viewpoint—and that whether a discussion was "objective" depended on students' subjective response. Doc. 44 at 117–18 n.59, 120 n.61.

seemingly ordinary words—as many laws do—can still fail to notify citizens of what conduct it prohibits. *Id.* (citing *Yates v. United States*, 574 U.S. 528, 537 (2015) ("Whether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words.")). The State's attempt to clarify the commonsense meaning of objectivity by pointing to its pervasiveness in the American legal system only proves the term's complexity. True, judges and attorneys must make determinations regarding objectivity regularly. But they undergo specialized training to do so—and even then, they don't always agree on what is objective. Neither do philosophers.[28]

Ordinary persons using common sense cannot be expected to understand objectivity *as a legal term of art* in everyday life. Indeed, this Court's Pattern Jury Instructions highlight how the concept of objectivity can take on different legal meanings in different contexts. In one instance, the pattern instructions use the term to mean a reasonably objective person; in another, the instructions ask jurors to distinguish between objective conditions and subjective feelings. *See, e.g.*, *Pattern*

---

[28] *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1183 (N.D. Fla. 2022) (summarizing views of Immanuel Kant, Friedrich Nietzsche, and Maurice Merleau-Ponty).

*Jury Instructions, Civil Cases*, Eleventh Circuit (2013 rev.) 4.19, 4.22 c,t. 2.

Second, while a scienter requirement could temper arbitrary enforcement in other contexts, its mere inclusion does not automatically render an otherwise vague restriction constitutional. *See, e.g.*, *Keyishian*, 385 U.S. at 599–600 (holding that a statute denying employment to persons who "willfully and deliberately advocate[] forceful overthrow of government" was vague). Even if the terms "espouses, promotes, advances, inculcates, or compels" did imply scienter, the district court recognized that they "do nothing to clarify how a professor can continue to incorporate such discussions in their classrooms in an 'objective' manner without violating the law." Doc. 44 at 122–23. Thus, even implied scienter does not provide fair notice as to whether an instructor's classroom discussions are objective enough.

Third, Regulation 10.005 does not "reduce[] vagueness concerns" by mitigating the potential for arbitrary enforcement. Appellants' Br. 48. The State contends that the Regulation requires universities to *first* order faculty to modify their instruction or teaching *before* issuing disciplinary measures. *Id.* Not so. The regulation provides no clear

opportunity for modification before punishment. Instead, it sets forth a range of arbitrary options and incentivizes institutions to impose harsh sanctions to avoid a loss of millions in funding due to an insufficiently "appropriate" response. Fla. Bd. of Govs. Reg. No. 10.005(3)(c).

The Stop WOKE Act fails to notify ordinary citizens of the conduct it prohibits and invites arbitrary enforcement. Should this Court lift the preliminary injunction imposed by the district court, it risks chilling unfettered open debate on college campuses. *See Reno*, 521 U.S. at 871–72 ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.").

## VI. The Stop WOKE Act's Vague Objectivity Without Endorsement Clause is not Severable.

The Act's "objectivity without endorsement" infects the remaining provisions with vagueness and renders the entire Act unconstitutional. Doc. 44 at 125 n.62. Deleting the saving clause from the statute altogether cannot save the Act from constitutional infirmity.

Severability is a matter of state law. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). Florida law dictates that "[i]f the legislative intent of the statute cannot be fulfilled absent the unconstitutional provision, the statute as a whole must be declared invalid." *Fla. Dep't of State, Div. of*

*Elections v. Martin*, 916 So.2d 763, 773 (Fla. 2005). Throughout the legislative process, the Stop WOKE Act's sponsors repeatedly claimed that the law did *not* bar objective discussion. *See, e.g.*, Doc. 19-1 at 4–9, ¶¶ 10, 13, 14; Doc 19-13 at 51:13–59:18, 1:18:25–44; Doc. 19-15 at 43:49, 55:00–56:02; Doc. 19-16 at 6:07:07. While the meaning of "objective manner without endorsement" remains ambiguous, one thing is clear: the State has provided no evidence that it intended to enact a version of the Act without the objectivity clause. Indeed, if this Court were to sever the objectivity clause from the rest of the statute, it would create a law even *more* constitutionally suspect than the one the State enacted because there would be no question that public professors must conform to the State's mandated viewpoints.

Similarly, the individual concepts, if found unconstitutional, cannot be severed from the Act. The state legislature selectively chose the eight prohibited concepts to function together as a cohesive "framework," and not as independent provisions. In an article meant to correct perceived misconceptions about the proposed law, Representative Bryan Avila wrote the legislation "provid[es] teachers with a clear and unifying framework to teach the facts about history, current events, and more, and

57

not divisive ideologies." Doc. 19-19. And Governor DeSantis issued a public handout stating the Act "codifie[d] the Florida Department of Education's prohibition on teaching critical race theory[.]" Doc. 19-13. In other words, the Act's drafters and supporters deliberately included each of the prohibited concepts with the intention to completely outlaw critical race theory. If the court were to sever certain concepts from the others, the law would no longer present a "unifying framework" or the complete prohibition of critical race theory the legislature intended.

## VII. Plaintiffs Successfully Satisfied the Remaining Preliminary Injunction Factors.

Plaintiffs satisfy the remaining preliminary injunction factors: They will suffer irreparable harm; the balance of equities tips in their favor; and an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Stop WOKE Act will cause irreparable harm to Plaintiffs if this Court lifts the injunction. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Should this Court reverse the district court's injunction, the Act will harm their rights to speak on and receive information and ideas.

58

The district court correctly held that the balance of equities weighs "decisively" in Plaintiffs' favor, as the state "has no legitimate interest in enforcing an unconstitutional ordinance." Doc. 44 at 127 (citing *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)). On the other hand, the public has an overwhelming interest in unfettered discourse in our public universities, as academic freedom "is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603.

## CONCLUSION

The State identifies no reason for this Court to overturn the district court's decision. So this Court should affirm the decision and remand the case for further proceedings.

DATED:    June 16, 2023                    Respectfully Submitted,

/s/ Greg H. Greubel                        /s/ Gary S. Edinger
GREG HAROLD GREUBEL                        GARY S. EDINGER, ESQUIRE
IA Bar No. 201452; PA. Bar No. 321130;     Fla. Bar No. 0606812
NJ No. 171622015; CA Bar No. 343028        BENJAMIN, AARONSON, EDINGER &
ADAM STEINBAUGH                                PATANZO, P.A.
PA. Bar No. 326475; CA No. 304829          305 N.E. 1st Street
JT MORRIS                                  Gainesville, Florida 32601
Tex. Bar No. 24094444                      Tel:  (352) 338-4440
FOUNDATION FOR INDIVIDUAL RIGHTS AND       Fax:  (352) 337-0696
    EXPRESSION                             GSEdinger12@gmail.com
510 Walnut Street, Suite 1250
Philadelphia, PA 19106

Tel:   (215) 717-3473
Fax:  (267) 573-3073
greg.greubel@thefire.org
adam@thefire.org
jt.morris@thefire.org

*Counsel for Plaintiffs-Appellees Adriana Novoa, Sam Rechek, and the First Amendment Forum*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this response complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(i) because this brief contains 12,157 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and 11TH CIR. R 32-4.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this response has been prepared in a proportionately spaced typeface using Microsoft Office for Word in 14-point Century Schoolbook font.

Dated:      June 16, 2023

/s/ Greg H. Greubel
Greg H. Greubel

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on June 16, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated:     June 16, 2023

/s/ Greg H. Greubel
Greg H. Greubel

62