No. 22-13992 & 22-13994

---

# United States Court of Appeals for the Eleventh Circuit

---

LEROY PERNELL, ET AL.,
*Plaintiffs-Appellees,*
v.
BRIAN LAMB, ET AL.,
*Defendants-Appellants.*

---

ADRIANA NOVOA, ET AL.,
*Plaintiffs-Appellees,*
v.
BRIAN LAMB, ET AL.,
*Defendants-Appellees.*

---

**Brief of *Amicus Curiae* Academic Freedom Alliance in Support of Defendants-Appellees**

---

On Appeal from the United States District Court
for the Northern District of Florida,
Nos. 4:22-cv-304-MW-MAF & 4:22-CV-324-MW-MAF

---

Eugene Volokh*
First Amendment Amicus Brief Clinic
UCLA School of Law
385 Charles E. Young Dr. E
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu

* Counsel would like to thank Pareesa Darafshi, Gerardo Valentino Gorospe IV, and Philip Raucci, UCLA School of Law students who worked on the brief.

**Certificate of Interested Persons and Corporate Disclosure Statement**

*Amicus Curiae* Academic Freedom Alliance, a nonprofit corporation organized, hereby states that it has no parent companies, subsidiaries, or affiliates and that it does not issue shares to the public. All parties have consented to the filing of this *amicus* brief. *Amici* certify that the following persons have an interest in the outcome, as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. Almond, Russell, *Plaintiff-Appellee*
2. American Civil Liberties Union Foundation of Florida, Inc., *Attorneys for Plaintiffs-Appellees*
3. American Civil Liberties Union of New York, *Attorneys for Plaintiffs-Appellees*
4. Academic Freedom Alliance, *Amicus Curiae*
5. Austin, Sharon Wright, *Plaintiff-Appellee*
6. Azis, Jacqueline Nicole, *Attorney for Plaintiffs-Appellees*
7. Ballard Spahr LLP, *Attorneys for Plaintiffs-Appellees*
8. Benjamin, Aaronson, Edinger & Patanzo, P.A., *Attorneys for Plaintiffs-Appellees*
9. Blankenship, Katherine, *Attorney for Plaintiffs-Appellees*
10. Boaz, Timothy L., *Defendant-Appellant*
11. Burgess, Tiffani, *Attorney for Plaintiffs-Appellees*
12. Callahan, Sandra, *Defendant-Appellant*
13. Carrere, Michael, *Defendant-Appellant*

14. Cerio, Timothy M., *Defendant-Appellant*

15. Coleman, Santino, *Attorney for Plaintiffs-Appellees*

16. Cooper & Kirk, PLLC, *Attorneys for Defendants-Appellants*

17. Cooper, Charles J., *Attorney for Defendants-Appellants*

18. Corcoran, Richard, *Defendant-Appellant*

19. Dauphin, Johana, *Plaintiff-Appellee*

20. Diaz, Jr., Manny, *Defendant-Appellant*

21. Donelly, N. Rogan, *Defendant-Appellant*

22. Dorsey, Dana Thompson, *Plaintiff-Appellee*

23. Dunn, Marvin, *Plaintiff-Appellee*

24. Edge, Aubrey, *Defendant-Appellant*

25. Edinger, Gary Scott, Attorney for *Plaintiffs-Appellees*

26. Edwards, Jerry Crawford, Attorney for *Plaintiffs-Appellees*

27. Fajana, Morenike, Attorney for *Plaintiffs-Appellees*

28. First Amendment Forum at University of South Florida, *Plaintiff-Appellee*

29. Fitzpatrick, Magistrate Judge Martin A., U.S. District Court for the Northern District of Florida

30. Florida A&M University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

31. Florida Board of Governors of the State University System, *Defendant (Dismissed on Nov. 22, 2022)*

32. Florida International University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

33. Florida State University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

34. Foundation for Individual Rights and Expression, *Attorneys for Plaintiffs-Appellees*

35. Frost, Patricia, *Defendant-Appellant*

36. Gabadage, Nimna, *Defendant-Appellant*

37. Gary S. Edinger & Associates PA – Gainesville, FL, *Attorney for Plaintiffs-Appellees*

38. Greubel, Greg Harold, *Attorney for Plaintiffs-Appellees*

39. Griffin, Michael, *Defendant-Appellant*

40. Haddock, Jr., Edward Ellis, *Defendant-Appellant*

41. Hinger, Sarah Ann, *Attorney for Plaintiffs-Appellees*

42. Horton, Oscar, *Defendant-Appellant*

43. Johnson, Alexsis Marie, *Attorney for Plaintiffs-Appellees*

44. Jones, Kenneth, *Defendant-Appellant*

45. Jordan, Darlene Luccio, *Defendant-Appellant*

46. Lamb, Brian, *Defendant-Appellant*

47. Leckerman, Jason Allen, *Attorney for Plaintiffs-Appellees*

48. Lee, Jin Hee, *Attorney for Plaintiffs-Appellees*

49. Leftheris, Julie, *Defendant-Appellant*

50. Levine, Alan, *Defendant-Appellant*

51. Lubin, Catharine E., *Attorney for Plaintiffs-Appellees*

52. Lydecker, Charles, *Defendant-Appellant*

53. Mabatah, Isiuwa Jacqueline, *Attorney for Plaintiffs-Appellees*

54. Mateer, Craig, *Defendant-Appellant*

55. McLaurin, Charles, *Attorney for Plaintiffs-Appellees*

56. McNamara, Caroline Andrews, *Attorney for Plaintiffs-Appellees*

57. Michael, Deanna, *Defendant-Appellant*

58. Monbarren, Lauran, *Defendant-Appellant*

59. Moraff, Laura Beth, *Attorney for Plaintiffs-Appellees*

60. Morris, Joshua ("J.T."), *Attorney for Plaintiffs-Appellees*

61. NAACP Legal Defense & Educational Fund, Inc., *Attorneys for Plaintiffs-Appellees*

62. Nascimento, Isabella Salomao, *Attorney for Plaintiffs-Appellees*

63. Novoa, Adriana, *Plaintiff-Appellee*

64. Ohlendorf, John David, *Attorney for Defendants-Appellants*

65. Palyam, Nithin, *Defendant-Appellant*

66. Park, Shelley, *Plaintiff-Appellee*

67. Patel, Shilen, *Defendant-Appellant*

68. Pernell, Leroy, *Plaintiff-Appellee*

69. Piccolo, Fredrick, *Defendant-Appellant*

70. Ramer, John, Attorney for *Defendants-Appellants*

71. Rechek, Samuel, *Plaintiff-Appellee*

72. Sandoval, Jennifer, *Plaintiff-Appellee*

73. Schneider, Jenifer Jasinski, *Defendant-Appellant*

74. Scott, Steven, *Defendant-Appellant*

75. Seixas, Melissa, *Defendant-Appellant*

76. Self, William, *Defendant-Appellant*

77. Silagy, Eric, *Defendant-Appellant*

78. Steinbaugh, Adam, *Attorney for Plaintiffs-Appellees*

79. Stermon, Kent, *Defendant-Appellant*

80. Sykes, Emerson James, *Attorney for Plaintiffs-Appellees*

81. Tilley, Daniel Boaz, *Attorney for Plaintiffs-Appellees*

82. Tobin, Charles David, *Attorney for Plaintiffs-Appellees*

83. University of Central Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

84. University of Florida Board of Trustees, Defendant *(Dismissed on Nov. 22, 2022)*

85. University of South Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

86. Volokh, Eugene, *Attorney for Amicus Curiae Academic Freedom Alliance*

87. Walker, Judge Mark E., U.S. District Court for the Northern District of Florida

88. Watson, Leah Monique, *Attorney for Plaintiffs-Appellees*

89. Weatherford, William, *Defendant-Appellant*

90. Wold, Megan M., *Attorney for Defendants-Appellants*

Dated: June 19, 2023

Respectfully Submitted,

s/ Eugene Volokh

Attorney for *Amicus Curiae*
Academic Freedom Alliance

## Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement .................... i

Table of Contents .................................................................................... vi

Table of Authorities .................................................................................. vii

Interest of *Amicus Curiae* ........................................................................ 1

Statement of the Issues................................................................................ 2

Summary of Argument................................................................................ 2

Argument.................................................................................................... 4

I. The Act prohibits speech that is integral to class discussion, and therefore cannot be justified under *Bishop* .......................................4

II. The “savings clause” does not actually save the statute.............................6

III. The Act affects the First Amendment rights of speakers across the political spectrum .........................................................................11

Conclusion ................................................................................................ 15

Certificate of Compliance ......................................................................... 17

Certificate of Service ................................................................................ 17

# Table of Authorities

## Cases

*Baggett v. Bullitt*, 377 U.S. 360 (1964) ....................8, 9

*Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991).................... 2, 4, 6

*Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973) ....................13

*Gentile v. State Bar*, 501 U.S. 1030 (1991) ....................9

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967).................... 9, 10, 15

*Sweezy v. N.H.*, 354 U.S. 234 (1957) ....................11

## Statutes and Rules

Fla. Stat. § 1000.05(4)....................6

Fla. Stat. § 1000.05(4)(a) ....................2

Fla. Stat. § 1000.05(4)(a)(1) ....................13

Fla. Stat. § 1000.05(4)(a)(2) ....................6

Fla. Stat. § 1000.05(4)(a)(3) ....................14

Fla. Stat. § 1000.05(4)(a)(4) .................... 3, 12

Fla. Stat. § 1000.05(4)(a)(6) .................... 4, 5, 11

Fla. Stat. § 1000.05(4)(a)(7) ....................5

## Other Authorities

Agyenim Boateng, Yan Wang, Collins Ntim & Keith W. Glaister, *National Culture, Corporate Governance and Corruption: A Cross-Country Analysis*, 26 Int'l J. Fin. & Econ. 3852 (2020) ....................14

Transparency Int'l, *Corruption Perceptions Index*....................14

## Interest of *Amicus Curiae*[1]

This *amicus curiae* brief is being filed on behalf of the Academic Freedom Alliance, a nonprofit organization whose members are dedicated to protecting the rights of faculty members at colleges and universities to speak, instruct, and publish without fear of sanction or punishment. Members of the Academic Freedom Alliance come from across the political spectrum, and are united in their commitment to truth-seeking scholarship and in recognizing that an attack on academic freedom anywhere is an attack on academic freedom everywhere.

Alliance members' experience as university professors, the range of subjects they teach, and the range of their ideological beliefs, gives them a special perspective on the dangers that the Florida Act poses to candid and comprehensive class discussion. Based on that experience, AFA has published a statement criticizing policies such as the one being challenged in this case. Academic Freedom Alliance, *Academic Freedom Alliance Statement on "Divisive Concepts" Policies*, Jan. 6, 2023, https://perma.cc/43PX-LJTN.

[1] No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. No person has contributed money that was intended to fund preparing or submitting the brief, except that UCLA School of Law paid the expenses involved in filing this brief.

## Statement of the Issues

Whether the Stop W.O.K.E. Act's restriction on the expression of certain viewpoints in university teaching violates the First Amendment.

## Summary of Argument

I. The Florida Act bars professors from "espous[ing], promot[ing], or advanc[ing]," Fla. Stat. § 1000.05(4)(a), a wide range of "concept[s]" that appear in debates at the heart of many university courses. These include discussions of important policy proposals that are constantly in the news, in court, and in legislatures: affirmative action, racial profiling, the participation of transgender athletes in sports, and more.

The Act thus cannot be justified by *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991). The *Bishop* decision upheld a university's restriction on a professor's discussing his personal religious beliefs in a class on exercise physiology; such a restriction, this Court reasoned, "asks only that [the professor] separate his personal and professional beliefs and that he not impart the former to his students during 'instructional time' or under the guise of the courses he teaches." *Id.* at 1071. Yet the Florida Act covers "professional" views as much as "personal" ones, including when they are directly relevant to the courses rather than being presented "under the guise of [the] courses."

II. Nor can the Act be saved on the theory that it bans only "espous[ing]" certain concepts and lets professors "discuss" those concepts "in an objective manner." What is or is not "objective" is often perceived highly subjectively. Even professors who do set forth both (or all) sides of an argument may be accused of deliberately framing one side well and another side badly; spending too much time on one side and not another; trying to spread their own views under the guise of objectivity; or even discussing one side in a positive tone of voice and the other in a way that is seen as critical or sarcastic.

That risk of allegations that classroom speech lacks "objectiv[ity]" is especially high in impromptu oral give-and-take between the professor and students, whether in a seminar, in a Socratic discussion, or in answers to questions. The Act thus tends to chill professors from seriously discussing certain subjects, notwithstanding the supposed savings clause for "objective" discussion.

III. The Act affects the First Amendment rights of speakers across the political spectrum, and across a wide range of topics. For instance, a serious discussion of the merits of traditionalist attitudes towards sex roles—attitudes that might no longer be endorsed in many contexts by American law, but that had been part of world history for millennia and are still approved of in many countries and by many religious traditions—might be seen as "advanc[ing]" the view that men "should not attempt to treat [women] without respect to . . . sex." § 1000.05(4)(a)(4). A discussion of the

merits of same-sex sports teams might be seen as "endors[ing]" the views that men "should be discriminated against" (by being excluded from women-only teams) "to achieve diversity, equity, or inclusion" for women athletes. § 1000.05(4)(a)(6). And if the Act is upheld, that will set a precedent for other legislatures banning the expression of still other views, whether pro-capitalist or anti-capitalist, pro-environmentalist or anti-environmentalist, pro-affirmative-action or anti-affirmative-action, and more.

For all these reasons, the Act is unconstitutionally vague and overbroad, and the decision below should be affirmed.

## Argument

### I. The Act prohibits speech that is integral to class discussion, and therefore cannot be justified under *Bishop*

This Court's *Bishop* precedent calls for a balance between the University's having "some authority over the conduct of teachers in and out of the classroom" and the "strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1074. In *Bishop,* this Court upheld a university's "demand[ing]" "the separation of [a professor's] personal views from his professorial duties." *Id.* at 1076 n.7. "Dr. Bishop's professional views" and "his religious beliefs," this Court held, "have to be conceptually separated for fair analysis," and the university must have "the authority . . . to request that [Bishop] sequester the personal from the professional." *Id.*

In contrast, the Florida Act applies to speech that is central to serious debates in a wide range of classes, such as history, law, sociology, criminology, anthropology, philosophy, and more. For example, the Act prohibits instruction that "advances" the "concept[]" that a "person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion." Fla. Stat. § 1000.05(4)(a)(6). Yet that concept, whether one agrees with it or not, is central to many defenses of affirmative action based on race, ethnicity, and sex. This means that law professors seeking to discuss the Supreme Court's affirmative action cases would be sharply limited in their ability to discuss one of the key arguments on one side of the debate.

Likewise, reparations for slavery are a controversial subject—but one that is constantly in the news, and that would indubitably arise in many serious classes that touch on modern race relations. Under the Act, professors would be unable to candidly and thoroughly discuss this topic, for fear of being seen as "advanc[ing]" the argument that "A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex." § 1000.05(4)(a)(7).

Similarly, classes on sociology, criminology, psychology, anthropology, criminal law, employment law, and many more subjects routinely discuss the question

whether people generally—or members of specific groups in particular—are especially likely to engage in subconscious bias. Yet professors are in peril whenever they discuss these arguments, because the arguments may be seen as stating that "A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously." § 1000.05(4)(a)(2).

That Bishop's personal views on theology could be excluded from a university class on physiology thus cannot justify upholding the Act: The Act restricts the free and frank discussion of questions that are a central to a class's subject matter, not just of distant tangents. It thus fails the First Amendment test set forth in *Bishop*, for reasons discussed in more detail in the Brief of Appellees Novoa et al. at 34-39.

## II. The "savings clause" does not actually save the statute

To be sure, the Act purports to allow professors to "discuss" the prohibited eight concepts, so long as they do so "in an objective manner without endorsement of the concepts." § 1000.05(4). But that offers no safe harbor, because what counts as "objective" will necessarily be in the eye of the beholder.

Consider, for instance, a professor discussing the arguments in the Supreme Court's affirmative action cases. Even a professor who is striving hard to be "objective" may spend more time on one side than another. The arguments for one side may be more complex. Students may have more questions about one side. Students may have a harder time understanding one side, and may need more explanation of

that side. Yet all these choices could be perceived by some students as betraying a lack of "objectiv[ity]."

And of course sometimes a professor may need to set forth the best argument for a particular side because the students are not adequately grasping the argument. The professor may only be seeking to explain the argument to the students, and may even disclaim any attempt to endorse the argument. But some students might nonetheless view this as a non-"objective" discussion.

Observers may also perceive what they view as a lack of "objectiv[ity]" in matters such as a professor's tone or emphasis. They might see a professor's responses to some students as dismissive, patronizing, or even sarcastic, while other observers may view the same remarks as thoughtful and balanced. Likewise, they might think that the professor is offering only a straw man argument for one side, while providing a much stronger argument for the other.

Such subjective perceptions of a lack of objectivity are especially likely for two reasons. First, it is human nature to perceive people one generally agrees with as "objective" and people on the other side of various debates as "biased." After all, people tend to view their sides as reasonable and correct (attributes that are commonly seen as connected with objectivity) and their adversaries as unreasonable and misguided. Students, administrators, and others are thus likely to often infer a lack

of objectivity on the part of professors simply because they disagree with the professors' views.

Second, sometimes the professor will have expressed a particular view outside class, whether in scholarship, public commentary, litigation, or any other exercise of the professor's First Amendment rights. If a professor is known as a supporter of affirmative action, for instance, many people will perceive even a balanced in-class discussion of the arguments for affirmative action as "espous[ing]," "promot[ing]," or "advanc[ing]" those arguments, rather than as being "objective."

Aware of this risk, careful professors may reasonably avoid discussing the perilous arguments altogether, rather than relying on an uncertain protection for supposedly "objective" "discuss[ion]." And that is especially so because much in-class discussion—especially in smaller seminars or in classes that are taught Socratically—is largely spontaneous. All of us recognize that sometimes something we say may be misperceived; we are even more aware that sometimes discussions that we view as objective will come across otherwise. In striking down vague loyalty oaths in *Baggett v. Bullitt*, 377 U.S. 360 (1964), the Court reasoned:

> The uncertain meanings of the oaths require the oath-taker—teachers and public servants—to "steer far wider of the unlawful zone" than if the boundaries of the forbidden areas were clearly marked. Those with a conscientious regard for what they solemnly swear or affirm, sensitive to the perils posed by the oath's indefinite language, avoid the risk of loss of employment, and perhaps profession, only by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited.

*Id.* at 372 (citation omitted). The same is true of vague safe harbors for supposed "objectiv[ity]."

The Court's decision in *Gentile v. State Bar*, 501 U.S. 1030 (1991), offers a helpful analogy. In that case, a supposed "safe harbor" provision allowed lawyers to publicly discuss the "general" nature of their defense, if they did so without "elaboration." But this, the Court held, actually offered no safety:

> [T]he Rule fails to provide fair notice to those to whom it is directed. A lawyer seeking to avail himself of Rule 177(3)'s protection must guess at its contours. The right to explain the "general" nature of the defense without "elaboration" provides insufficient guidance because "general" and "elaboration" are both classic terms of degree. In the context before us, these terms have no settled usage or tradition of interpretation in law. The lawyer has no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the elaborated.

*Id.* at 1048-49 (cleaned up). The same is true here: The distinction between "objective" "discuss[ion]" of certain "concepts" and forbidden "espous[al]," "promot[ion]," or "advance[ment]" provides "insufficient guidance" where First Amendment rights are involved.

Indeed, under the Florida Act, "[i]t would be a bold teacher who would not stay as far as possible from utterances or acts which might jeopardize his living by enmeshing him in [the] intricate machinery," *Keyishian v. Bd. of Regents*, 385 U.S. 589, 601 (1967), that would necessarily be deployed in determining whether a spontaneously flowing class discussion was sufficiently "objective." The Florida Act will

thus cause the very sort of "pall of orthodoxy over the classroom" that "the First Amendment . . . does not tolerate." *Id.* at 603.

Finally, sometimes students may ask professors for their personal, non-"objective" opinions. "OK, we've heard your presentation of the arguments for and against affirmative action, professor; but what do *you* think?" This is a normal exchange to have in a university context, especially in a small seminar that is supposed to be a conversation among fellow scholars.

Yet under the Act, professors would be unable to express their honest views on the subject, for fear that any such expression—and perhaps all the other expression that came before it—will be seen as not just "objective" "discuss[ion]" of certain ideas, but as forbidden "espous[al]," "promot[ion]," or "advance[ment]" of those ideas. Indeed, the professors might not even be able to respond, "I'm afraid I shouldn't answer, given the Florida Act," because that itself may betray their views. After all, if their views were consistent with the Florida Legislature's, they would be free to answer; the Act would only forbid the expression of their views if the views are the ones that the Legislature condemned.

To be safe, professors would just have to have a general "no comment" policy as to any matters on the prohibited list. Yet "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die," and this sort of "[s]cholarship

cannot flourish in an atmosphere of suspicion and distrust." *Sweezy v. N.H.*, 354 U.S. 234, 250 (1957) (plurality opin.). Such inquiry and scholarship likewise "cannot flourish in an atmosphere" of legislatively mandated "no comment." The First Amendment cannot tolerate such "governmental intrusion into the intellectual life of a university," which causes "grave harm" to the marketplace of ideas. *Id.* (Frankfurter, J., joined by Harlan, J., concurring). Again, this chilling effect that the Act imposes on professors' speech further shows that the Act is unconstitutionally overbroad, and is not saved by the vague "objective" "discuss[ion]" provision.

## III. The Act affects the First Amendment rights of speakers across the political spectrum

The Act would of course be unconstitutional even if it limited only the speech of the "woke," as the initial name of the Act—Stop W.O.K.E. Act—suggests. But the Act is vastly broader than that.

Consider, for instance, the prohibition on speech that "advances" the "concept" that "[a] person, by virtue of his or her . . . sex . . . should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion." Fla. Stat. § 1000.05(4)(a)(6). This "concept" literally includes the view—a view embedded in current American law—that men should be excluded "by virtue of [their] . . . sex" from women's sports teams in order to promote "diversity, equity, or inclusion."

The Act would thus bar arguments that transgender athletes should not be allowed on women's teams. But even beyond that, it would bar a defense of the well-established position that those athletes who are undisputedly male should be excluded from women's teams.

Likewise, the Act prohibits university classroom speech that "advances" the "concept" that "Members of one . . . sex . . . should not attempt to treat others without respect to . . . sex." § 1000.05(4)(a)(4). Of course, many religious, cultural, and moral traditions take the view that men should treat women differently because they are women. Indeed, throughout human history, this view has seemingly been the norm.

This view is still commonly acted on by people in family life, social life, and religious life even in modern America, where discrimination in employment and other contexts based on sex is generally banned. Theorizing that such a view is sound, because men and women really are different in important ways, would thus be forbidden.

And the Act would also forbid arguments that some facets of modern culture may have gone too far in erasing sex differences—for instance, that the military may have erred in allowing women in combat roles, or that boys should be raised to take a more traditionally "chivalrous" view towards women. Yet such arguments are of

course fundamental to important debates about law, social organization, moral philosophy, religion, and more.

Criminology or psychology classes may also need to discuss the reality that, in our own society and throughout the world, men tend to be more violent than women, and thus that women tend to be less violent than men. Yet statements that "advance[]" this "concept" would be forbidden on the theory that they suggest that "[m]embers of one . . . sex are morally superior to members of another . . . sex." § 1000.05(4)(a)(1).

Classes that deal with comparative politics or economic development also have to confront the reality that some countries are much more politically and economically successful than others. There are many possible explanations for such national differences, but some of them turn on differences in the nations' cultural attitudes towards morally laden matters such as corruption, trust, industriousness, education, individual freedom, personal violence, and the like.

The Act would, however, ban any teaching that "advances" such "concepts," because those could be seen as expressing the view that "[m]embers of one . . . national origin . . . are morally superior to members of another . . . national origin." Fla. Stat. § 1000.05(4)(a)(1). "National origin," after all, refers not just to distant ethnic origin but also to "the country where a person was born." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973).

A statement such as, "Germany does better economically than Spain because Germans tend to be less corrupt in business and government" would thus be forbidden by the Act.[2] Likewise, statements such as, "The success of Chinese immigrants in many societies stems in large part from their greater commitment to education" would be forbidden as well.[3]

The Act also prohibits teaching "that a person's . . . status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a)(3). This means that a professor could not argue against race-based affirmative action by claiming that affirmative action programs are improper because they "necessarily" give non-whites a "privileged" "status."

---

[2] *Cf., e.g.*, Transparency Int'l, *Corruption Perceptions Index*, https://www.transparency.org/en/cpi/2021 (reporting large difference in perception of corruption in Germany and in Spain); Agyenim Boateng, Yan Wang, Collins Ntim & Keith W. Glaister, *National Culture, Corporate Governance and Corruption: A Cross-Country Analysis*, 26 Int'l J. Fin. & Econ. 3852 (2020) (discussing, throughout the article, the effects of various cultural attributes as well as legal rules on corruption, and noting at pp. 3859 & 3863 that having a German- or Scandinavian-origin legal system is associated with lower corruption than having a French- or Spanish-origin legal system).

[3] *Cf., e.g.*, Amy Hsin & Yue Xie, *Explaining Asian Americans' Academic Advantage over Whites*, 111 Proc. Nat'l Acad. Sci. 8416, 8416 (2014) (concluding that "the Asian-American educational advantage is attributable mainly to Asian students exerting greater academic effort" and "the disadvantaged children of Chinese and Vietnamese immigrant families routinely surpass the educational attainment of their native-born, middle-class white peers").

And of course, these are just applications of the Florida Act itself. If the Act is upheld, then such a precedent could equally be used by other state legislatures to ban a vast range of other views, whether on the Left, Right, or otherwise. A legislature that disapproved of free market economics could ban teaching that "advances" such "concepts." A legislature that disapproved of criticism of race-based affirmative action could ban teaching that advances the concept that the government should be color-blind. Legislatures that took particular views on environmentalism or climate change could ban any teaching that advances concepts inconsistent with those legislatures' views. That is not consistent with "Our Nation['s] . . . deep[] commit[ment] to safeguarding academic freedom," *Keyishian*, 385 U.S. at 603.

## Conclusion

The Florida Act abridges the First Amendment rights of a vast range of speakers—"woke" and otherwise—by interfering with university professors' ability to have honest and thorough classroom discussions with their students. It chills discussions on speech that is directly related to course content. And the illusory supposed safe harbor for "objective" speech cannot provide constitutionally adequate protection.

Respectfully Submitted,

s/ Eugene Volokh
Attorney for *Amicus Curiae*
Academic Freedom Alliance
First Amendment Clinic
UCLA School of Law
385 Charles E. Young Dr. E
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,543 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: June 19, 2023

s/ Eugene Volokh

Attorney for *Amicus Curiae*

## Certificate of Service

I hereby certify that I electronically filed the foregoing Brief *Amicus Curiae* today with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. All participants except Isabella Salomao Nascimento in the case are registered CM/ECF users, and will be served by the appellate CM/ECF system. Ms. Nascimento, one of the counsel for appellee Pernell, has been served by e-mail at salomaonascimentoi@ballardspahr.com (with consent of her co-counsel and law firm colleague Jason Leckerman).

Dated: June 19, 2023

s/ Eugene Volokh

Attorney for *Amicus Curiae*