# In the United States Court of Appeals

# for the Eleventh Circuit

LEROY PERNELL, ET AL.,
*Plaintiffs-Appellees,*

v.

BRIAN LAMB, ET AL.,
*Defendants-Appellants.*

ADRIANA NOVOA, ET AL.,
*Plaintiffs-Appellees,*

v.

MANNY DIAZ, JR., ET AL.,
*Defendants-Appellants.*

On Appeal from the United States District Court for
the Northern District of Florida,
Nos. 4:22-CV-304-MW-MAF &
4:22-CV-324-MW-MAF

**BRIEF OF *AMICUS CURIAE* THE NEW PRESS
IN SUPPORT OF PLAINTIFFS-APPELLEES URGING AFFIRMANCE**

Herbert M. Wachtell
Sunny S. Jeon
Ioannis D. Drivas
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Phone Number: (212) 403-1000
Fax Number: (212) 403-2000
hmwachtell@wlrk.com

*Counsel for Amicus Curiae The New Press*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons and entities as described in 11th Cir. R. 26.1-2(a) have an interest in the outcome of this case, and were omitted from the Certificates of Interested Persons in briefs that were previously filed per 11th Cir. R. 26.1-2(b):

- The New Press.

The New Press is a not-for-profit corporation exempt from income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). It does not have a parent corporation, and no publicly held company has a 10 percent or greater ownership interest in the company.

# TABLE OF CONTENTS

INTERESTS OF AMICUS CURIAE .................................................................1

STATEMENT OF THE ISSUE ........................................................................4

SUMMARY OF ARGUMENT .........................................................................4

ARGUMENT .................................................................................................7

POINT I:  THE STOP W.O.K.E. ACT AMOUNTS TO AN
  UNCONSTITUTIONAL, VIEWPOINT-BASED RESTRICTION
  ON SPEECH. ...........................................................................................7

    A.    Viewpoints prohibited under the Act ......................................9

    B.    The Act's Unconstitutionality under the First Amendment ..................11

POINT II:  THE ACT UNCONSTITUTIONALLY CHILLS THE
  DISTRIBUTION OF BOOKS, INCLUDING THOSE OF THE
  NEW PRESS. ..........................................................................................15

POINT III:  THE ACT STIFLES ACADEMIC FREEDOM IN
  HIGHER EDUCATION. ..........................................................................22

POINT IV:  THE ACT IS PART OF A NATIONWIDE "BURN THE
  BOOKS" CAMPAIGN THAT THE STATE OF FLORIDA IS
  SPEARHEADING. ...................................................................................23

SUMMARY ...............................................................................................29

CONCLUSION ...........................................................................................29

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Bantam Books, Inc.* v. *Sullivan*,
   372 U.S. 58 (1963) ............................................................................... 16

*Bishop* v. *Aronov*,
   926 F.2d 1066 (11th Cir. 1991) ......................................................... 22

*Hazelwood Sch. Dist.* v. *Kuhlmeier*,
   484 U.S. 260 (1988) ............................................................................. 13

*Iancu* v. *Brunetti*,
   139 S. Ct. 2294 (2019) ........................................................................ 14

*Jamison* v. *Texas*,
   318 U.S. 413 (1943) ............................................................................. 16

*Keyishian* v. *Bd. of Regents of Univ. of State of N.Y.*,
   385 U.S. 589 (1967) .......................................................................... 5, 22

*LaCroix* v. *Town of Fort Myers Beach*,
   38 F.4th 941 (11th Cir. 2022) ............................................................ 16

*Lamont* v. *Postmaster Gen.*,
   381 U.S. 301 (1965) ............................................................................. 17

*Lovell* v. *City of Griffin*,
   303 U.S. 444 (1938) ............................................................................. 16

*Martin* v. *City of Struthers*,
   319 U.S. 141 (1943) ............................................................................. 17

*Matal* v. *Tam*,
   582 U.S. 218 (2017) ............................................................................... 9

*Pernell* v. *Fla. Bd. of Govs. of State Univ. Sys.*,
   2022 WL 16985720 (N.D. Fla. Nov. 17, 2022) ........................... 10, 15

*Reed* v. *Town of Gilbert*,
   576 U.S. 155 (2015) ............................................................................. 15

*Reno* v. *Am. Civil Liberties Union*,
  521 U.S. 844 (1997)................................................................9

*Rosenberger* v. *Rectors and Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)..............................................................14

*Searcey* v. *Harris*,
  888 F.2d 1314 (11th Cir. 1989) ....................................13, 14

*Speech First, Inc.* v. *Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) .................................*passim*

*Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969)..............................................................22

**Statutes and Rules**

*10.005 Prohibition of Discrimination in University Training or Instruction*, Bd. of Governors, State Univ. Sys. of Fla. (Aug. 26, 2022) ......................................................................11 n.9

2022 F.L. H.B. 1467 .....................................................24 n.28

Fla. Stat. Ann. § 1000.05(4)(a) ....................4, 7, 10 n.9, 11 n.10

Fla. Stat. Ann. § 1000.05(4)(a)(3)..............................12, 19

Fla. Stat. Ann. § 1000.05(4)(a)(4)..............................12, 19

Fla. Stat. Ann. § 1000.05(4)(a)(6)......................................19

Fla. Stat. Ann. § 1000.05(4)(a)(8)......................................12

Fla. Stat. Ann. § 1000.05(4)(b) .............................4, 9-10 n.8

**Other Citations**

*@SenMannyDiazJr*, Twitter (Jan 20, 2023, 5:35 PM),
  https://rb.gy/hs2yv .....................................................27 n.37

*About the Fund*, Art for Justice Fund,
  https://artforjusticefund.org/about/ ...........................19 n.18

A.G. Gancarski, *Ron DeSantis cites 'queer theory' and 'intersectionality' in defense of African American studies course ban*, FLORIDA POLITICS (Dec. 15, 2021), https://floridapolitics.com/archives/583030-gov-desantis-condemns-queer-theory-and-intersectionality-to-defend-african-american-studies-course-ban/ ..................................................21 n.23

Andrew Albanese, *As Book Bans and Legislative Attacks Escalate, the New Press Pushes Back*, PUBLISHERS WEEKLY (Feb. 17, 2023), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/91566-as-book-bans-and-legislative-attacks-escalate-the-new-press-pushes-back.html ......................................24 n.29

Anemona Hartocollis & Eliza Fawcett, *The College Board Strips Down Its A.P. Curriculum for African American Studies*, N.Y. TIMES (Feb. 1, 2023), https://www.nytimes.com/2023/02/01/us/college-board-advanced-placement-african-american-studies.html...........27 n.38

*AP African American Studies*: *Official Course Framework, Project, and Exam Overview, Effective 2023-2024*, COLL. BD., https://apcentral.collegeboard.org/media/pdf/ap-african-american-studies-course-framework.pdf ....................................................27 n.39

*AP African American Studies Scholars to Make Changes to Course*, COLL. BD. (Apr. 24, 2023), https://newsroom.collegeboard.org/ap-african-american-studies-scholars-make-changes-course .........................28 n.40

Asher Lehrer-Small, *National Study Reveals 1 in 4 Teachers Altering Lesson Plans Due to Anti-Critical Race Theory Laws*, THE 74 (Jan. 25, 2023) https://www.the74million.org/article/national-study-reveals-1-in-4-teachers-altering-lesson-plans-due-to-anti-critical-race-theory-laws/........................................................................28 n.42

Bianca Quilantan, *Ron DeSantis' Ban of School Diversity Programs is Coming to These States Next*, POLITICO (May 17, 2023), https://www.politico.com/news/2023/05/17/diversity-initiatives-states-are-next-00097268 ..........................................................25 n.31

Bill Keller & Eli Hager, *Everything You Think You Know About Mass Incarceration Is Wrong*, THE MARSHALL PROJECT (Feb. 9, 2017), https://www.themarshallproject.org/2017/02/09/everything-you-think-you-know-about-mass-incarceration-is-wrong ................................19 n.17

CRITICAL RACE THEORY: THE KEY WRITINGS THAT FORMED THE
MOVEMENT (Kimberlé Crenshaw et. al. eds., 1st ed. 1996).........................*passim*

*Critical Race Theory: The Key Writings That Formed the Movement*,
THE NEW PRESS, https://thenewpress.com/books/critical-race-
theory ...............................................................................................20 n.19, n.20

*CRT Forward: Tracking the Attack on Critical Race Theory*,
U.C.L.A. SCH. OF L. CRITICAL RACE STUDIES PROGRAM
(Apr. 2023), https://crtforward.law.ucla.edu/wp-
content/uploads/2023/04/UCLA-Law_CRT-Report_Final.pdf..................25 n.33

*CRT Forward*, U.C.L.A. SCH. OF L. CRITICAL RACE STUDIES
PROGRAM, https://crtforward.law.ucla.edu/ ................................................25 n.32

Dana Goldstein, *Florida Rejects Math Textbooks, Citing 'Prohibited
Topics'*, N.Y. TIMES (Apr. 18, 2022),
https://www.nytimes.com/2022/04/18/us/florida-math-textbooks-
critical-race-theory.html .............................................................................26 n.35

Dana Goldstein, Stephanie Saul, and Anemona Hartocollis, *Florida
Officials Had Repeated Contact With College Board Over African
American Studies*, N.Y. TIMES (Feb. 9, 2023),
https://www.nytimes.com/2023/02/09/us/florida-college-board-
african-american-studies.html.....................................................................27 n.37

*Foreword by Cornel West*, THE NEW JIM CROW: MASS
INCARCERATION IN THE AGE OF COLORBLINDNESS,
https://newjimcrow.com/about/foreword-by-cornel-west ..........................19 n.16

Jacey Fortin, *Critical Race Theory: A Brief History*, N.Y. TIMES
(Nov. 8, 2021), https://www.nytimes.com/article/what-is-critical-
race-theory.html .......................................................................................20 n.19

Jane Coaston*, The Intersectionality Wars*, VOX (May 28, 2019),
https://www.vox.com/the-
highlight/2019/5/20/18542843/intersectionality-conservatism-law-
race-gender-discrimination .......................................................................21 n.22

Jeffrey S. Solochek, *Florida Asks College Board to Modify AP Psych
Curriculum. The Answer: Absolutely Not*, MIAMI HERALD
(June 15, 2023)..........................................................................................28 n. 41

Jeremy C. Young et al., *America's Censored Classrooms*, PEN AM. (Aug. 17, 2022), https://pen.org/report/Americas-censored-classrooms/...............................................................................25 n. 30

Jim Milliot, *PW's 2021 Person of the Year: Ellen Adler*, PUBLISHERS WEEKLY (Dec. 17, 2021), https://shorturl.at/isAD8 .......................................3 n.1

Jonathan Friedman & Nadine Farid Johnson, *Banned in the USA: Rising School Book Bans Threaten Free Expression and Students' First Amendment Rights*, PEN AM. (April 2022), https://pen.org/banned-in-the-usa/ ............................................................24 n.27

Kasey Meehan et al., *Banned in the USA: State Laws Supercharge Book Suppression in Schools*, PEN AM. (Apr. 20, 2023), https://pen.org/report/banned-in-the-usa-state-laws-supercharge-book-suppression-in-schools/ ....................................................................23 n.26

Michelle Alexander, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS (10th Anniversary ed. 2020) .....................*passim*

*The New Canon: What's the Most Influential Book of the Past 20 Years?*, CHRON. OF HIGHER EDUC. (Oct. 30, 2018), https://www.chronicle.com/article/whats-the-most-influential-book-of-the-past-20-years/........................................................................18 n.12

*Our commitment to AP African American Studies, the scholars, and the field*, COLL. BD. (Feb. 11, 2023), https://newsroom.collegeboard.org/our-commitment-ap-african-american-studies-scholars-and-field ...........................................................28 n.41

Patricia Mazzei et al., *Florida at Center of Debate as School Book Bans Surge Nationally*, N.Y. TIMES (Apr. 22, 2023), https://www.nytimes.com/2023/04/22/books/book-ban-florida.html ........24 n.28

Press Release, *Florida Rejects Publishers' Attempts to Indoctrinate Students*, FLA. DEPT. OF EDUC. (Apr. 15, 2022), https://www.fldoe.org/newsroom/latest-news/florida-rejects-publishers-attempts-to-indoctrinate-students.stml......................................26 n.36

Press Release, *Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations ........................................8 n.3, 8 n.6, 20 n.21

Press Release, *Governor DeSantis Emphasizes Importance of Keeping Critical Race Theory Out of Schools at State Board of Education Meeting* (June 10, 2021), https://www.flgov.com/2021/06/10/governor-desantis-emphasizes-importance-of-keeping-critical-race-theory-out-of-schools-at-state-board-of-education-meeting/ ........................................................8 n.5

Press Release, *Governor Ron DeSantis Signs Legislation to Protect Floridians from Discrimination and Woke Indoctrination* (Apr. 22, 2022), https://www.flgov.com/2022/04/22/governor-ron-desantis-signs-legislation-to-protect-floridians-from-discrimination-and-woke-indoctrination/ ................................................................29 n.43

Ray Bradbury, FAHRENHEIT 451 (Ballantine Books 7th ed. 1972) ...........................7

Raymond Garcia, *American Library Association Reports Record Number of Demands to Censor Library Books and Materials in 2022*, ALA NEWS (Mar. 22, 2023), https://www.ala.org/news/press-releases/2023/03/record-book-bans-2022 ..............................................................................23 n.25

Sarah Mervosh et al., *Florida Rejects Dozens of Social Studies Textbooks, and Forces Changes in Others*, N.Y. TIMES (May 9, 2023), https://www.nytimes.com/2023/05/09/us/desantis-florida-social-studies-textbooks.html ..................................................26 n.34

Summer Meza, *Florida Gov. Ron DeSantis denies systemic racism exists. Critics say his state's new voting law is a clear example*, YAHOO! (Apr. 30, 2021), https://www.yahoo.com/video/florida-gov-ron-desantis-denies-172055949.html. ....................................8 n.4

*WOKE*, DICTIONARY.COM, https://www.dictionary.com/browse/woke .............9 n.7

## INTEREST OF *AMICUS CURIAE*

The New Press is a not-for-profit publishing house, established in 1990 as an alternative to large, commercial publishers. As a mission-driven publisher advancing social change in the public interest, The New Press seeks to amplify voices advocating for a more inclusive, just, and equitable world and seeks to publish books to facilitate social change, enrich public discourse, and defend democratic values. To that end, The Press is committed to publishing works of educational, cultural, and community value that, despite their intellectual merits, may be deemed insufficiently profitable by commercial publishers and underrepresented in the mass media. It survives financially as a not-for-profit by a combination of donor support and proceeds from books that generate sales.

The New Press's editorial decisions are informed by three related aims: (1) to add traditionally underrepresented voices to the national conversation; (2) to broaden the audience for serious intellectual work; and (3) to address the problems of a society in transition, highlighting attempts at reform and innovation in a wide range of fields.

Guided by these principles, The New Press has brought to the fore paradigm-shifting voices across the progressive spectrum in a number of key areas including: race relations, education reform, criminal justice, immigration, labor and economic justice, gender studies, cultural criticism, legal studies, and international literature. Across these disciplines, The Press has also taken a

leading role in publishing a wide range of new work in African-American, Asian-American, Latino, LGBT, and Native-American studies. The cultural and political salience of The New Press's publications have made them widely used in high school, college and graduate level courses throughout the country.

The Press's publications in these areas range from such (unexpected) national bestsellers as Michelle Alexander's *The New Jim Crow:  Mass Incarceration in the Age of Colorblindness* (some 1.8 million copies sold); *Critical Race Theory:  The Key Writings That Formed the Movement*, a groundbreaking book collecting essays by the Critical Race Theory movement's key founders and theoreticians, led by Kimberlé Crenshaw; Steve Phillips's *Brown Is the New White:  How the Demographic Revolution Has Created A New American Majority*; and Elie Mystal's 2022 *New York Times* bestseller, *Allow Me To Retort:  A Black Guy's Guide to the Constitution*; to lesser known but equally important books including Peter Edelman's *So Rich, So Poor:  Why It's So Hard to End Poverty in America*, many books of declassified government documents in conjunction with the National Security Archive, and recent books making the case for a new Equal Rights Amendment and for mandatory voting.

The New Press and its authors—recognized for their extensive contributions in a variety of fields—have won many awards, including the Pulitzer Prize, the National Book Award, the American Book Award, the Bancroft Prize, the Prix Goncourt, the International IMPAC Dublin Literary Award, and the 2021 Nobel

Prize for Literature. In 2021, The New Press's publisher was named the publishing industry's "Person of the Year" by *Publishers Weekly*.[1]

Florida's "Individual Freedom Act," known alternatively as the Stop Wrongs to Our Kids and Employees ("W.O.K.E.") Act (the "Act"), has impeded The New Press in its mission. This statute—which prohibits Florida professors in state colleges from endorsing an enumerated list of viewpoints, including those recognizing the existence of systemic racial inequality—has chilled the distribution of The New Press's books on Florida campuses. Many such books espouse these very prohibited viewpoints. The Act also stifles academic debate on subject matters focused on by many of The New Press's most prominent publications, and in particular, race relations and criminal justice reform.

Through its chilling effects, the Act has interfered with the distribution of The Press's books on Florida college and university campuses. A significant portion of the New Press's book sales occur at colleges: when a professor assigns a book for discussion, a book store attendant upon the college will order a relevant quantity of the book to be available for student purchase. Since the passing of the Act, when a professor has felt compelled not to assign or recommend a New Press book for reading, such sales have ended.

---

[1] Jim Milliot, *PW's 2021 Person of the Year: Ellen Adler*, PUBLISHERS WEEKLY (Dec. 17, 2021), https://shorturl.at/isAD8.

The New Press thus has a significant interest in the outcome of this case, which will determine whether enforcement of the Act should be preliminarily enjoined on Florida public college campuses.[2]

## STATEMENT OF THE ISSUE

Whether the Stop W.O.K.E. Act is unconstitutional in that it proscribes disfavored viewpoints in violation of the First Amendment and in so doing stifles academic freedom in Florida public education and chills the distribution of books expressing progressive opinions.

## SUMMARY OF ARGUMENT

The current Florida administration, unhappy with the expression of progressive opinions on Florida campuses, has turned to a familiar old approach: censorship of the public debate. The State has found such opinions on issues such as race and gender inconvenient. And rather than combat those opinions through reasoned argument from countervailing points of view, the State has instead attempted to silence one side of the debate by passing the Stop W.O.K.E. Act.

The Act prohibits educators in Florida colleges and schools from expressing eight enumerated viewpoints. While it describes these disfavored viewpoints vaguely and in such a way as to make their prohibition seem unimpeachable, by

---

[2] The parties have consented to the filing of this brief. Neither the parties nor their counsel have authored this brief in whole or in part, and neither they nor any other person or entity other than The New Press or its counsel contributed money that was intended to fund preparing or submitting this brief.

the State's own admissions, the statute is intended to stifle the expression of widely held progressive opinions, such as those endorsing affirmative action to combat racial inequities.  Far from a valid regulation of school curriculum, Florida has made no secret of the Act's true discriminatory purpose—to banish "woke" (*i.e.*, progressive) viewpoints from Florida schools in an effort to tilt the academic debate in favor of the State's preferred opinions.  Such an Act is unconstitutional. *See* Point I, *infra.*

In addition to infringing the First Amendment rights of Florida professors and students, the Act chills the distribution of books expressing disfavored viewpoints on Florida college campuses.  Florida professors will avoid the appearance of endorsing the Act's proscribed viewpoints by assigning or recommending progressive books.  In so doing, the Act effectively bans these important works from Florida campuses, including many of The New Press's most celebrated publications, such as Michelle Alexander's *The New Jim Crow* and the seminal essay collection, *Critical Race Theory*, edited by Kimberlé Crenshaw *et al*. The Act therefore stifles intellectual inquiry and academic freedom on Florida campuses, casting a "pall of orthodoxy" over Florida public education, *Keyishian* v. *Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967), and unconstitutionally impeding the distribution of progressive books, including those of The New Press.  *See* Points II and III, *infra.*

Finally, the Act is part of a nationwide "burn the books" campaign spearheaded by Florida, rendering it essential that this Court lead the way in establishing that such legislation is unconstitutional. *See* Point IV, *infra*.

Since its founding, The New Press has sought to publish works that promote a more inclusive, just, and equitable world and advance many of the precise viewpoints that the State would prefer to banish from the public discourse. These works contribute to the country's "intellectual bottom line," and our democracy suffers when they are silenced on the ground that they express opinions that chafe against the State's viewpoint. This Court should recognize the Act for what it is—a flagrantly unconstitutional restriction of speech—and accordingly affirm the District Court's order preliminarily enjoining its enforcement.

## <u>ARGUMENT</u>

*White people don't feel good about Uncle Tom's Cabin.  Burn it.*
*Someone's written a book on tobacco and cancer of the lungs?*
*The cigarette people are weeping?  Burn the book.*

— Ray Bradbury, FAHRENHEIT 451, 59
(Ballantine Books 7th ed. 1972)

## <u>POINT I</u>

### THE STOP W.O.K.E. ACT AMOUNTS TO AN UNCONSTITUTIONAL, VIEWPOINT-BASED RESTRICTION ON SPEECH.

The Stop W.O.K.E. Act violates the free speech rights of Florida professors and students by impermissibly banning the expression of disfavored viewpoints on college campuses and on the ground of its unconstitutional vagueness.  The New Press endorses the Appellees' briefs regarding the Act's unconstitutionality on each of these bases and will accordingly keep its perspective on these issues brief.

The Act makes it unlawful for professors in Florida public universities and colleges to "subject [] student[s] . . . to training or instruction that espouses, promotes, advances, inculcates, or compels" them to believe eight proscribed concepts.  *See* Fla. Stat. Ann. § 1000.05(4)(a).  The Act describes each of these proscribed viewpoints in such a way as to make its prohibition appear unobjectionable or even laudable—that is, to suggest that no reasonable professor would advocate for such a viewpoint in instructing their students.

But the Act wears its prejudice on its sleeve.  As Governor Ron DeSantis announced in proposing the Stop W.O.K.E. Act, he intends the Act as a "tool[] to

fight back against woke indoctrination," in part by taking "a stand against the state-sanctioned racism that is critical race theory."[3]  He has repeatedly denounced the viewpoints banned in the Act, describing the idea of systemic racism as "a bunch of horse manure" and "a very harmful ideology,"[4] and lambasting critical race theory as "nonsense."[5]  And as Lieutenant Governor Jeanette Nuñez put it bluntly, the Act's very purpose is to "put an end to [the] wokeness that is permeating our schools and workforce."[6]

The term "woke" relates to a liberal ideological framework and has been defined as "promoting inclusive policies or ideologies that welcome or embrace

---

[3] *See* Press Release, *Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations.

[4] *See* Summer Meza, *Florida Gov. Ron DeSantis denies systemic racism exists. Critics say his state's new voting law is a clear example*, YAHOO! (Apr. 30, 2021), https://www.yahoo.com/video/florida-gov-ron-desantis-denies-172055949.html.

[5] *See* Press Release, *Governor DeSantis Emphasizes Importance of Keeping Critical Race Theory Out of Schools at State Board of Education Meeting* (June 10, 2021), https://www.flgov.com/2021/06/10/governor-desantis-emphasizes-importance-of-keeping-critical-race-theory-out-of-schools-at-state-board-of-education-meeting/.

[6] Press Release, *Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations.

ethnic, racial, or sexual minorities."[7]  Per such definition, The New Press's books are decidedly "woke" and are directly in the gunsights of Florida's concededly "anti-woke" statute.  New Press books advocate for a more inclusive and equitable world and unashamedly promote inclusive policies that embrace ethnic, racial, or sexual minorities.  These viewpoints—which The New Press has proudly espoused since its founding—are the precise ideas that Florida has sought to scrub from public discourse.

### A.  Viewpoints prohibited under the Act

The fundamental purpose and effect of the Act is to silence one side of the debate on matters of the highest public concern, including contemporary race relations, by dictating the opinions Florida educators may and may not express, in violation of "the 'bedrock First Amendment principle' that '[s]peech may not be banned on the ground that it expresses ideas that offend.'"  *Speech First, Inc.* v. *Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) (quoting *Matal* v. *Tam*, 582 U.S. 218, 223 (2017)).  While the Act's unconstitutionally vague wording obscures the exact conduct that it prohibits—and on this ground alone is constitutionally invalid,[8] *see Reno* v. *Am. Civil Liberties Union*, 521 U.S. 844, 871-72 (1997)—on

---

[7] *WOKE*, Dictionary.com, https://www.dictionary.com/browse/woke (last visited June 5, 2023).

[8] "A regulation that covers substantially more speech than the First Amendment allows is overbroad and thus invalid."  *Cartwright*, 32 F.4th at 1125.  Nor does the Act's purported savings clause—stating it does not "prohibit discussion of the

its face, the Act bars professors from endorsing eight viewpoints in their instruction of students, censoring a wide variety of valid and commonly-held progressive opinions. *Cartwright*, 32 F.4th at 1125-26 (explaining that "[v]iewpoint discrimination is even more anathematic to the First Amendment" than content-based regulations, which themselves are "presumptively unconstitutional"). Examples of the types of viewpoints precluded are as follows:

- Subsection (2) precludes the expression of viewpoints acknowledging the pervasiveness of unconscious bias;

- Subsection (4) precludes viewpoints opposed to racial colorblindness;

- Subsection (6) prohibits opinions endorsing affirmative action policies, as the State conceded before the District Court, *see Pernell* v. *Fla. Bd. of Govs. of State Univ. Sys.*, 2022 WL 16985720, at *4 (N.D. Fla. Nov. 17, 2022); and

- Subsection (8) proscribes, among other things, opinions acknowledging the realities of racial and gender disparities that undermine creating a truly merit-based social system.

---

concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts"—save its unconstitutional vagueness, given the lack of clear distinctions between what is discussion (in Fla. Stat. Ann. § 1000.05(4)(b)) versus endorsement (in Fla. Stat. Ann. § 1000.05(4)(a)). "The [Act's] imprecision exacerbates its chilling effect." *Cartwright*, 32 F.4th at 1121.

While the Act does not assert plainly that it targets only progressive viewpoints, a state may not mask viewpoint discrimination under the guise of neutrality. *See Cartwright*, 32 F.4th at 1126-28 (enjoining the University of Central Florida's "discriminatory-harassment" policy because it effectively targeted "particular views taken by students," and thus impermissibly chose "winners and losers in the marketplace of ideas" (citation omitted)).

**B.    The Act's Unconstitutionality under the First Amendment**

Professors on Florida public campuses justifiably fear the consequences of appearing to endorse any of these proscribed viewpoints in their course instruction. Such consequences include causing their college or university to become ineligible for performance funding, risking disciplinary measures, and facing termination for failure or refusal to comply with the statute's provisions.[9]  The Act, in essence, subjects professors to the Hobson's choice of either risking these consequences or self-censoring—thereby preventing them from freely teaching subjects such as structural racism, policing and criminal justice, critical race theory, and implicit bias.

---

[9] The Florida Board of Governors issued implementing regulation 10.005 on August 26, 2022 as the enforcement mechanism for Section 1000.05(4)(a). *See 10.005 Prohibition of Discrimination in University Training or Instruction*, Bd. of Governors, State Univ. Sys. of Fla. (Aug. 26, 2022).

This Court only last year reiterated that these forms of injuries must be redressed through court intervention "because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Cartwright*, 32 F.4th at 1120 (citation omitted). As this Court emphasized, "[w]here the alleged danger of legislation is one of self-censorship, harm can be realized even without an actual prosecution." *Id.* (citation omitted).

And the record here plainly establishes that the Act indeed stifles scholarship, instruction and public discourse on Florida campuses in support of race or gender consciousness.[10] For example, the Act would preclude Professor Plaintiff LeRoy Pernell from teaching the foundational premise of his criminal procedure course "that the legal system is not, and has never been, race-neutral" (Pernell Decl. ¶¶ 18, 23), arguably violating the Act's third and fourth prohibited viewpoints. *See* Fla. Stat. Ann. §§ 1000.05(4)(a)(3)-(4).

By way of further example, the Act would preclude Professor Plaintiff Dana Thompson Dorsey's teaching and research on the existence of embedded racism and white privilege, and critiques of colorblindness (*see* Dorsey Decl. ¶¶ 41, 43-44), as arguably endorsing the Act's third, fourth, and eighth proscribed viewpoints. Fla. Stat. Ann. §§ 1000.05(4)(a)(3)-(4), (8). The Act's burden on

---

[10] *See* Ex. 1 (Pernell Decl.) and Ex. 2 (Dorsey Decl.) to the Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj., Case No.: 4:22-cv-304, Dkt. No. 13 ("Plaintiffs' Mot.").

these Professor Plaintiffs-Appellees' free speech also curtails students' rights to receive information and ideas that would, absent the Act, feature in class instruction.

The State contends that the Act only regulates in-classroom instruction, which, according to the State, "is indisputably government speech [and] is wholly unprotected by the First Amendment." Brief of Defendants-Appellants at 24. Put another way, the State asserts "that the First Amendment does not grant individual professors the constitutional right to determine the public-university curriculum," *id.* at 17, given "the State's unquestioned authority to control the subjects taught in 'the established curriculum,'" *id.* at 32.

But the State has it wrong: the Act is not saved simply because it purports to regulate curriculum. Although this is an area in which state governments are generally afforded considerable discretion, *see Hazelwood Sch. Dist.* v. *Kuhlmeier*, 484 U.S. 260, 273 (1988), that discretion, even as to curriculum, does not give Florida a free hand to discriminate on the basis of viewpoint. For, as this Court has explicitly held, *Hazelwood* does *not* alter the test for reasonableness and non-discrimination in a school. *See Searcey* v. *Harris*, 888 F.2d 1314, 1318-19, 1319 n. 7 (11th Cir. 1989) (explaining that "there is no indication that the Court [in *Hazelwood*] intended to drastically rewrite First Amendment law to allow a school official to discriminate based on a speaker's view" in regulating curricular activity; even in the curriculum context, regulations of speech must be "reasonable in light

of the purposes served" and "viewpoint neutral" (citations omitted)). Thus, the requirement of the constitutional test that such restrictions must not only be "reasonable," but "viewpoint neutral" as well, remains in full force as to school curriculum. And such requirements apply, *a fortiori*, here in a case with curriculum at the college level. *See Cartwright*, 32 F. 4th at 1128 ("Nowhere is free speech more important than in our leading institutions of higher learning."). Having no answer to this Court's seminal decisions in *Searcey* and *Cartwright*, you will not find them cited in the State's brief.

The Act's regulation of Florida public curriculum could not be further from "viewpoint neutral"—it is expressly intended to silence progressive viewpoints as part of a crusade against "wokeness." This viewpoint-based restriction in the academic environment is contrary to the axiom that the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger* v. *Rectors and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Iancu* v. *Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring) ("Viewpoint discrimination is poison to a free society.").

As is clear, the Act is a textbook case of viewpoint discrimination. It eliminates a spectrum of protected expression that "espouses" "concepts" disfavored by the state (disparagingly characterized by Florida as "woke indoctrination"), thereby "regulat[ing] [] speech based on the specific motivating

ideology or the opinion or perspective of the speaker," rather than combatting "woke" ideas with countervailing views. *See Reed* v. *Town of Gilbert*, 576 U.S. 155, 168 (2015). As the district judge found, Florida has even admitted that it is engaging in rank viewpoint discrimination. *See Pernell*, 2022 WL 16985720, at *37. The Act is thus a flagrant abuse of the First Amendment rights of Florida educators to espouse (and Florida students to receive) ideas. It should accordingly be struck down.

## POINT II

### THE ACT UNCONSTITUTIONALLY CHILLS THE DISTRIBUTION OF BOOKS, INCLUDING THOSE OF THE NEW PRESS.

In addition to violating the free speech rights of professors and students on Florida public campuses, the Act has a palpable chilling effect on instructors' assignment, and therefore distribution, of books and readings that could be considered endorsements of proscribed viewpoints, including those published by The New Press. Plaintiff-Appellees themselves have identified certain readings that they would self-censor out of fear of violating the Act, including:

- Plaintiff Professor LeRoy Pernell's casebook on criminal procedure describing systemic racism in the criminal justice system, *see* Pernell Decl. ¶ 22;

- Plaintiff Professor Dana Thompson Dorsey's academic articles on critical race studies (including ones she has authored) discussing

white privilege and denouncing the concept of colorblindness, *see* Dorsey Decl. ¶ 43; and

- Plaintiff Professor Sharon Austin's articles endorsing critical race theory and affirmative action, *see* Austin Decl. ¶¶ 40-43.[11]

And like these course materials identified by the Plaintiff-Appellees, many of The New Press's publications fit squarely within the category of books proscribed, and whose distribution has consequently been impeded, by the Act.

This interference with The New Press's distribution of its books is constitutionally impermissible. One does not have to burn books physically to run afoul of the Constitution. Rather, the Supreme Court has long made clear that unjustifiable impediments to publishers' *distribution* of books cannot survive scrutiny under the First Amendment. *See generally Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 64 n.6 (1963) ("The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication[.]"); *see also LaCroix* v. *Town of Fort Myers Beach*, 38 F.4th 941, 949-50 (11th Cir. 2022) (collecting cases); *Lovell* v. *City of Griffin*, 303 U.S. 444, 451-52 (1938) (invalidating an ordinance that banned the distribution of literature within the municipality); *Jamison* v. *Texas*, 318 U.S. 413, 416 (1943) (invalidating an

---

[11] *See* Ex. 1 (Pernell Decl.), Ex. 2 (Dorsey Decl.), and Ex. 3 (Austin Decl.) to Plaintiffs' Mot.

ordinance prohibiting the dissemination of handbills on public streets); *Martin* v. *City of Struthers*, 319 U.S. 141, 145-49 (1943) (invalidating an ordinance that banned the door-to-door distribution of literature).

By stifling the expression of progressive viewpoints, and thereby discouraging Florida professors from assigning New Press books, the Act burdens The New Press's right to distribute those books. In so doing, the Act also burdens students' right to receive the ideas expressed in New Press publications—after all, the "right of freedom of speech and press . . . embraces the right to distribute literature . . . and necessarily protects the right to receive it," *Martin*, 319 U.S. at 143 (citation omitted), as the "dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them," *Lamont* v. *Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J. concurring).

The Act's chilling effect on The New Press's speech is not excused simply because that effect is indirect. *See Cartwright*, 32 F.4th at 1123 (explaining that "indirect pressure may suffice" to satisfy First Amendment standing; "[i]t is necessary . . . to look through forms to the substance and recognize that informal censorship may sufficiently inhibit—*i.e.*, chill—the circulation of publications to warrant injunctive relief" (internal quotations and citations omitted)). While the Act does not directly regulate The New Press's ability to sell books, it nevertheless impedes the distribution of New Press books by strong-arming Florida professors against assigning or recommending them. But state policies that unconstitutionally

interfere with the exercise of First Amendment rights can undoubtedly offend the Constitution, as "informal sanctions," such as "coercion, persuasion, and intimidation . . . can sufficiently inhibit expression as to violate the First Amendment[.]" *See id.* (citation omitted).

Many of The New Press's most celebrated and influential works fall squarely within the Act's ambit, burdening their distribution.  For example, civil rights litigator and legal scholar Michelle Alexander's *The New Jim Crow* was named one of the most influential books of the last 20 years by the Chronicle of Higher Education, with a thesis that "not only touched scholars but also transformed the public's understanding of structural racism in the American justice system."[12]  As Professor Alexander states, her book characterizes the rise of mass incarceration as a "stunningly comprehensive and well-designed system of racialized social control that functions in a manner strikingly similar to Jim Crow."[13]  And, as Alexander has convincingly shown, the politically charged "War on Drugs" has fueled the rise of the prison population—comprised disproportionately of young Black and Hispanic men—from 300,000 in the 1980s

---

[12] *The New Canon:  What's the Most Influential Book of the Past 20 Years?*, THE CHRON. OF HIGHER EDUC. (Oct. 30, 2018), https://www.chronicle.com/article/whats-the-most-influential-book-of-the-past-20-years/.

[13] Michelle Alexander, THE NEW JIM CROW:  MASS INCARCERATION IN THE AGE OF COLORBLINDNESS, 5 (10th Anniversary ed. 2020).

to more than two million today.[14]  As Alexander writes, "[w]e have not ended racial caste in America; we have simply redesigned it."[15]

These viewpoints, which permeate *The New Jim Crow*— a book that has been called the "secular bible of a new social movement"[16] and "[t]he most influential criminal justice book of this decade"[17] and that has been cited as the impetus for the founding of key criminal justice reform organizations, including the Art for Justice Fund[18]—are precisely the sorts of opinions that Florida has attempted to silence on public college campuses.  Any professor who assigns *The New Jim Crow* and thus in so doing appears to endorse its viewpoints, leaves himself or herself a target of State action.  *See* Fla. Stat. Ann. §§ 1000.05(4)(a)(3), (4), (6).  As in *Cartwright*, it is "clear that the average [professor] would be intimidated . . . by the" Act from assigning this reading. *Cartwright*, 32 F.4th at 1124.

---

[14] THE NEW JIM CROW, at 7.

[15] THE NEW JIM CROW, at x.

[16] *Foreword by Cornel West*, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS, https://newjimcrow.com/about/foreword-by-cornel-west.

[17] Bill Keller & Eli Hager, *Everything You Think You Know About Mass Incarceration Is Wrong*, THE MARSHALL PROJECT (Feb. 9, 2017), https://www.themarshallproject.org/2017/02/09/everything-you-think-you-know-about-mass-incarceration-is-wrong.

[18] *About the Fund*, ART FOR JUSTICE FUND, https://artforjusticefund.org/about/.

The New Press also publishes the seminal collection of essays, *Critical Race Theory*,[19] edited by Kimberlé Crenshaw (now Distinguished Professor of Law at the University of California, Los Angeles; Isidor and Seville Sulzbacher Professor of Law at Columbia Law School; winner of the Outstanding Scholar Award from the Fellows of the American Bar Foundation; and member of the American Academy of Arts and Sciences), along with Neil T. Gotanda, Gary Peller, and Kendall Thomas.  Writing about this book when it was first issued in 1996, Nobel Prize-winning author Toni Morrison set forth, "[a]s of the publication of *Critical Race Theory* it will be unwise, if not impossible, to do any serious work on race without referencing this splendid collection."[20]

Not only does this publication express viewpoints proscribed by the Act, but the very field of scholarship that this work artfully synthesizes is the statute's principal target.  Governor DeSantis rendered this unquestionable in describing the Act as "a stand against the state-sanctioned racism that is critical race theory."[21]

---

[19] *Critical Race Theory:  The Key Writings That Formed the Movement*, THE NEW PRESS, https://thenewpress.com/books/critical-race-theory.  Critical Race Theory "argues that historical patterns of racism are ingrained in law and other modern institutions," making racism "a systemic problem."  *See* Jacey Fortin, *Critical Race Theory:  A Brief History*, N.Y. TIMES (Nov. 8, 2021), https://www.nytimes.com/article/what-is-critical-race-theory.html.

[20] *See Critical Race Theory:  The Key Writings That Formed the Movement*, THE NEW PRESS, https://thenewpress.com/books/critical-race-theory.

[21] *See* Press Release, *Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations*

*See* pp. 7-8, *supra*.  Professor Crenshaw is also responsible for coining the term "intersectionality"[22]—a key social-justice concept that Florida's Governor has likewise cited as being on the "wrong side of the line for Florida standards."[23]  Her book on this topic is forthcoming from The New Press.[24]

By chilling the distribution of The New Press's books (and others expressing similar viewpoints), the Act infringes upon The New Press's clear constitutional right to distribute books without unlawful restraint and hinders its efforts to facilitate social change, enrich public discourse, and defend democratic values through its publications.

---

(Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations.

[22] *See* Jane Coaston*, The Intersectionality Wars*, Vox (May 28, 2019), https://www.vox.com/the-highlight/2019/5/20/18542843/intersectionality-conservatism-law-race-gender-discrimination.

[23] *See* A.G. Gancarski, *Ron DeSantis cites 'queer theory' and 'intersectionality' in defense of African American studies course ban*, Florida Politics (Dec. 15, 2021), https://floridapolitics.com/archives/583030-gov-desantis-condemns-queer-theory-and-intersectionality-to-defend-african-american-studies-course-ban/.

[24] Many other New Press books plainly implicate the Act's proscriptions, including:  *Chokehold:  Policing Black Men*, by Paul Butler (2017); *No More Police:  A Case for Abolition*, by Mariame Kaba and Andrea J. Ritchie (2022); *Pushout:  The Criminalization of Black Girls In Schools*, by Monique W. Morris (2018); *Race to Incarcerate*, by Marc Mauer (2006); *Unreasonable:  Black Lives, Police Power, and the Fourth Amendment*, by Devon W. Carbado (2022); and the American Book Award-winning bestseller, *Lies My Teacher Told Me:  Everything Your American History Textbook Got Wrong*, by James W. Loewen (1995).

# POINT III

## THE ACT STIFLES ACADEMIC FREEDOM IN HIGHER EDUCATION.

Academic freedom is a constitutionally recognized interest under the First Amendment, as has been repeatedly acknowledged by the courts. "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

And this Court's precedents recognize "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *See Bishop* v. *Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991).

The Act tramples on this important interest by stifling debate on matters of the highest public concern and by discouraging professors from assigning or recommending books—including those of The New Press—that offer important perspectives on these matters that the State would prefer to silence. As such, the Act not only violates principles of free speech, but is contrary to the values of a

society that prizes robust public discourse, in which ideas are assessed on their merits, rather than by how closely they align with state-sanctioned orthodoxy.

## POINT IV

### THE ACT IS PART OF A NATIONWIDE "BURN THE BOOKS" CAMPAIGN THAT THE STATE OF FLORIDA IS SPEARHEADING.

Florida's Stop W.O.K.E. Act is but one state legislative measure in the nationwide campaign against books and ideas that do not conform to anti-woke orthodoxy. As reported by the American Library Association in March 2023, attempts to ban books in libraries nearly doubled in 2022, and a record 2,571 unique titles were targeted for censorship, with a majority of targeted books written by, or focusing on, LGBT individuals and people of color.[25] A study by the PEN American Center (a literary and advocacy group) similarly found record-breaking book bans in the second half of 2022, with expanded censorship of themes centered on race, history, sexual orientation, and gender, most prevalently in the states of Florida and Texas.[26] An earlier PEN America study tracked the increasing numbers in 2021, concluding that between July 1, 2021 and March 31,

---

[25] Raymond Garcia, *American Library Association Reports Record Number of Demands to Censor Library Books and Materials in 2022*, ALA NEWS (Mar. 22, 2023), https://www.ala.org/news/press-releases/2023/03/record-book-bans-2022.

[26] Kasey Meehan et al., *Banned in the USA: State Laws Supercharge Book Suppression in Schools*, PEN AM. (Apr. 20, 2023), https://pen.org/report/banned-in-the-usa-state-laws-supercharge-book-suppression-in-schools/.

2022, 1,145 books were banned across 86 school districts in 26 states.[27]  In Florida

specifically, the censorship of books has reached stratospheric levels—Governor

DeSantis signed a law effective July 2022 that requires library media resources,

including books, to be pre-approved or vetted by media specialists[28]—making

Florida the emerging epicenter of the national book-banning movement.

Although The New Press has vowed to "promote and protect the work of

[its] authors,"[29] its efforts are dwarfed by the growing government bowdlerization

of classrooms.  The Act is part of a growing trend in favor of educational gag

orders, or state legislative efforts to restrict teaching in K-12 and higher education

on topics such as race, gender, American history, and LGBTQ+ identities, with—

as of August 2022—a 250% increase in proposed gag orders, as compared to

---

[27] *See* Jonathan Friedman & Nadine Farid Johnson, *Banned in the USA:  Rising School Book Bans Threaten Free Expression and Students' First Amendment Rights*, PEN AM. (April 2022), https://pen.org/banned-in-the-usa/.

[28] 2022 F.L. H.B. 1467, https://www.flsenate.gov/Session/Bill/2022/1467; *see also* Patricia Mazzei et al., *Florida at Center of Debate as School Book Bans Surge Nationally*, N.Y. TIMES (Apr. 22, 2023), https://www.nytimes.com/2023/04/22/books/book-ban-florida.html.

[29] Andrew Albanese, *As Book Bans and Legislative Attacks Escalate, the New Press Pushes Back*, PUBLISHERS WEEKLY (Feb. 17, 2023), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/91566-as-book-bans-and-legislative-attacks-escalate-the-new-press-pushes-back.html.

2021.[30]  To date, although Florida "has the most sweeping set of restrictions," the

State's work has inspired dozens of other programs.[31]

On a national level, state legislative efforts have explicitly targeted critical

race theory, a term first coined by a group of scholars led by Derrick Bell and New

Press author Kimberlé Crenshaw.  As noted above, pp. 7-8, 20 *supra*, Governor

DeSantis—among other pejoratives—deems the theory "nonsense."  And the

U.C.L.A. School of Law Critical Race Studies Program has documented, since

September 2020, a total of 214 local, state, and federal government entities across

the United States have introduced 699 anti-critical race theory bills, resolutions,

executive orders, opinion letters, statements, and other measures, as of the filing of

this brief.[32]  A report published by the U.C.L.A. School of Law's CRS Program in

April 2023 found that, as of December 2022, government actors in 49 states had

put forth attempts to ban critical race theory, with lawmakers in 28 states adopting

at least one anti-"CRT" measure.[33]

---

[30] Jeremy C. Young et al., *America's Censored Classrooms*, PEN AM. (Aug. 17, 2022), https://pen.org/report/Americas-censored-classrooms/.

[31] *See* Bianca Quilantan, *Ron DeSantis' Ban of School Diversity Programs is Coming to These States Next*, POLITICO (May 17, 2023), https://www.politico.com/news/2023/05/17/diversity-initiatives-states-are-next-00097268.

[32] *CRT Forward*, U.C.L.A. SCH. OF L. CRITICAL RACE STUDIES PROGRAM (last accessed June 20, 2023), https://crtforward.law.ucla.edu/.

[33] *CRT Forward:  Tracking the Attack on Critical Race Theory*, U.C.L.A. SCH. OF L. CRITICAL RACE STUDIES PROGRAM, 5, 16 (Apr. 2023),

Furthermore, the Act is just one front in the State's broadside assault on progressive viewpoints and ideals. Just last month, the State announced the rejection of dozens of social studies textbooks with content on topics, such as the Black Lives Matter movement and protestations of police brutality and racism.[34] The year prior, the State rejected nearly a third of all proposed math textbooks that referenced critical race theory or "social and emotional learning"[35] and touted its rejection of "publishers' attempts to indoctrinate students."[36]

In another example, during the College Board's development of its first Advanced Placement course in African American studies for national acceptance, the Florida Department of Education, by its own admission, repeatedly contacted the College Board in 2022 and early 2023, to urge the Board to remove certain subject matter modules—which included works by New Press authors—from the

---

https://crtforward.law.ucla.edu/wp-content/uploads/2023/04/UCLA-Law_CRT-Report_Final.pdf.

[34] Sarah Mervosh et al., *Florida Rejects Dozens of Social Studies Textbooks, and Forces Changes in Others*, N.Y. TIMES (May 9, 2023), https://www.nytimes.com/2023/05/09/us/desantis-florida-social-studies-textbooks.html.

[35] Dana Goldstein, *Florida Rejects Math Textbooks, Citing 'Prohibited Topics'*, N.Y. TIMES (Apr. 18, 2022), https://www.nytimes.com/2022/04/18/us/florida-math-textbooks-critical-race-theory.html.

[36] Press Release, *Florida Rejects Publishers' Attempts to Indoctrinate Students*, FLA. DEPT. OF EDUC. (Apr. 15, 2022), https://www.fldoe.org/newsroom/latest-news/florida-rejects-publishers-attempts-to-indoctrinate-students.stml.

course's scope.[37]  Ultimately, Florida's education department sent a January 12, 2023, letter informing the College Board that the course even as then revised—plainly as a consequence of Florida's importuning—would not be approved in Florida schools in part by reason of references to critical race theory and other progressive ideas.[38]  The College Board's proposed final version, released in February 2023, then eliminated all references to New Press books from the study program with national effect.[39]  The College Board has since announced that it

---

[37] *See, e.g.*, *@SenMannyDiazJr*, TWITTER (Jan 20, 2023, 5:35 PM), https://rb.gy/hs2yv (stating "Florida rejected an AP course filled with Critical Race Theory and other obvious violations of Florida law."); *see also* Dana Goldstein, Stephanie Saul, and Anemona Hartocollis, *Florida Officials Had Repeated Contact With College Board Over African American Studies*, N.Y. TIMES (Feb. 9, 2023), https://www.nytimes.com/2023/02/09/us/florida-college-board-african-american-studies.html.

[38] *See* Anemona Hartocollis & Eliza Fawcett, *The College Board Strips Down Its A.P. Curriculum for African American Studies*, N.Y. TIMES (Feb. 9, 2023), https://www.nytimes.com/2023/02/01/us/college-board-advanced-placement-african-american-studies.html.

[39] *AP African American Studies*: *Official Course Framework, Project, and Exam Overview, Effective 2023-2024*, COLL. BD., https://apcentral.collegeboard.org/media/pdf/ap-african-american-studies-course-framework.pdf (last visited June 12, 2023).

would again revise the course curriculum,[40] and has acknowledged "mistakes" in

its previous handling of the African American studies program.[41]

It is respectfully submitted that it is essential for this Court to act forcefully

to affirm the District Court's issuance of a preliminary injunction to stem the tide

of these flagrant attacks on First Amendment rights in the education context—in

Florida, specifically, and then, by way of precedent, across the nation.  The harm

from these attacks is readily apparent:  As reported by "The 74," a nonprofit news

organization covering America's educational system, a quarter of all classroom

teachers have altered their lesson plans in some way to avoid topics that parents or

governmental officials may deem controversial.[42]  Absent affirmance of the

injunctive relief granted by the District Court, the chilling effects from the Act's

proscriptions will only spread, indefinitely stifling the public discourse on race

---

[40] *AP African American Studies Scholars to Make Changes to Course*, COLL. BD. (Apr. 24, 2023), https://newsroom.collegeboard.org/ap-african-american-studies-scholars-make-changes-course.

[41] *Our commitment to AP African American Studies, the scholars, and the field*, COLL. BD. (Feb. 11, 2023), https://newsroom.collegeboard.org/our-commitment-ap-african-american-studies-scholars-and-field.  *See also* Jeffrey S. Solochek, *Florida Asks College Board to Modify AP Psych Curriculum.  The Answer: Absolutely Not*, MIAMI HERALD (June 15, 2023), https://www.miamiherald.com/news/local/education/article276457656.html.

[42] Asher Lehrer-Small, *National Study Reveals 1 in 4 Teachers Altering Lesson Plans Due to Anti-Critical Race Theory Laws*, THE 74 (Jan. 25, 2023), https://www.the74million.org/article/national-study-reveals-1-in-4-teachers-altering-lesson-plans-due-to-anti-critical-race-theory-laws/.

relations and other important issues in our nation at the time when open debate of these issues is critical.

## SUMMARY

Since its founding, The New Press has committed to publishing books that contribute to the country's intellectual bottom line, including those advancing viewpoints that chafe against the prevailing orthodoxy of the times. Promoting these viewpoints enriches the national conversation and is critical to the health of our democracy. Through the Stop W.O.K.E. Act, Florida has attempted to silence precisely such viewpoints. Though the Florida Governor's website states that "[t]here is no place for indoctrination or discrimination in Florida,"[43] the Stop W.O.K.E. Act most decidedly discriminates against viewpoints not embraced by the state and imposes the state's own viewpoints in a form of indoctrination forbidden by our Constitution. This Court should intervene to clearly establish the legislation's flagrant unconstitutionality.

## CONCLUSION

For the reasons set forth above, The New Press respectfully submits that the District Court's order directing a preliminary injunction be affirmed.

---

[43] Press Release, *Governor Ron DeSantis Signs Legislation to Protect Floridians from Discrimination and Woke Indoctrination* (Apr. 22, 2022), https://www.flgov.com/2022/04/22/governor-ron-desantis-signs-legislation-to-protect-floridians-from-discrimination-and-woke-indoctrination/.

Respectfully submitted,

/s/ Herbert M. Wachtell
Herbert M. Wachtell
Sunny S. Jeon
Ioannis D. Drivas
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Phone Number: (212) 403-1000
Fax Number: (212) 403-2000
hmwachtell@wlrk.com

*Counsel for Amicus Curiae*
*The New Press*

**<u>CERTIFICATE OF SERVICE</u>**

I caused the foregoing to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit on June 22, 2023, by using the appellate CM/ECF system, and service was accomplished on all counsel of record by the appellate CM/ECF system.

<u>/s/ Herbert M. Wachtell</u>
Herbert M. Wachtell

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with Federal Rules of Appellate Procedure 29(a)(5), 32(a)(7)(B)(i), and 11 Cir. R. 32-4 because it contains 6,365 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type style requirements of Federal Rules of Appellate Procedure 32(a)(6) and 11 Cir. R. 32-3 because it has been prepared in a proportionally spaced typeface using Microsoft Word (14-point Times New Roman) and is double-spaced.

/s/ Herbert M. Wachtell
Herbert M. Wachtell