Nos. 22-13992 & 22-13994

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

LEROY PERNELL, ET AL.,
*Plaintiffs-Appellees*,
v.
BRIAN LAMB, ET AL.,
*Defendants-Appellants*.

_____

ADRIANA NOVOA, ET AL.,
*Plaintiffs-Appellees*,
v.
MANNY DIAZ, JR., ET AL.,
*Defendants-Appellants*.

_____

On appeal from the United States District Court
for the Northern District of Florida
Nos. 4:22-CV-304-MW-MAF & 4:22-CV-324-MW-MAF

_____

### BRIEF OF *AMICUS CURIAE*
### AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS
### IN SUPPORT OF PLAINTIFFS-APPELLEES

_____

*Counsel of Record:*
Richard Siwica
EGAN, LEV & SIWICA, P.A.
231 East Colonial Drive
Orlando, Florida 32801
Telephone: (407) 422-1400
Facsimile: (407) 422-3658

*Counsel list continued on the following page.*

*Counsel for Amicus Curiae*:

RISA L. LIEBERWITZ
  *General Counsel*
AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS
  *Professor of Labor and Employment Law*
SCHOOL OF INDUSTRIAL & LABOR RELATIONS
CORNELL UNIVERSITY
361 Ives Hall
Ithaca, New York 14853
Telephone: (607) 255-3289

AARON NISENSON
  *Senior Counsel*
EDWARD D. SWIDRISKI III
  *Assistant Counsel*
AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS
555 New Jersey Avenue NW, Suite 600
Washington, D.C. 20001
Telephone: (202) 737-5900
Email: legal.dept@aaup.org

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3, *amicus curiae* American Association of University Professors certifies that it believes the Certificates of Interested Persons contained in the first brief filed in this matter by Defendants-Appellants and in the briefs subsequently filed by Plaintiffs-Appellees and *amicus curiae* Academic Freedom Alliance are a complete list of all persons and entities (trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations) known to have an interest in the outcome of this appeal, subject to the following additions:

1.    American Association of University Professors, *Amicus Curiae*

2.    Lieberwitz, Risa L., *Counsel for Amicus Curiae AAUP*

3.    Nisenson, Aaron, *Counsel for Amicus Curiae AAUP*

4.    Siwica, Richard, *Counsel of Record for Amicus Curiae AAUP*

5.    Swidriski, Edward D., *Counsel for Amicus Curiae AAUP*

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, *amicus curiae* American Association of University Professors states that it is a not-for-profit organization, that is has no parent companies, and that it has not issued shares of stock.

*Pernell et al. v. Lamb et al.*; *Novoa et al. v. Diaz et al.*
Nos. 22-13992 & 22-13994

Dated:  June 23, 2023

Respectfully submitted,

/s/ <u>Richard Siwica</u>

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................................... C-1

TABLE OF AUTHORITIES AND CITATIONS ..................................................... iii

RULE 29(A)(4)(D) STATEMENT OF *AMICUS CURIAE* ....................................... 1

RULE 29(A)(4)(E) STATEMENT OF *AMICUS CURIAE* ....................................... 2

STATEMENT OF THE ISSUE...……………………………………………………...3

SUMMARY OF THE ARGUMENT ......................................................................... 3

ARGUMENT ............................................................................................................. 5

I. The IFA violates the First Amendment and if allowed to go into effect will destroy academic freedom, sabotage higher education, and undermine democracy ......................................................................................................... 5

A. Allowing politicians to ban the expression of viewpoints they dislike from the university classroom is antithetical to academic freedom, the First Amendment, and the very concept of higher education ............................... 5

1. Academic freedom, which includes the freedom to teach, is a special concern of the First Amendment, and state censorship of instruction is incompatible with the purpose of a university ........................................... 5

i

**TABLE OF CONTENTS**

**(continued)**

2. Academic freedom protects classroom instruction regardless of the ideological or political viewpoint of the ideas involved ...........................11

3. The IFA's censorship of viewpoints that the government disfavors violates academic freedom and the First Amendment. ............................12

B. Allowing Florida's current political elites to ban ideas they disfavor will undermine democracy .................................................................................17

II. Defendants-Appellants' claim that the IFA is exempt from the First Amendment because classroom speech is "the government's speech" is meritless ........................................................................................................19

A. *Garcetti* does not bar public university classroom instruction from the protection of the First Amendment .............................................................19

B. The "government speech doctrine" does not shield the IFA ......................23

CONCLUSION .....................................................................................................26

CERTIFICATE OF COMPLIANCE ......................................................................29

CERTIFICATE OF SERVICE ..............................................................................30

# TABLE OF AUTHORITIES AND CITATIONS

**Page**

**Cases**

*Adamian v. Jacobsen*, 523 F.2d 929 (9th Cir. 1975) .............................................2, 6

*Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011).......21

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) .................................................... 1, 2, 6

*Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991)...................................................23

*Blum v. Schlegel*, 18 F.3d 1005 (2d Cir. 1994)………………………………...12

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) ...................................12

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) ..........................................................17

*Browzin v. Catholic Univ. of Am.*, 527 F.2d 843 (D.C. Cir. 1975)...........................6

*Columbia Univ.*, 364 NLRB 1080 (2016)..................................................................2

*Connick v. Myers*, 461 U.S. 138 (1983)..................................................................22

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)................................................ 21, 22

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .................................................. 4, 19, 20

*Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543 (11th Cir. 1997) ....................13

*Grutter v. Bollinger*, 539 U.S. 306 (2003)..............................................................17

*Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671 (6th Cir. 2001) ...............................22

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004)..............12

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967).......................................... passim

# TABLE OF AUTHORITIES AND CITATIONS

## (continued)

**Page**

*Mayberry v. Dees*, 663 F.2d 502 (4th Cir. 1981)......................................................6

*McAdams v. Marquette Univ.*, 914 N.W.2d 708 (Wis. 2018) ........................ 2, 6, 11

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ..................... 11, 12, 20, 21, 22

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) .................................................15

*Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667 (1973)……………..…12

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).....................................................22

*Pleasant Grove City v. Summum*, 555 U.S. 460  (2009) .........................................24

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995)...........13

*Shurtleff v. City of Bos.*, 142 S. Ct. 1583 (2022) ....................................................25

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110  (11th Cir. 2022) ............. 11, 12, 13

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ........................................... 7, 8, 14

*Tilton v. Richardson*, 403 U.S. 672 (1971)............................................................2, 6

*Wieman v. Updegraff*, 344 U.S. 183 (1952) ................................................ 14, 17, 18

*Williams v. Rhodes*, 393 U.S. 23 (1968)................................................................17

**Other Authorities**

*1915 Declaration of Principles on Academic Freedom and Academic Tenure*,

 AAUP POLICY DOCUMENTS AND REPORTS (11th ed. 2015) ......................... passim

**TABLE OF AUTHORITIES AND CITATIONS**

**(continued)**

**Page**

*1940 Statement of Principles on Academic Freedom and Tenure*, AAUP POLICY DOCUMENTS AND REPORTS (11th ed. 2015) .................................................. 1, 6, 9

AAUP, *Endorsers of the 1940 Statement*, https://www.aaup.org/endorsers-1940-statement .............................................................................................................6

*Freedom in the Classroom*, ACADEME, September–October 2007, *available at* https://www.aaup.org/report/freedom-classroom .................................. 6, 7, 13, 15

HELEN NORTON, THE GOVERNMENT'S SPEECH AND THE CONSTITUTION (2019) .....25

William A. Kaplin & Barbara A. Lee, THE LAW OF HIGHER EDUCATION (5th ed. 2013) .....................................................................................................................10

## RULE 29(A)(4)(D) STATEMENT OF *AMICUS CURIAE*

The American Association of University Professors (AAUP) is a non-profit organization that represents more than 43,000 faculty, librarians, graduate students, and academic professionals employed at institutions of higher education across the United States. Founded in 1915, the AAUP is committed to advancing academic freedom and shared governance, defining fundamental professional values and standards for higher education, promoting the economic security of faculty and other academic workers, and ensuring higher education's contribution to the common good. In furtherance of these ends, the AAUP has published numerous statements of principle and policy, including the *1915 Declaration of Principles on Academic Freedom and Academic Tenure*, AAUP POLICY DOCUMENTS AND REPORTS 3–12 (11th ed. 2015), and the *1940 Statement of Principles on Academic Freedom and Tenure*, *id.* at 13–19. These statements are widely respected and followed by American colleges and universities.

The AAUP frequently submits *amicus curiae* briefs in cases that implicate AAUP policies or that otherwise involve legal issues important to faculty members and the broader higher education community. The Supreme Court of the United States, federal courts of appeals, state courts, and government agencies have relied upon these amicus briefs, which expand upon AAUP statements and policies and explain prevailing practices in the profession. *E.g.*, *Bd. of Regents v. Roth*, 408 U.S.

564, 579 n.17 (1972); *Tilton v. Richardson*, 403 U.S. 672, 681–82 (1971); *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975); *McAdams v. Marquette University*, 914 N.W.2d 708, 730, 733 (Wis. 2018); *Columbia University*, 364 NLRB 1080, 1089 n.82, 1095 n.104 (2016).

The AAUP seeks to participate as *amicus curiae* in the present matter in order to demonstrate to this Court that the Florida statute and regulations preliminarily enjoined by the district court violate the First Amendment and fundamental principles of academic freedom set forth in AAUP statements and policy documents. The AAUP also seeks to make clear that the principle of academic freedom opposes the censorship of ideas regardless of their political or ideological viewpoint, and that while the Florida law at issue in this case seeks to suppress so-called "woke" concepts, its assault on academic freedom ultimately imperils free thought and expression of every sort, whether conservative or liberal, moderate or radical.

The AAUP files this brief with the consent of all parties, pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure.

## RULE 29(A)(4)(E) STATEMENT OF *AMICUS CURIAE*

No party's counsel authored this brief in whole or in part. No party, nor any party's counsel, contributed money that was intended to fund the preparation or submission of this brief. No person—other than the *amicus curiae*, its members, or its counsel—contributed money that was intended to fund the preparation or

submission of this brief. In the interest of full disclosure, the AAUP states that it may seek grant funding from the AAUP Foundation, a Delaware non-profit corporation, for costs associated with preparing and filing this brief.

## STATEMENT OF THE ISSUE

Did the district court abuse its discretion when it granted a preliminary injunction prohibiting Defendants-Appellants from enforcing those provisions of Florida's so-called "Individual Freedom Act" ("IFA") that violate the First Amendment by banning faculty at public colleges and universities from engaging in instruction that expresses certain viewpoints that Florida's politicians disfavor?

## SUMMARY OF THE ARGUMENT

The IFA is an egregiously unconstitutional attempt by politicians to "cast a leaden pall of orthodoxy over Florida's state universities." App. 397. Better known as the "Stop W.O.K.E. Act"—an openly cynical moniker adopted by the law's own architects that makes explicit their goal of imposing a regime of ideological censorship—the statute prohibits faculty at the state's public colleges and universities from engaging in instruction that expresses particular viewpoints relating to racial and sexual discrimination and injustice. The district court correctly determined that the IFA is antithetical to academic freedom and rightly granted a preliminary injunction barring enforcement of those provisions of the statute that violate the First Amendment by "prophylactically muzzl[ing] professors from

3

expressing certain viewpoints about topics that the State of Florida has deemed fair game for classroom discussion." App. 398.

I. The ability of college and university faculty to teach their subjects free from political or ideological censorship by the government is an essential aspect of academic freedom, a value the Supreme Court has recognized as "a special concern of the First Amendment." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). Academic freedom is a non-partisan value that protects classroom instruction regardless of the ideological viewpoint of the ideas being discussed. By selectively banning the expression of certain viewpoints that state authorities disfavor, the IFA violates academic freedom, undermines the process of higher education, and subverts democracy.

II. Defendants-Appellants' central argument in this appeal—that the IFA does not have to comply with the First Amendment because speech that occurs in a public university classroom is the "government's speech"—is meritless. In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court expressed reluctance to extend "customary employee-speech jurisprudence" to "academic scholarship or classroom instruction" due to the ramifications that would have for academic freedom "as a constitutional value," *id.* at 425. This Court should join every other federal court of appeals that has squarely faced the issue and hold that *Garcetti*'s rule excluding government employee speech "made pursuant to the employee's official duties"

4

from First Amendment protection does not apply to "scholarship or teaching" at public universities. The rationale of *Garcetti* and other "government speech" cases rests on the policy view that government control over public employee speech is necessary if a government program is to function. But that reasoning does not extend to institutions of higher education, which can only function if the government does *not* have the power to dictate which viewpoints faculty may discuss in the classroom. In addition, consideration of the factors used in determining whether speech that occurs within a government program constitutes the government's own speech or private expression demonstrates that public university classroom instruction is not government speech.

The district court correctly concluded that Plaintiffs are likely to succeed on the merits of their First Amendment claims. Amicus AAUP urges this Court to affirm the preliminary injunction granted by the district court.

## ARGUMENT

**I.** **The IFA violates the First Amendment and if allowed to go into effect will destroy academic freedom, sabotage higher education, and undermine democracy.**

**A.** **Allowing politicians to ban the expression of viewpoints they dislike from the university classroom is antithetical to academic freedom, the First Amendment, and the very concept of higher education.**

**1.** **Academic freedom, which includes the freedom to teach, is a special concern of the First Amendment, and state censorship of instruction is incompatible with the purpose of a university.**

An essential aspect of academic freedom is the freedom of college and university faculty to teach a given subject without the government invading the classroom to suppress the expression of certain viewpoints. The AAUP has long maintained that "teachers are entitled to freedom in the classroom in discussing their subject" and that this freedom "is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning." *1940 Statement of Principles on Academic Freedom and Tenure*, AAUP POLICY DOCUMENTS AND REPORTS at 14 (hereinafter, "*1940 Statement*").[1] At its core, the freedom to teach means that, just as "scholars must be free to examine and test, they must also be free to explain and defend their results, and they must be free to do so as much before their students as before their colleagues or the public at large." *Freedom in the*

---

[1] The *1940 Statement* was jointly formulated by the AAUP and the Association of American Colleges and Universities and has been endorsed by more than 250 scholarly and educational organizations. AAUP, *Endorsers of the 1940 Statement*, https://www.aaup.org/endorsers-1940-statement. Courts have routinely looked to the *1940 Statement* for guidance in understanding and applying the principle of academic freedom. *E.g.*, *Roth*, 408 U.S. at 579 n.17; *Tilton*, 403 U.S. at 681–82; *Adamian*, 523 F.2d at 934–35; *Mayberry v. Dees*, 663 F.2d 502, 513 (4th Cir. 1981) (noting that the AAUP was a framer of "the 1940 Statement of Principles on Academic Freedom and Tenure, the fundamental document on the subject"); *Browzin v. Catholic Univ. of Am.*, 527 F.2d 843, 848 & n.8 (D.C. Cir. 1975) ("[The *1940 Statement*] represents widely shared norms within the academic community, having achieved acceptance by organizations which represent teachers as well as organizations which represent college administrators and governing boards."); *McAdams*, 914 N.W.2d at 730, 733.

*Classroom*, ACADEME, September–October 2007, 54–61, *available at* https://www.aaup.org/report/freedom-classroom.

The Supreme Court has long recognized that academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). The Court has also warned that "impos[ing] any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation," and that "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

The Supreme Court's landmark decisions in *Sweezy* and *Keyishian* underscore the constitutional necessity of safeguarding academic freedom by protecting the university classroom from government interference. At issue in *Sweezy* was the constitutionality of a state government's investigation of a scholar who had delivered a lecture to a class of students at a state university. 354 U.S. at 235, 243–44. The Court held that the state's efforts to compel the scholar to answer questions about the lecture—including its subject and whether he had "advocated Marxism" or expressed the opinion that "Socialism was inevitable" in the United States—violated his rights under the Due Process Clause of the Fourteenth Amendment. *Id.* at 243–

44, 254–55. In doing so, the Court recognized that the scholar's "right to lecture" was "safeguarded by the Bill of Rights and the Fourteenth Amendment," adding that the state's investigation "unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression." *Id.* at 243–44, 250. The Court also explained that the protection of academic freedom was a matter of national life and death and warned of the dangers of infringing upon "such highly sensitive areas as freedom of speech . . . and freedom of communication of ideas, particularly in the academic community." *Id.* at 245. In a celebrated concurring opinion, Justice Frankfurter similarly stressed "the dependence of a free society on free universities," concluding that "[t]his means the exclusion of governmental intervention in the intellectual life of a university." *Id.* at 262.

In *Keyishian*, the Supreme Court again championed academic freedom in colleges and universities as a value of constitutional importance. There, the Court sustained a challenge, brought by faculty members employed at a state university, to New York state's teacher loyalty laws—a set of statutes and administrative regulations aimed at preventing the employment of "subversive" persons. 385 U.S. at 591–92. Among the parts of the law being challenged was a provision requiring the removal of employees for "treasonable or seditious" utterances or acts, and a provision barring the employment of any person who "willfully and deliberately advocates, advises or teaches the doctrine of forceful overthrow of government." *Id.*

at 597–98 (internal quotation marks omitted). In striking down these provisions due to their unconstitutional vagueness, the Court emphasized their incursion upon academic freedom, "a special concern of the First Amendment." *Id.* at 603. The Court pointed in particular to the law's unconstitutional abridgement of academic freedom in classroom instruction, asking whether "the teacher who informs his class about the precepts of Marxism or the Declaration of Independence" would be in violation of the statute. *Id.* at 600. The Court also stressed that its decision was rooted in the constitutional necessity of preserving the freedom of teachers to teach and of students to learn, stating that the Constitution "does not tolerate laws that cast a pall of orthodoxy over *the classroom*" and stressing that "[*t*]*he classroom* is peculiarly the 'marketplace of ideas.'" *Id.* at 603 (emphasis added).

The Supreme Court's repeated recognition that state censorship of instruction at public colleges and universities is antithetical to higher education echoes longstanding AAUP statements affirming that "[i]nstitutions of higher education are conducted for the common good" and that the achievement of this purpose "depends upon the free search for truth and its free exposition." *1940 Statement* at 14. As the AAUP's *1915 Declaration of Principles on Academic Freedom and Academic Tenure*, AAUP POLICY DOCUMENTS AND REPORTS 3–12 (hereinafter, "*1915*

9

*Declaration*"), issued at the Association's founding,[2] explains, academic freedom is essential to the university's three essential functions: promoting inquiry and advancing the sum of human knowledge; providing instruction to students; and developing experts for public service. *Id.* at 7. In the absence of academic freedom, a university cannot fulfill these core functions: research stagnates, education becomes indoctrination, and the training of disinterested experts becomes impossible. The result is that the university becomes a "proprietary institution," whose "purpose is not to advance knowledge by the unrestricted research and unfettered discussion of impartial investigators," but rather to promote the "particular opinion[s]" of those who control it. *1915 Declaration* at 5. Adherence to academic freedom is critical for all universities, which, as a public trust, "have no moral right to bind the reason or the conscience of any professor," any "claim to such right [having been] waived by the appeal to the general public for contributions and for moral support in the maintenance, not of a propaganda, but of a non-partisan institution of learning." *Id.* at 5.

---

[2] The *1915 Declaration* was the first authoritative statement concerning academic freedom in the United States. William A. Kaplin & Barbara A. Lee, THE LAW OF HIGHER EDUCATION 706–07 (5th ed. 2013).

## 2. Academic freedom protects classroom instruction regardless of the ideological or political viewpoint of the ideas involved.

Academic freedom is a non-partisan value. As the *1915 Declaration* states, the "menace to academic freedom" lies in "the repression of opinions" regardless of whether they are deemed to be "ultra-conservative" or "ultra-radical." *1915 Declaration* at 8. The ideological neutrality of academic freedom as a professional value is equally true of academic freedom as a constitutional value. *Sweezy* and *Keyishian* both involved state interference with "radical" ideas. In *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), however, the Sixth Circuit relied upon academic freedom in upholding the First Amendment claim of a public university professor who faced discipline for refusing to comply with a university policy requiring faculty to refer to students by their preferred pronouns. *Id.* at 507 (stating that "public universities do not have a license to act as classroom thought police" and "cannot force professors to avoid controversial viewpoints altogether in deference to a state-mandated orthodoxy"); *see also McAdams*, 914 N.W.2d at 712 (concluding that a university violated academic freedom by suspending a tenured faculty member for comments made on a personal blog that criticized an instructor for refusing to allow a student to debate gay rights).

Undergirded by the principle of academic freedom, the First Amendment protects speech in the university setting even if it involves the discussion of controversial or divisive ideas. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126

(11th Cir. 2022) ("The Supreme Court has reiterated time and again—and increasingly of late—the 'bedrock First Amendment principle' that '[s]peech may not be banned on the ground that it expresses ideas that offend.'" (alterations in original) (quoting *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017))); *Meriwether*, 992 F.3d at 507 ("[P]ublic universities do not have a license to act as classroom thought police. They cannot force professors to avoid controversial viewpoints altogether in deference to a state-mandated orthodoxy."); *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam) ("[T]he mere dissemination of ideas . . . on a state university campus may not be shut off in the name alone of 'conventions of decency.'"); *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994) (observing that "the efficient provision of services" by a state university "actually depends, to a degree, on the dissemination in public fora of controversial speech implicating matters of public concern").

### 3. The IFA's censorship of viewpoints that the government disfavors violates academic freedom and the First Amendment.

The IFA is a blatant attempt by politicians to use the power of the government to ban ideas of which they do not approve. As such, the statute is a straightforward instance of unconstitutional viewpoint discrimination, which the Supreme Court has condemned as "an egregious form of content discrimination" that violates the principle that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the

rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Moreover, as this circuit has emphasized, "the dangers of viewpoint discrimination are *heightened* in the university setting." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) (internal quotation marks omitted) (quoting *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997) (citing *Rosenberger*, 515 U.S. at 819)).

Applying the principles and policies described above demonstrates why the regime of viewpoint censorship created by the IFA is so clearly impermissible. To begin, the IFA corrupts the very nature of public colleges and universities, turning them from places of genuine education into sites of state indoctrination. The essential distinction between instruction and indoctrination is that indoctrination occurs when "instructors dogmatically insist on the truth of [genuinely contestable] propositions by refusing to accord their students the opportunity to contest them." *Freedom in the Classroom* at 55. That is precisely what the IFA does with respect to the viewpoints it bans: it artificially restricts faculty from presenting ideas to students, not based on professional norms or disciplinary standards, but according to governmental diktat, and thereby conscripts them into the service of "anti-woke" indoctrination.

In addition, the IFA creates a harmful chilling effect that infringes upon speech that the statute does not directly proscribe. This chilling effect is in part a

result of the statute's unconstitutional vagueness. App. 399–416 (concluding that "the IFA is impermissibly vague on its face in violation of the Due Process Clause of the Fourteenth Amendment"); *see also Keyishian*, 385 at 604 ("The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed."). But it is also a product of the realities of academic speech, which by its very nature often involves discussions of disputed and controversial ideas that are liable to offend the powers that be. This is particularly true in disciplines such as history and the social sciences—the IFA's primary targets. *Sweezy*, 354 U.S. at 250 (stressing the importance of academic freedom "in the social sciences, where few, if any, principles are accepted as absolutes"). In this sensitive context, the politically-motivated silencing of *any* classroom speech by the government "has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice." *Wieman v. Updegraff*, 344 U.S. 183, 195 (1952) (Frankfurter, J., concurring).

Further exacerbating the IFA's chilling effect is the fact that its statutory design empowers the government to exploit its position as employer as a means of furthering its aim of political censorship. Due to their economic dependence upon their employer, employees are particularly sensitive to their employer's unstated messages and are likely to "pick up intended implications . . . that might be more

readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969). The Supreme Court recognized this in *Keyishian* when it remarked that "[i]t would be a bold teacher who would not stay as far as possible from utterances or acts which might jeopardize his living." 385 U.S. at 601. In the already sensitive context of academic speech, this dynamic creates the perfect conditions for a statute like the IFA to become a "highly efficient *in terrorem* mechanism." *Id.* at 601. The casualty of that mechanism is education, which "cannot possibly thrive in an atmosphere of state-encouraged suspicion and surveillance." *Freedom in the Classroom* at 61.

The degree of harm that the IFA threatens to inflict becomes more apparent when one considers the implications of Defendants-Appellants' sweeping contention that "classroom instruction in public universities is government speech and thus not entitled to First Amendment protection." Appellants' Br. at 24. Consider just a few examples of what that contention would entail:

- A state with a different political leaning than Florida—or perhaps Florida itself were political winds to shift—would be allowed to prohibit faculty at public law schools from engaging in any teaching that espouses or promotes the view that originalism is a valid method of constitutional analysis, that the Second Amendment should be interpreted to protect an individual right to possess a firearm, or that the

Constitution allows the states to restrict women from obtaining an abortion.

- A state could prohibit faculty at its public medical schools and schools of public health from engaging in any instruction that espouses the benefits of wearing face masks, vaccinations, or social distancing during a pandemic. Meanwhile, another state could prohibit the faculty at its universities from engaging in any instruction that casts doubt on the benefits of any of these practices.

- Some states could prohibit the faculty in their university science programs from teaching anything that promotes the view that climate change is real or that human activity is a substantial contributor to it. Other states could prohibit the faculty in their university economics departments from engaging in any instruction that advances the view that minimum wage or rent control laws are inefficient.

In short, accepting Defendants-Appellants' defense of the IFA would be tantamount to declaring open season on the notion of universities as "non-partisan institution[s] of learning." *1915 Declaration* at 5. Higher education would be liable to devolving into a political free-for-all, with the result that colleges and universities could no longer be relied upon to foster the discovery of knowledge and truth, to properly educate students, or to prepare experts and professionals for public service.

Avoiding that dystopian outcome requires only what the First Amendment already mandates: adherence to the principle of academic freedom.

**B.    Allowing Florida's current political elites to ban ideas they disfavor will undermine democracy.**

Institutions of higher education based on academic freedom also play a vital role in fostering and maintaining this nation's system of democratic self-government. The Supreme Court has long acknowledged that education "is the very foundation of good citizenship," *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003) (quoting *Brown v. Board of Education*, 347 U.S. 483, 493 (1954)), and that it empowers individuals to effectively exercise their most basic constitutional rights, including the right of free expression, *Wieman*, 344 U.S. at 195 (Frankfurter, J., concurring) (noting "the teacher's relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment"). In this connection, the Court has underscored that universities "occupy a special niche in our constitutional tradition" on account of "the expansive freedoms of speech and thought associated with the university environment," *Grutter*, 539 U.S. at 329 (collecting cases). The university is the ultimate "marketplace of ideas," *Keyishian*, 385 U.S. at 603, where there occurs a "[c]ompetition in ideas and governmental policies [that] is at the core of our electoral process and of the First Amendment freedoms," *Williams v. Rhodes*, 393 U.S. 23, 32 (1968). It is the location of the "robust exchange of ideas," *Keyishian*, 385 U.S. at 603, and of the "free play of the

spirit," *Wieman*, 344 U.S. at 195 (Frankfurter, J., concurring), which are central to the maintenance of democratic traditions and institutions. Similarly, the AAUP has recognized the central role that higher education and academic freedom play in fostering and maintaining democratic principles in this country. *1915 Declaration* at 9 ("One of [the university's] most characteristic functions in a democratic society is to help make public opinion more self-critical and more circumspect, to check the more hasty and unconsidered impulses of popular feeling, to train the democracy to the habit of looking before and after.").

By undermining the core values of higher education, the IFA will erode democracy as well. Government censorship of ideas in the classroom prevents students from learning behaviors essential to the maintenance of the Constitution and rule of law, including critical and independent thinking; tolerance of disagreement, dissent, and unpopular ideas; and courage in expressing and defending unconventional or unpopular ideas. What is more, the particular ideas and viewpoints banned by the IFA—which relate to teaching about racial and sexual injustice—are at the center of important ongoing public debates. Their censorship will impair the quality of our democracy and will leave students poorly equipped to deal with them as citizens. Furthermore, the statute allows a political faction to exploit the state's public universities for raw partisan advantage. The IFA forces faculty to participate in a regime that indoctrinates students, and thereby allows the

current government to potentially entrench itself in power by distorting the opinions of a not insignificant portion of the electorate. States should be laboratories of democracy, not testing grounds for authoritarianism and indoctrination.

## II. Defendants-Appellants' claim that the IFA is exempt from the First Amendment because classroom speech is "the government's speech" is meritless.

As Defendants-Appellants' brief to this Court makes clear, the constitutionality of the IFA hinges on their assertion that "classroom instruction in public universities is government speech and thus not entitled to First Amendment protection." Appellants' Br. at 24. In essence, Defendants claim that a state government can do away with academic freedom, coopt public universities to serve as its partisan mouthpiece, and engage in blatant viewpoint discrimination by banning university faculty from expressing viewpoints on one side of an issue—and the Constitution has nothing to say about it. That contention should be rejected.

### A. *Garcetti* does not bar public university classroom instruction from the protection of the First Amendment.

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court held that the First Amendment does not protect the speech of government employees if it is uttered "pursuant to their official duties," *id.* at 421. Although the facts of *Garcetti* did not implicate academic freedom and did not involve circumstances remotely analogous to faculty speech in a public university classroom, the Court made explicit its reluctance to extend "customary employee-speech jurisprudence" to "academic

scholarship or classroom instruction" in light of the ramifications that would have for academic freedom "as a constitutional value," *id.* at 425. The present case falls squarely within the *Garcetti* caveat, as the IFA restricts "classroom instruction."

Moreover—and contrary to Defendants' contention, Appellants' Br. at 43—exempting classroom instruction from *Garcetti*'s holding is consistent with the decision's reasoning. The rationale for *Garcetti*'s rule exempting certain speech of public employees from First Amendment protection is that such a rule is necessary for the government to function effectively. In its own words, the Court reasoned that "[w]ithout a significant degree of control over its employees' words and actions, a government employer would have little chance to provide public services efficiently." *Id.* at 418.[3] Unlike other types of public employment, the efficient accomplishment of university-level teaching and research does not require that the government be permitted to exercise a "significant degree of control" over faculty speech. In fact, the successful performance of instruction in the university classroom demands that the government *not* be allowed to exercise such control, in order that the "free play of ideas" can take place in an atmosphere free from government-imposed orthodoxy of thought. *See Meriwether*, 992 F.3d at 507 ("The need for the

---

[3] Defendants-Appellants claim that "[t]he classroom speech of public-university professors clearly falls within the rationale of *Garcetti* because these statements are made 'pursuant to their official duties.'" Appellants' Br. at 43 (quoting *Garcetti*, 547 U.S. at 421–22.) In so doing, they engage in circular reasoning, confusing the rule laid down in *Garcetti* with the rationale for that rule.

free exchange of ideas in the college classroom is unlike that in other public workplace settings. And a professor's in-class speech to his students is anything but speech by an ordinary government employee."). Thus, *Garcetti*'s efficiency-centered rationale is consistent with recognizing that governmental viewpoint discrimination is impermissible in the public university classroom.

The correctness of this conclusion finds support in the agreement of every federal court of appeals to have directly considered the question that *Garcetti*'s holding does not extend to academic speech in the university setting. The Sixth Circuit, in *Meriwether*, so concluded, and the speech at issue in that case was less closely connected to the core concerns of academic freedom than the speech prohibited by Florida's IFA. *See* 992 F.3d at 506–07 (relying on the fact that "the academic-freedom exception to *Garcetti* covers all classroom speech related to matters of public concern, *whether that speech is germane to the contents of the lecture or not*" (emphasis added)). Likewise, in *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), the Ninth Circuit held that "*Garcetti* does not apply to speech related to scholarship or teaching," *id.* at 406, 412 (internal quotation marks omitted). In addition, the Fourth Circuit, in *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011), stated that it was "persuaded that *Garcetti* would not apply in the academic context of a public university as represented by the facts of this case," *id.* at 562.

Recognizing that *Garcetti* does not apply to classroom instruction by public university professors is not the end of the matter. Under the *Pickering-Connick* framework, two questions remain. *Meriwether*, 992 F.3d at 507–08; *Demers*, 746 F.3d at 415. The first is whether the speech restricted by the IFA involves "a matter of public concern." *Meriwether*, 992 F.3d at 508; *Demers*, 746 F.3d at 415. Speech addresses a matter of public concern if it "relates 'to any matter of political, social, or other concern to the community.'" *Meriwether*, 992 F.3d at 508 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). The classroom speech prohibited by the IFA, which as noted above involves views about racial and sexual discrimination and injustice that lie at the center of ongoing public debates, readily satisfies this requirement. *See id.* (noting that "a teacher's in-class speech about 'race, gender, and power conflicts' addresses matters of public concern" (quoting *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001)).

The second question is whether the interest of faculty in speaking on these matters outweighs the state's interest in restricting such expression. *Meriwether*, 992 F.3d at 508. In this case, the balance so overwhelmingly favors the interest of faculty that it matters little whether one employs the balancing analysis set out in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)—which takes into account the government's interest as an employer in "promoting the efficiency of the public services it performs through" its employees, *id.* at 568; *Meriwether*, 992 F.3d at 508—or the

balancing analysis used by the district court, App. 380–81, which considers the three factors used in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), namely, "the context," "the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than those of other persons," and "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment," *id.* at 1074–75.

Here, the interests of faculty are at their zenith, lying as they do at the core of academic freedom. At the same time, the state's interest in the IFA's speech restrictions is at a minimum. Such a scheme of overtly ideological viewpoint discrimination bears no rational relationship to any legitimate governmental interest in regulating the university curriculum and actively hinders, rather than furthers, the success of any program of higher education. Other pernicious features of the IFA, including its unconstitutional vagueness, the chilling effect it imposes on other speech, and its nature as a prior restraint that seeks to impose a prophylactic gag on faculty, further undercut the state of Florida's interest in maintaining the IFA.

**B.** **The "government speech doctrine" does not shield the IFA.**

Because the IFA restricts public employee speech, it is best analyzed under the *Pickering-Connick-Garcetti* line of cases just discussed, and there is no need for this Court to consider other strands of the "government speech doctrine." In any

event, assessing the IFA against the broader government speech doctrine solidifies the conclusion that it cannot stand.

First, the rationale for the government speech doctrine does not justify the IFA's viewpoint-based censorship of public university classroom speech. As with *Garcetti*, the underlying rationale for the government speech doctrine is that the government could not "function" if it could not favor or disfavor certain points of view in its programs. *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) ("[I]t is not easy to imagine how government could function if it lacked this freedom."). But as explained above, a university, unlike other government programs, cannot properly function if the government is allowed to pick and choose which viewpoints may be expressed during classroom teaching.

Second, there are compelling reasons why the government speech doctrine should not allow politicians to turn public university faculty into government mouthpieces. As explained above, the consequences of allowing total government control over classroom speech, without any First Amendment protection against viewpoint discrimination, would be disastrous for higher education and democracy. In addition, the government speech doctrine relies upon the crucial assumption that when the government speaks, it does so with sufficient transparency that citizens can recognize the government as the speaker, assess the content of the message with that in mind, and hold the government accountable for what it says. *See* Helen Norton,

THE GOVERNMENT'S SPEECH AND THE CONSTITUTION 50 (2019). This implicit transparency requirement is a necessary safeguard that serves as a check on government's powers of obfuscation and ensures that it acts with the consent of the governed. But, as explained below, no one would reasonably understand a public university professor's classroom instruction to be the government's speech. Accordingly, the IFA fails the government speech doctrine's implicit transparency requirement. By fundamentally altering the nature of Florida's system of higher education in a non-transparent manner, the IFA requires the state's public universities to "sail under false colors," which they must not be permitted to do. *1915 Declaration* at 5.

Third, in *Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022), the Supreme Court identified three types of evidence used in "determin[ing] whether the government intends to speak for itself or to regulate private expression": (1) "the history of the expression at issue"; (2) "the public's likely perception as to who (the government or a private person) is speaking"; and (3) "the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589–90. All three of these considerations demonstrate that the classroom instruction of public university professors is not "the government's speech."

The history of instruction in public universities shows that state legislatures have overwhelming refrained from censoring the expression of particular viewpoints

in the classroom and that, in the very few instances where a state government has taken preliminary steps towards that end, the federal courts have prevented them from doing so, as in *Sweezy* and *Keyishian*.

As for the public's perception of who is speaking when classroom teaching occurs, it is exceedingly difficult to see how anyone could reasonably understand a faculty member's in-class instruction as representing the views of the university, let alone of the state government. This is likely due to the traditions of academic freedom and professionalism in American universities. Other types of faculty classroom speech, such as administrative announcements and notifications required by law or university policy (e.g., notices regarding reasonable accommodations for persons with disabilities) serve as a useful contrast, as students and others could well understand those communications as conveying messages on behalf of the university or the state.

Finally, the absence of past efforts by the Florida legislature to dictate the viewpoints expressed by faculty during classroom teaching demonstrates the state's longstanding recognition of the independence of university instruction and its effective renouncement of any authority to affirm or control such instruction.

## CONCLUSION

Academic freedom is a special concern of the First Amendment and is essential to the functions of higher education and to the maintenance of democratic

governance. The IFA's attack on academic freedom undermines these values: it violates core First Amendment principles designed to prevent the government from stifling free expression in higher education; it coopts and distorts the functioning of the state's universities, substituting indoctrination for education; and it imperils democracy by corrupting the function of higher education that lies at the heart of self-government. The district court did not abuse its discretion in granting a preliminary injunction against enforcement of the IFA, and the AAUP urges this Court to affirm that order.

Dated:  June 23, 2023                              Respectfully submitted,

                                                  */s/* Richard Siwica
                                                  Richard Siwica

*Counsel of Record:*
Richard Siwica
EGAN, LEV & SIWICA, P.A.
231 East Colonial Drive
Orlando, Florida 32801
Telephone: (407) 422-1400
Facsimile: (407) 422-3658

*Counsel list continued on the following page.*

*Counsel for Amicus Curiae*:

RISA L. LIEBERWITZ
  *General Counsel*
AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS
  *Professor of Labor and Employment Law*
SCHOOL OF INDUSTRIAL & LABOR RELATIONS
CORNELL UNIVERSITY
361 Ives Hall
Ithaca, New York 14853
Telephone: (607) 255-3289

AARON NISENSON
  *Senior Counsel*
EDWARD D. SWIDRISKI III
  *Assistant Counsel*
AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS
555 New Jersey Avenue NW, Suite 600
Washington, D.C. 20001
Telephone: (202) 737-5900
Email: legal.dept@aaup.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a)(7) because, excluding the part of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, it contains 5,695 words.

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO word processing software, in 14-point Times New Roman font.

Dated: June 23, 2023

/s/ Richard Siwica
Richard Siwica

*Counsel of Record for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on June 23, 2023. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 23, 2023

/s/ Richard Siwica
Richard Siwica

*Counsel of Record for Amicus Curiae*