**Nos. 22-13992 & 22-13994**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

LEROY PERNELL, ET AL.,
*Plaintiffs/Appellees,*
v.
BRIAN LAMB, ET AL.,
*Defendants/Appellants.*

---

ADRIANA NOVOA, ET AL.,
*Plaintiffs/Appellees,*
v.
MANNY DIAZ, JR., ET AL.,
*Defendants/Appellants.*

---

Appeal from the United States District Court for the Northern District of Florida
Case Nos. 4:22-cv-304-MW-MAF & 4:22-cv-324-MW-MAF

---

# MOTION OF PROFESSORS AMNA KHALID AND JEFFREY AARON SNYDER FOR LEAVE TO FILE A BRIEF AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS/APPELLEES

---

Laurie Webb Daniel
Matthew Friedlander
Skyler McDonald
WEBB DANIEL FRIEDLANDER LLP
75 14th St. NW, Suite 2450, Atlanta, GA 30309
Tel.: (404) 433-6430
laurie.daniel@webbdaniel.law
matthew.friedlander@webbdaniel.law
skyler.mcdonald@webbdaniel.law

*Counsel for Professors Amna Khalid and Jeffrey Aaron Snyder, as Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record for Professors Amna Khalid and Jeffrey Aaron Snyder, as proposed amici curiae, hereby submit the following Certificate of Interested Persons and Corporate Disclosure Statement pursuant to Federal Rule of Appellate Procedure 26.1, Eleventh Circuit Rule 26-1.1, and Eleventh Circuit Rule 29-1.

1. Almond, Russell (Plaintiff-Appellee)
2. American Civil Liberties Union Foundation of Florida, Inc. (Counsel for Plaintiffs-Appellees)
3. American Civil Liberties Union Foundation (Counsel for Plaintiffs-Appellees)
4. Austin, Sharon Wright (Plaintiff-Appellee)
5. Azis, Jacqueline Nicole (Counsel for Plaintiffs-Appellees)
6. Ballard Spahr LLP (Counsel for Plaintiffs-Appellees)
7. Benjamin, Aaronson, Edinger & Patanzo, P.A. (Counsel for Plaintiffs-Appellees)
8. Blankenship, Katherine (Counsel for Plaintiffs-Appellees)
9. Boaz, Timothy L. (Defendant-Appellant)
10. Burgess, Tiffani (Counsel for Plaintiffs-Appellees)

11. Callahan, Sandra (Defendant-Appellant)

12. Carrere, Michael (Defendant-Appellant)

13. Cerio, Timothy M. (Defendant-Appellant)

14. Coleman, Santino (Counsel for Plaintiffs-Appellees)

15. Cooper & Kirk, PLLC (Counsel for Defendants-Appellants)

16. Cooper, Charles J. (Counsel for Defendants-Appellants)

17. Corcoran, Richard (Defendant-Appellant)

18. Daniel, Laurie Webb (Counsel for Amici Curiae)

19. Dauphin, Johana (Plaintiff-Appellee)

20. Diaz, Jr., Manny (Defendant-Appellant)

21. Donelly, N. Rogan (Defendant-Appellant)

22. Dorsey, Dana Thompson (Plaintiff-Appellee)

23. Dunn, Marvin (Plaintiff-Appellee)

24. Edge, Aubrey (Defendant-Appellant)

25. Edinger, Gary Scott (Counsel for Plaintiffs-Appellees)

26. Edwards, Jerry Crawford (Counsel for Plaintiffs-Appellees)

27. Fajana, Morenike (Counsel for Plaintiffs-Appellees)

28. First Amendment Forum at University of South Florida (Plaintiff-Appellee)

29. Fitzpatrick, Magistrate Judge Martin A., U.S. District Court for the Northern District of Florida

30. Florida A&M University Board of Trustees (Defendant (dismissed Nov. 22, 2022))

31. Florida Board of Governors of the State University System (Defendant (dismissed Nov. 22, 2022))

32. Florida International University Board of Trustees (Defendant (dismissed Nov. 22, 2022))

33. Florida State University Board of Trustees (Defendant (dismissed Nov. 22, 2022))

34. Foundation for Individual Rights and Expression (Counsel for Plaintiffs-Appellees)

35. Friedlander, Matthew (Counsel for Amici Curiae)

36. Frost, Patricia (Defendant-Appelant)

37. Gabadage, Nimma (Defendant-Appellant)

38. Gary S. Edinger & Associates, PA – Gainesville, FL (Counsel for Plaintiffs-Appellees)

39. Greubel, Greg Harold (Counsel for Plaintiffs-Appellees)

40. Griffin, Michael (Defendant-Appellant)

41. Haddock, Jr., Edward Ellis (Defendant-Appellant)

42. Hinger, Sarah Ann (Counsel for Plaintiffs-Appellees)

43. Horton, Oscar (Defendant-Appellant)

44. Johnson, Alexsis Marie (Counsel for Plaintiffs-Appellees)

45. Jones, Kenneth (Defendant-Appellant)

46. Jordan, Darlene Luccio (Defendant-Appellant)

47. Khalid, Prof. Amna (Amicus Curiae)

48. Lamb, Brian (Defendant-Appellant)

49. Leckerman, Jason Allen (Counsel for Plaintiffs-Appellees)

50. Lee, Jin Hee (Counsel for Plaintiffs-Appellees)

51. Leftheris, Julie (Defendant-Appellant)

52. Levine, Alan (Defendant-Appellant)

53. Lubin, Catharine E. (Counsel for Plaintiffs-Appellees)

54. Lydecker, Charles (Defendant-Appellant)

55. Mabatah, Isiuwa Jacqueline (Counsel for Plaintiffs-Appellees)

56. Mateer, Craig (Defendant-Appellant)

57. McDonald, Skyler (Counsel for Amici Curiae)

58. McLaurin, Charles (Counsel for Plaintiffs-Appellees)

59. McNamara, Caroline Andrews (Counsel for Plaintiffs-Appellees)

60. Michael, Deeana (Defendant-Appellant)

61. Monbarren, Lauran (Defendant-Appellant)

62. Moraff, Laura Beth (Counsel for Plaintiffs-Appellees)
63. Morris, Joshua ("J.T.") (Counsel for Plaintiffs-Appellees)
64. NAACP Legal Defense & Educational Fund, Inc. (Counsel for Plaintiffs-Appellees)
65. Nascimento, Isabella Solomao (Counsel for Plaintiffs-Appellees)
66. Novoa, Adriana (Plaintiff-Appellee)
67. Occhipinti, Anna (Counsel for Plaintiffs-Appellees)
68. Ohlendorf, John David (Counsel for Defendants-Appellants)
69. Palyam, Nithin (Defendant-Appellant)
70. Pardue, Crystal A. (Counsel for Plaintiffs-Appellees)
71. Park, Shelley (Plaintiff-Appellee)
72. Parsons, Emily Shaw (Counsel for Plaintiffs-Appellees)
73. Patel, Shilen (Defendant-Appellant)
74. Pernell, LeRoy (Plaintiff-Appellee)
75. Piccolo, Fredrick (Defendant-Appellant)
76. Ramer, John (Counsel for Defendants-Appellants)
77. Rechek, Samuel (Plaintiff-Appellee)
78. Sandoval, Jennifer (Plaintiff-Appellee)
79. Schneider, Jenifer Jasinski (Defendant-Appellant)
80. Scott, Steven (Defendant-Appellant)

81. Seixas, Melissa (Defendant-Appellant)

82. Self, William (Defendant-Appellant)

83. Silagy, Eric (Defendant-Appellant)

84. Snyder, Prof. Jeffrey Aaron (Amicus Curiae)

85. Steinbaugh, Adam (Counsel for Plaintiffs-Appellees)

86. Stermon, Kent (Defendant-Appellant)

87. Sykes, Emerson James (Counsel for Plaintiffs-Appellees)

88. Tilley, Daniel Boaz (Counsel for Plaintiffs-Appellees)

89. Tobin, Charles David (Counsel for Plaintiffs-Appellees)

90. University of Central Florida Board of Trustees (Defendant (dismissed Nov. 22, 2022))

91. University of Florida Board of Trustees (Defendant (dismissed Nov. 22, 2022))

92. University of South Florida Board of Trustees (Defendant (dismissed Nov. 22, 2022))

93. Walker, The Honorable Mark E., U.S. District Court Judge for the Northern District of Florida

94. Watson, Leah Monique (Counsel for Plaintiffs-Appellees)

95. Weatherford, William (Defendant-Appellant)

96. Webb Daniel Friedlander LLP (Counsel for Amici Curiae)

97. Wold, Megan M. (Attorney for Defendants-Appellants)

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: June 23, 2023

*/s/ Laurie Webb Daniel*
Laurie Webb Daniel

*Attorneys for Professors Amna Khalid and Jeffrey Aaron Snyder, as Amici Curiae*

# MOTION FOR LEAVE TO FILE AMICUS BRIEF

Pursuant to Federal Rule of Appellate Procedure 29(a) and Eleventh Circuit Rule 29-1, Professors Amna Khalid and Jeffrey Aaron Snyder (the "Amici-Professors") move the Court for leave to file the attached brief as *amici curiae* in support of Plaintiffs-Appellees and in support of affirming the district court's grant of a preliminary injunction.

Professor Amna Khalid is an Associate Professor of History at Carleton College, a leading liberal arts college. Professor Jeffrey Aaron Snyder is an Associate Professor of Educational Studies at Carleton College. Both professors are historians with doctoral degrees who each have over a decade of experience teaching undergraduates. Their work extends across numerous fields including education, United States history, South Asian history, the history of medicine and the global history of free expression.

Leave to file as *amici curiae* should be granted when the "amici have stated an interest in the case, and it appears that their brief is relevant and desirable." *Neonatology Assocs., P.A. v. C.I.R.*, 293 F.3d 128, 133 (3d Cir. 2002) (Alito, J.). The Amici-Professors meet both requirements.

The Amici-Professors have significant expertise in issues pertaining to academic freedom and free expression. They write frequently on these topics for national outlets and regularly speak about the same at professional conferences as

well as at colleges and universities in the United States and abroad. The Amici-Professors served as fellows together at the University of California National Center for Free Speech and Civic Engagement during the 2022-2023 academic year; their research project focused on the impact of state legislation on the freedom to teach and learn in public colleges and universities in Florida. They conducted more than a dozen interviews with faculty members, most of whom teach at Florida's public universities.

The Amici-Professors wish to illustrate how HB 7 (Florida's "Stop WOKE Act") negatively affects classroom teaching, with a particular emphasis on history courses. Drawing on their personal experience as college professors and the research they conducted as fellows, the Amici-Professors believe that HB 7 undermines the academic freedom of faculty, constraining their ability to deliver accurate, engaging, and effective classroom instruction. They believe that HB 7 is fundamentally at odds with the mission of public higher education, which is to develop students' critical thinking skills and help prepare them to be active, informed citizens.

Professor Khalid is originally from Pakistan and has direct experience of how public education is destroyed when it falls victim to political interference. Indeed, this was one of the main reasons she relocated to the United States, and she does not want to see public education in her adopted home suffer a similar fate. As

a historian of education, Professor Snyder has observed that the quality of public higher education inevitably suffers whenever the government attempts to control, limit, or censor what professors can teach in the classroom.

The Amici-Professors' experience makes the submission of the attached amicus brief relevant and desirable to the resolution of this appeal. Their experience as college professors specializing in history and education gives them a unique perspective on the implications of HB 7 on higher education. Utilizing this experience, the proposed brief points out how HB7 is already preventing college faculty members from effectively teaching their subject matter, how the legislation prevents instructors from using common and tested teaching techniques, and prevents instructors from presenting realistic facts and viewpoints about historical events. The proposed brief further explains how HB 7 will limit professors' ability to teach history by artificially limiting the topics and materials that can be taught, which will chill classroom discussion and ultimately undermine one of the core missions of higher education—to promote critical thinking and responsible citizenship. And, importantly, the Amici-Professors' work interviewing faculty members at Florida public universities—people directly affected by this legislation—is an insight that few other college professors could offer.

For these reasons, the Amici-Professors respectfully request that the Court grant this Motion for Leave to File a Brief as Amici Curiae and accept the attached brief for filing.

Respectfully submitted this 23rd day of June, 2023.

/s/ *Laurie Webb Daniel*
Laurie Webb Daniel
Georgia Bar No. 204225
Matthew Friedlander
Georgia Bar No. 416707
Skyler McDonald
Georgia Bar No. 599142
WEBB DANIEL FRIEDLANDER LLP
75 14th St. NW, Suite 2450
Atlanta, GA 30309
Tel.: (404) 433-6430
laurie.daniel@webbdaniel.law
matthew.friedlander@webbdaniel.law
skyler.mcdonald@webbdaniel.law

*Counsel for Professors Amna Khalid and Jeffrey Aaron Snyder, as Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 663 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and 11th Cir. Rule 32-4.

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

This 23rd day of June, 2023.

/s/ *Laurie Webb Daniel*
Laurie Webb Daniel

*Counsel for Professors Amna Khalid and Jeffrey Aaron Snyder, as Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, I electronically filed the foregoing **MOTION OF PROFESSORS AMNA KHALID AND JEFFREY AARON SNYDER FOR LEAVE TO FILE A BRIEF AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS/APPELLEES** with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, which I understand will automatically send an e-mail notification of such filing to the counsel of record for this matter.

/s/ *Laurie Webb Daniel*
Laurie Webb Daniel

*Counsel for Professors Amna Khalid and Jeffrey Aaron Snyder, as Amici Curiae*

# EXHIBIT 1

**Nos. 22-13992 & 22-13994**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

LEROY PERNELL, ET AL.,
*Plaintiffs/Appellees,*
v.
BRIAN LAMB, ET AL.,
*Defendants/Appellants.*

---

ADRIANA NOVOA, ET AL.,
*Plaintiffs/Appellees,*
v.
MANNY DIAZ, JR., ET AL.,
*Defendants/Appellants.*

---

Appeal from the United States District Court for the Northern District of Florida
Case Nos. 4:22-cv-304-MW-MAF & 4:22-cv-324-MW-MAF

---

**BRIEF OF PROFESSORS AMNA KHALID & JEFFREY AARON SNYDER AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS/APPELLEES**

---

Laurie Webb Daniel
Matthew Friedlander
Skyler McDonald
WEBB DANIEL FRIEDLANDER LLP
75 14th St. NW, Suite 2450, Atlanta, GA 30309
Tel.: (404) 433-6430
laurie.daniel@webbdaniel.law
matthew.friedlander@webbdaniel.law
skyler.mcdonald@webbdaniel.law

*Counsel for Professors Amna Khalid and Jeffrey Aaron Snyder, as Amici Curiae*

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

The undersigned counsel of record for Professors Amna Khalid and Jeffrey Aaron Snyder, as proposed *amici curiae*, hereby submit the following Certificate of Interested Persons and Corporate Disclosure Statement pursuant to Federal Rule of Appellate Procedure 26.1, Eleventh Circuit Rule 26-1.1, and Eleventh Circuit Rule 29-1.

1. Almond, Russell (Plaintiff-Appellee)
2. American Civil Liberties Union Foundation of Florida, Inc. (Counsel for Plaintiffs-Appellees)
3. American Civil Liberties Union Foundation (Counsel for Plaintiffs-Appellees)
4. Austin, Sharon Wright (Plaintiff-Appellee)
5. Azis, Jacqueline Nicole (Counsel for Plaintiffs-Appellees)
6. Ballard Spahr LLP (Counsel for Plaintiffs-Appellees)
7. Benjamin, Aaronson, Edinger & Patanzo, P.A. (Counsel for Plaintiffs-Appellees)
8. Blankenship, Katherine (Counsel for Plaintiffs-Appellees)
9. Boaz, Timothy L. (Defendant-Appellant)
10. Burgess, Tiffani (Counsel for Plaintiffs-Appellees)

11. Callahan, Sandra (Defendant-Appellant)
12. Carrere, Michael (Defendant-Appellant)
13. Cerio, Timothy M. (Defendant-Appellant)
14. Coleman, Santino (Counsel for Plaintiffs-Appellees)
15. Cooper & Kirk, PLLC (Counsel for Defendants-Appellants)
16. Cooper, Charles J. (Counsel for Defendants-Appellants)
17. Corcoran, Richard (Defendant-Appellant)
18. Daniel, Laurie Webb (Counsel for Amici Curiae)
19. Dauphin, Johana (Plaintiff-Appellee)
20. Diaz, Jr., Manny (Defendant-Appellant)
21. Donelly, N. Rogan (Defendant-Appellant)
22. Dorsey, Dana Thompson (Plaintiff-Appellee)
23. Dunn, Marvin (Plaintiff-Appellee)
24. Edge, Aubrey (Defendant-Appellant)
25. Edinger, Gary Scott (Counsel for Plaintiffs-Appellees)
26. Edwards, Jerry Crawford (Counsel for Plaintiffs-Appellees)
27. Fajana, Morenike (Counsel for Plaintiffs-Appellees)
28. First Amendment Forum at University of South Florida (Plaintiff-Appellee)

29. Fitzpatrick, Magistrate Judge Martin A., U.S. District Court for the Northern District of Florida

30. Florida A&M University Board of Trustees (Defendant (dismissed Nov. 22, 2022))

31. Florida Board of Governors of the State University System (Defendant (dismissed Nov. 22, 2022))

32. Florida International University Board of Trustees (Defendant (dismissed Nov. 22, 2022))

33. Florida State University Board of Trustees (Defendant (dismissed Nov. 22, 2022))

34. Foundation for Individual Rights and Expression (Counsel for Plaintiffs-Appellees)

35. Friedlander, Matthew (Counsel for Amici Curiae)

36. Frost, Patricia (Defendant-Appelant)

37. Gabadage, Nimma (Defendant-Appellant)

38. Gary S. Edinger & Associates, PA – Gainesville, FL (Counsel for Plaintiffs-Appellees)

39. Greubel, Greg Harold (Counsel for Plaintiffs-Appellees)

40. Griffin, Michael (Defendant-Appellant)

41. Haddock, Jr., Edward Ellis (Defendant-Appellant)

42. Hinger, Sarah Ann (Counsel for Plaintiffs-Appellees)

43. Horton, Oscar (Defendant-Appellant)

44. Johnson, Alexsis Marie (Counsel for Plaintiffs-Appellees)

45. Jones, Kenneth (Defendant-Appellant)

46. Jordan, Darlene Luccio (Defendant-Appellant)

47. Khalid, Prof. Amna (Amicus Curiae)

48. Lamb, Brian (Defendant-Appellant)

49. Leckerman, Jason Allen (Counsel for Plaintiffs-Appellees)

50. Lee, Jin Hee (Counsel for Plaintiffs-Appellees)

51. Leftheris, Julie (Defendant-Appellant)

52. Levine, Alan (Defendant-Appellant)

53. Lubin, Catharine E. (Counsel for Plaintiffs-Appellees)

54. Lydecker, Charles (Defendant-Appellant)

55. Mabatah, Isiuwa Jacqueline (Counsel for Plaintiffs-Appellees)

56. Mateer, Craig (Defendant-Appellant)

57. McDonald, Skyler (Counsel for Amici Curiae)

58. McLaurin, Charles (Counsel for Plaintiffs-Appellees)

59. McNamara, Caroline Andrews (Counsel for Plaintiffs-Appellees)

60. Michael, Deeana (Defendant-Appellant)

61. Monbarren, Lauran (Defendant-Appellant)

62. Moraff, Laura Beth (Counsel for Plaintiffs-Appellees)
63. Morris, Joshua ("J.T.") (Counsel for Plaintiffs-Appellees)
64. NAACP Legal Defense & Educational Fund, Inc. (Counsel for Plaintiffs-Appellees)
65. Nascimento, Isabella Solomao (Counsel for Plaintiffs-Appellees)
66. Novoa, Adriana (Plaintiff-Appellee)
67. Occhipinti, Anna (Counsel for Plaintiffs-Appellees)
68. Ohlendorf, John David (Counsel for Defendants-Appellants)
69. Palyam, Nithin (Defendant-Appellant)
70. Pardue, Crystal A. (Counsel for Plaintiffs-Appellees)
71. Park, Shelley (Plaintiff-Appellee)
72. Parsons, Emily Shaw (Counsel for Plaintiffs-Appellees)
73. Patel, Shilen (Defendant-Appellant)
74. Pernell, LeRoy (Plaintiff-Appellee)
75. Piccolo, Fredrick (Defendant-Appellant)
76. Ramer, John (Counsel for Defendants-Appellants)
77. Rechek, Samuel (Plaintiff-Appellee)
78. Sandoval, Jennifer (Plaintiff-Appellee)
79. Schneider, Jenifer Jasinski (Defendant-Appellant)
80. Scott, Steven (Defendant-Appellant)

81. Seixas, Melissa (Defendant-Appellant)
82. Self, William (Defendant-Appellant)
83. Silagy, Eric (Defendant-Appellant)
84. Snyder, Prof. Jeffrey Aaron (Amicus Curiae)
85. Steinbaugh, Adam (Counsel for Plaintiffs-Appellees)
86. Stermon, Kent (Defendant-Appellant)
87. Sykes, Emerson James (Counsel for Plaintiffs-Appellees)
88. Tilley, Daniel Boaz (Counsel for Plaintiffs-Appellees)
89. Tobin, Charles David (Counsel for Plaintiffs-Appellees)
90. University of Central Florida Board of Trustees (Defendant (dismissed Nov. 22, 2022))
91. University of Florida Board of Trustees (Defendant (dismissed Nov. 22, 2022))
92. University of South Florida Board of Trustees (Defendant (dismissed Nov. 22, 2022))
93. Walker, The Honorable Mark E., U.S. District Court Judge for the Northern District of Florida
94. Watson, Leah Monique (Counsel for Plaintiffs-Appellees)
95. Weatherford, William (Defendant-Appellant)
96. Webb Daniel Friedlander LLP (Counsel for Amici Curiae)

97. Wold, Megan M. (Attorney for Defendants-Appellants)

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: June 23, 2023

*/s/ Laurie Webb Daniel*
Laurie Webb Daniel

*Attorneys for Professors Amna Khalid and Jeffrey Aaron Snyder, as Amici Curiae*

# TABLE OF CONTENTS


CIP AND CORPORATE DISCLOSURE STATEMENT……….……………..C-1

TABLE OF CONTENTS………………………………………..…………i

TABLE OF AUTHORITIES...…………………………………..………ii

IDENTITY AND INTEREST OF AMICI CURIAE ..............................................1

STATEMENT OF THE ISSUE .........................................................................2

SUMMARY OF ARGUMENT .........................................................................2

ARGUMENT .................................................................................................3

I. The Mission of Higher Education is to Promote Critical Thinking and Prepare Young People for Citizenship. ..........................................................3

II. Academic Freedom is Essential to Fulfilling the Mission of Higher Education. ..................................................................................................4

III. The Stop WOKE Act Chills Academic Freedom. ..........................................9

IV. The Stop WOKE Act Compels Professors to Commit Educational Malpractice. ..............................................................................................14

A. The Stop WOKE Act prevents professors from teaching their subject matter. ............................................................................................14

B. The Stop WOKE Act prevents professors from using the most common and effective teaching techniques. ...........................................15

1. Debate, playing devil's advocate, and assigning material from a range of viewpoints..........................................................................15

2. Implications for critical thinking and citizenship. ............................17

C. The Stop WOKE Act whitewashes history. ..........................................19

1. "You need to deny reality to teach according to this law." .............19

2. Primary sources cannot be taught. ...................................................22

D. The Stop WOKE Act is an unprecedented and dangerous attack on academic freedom. .........................................................................24

CONCLUSION ............................................................................................26

# TABLE OF AUTHORITIES


Page(s)

**Cases**

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)........................................18

*Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985).......................................7

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ............................4

**Books and Periodical Materials**

BENJAMIN QUARLES, BLACK MOSAIC: ESSAYS IN AFRO-AMERICAN HISTORY AND HISTORIOGRAPHY (1988)…………………………………………...20

CHRISTOPHER P. LOSS, BETWEEN CITIZENS AND THE STATE: THE POLITICS OF AMERICAN HIGHER EDUCATION IN THE 20TH CENTURY (2012)……………………3

HENRY REICHMAN, UNDERSTANDING ACADEMIC FREEDOM (2021)………………..7

JOAN WALLACH SCOTT, KNOWLEDGE, POWER AND ACADEMIC FREEDOM (2019)…………………………6, 7

John Hope Franklin, *The New Negro History,* 64 THE CRISIS 67 (James W. Ivy ed., Feb. 1957)……………………………………………………23-24

**Internet-Based Sources**

Abraham Lincoln, Fourth Debate with Stephen A. Douglas at Charleston, Illinois, *in* 5 COLLECTED WORKS OF ABRAHAM LINCOLN 145……..23

Amna Khalid & Jeffrey Aaron Snyder, *Conservative Attacks on Higher Ed are Attacks on Democracy*, CHRON. OF HIGHER EDUC……………….. 25

Amna Khalid & Jeffrey Aaron Snyder, *Dark Times for Academic Freedom in the Sunshine State,* PERSUASION…………………………..25

*Appendix I: 1915 Declaration of Principles on Academic Freedom and Academic Tenure,* AM. ASS'N OF UNIV. PROFESSORS ……………………5, 8-9

Bianca Quilantan, *How the Supreme Court's decision on affirmative action may change the future of college,* POLITICO ……………….....18

Carissa Allen, *Florida higher education union decries new "anti-WOKE" law,* WUFT NEWS……………………………………..13, 14

Daniel Golden, *Muzzled by DeSantis, Critical Race Theory Professors Cancel Courses or Modify Their Teaching,* PROPUBLICA………………………...13

Ellen Schrecker, *Yes, these bills are the new McCarthyism*, ACADEME BLOG……25

*Freedom in the Classroom*, AM. ASS'N OF UNIV. PROFESSORS………….. 7-8, 16, 25

*Getting Started with Primary Sources*, LIBR. OF CONG………………………….. 22

John Stuart Mill, *On Liberty* (available as e-book via Project Gutenberg)……….16

Katheryn Russell-Brown, *"The Stop WOKE Act": HB 7, Race, and Florida's 21st Century Anti-literacy Campaign,* 2022 UF LAW PUBL'NS 1200…………………………………………...……16-17

Kristen de Groot, *Higher Education's Role in Democracy*, PENN TODAY……..…19

*Mission and Goals*, UNIV. OF S. FLA………………………………………………4

*Mission Statement*, UNIV. OF FLA. FACULTY HANDBOOK………………………..…4

*Significance of History for the Educated Citizen*, UCLA HISTORY PUBLIC HISTORY INITIATIVE……………………………………..24

Thomas Jefferson, *Notes on the State of Virginia*…………………………….22-23

## IDENTITY AND INTEREST OF AMICI CURIAE

This *amicus curiae* brief is filed on behalf of Amna Khalid and Jeffrey Aaron Snyder (the "Amici-Professors"), who are both Associate Professors at Carleton College, a leading liberal arts college. Both Amici-Professors are historians with doctoral degrees who each have over a decade of experience teaching undergraduates. Their work extends across numerous fields including education, United States history, South Asian history, the history of medicine, and the global history of free expression.

The Amici-Professors have significant expertise in issues pertaining to academic freedom and free expression. They write frequently on these topics for national outlets and regularly speak about the same at professional conferences as well as at colleges and universities in the United States and abroad. The Amici-Professors served as fellows together at the University of California National Center for Free Speech and Civic Engagement during the 2022-2023 academic-year; their research project focused on the impact of state legislation on the freedom to teach and learn in public colleges and universities in Florida. They conducted more than a dozen interviews with faculty members, most of whom teach at Florida's public universities.

The Amici-Professors' experience as college professors specializing in history and education gives them a unique perspective on the implications of HB 7

on higher education, including the dangers of artificially limiting the topics and materials that can be taught, which will chill classroom discussion and ultimately undermine the core mission of higher education—to promote critical thinking and citizenship. And, importantly, the Amici-Professors' work interviewing faculty members at Florida public universities—people directly affected by this legislation—makes their proffered insights even more relevant.

Pursuant to Fed. R. App. P. 29(a)(4), the undersigned certifies that no party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting this brief. No person—excluding the Amici-Professors and their counsel—has contributed money intended to fund preparing or submitting this brief.

## STATEMENT OF THE ISSUE

Whether restrictions on the expression of certain viewpoints in university instruction in Florida's HB 7 (the "Stop WOKE Act") violate the First and Fourteenth Amendments of the United States Constitution.

## SUMMARY OF ARGUMENT

The Stop WOKE Act undermines the mission of public higher education, which is to develop students' critical thinking skills and help prepare them to be active, informed citizens. It poses a grave threat to the academic freedom of faculty members, constraining their ability to deliver accurate, engaging, and effective

classroom instruction. Interviews conducted by the Amici-Professors with professors at Florida's public universities attest to the Act's chilling effects and its pernicious influence on the quality of education.

By preventing faculty from teaching essential content, the Stop WOKE Act compels professors to commit educational malpractice. It is particularly detrimental to history instruction, making it impossible to teach the truth of United States history. Under the Stop WOKE Act, students are the ones who ultimately suffer, as they will not gain the knowledge required to further their education, advance their career prospects, and exercise their citizenship rights.

## ARGUMENT

### I. The Mission of Higher Education is to Promote Critical Thinking and Prepare Young People for Citizenship.

For over a century, the mission of public higher education has focused on promoting critical thinking and preparing young people for their roles as citizens. *See* CHRISTOPHER P. LOSS, BETWEEN CITIZENS AND THE STATE: THE POLITICS OF AMERICAN HIGHER EDUCATION IN THE 20TH CENTURY (2012). Last year, Judge Newsom, writing for this Court, summed up this twofold mission of higher education as follows:

> Colleges and universities serve as the founts of—and the testing grounds for—new ideas. Their chief mission is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic.

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022) (reversing district court's denial of preliminary injunction pertaining to university policy that violated First Amendment protections).

These twin pillars of critical thinking and citizenship are reflected in the mission statements of Florida's twelve public universities. At the University of South Florida, home to Plaintiffs Adriana Novoa and Sam Rechek, the first goal of the university is to "promote the success of well-educated, highly skilled, and adaptable alums who, as lifelong learners, lead enriched lives, contribute to the democratic process, function as engaged community citizens, and thus thrive in a dynamic global market." *Mission and Goals*, UNIV. OF S. FLA., https://www.usf.edu/about-usf/mission-vision.aspx. The mission of the University of Florida is to "enable our students to lead and influence the next generation and beyond for economic, cultural and societal benefit." *Mission Statement*, UNIV. OF FLA. FACULTY HANDBOOK, https://handbook.aa.ufl.edu/about-uf/mission-and-plans/. The state's flagship university "welcomes the full exploration of its intellectual boundaries and supports its faculty and students in the creation of new knowledge and the pursuit of new ideas." *Id.*

## II. Academic Freedom is Essential to Fulfilling the Mission of Higher Education.

If Florida's public universities want to be able to fulfill their core mission, they need to protect the academic freedom of the faculty. Unfortunately, as Judge

Mark Walker stated in his order granting in part the preliminary injunction at issue in this case: "The Stop WOKE Act is antithetical to academic freedom and has cast a leaden pall of orthodoxy over Florida's state universities." (Dist. Ct. Case No. 4:22-cv-304-MW-MAF, Docket Entry ("Doc.") 63 at 106). The freedom to teach is one of the three pillars of academic freedom, along with freedom of inquiry and freedom of extramural speech.

In the United States, academic freedom has been defined and codified by the American Association of University Professors ("AAUP"). From its inception in 1915, the AAUP has articulated the significance of academic freedom in light of the university's main purposes: to generate and disseminate knowledge; and to help foster an informed, democratically engaged citizenry. Professors, according to the AAUP, should be able to carry out their research and teaching "without fear or favor" because they are experts whose professional work advances "the sum of human knowledge and contributes to the public good." *Appendix I: 1915 Declaration of Principles on Academic Freedom and Academic Tenure,* AM. ASS'N OF UNIV. PROFESSORS, at 294, https://www.aaup.org/NR/rdonlyres/A6520A9D-0A9A-47B3-B550-C006B5B224E7/0/1915Declaration.pdf (hereafter, "1915 AAUP Declaration").

Defendants/Appellants, therefore, demonstrate a fundamental misunderstanding of academic freedom when they say it is nothing more than a

license for professors to indoctrinate their students. (*See* Def. Br. at 7). The Defendants argue that the district court's decision "anoints individual professors as universities unto themselves, at liberty under the First Amendment to indoctrinate college students in whatever views they please, no matter how contrary to the university's curriculum or how noxious to the People of Florida." *Id.* But that is not so.

Contrary to the conclusory position advanced by Defendants/Appellants, academic freedom does not give professors free reign to inject their "personal viewpoints" into the classroom and to teach their subject matter without regard for accuracy, facts, and established scholarly norms. *Id.* at 4. And Defendants are mistaken when they say that "[a] history professor teaching a course on World War II, for example, would be free to espouse the view that the Holocaust was a hoax and to lament the fact that the Nazis were defeated." *Id.* This "anything goes" caricature of academic freedom could not be further from the truth. Indeed, there is no academic *freedom* without academic *responsibility*.

In the classroom, academic freedom protects the right of faculty members to make *informed* decisions about what and how to teach based on the professional expertise they have developed over years of specialized training. Academic freedom is not "the right to express one's ideas, however true or false they may be." JOAN WALLACH SCOTT, KNOWLEDGE, POWER AND ACADEMIC FREEDOM 1

(2019). Rather, the exercise of academic freedom depends on the "rigorous examination of evidence, the distinction between true and false…[and] the exercise of reasoned judgment." *Id.* at 4. Along these same lines, the scope of academic freedom is circumscribed by the established methods and bodies of knowledge in particular disciplines and fields. HENRY REICHMAN, UNDERSTANDING ACADEMIC FREEDOM 193-196 (2021).

Academic freedom would not allow a history professor to teach that the Holocaust was a hoax, a biology professor to teach creationism, or an astronomer to teach astrology. It does not provide cover for professors to teach discredited, bogus, or pseudo-scientific material.

Defendants/Appellants make another baseless assertion—that Florida's public universities are hotbeds of "woke indoctrination." In the course of their fellowship research, the Amici-Professors did not meet a single faculty member at Florida's public universities who believed that professors had a right to indoctrinate their students. In fact, indoctrination is fundamentally at odds with the "uninhibited exchange of ideas among teachers and students" that academic freedom promotes and protects. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985). As the 2007 AAUP *Freedom in the Classroom* report avers: "The essence of higher education does not lie in the passive transmission of knowledge but in the inculcation of a mature independence of mind." *Freedom in the*

*Classroom* (June 2007), AM. ASS'N OF UNIV. PROFESSORS, https://www.aaup.org/report/-freedom-classroom (hereafter, "AAUP *Freedom in the Classroom* Report").

Claiming that the Stop WOKE Act does not effectively ban critical concepts from the classroom altogether, the Defendants/Appellants write: "All the Act does is prohibit the State's educators from endorsing the enumerated concepts while teaching the State's curriculum, in the State's classrooms, on the State's time, in return for a State paycheck." (Def. Br. at 2). But this sounds like the language of a despotic regime—top-down governmental control of this kind is at odds with our democratic society.

The AAUP has always seen political interference as the most significant threat to academic freedom in the classroom. The very principles of academic freedom originally enshrined in the AAUP's 1915 *Declaration of Principles on Academic Freedom and Academic Tenure*, were in great part a response to the uptick in summary dismissals of faculty by presidents and boards of trustees. In that document, the AAUP noted that administrators, trustees, and state legislators would sometimes pressure faculty members to stop teaching "unpopular or dangerous subjects." Given the university's vital role as an "intellectual experiment station" dedicated to the "quest for truth" and the "public interest," this kind of arm-twisting is especially pernicious. As explained in the AAUP's 1915

*Declaration*, the quality of classroom instruction would inevitably suffer without faculty independence:

> No man can be a successful teacher unless he enjoys the respect of his students, and their confidence in his intellectual integrity. It is clear, however, that this confidence will be impaired if there is suspicion on the part of the student that the teacher is not expressing himself fully or frankly, or that college and university teachers in general are a repressed and intimidated class who dare not speak with that candor and courage which youth always demands in those whom it is to esteem.

1915 AAUP Declaration at 296.

## III. The Stop WOKE Act Chills Academic Freedom.

The Amici-Professors agree with Plaintiffs/Appellees that the Stop WOKE Act is way too vague. "[T]he Act fails to clearly define the particular conduct it prohibits"; "the abstract concepts prohibited by the Act are vague"; and "the savings clause exacerbates the Act's vagueness." (Br. of Pernell Plaintiffs/Appellees at 40-46). For example, the savings clause stipulates that the eight enumerated concepts may be discussed "as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." But, as Andrew Gothard, the president of the United Faculty of Florida Union, pointed out in an interview with the Amici-Professors: "It's very unclear who gets to decide what counts as objective. Does the student get to decide? Does the faculty member? Is there some third party that gets to decide how 'objective' is defined?" Interview with Andrew Gothard,

English Instructor, Fla. Atl. Univ. & President, United Faculty of Fla. Union (Feb. 22, 2023) ("Gothard Interview (Feb. 22, 2023)").

The Amici-Professors' research also documented the problems this law has created for Jeffrey Adler, professor of history at the University of Florida. Adler explained that there are "mandates about what we're not supposed to do and about what we're not supposed to say" but the details and specifics of the mandates remain amorphous. Interview with Jeffrey Adler, Professor of History, Univ. of Fla. (Jan. 23, 2023) ("Adler Interview (Jan. 23, 2023)"). In other words, the Stop WOKE Act is an "eerie combination of Orwell and Kafka." *Id.*

When the Amici-Professors interviewed Frank Fernandez, Assistant Professor of Higher Education Administration and Policy at the University of Florida, he made the following memorable statement: "The law is vague, but the message is clear." Interview with Frank Fernandez, Assistant Professor of Higher Education Leadership and Policy, Univ. of Fla. (Nov. 15, 2022) ("Fernandez Interview (Nov. 15, 2022)"). The message is that faculty members should simply avoid introducing topics related to race, racism, and social inequality. *Id.* And this view is consistent with the guidance provided to faculty by Florida's public colleges and universities after the Stop WOKE Act was passed. (Dist. Ct. Case No. 4:22-cv-324-MW-MAF, Doc. 1 at 24-31). At North Florida College, for instance, the college's attorney warned faculty that a professor "teaching a class on U.S.

History and Jim Crow laws could not tell students the historical fact that 'white people were responsible for enacting' Jim Crow laws." *Id.* at 27.

There are dire consequences for faculty members who violate the Stop WOKE Act. They may be fired or sued, and their institutions could lose millions of dollars in annual funding. And, despite the preliminary injunction against the Stop WOKE Act, the law has already had significant chilling effects. Based on media reports as well as the Amici-Professors' research, the Stop WOKE Act has negatively impacted teaching in the following areas: African American Studies, Communication and Media Studies, Educational Studies, History, Law, Philosophy, Political Science and Psychology. Research reveals that the burdens of the Stop WOKE Act fall particularly hard on faculty in the humanities and social sciences; untenured and contingent faculty; and faculty of color.

Robert Cassanello, associate professor in history at the University of Central Florida and the president of the university's chapter of the United Faculty of Florida Union, told the Amici-Professors that he has had numerous meetings with contingent faculty who feel intimidated by the Stop WOKE Act. Interview with Robert Cassanello, Assoc. Professor of History, Univ. of Cent. Fla. (Jan. 19, 2023). Many of them informed Cassanello that they decided to pre-emptively drop materials and content from their courses to avoid threats to their livelihoods. *Id.*

The Stop WOKE Act has resulted in what Kathleen Hilliard, associate professor of history at Iowa State University, refers to as "risk averse pedagogy." Interview with Kathleen Hilliard, Assoc. Professor of History & Director of Graduate Educ., Iowa State Univ. (Jan. 6, 2023). Professors are quietly dropping material from their courses, lest they run afoul of the law. *Id.* Andrew Gothard, president of the United Faculty of Florida union, reports that dozens of faculty from across the state are altering their syllabi and censoring themselves in the classroom. Gothard Interview (Feb. 22, 2023). In his words, "These people are reading the tea leaves of what the governor may or may not want, or what he may or may not target next. They are overcorrecting to make sure that they're not doing anything that could draw attention to themselves." *Id.*

An untenured faculty member at the University of Florida, who asked to remain anonymous for fear of reprisals, "know[s] of faculty in the humanities and political science who are thinking about whether they keep content in their lectures that they've taught in previous years or whether they really need to remove that, just to sidestep the potential harm to their careers." Interview with untenured faculty member who wishes to not be named (Nov. 17, 2022). That professor perceives that the Stop WOKE Act "is causing junior faculty in the humanities and the liberal arts non-negotiable amounts of stress in an already stressful job." *Id.*

Some junior faculty are even canceling entire classes to avoid violating the Stop WOKE Act. In the fall of 2022, Jonathan Cox, a tenure-track assistant professor of sociology at the University of Central Florida, canceled two courses because they included readings challenging the assertion that the United States is a colorblind society. Daniel Golden, *Muzzled by DeSantis, Critical Race Theory Professors Cancel Courses or Modify Their Teaching,* PROPUBLICA (Jan 3, 2023), https://www.propublica.org/article/desantis-critical-race-theory-florida-college-professors. Cox is concerned that "somebody who's not even in the class could come after me." *Id.* "Somebody sees the course catalog," . . . "complains to a legislator--next thing I know, I'm out of a job." *Id.* Cox's department chair said it was "an absolute tragedy that classes like this get canceled." *Id.* For the fall 2022 semester, the University of Central Florida Sociology department offered 39 courses. None of them focused primarily on race. *Id.*

In a recent article, Steven Kirn, a retired faculty member from the University of Florida, observed that the passage of the Stop WOKE Act has resulted in fewer applicants for lecturer positions. Carissa Allen, *Florida higher education union decries new "anti-WOKE" law,* WUFT NEWS (June 20, 2022), https://www.wuft.org/news/2022/06/20/florida-higher-education-union-decries-new-anti-woke-law/. The faculty already on campus, Kirn reported, "are hunkering down and saying the smart thing to do right now in this climate is to not stick your

head out of the foxhole. Got to do your work, keep your nose clean, don't bother anybody, don't do anything controversial. And that's not a vibrant academic environment." *Id.*

The current campus environment at Florida's public colleges and universities, according to Jeffrey Adler, is especially unwelcoming to faculty of color. He relayed to the Amici-Professors that the Stop WOKE Act, along with other higher education laws and initiatives, has prompted a number of his Black and Hispanic colleagues to look for work outside of Florida. Adler Interview (Jan. 23, 2023). They are willing to take significant pay cuts "because they think they are under siege." *Id.*

## IV. The Stop WOKE Act Compels Professors to Commit Educational Malpractice.

### A. The Stop WOKE Act prevents professors from teaching their subject matter.

The Stop WOKE Act prevents professors from teaching essential content in their fields. In an interview with the Amici-Professors, University of Florida assistant professor Frank Fernandez shared the following:

> One cannot graduate from a higher ed administration program without encountering critical race theory. I don't care whether you personally believe it, but you need to be familiar with it. I feel like it would be educational malpractice on my part if I did not teach theories or perspectives that are recognized as important and foundational knowledge for students to be aware of to do research and get jobs. To be clear, I'm not using malpractice here as a legal standard. I mean malpractice in terms of going against the professional norms[.]

Fernandez Interview (Nov. 15, 2022).

Imagine a chemistry professor who couldn't mention carbon, a biology professor barred from discussing DNA, or a physics professor forbidden from talking about gravity—this is the scale of educational malpractice the Stop WOKE Act engenders for many faculty in the humanities and social sciences.

**B. The Stop WOKE Act prevents professors from using the most common and effective teaching techniques.**

*1. Debate, playing devil's advocate, and assigning material from a range of viewpoints.*

By dictating that professors must not "espouse," "promote," or "advance" specific concepts or viewpoints, the Stop WOKE Act prevents them from using many of the most common and effective pedagogical strategies to promote student learning, from assigning texts with competing perspectives to playing devil's advocate and encouraging debate.

The Stop WOKE Act eliminates a professor's prerogative to assign materials they deem relevant in light of their expertise. If an article, white paper, op-ed, novel, podcast, film or any other kind of assigned material advances one of the eight prohibited concepts, professors must strike it from the curriculum. Of course, this dramatically curtails the range of ideas under discussion. It also fails to take into account the different reasons a professor may have for assigning particular materials. As the 2007 AAUP *Freedom in the Classroom* report explains:

> It is fundamental error to assume that the assignment of teaching materials constitutes their endorsement. An instructor who assigns a book no more endorses what it has to say than does the university library that acquires it. Assignment of a book attests only to the judgment that the work is worthy of discussion; it says nothing about the kind of discussion that the work will provoke or inspire.

AAUP *Freedom in the Classroom* Report.

In terms of teaching techniques, assuming the role of an adversary is a particularly powerful way for professors to both model and provide occasions for students to practice the art of argumentation. Playing devil's advocate and presenting opposing points of view is a common pedagogical strategy to sharpen the minds of students. Students cannot test the strength of their arguments without being challenged to consider and contend with counter-arguments. As John Stuart Mill's famous aphorism goes, "He who only knows his side of the case, knows little of that." John Stuart Mill, *On Liberty,* at 67 (available as e-book via Project Gutenberg, Jan. 10, 2011), https://www.gutenberg.org/files/34901/34901-h/34901-h.htm. By limiting the viewpoints a professor can express, the Stope WOKE Act is ultimately denying students the opportunity to develop their critical thinking skills.

The "objective manner" savings clause in the Act further constricts a professor's ability to engage in classroom discussion and debate. In a recent publication, University of Florida professor of law Katheryn Russell-Brown, presents a scenario from a law school classroom to drive this point home. Katheryn Russell-Brown, *"The Stop WOKE Act": HB 7, Race, and Florida's 21st Century*

*Anti-literacy Campaign,* 2022 UF LAW PUBL'NS 1200, https://scholarship.law.ufl.edu/facultypub/1200. During a class on the death penalty, a law professor assigns material on the demographic data of death row inmates. *Id.* at 23. And a student may ask the professor: "What's your opinion on whether the death penalty operates in a racially discriminatory and unconstitutional manner"? But the professor must remain silent to avoid the risk of "endorsing" concept number 3 ("A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex"). *Id.* at 23-24. While students can air opinions under the Stop WOKE Act, the professor is silenced in the precise area of her expertise. *Id.* at 24.

*2. Implications for critical thinking and citizenship.*

Professors are uniquely situated to provide an insider's window into the nuts and bolts of classroom instruction and how the Stop WOKE Act hampers the development of crucial critical thinking skills. Banning particular viewpoints from the classroom hamstrings their ability to do the very job they are entrusted with, which is to train independent thinkers. Examining available evidence and considering different arguments are essential elements of critical thinking. The motivation behind giving students the full breadth of scholarly viewpoints is not to indoctrinate them. To the contrary, it is intended to make students *less* susceptible to indoctrination. Once students are familiar with the range of expert viewpoints on

an issue, they are better equipped to see things from multiple perspectives, rigorously evaluate arguments and form their own considered judgements.

The Stop WOKE Act prevents students from acquiring the basic knowledge that is necessary to engage meaningfully with some of the most pressing issues of our time. Because of prohibited concept number 6 ("A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion"), students would not be able to read any material that endorses affirmative action, including the landmark 1978 *Bakke* Supreme Court case that established the parameters of affirmative action in higher education. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978). The constitutionality of affirmative action in college admissions is currently being considered by the U.S. Supreme Court in two cases: *Students for Fair Admissions v. University of North Carolina*, Docket No. 21-707; and *Students for Fair Admissions v. President and Fellows of Harvard College*, Docket No. 20-1199. *See* Bianca Quilantan, *How the Supreme Court's decision on affirmative action may change the future of college*, POLITICO (June 22, 2023), https://www.politico.com/news/2023/06/22/the-supreme-court-could-end-race-in-college-admissions-heres-what-to-know-00103149. Yet, under the Stop WOKE Act, Florida's public university professors cannot discuss with students the topic of

affirmative action. Absent the opportunity to examine the full range of opinions, students will have but a shadow of an understanding of this important issue.

In limiting students' ability to think through the pros and cons of vital public policy debates like affirmative action, the Stop WOKE Act provides a recipe for civic illiteracy. In the words of Michael Carpini, Emeritus Professor of Communication and Democracy at the University of Pennsylvania:

> Responsible and responsive democracy requires citizens that are willing and able to engage with each other and its leaders in informed, robust, and productive ways. It also requires an understanding that well-intentioned people can legitimately disagree on how best to address the many difficult problems we face, or even what those problems are. Developing such citizens…should be a central goal of higher education.

Kristen de Groot, *Higher Education's Role in Democracy*, PENN TODAY (Nov. 2, 2022), https://penntoday.upenn.edu/news/higher-educations-role-democracy.

If we think of classrooms as laboratories of democracy, the Stop WOKE Act is undermining their potential as sites of deliberation, experimentation, and innovation.

### C. The Stop WOKE Act whitewashes history.

#### *1. "You need to deny reality to teach according to this law."*

It is no exaggeration to say that the Stop WOKE Act makes it impossible to teach the truth of U.S. history, not to mention the harsh realities of history across the globe. To paraphrase historian Benjamin Quarles, the truth may set you free but

it also makes you sick. BENJAMIN QUARLES, BLACK MOSAIC: ESSAYS IN AFRO-AMERICAN HISTORY AND HISTORIOGRAPHY 207 (1988). The historical record is filled with shocking, heart-breaking and horrifying events—slavery, the Trail of Tears, the Holocaust, and 9/11, to name a few. Teaching history with accuracy and integrity will necessarily elicit strong emotions. That's why the Stop WOKE Act's seventh forbidden concept, in particular, poses such serious problems for history instruction. It reads as follows: "A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex."

There are myriad historical topics that have the potential to elicit a sense of "personal responsibility" and "psychological distress" in students because of past actions committed by people who share their racial background or national origin. Like many U.S. students, Amicus-Professor Jeffrey Aaron Snyder was profoundly disturbed when he first learned about the horrors of slavery and Jim Crow. As a white U.S. citizen, this distress was accompanied by a sense of personal responsibility to help rectify past injustices perpetrated by white Americans. In Snyder's view, gaining historical knowledge and developing empathy was a

positive outcome—not something to be prohibited, as the state of Florida would have it.

Were Amicus-Professor Amna Khalid teaching in Florida, there would be many important topics in South Asian history that she would have to drop. Her entire class on colonial rule in India would have to be struck. Any foray into the brutality and injustice of British rule would violate the Stop WOKE Act if a British student claimed they were disturbed or upset. In her course on contemporary India, Professor Khalid would not be able to discuss the role of Hindu extremists in the mass murder and sexual assault of Muslims in Gujarat in 2002, lest one of her Hindu students from India feel "guilt, anguish, or other forms of psychological distress."

The past is littered with gross injustices inflicted by one group against another, and history instruction should not sugar-coat or omit these significant moments. "I cover horrific events," Plaintiff Adriana Novoa told the Amici-Professors. She explained:

> If you are a decent human being, you will be bothered by them. You will be disturbed and uncomfortable when I teach about the massacres in Guatemala. What happens if a student is upset by reading documents that come from the United States archives about US participation in the massacres? The problem is that you need to deny reality to teach according to this law. And that is my issue with HB 7. It makes it impossible to teach the topics I need to address.

Interview with Adriana Novoa, Assoc. Professor of History, Univ. of S. Fla. (Oct. 17, 2022).

### *2. Primary sources cannot be taught.*

Primary sources, as the Library of Congress explains, are the "raw materials of history" comprised of the "original documents and objects that were created at the time under study." *Getting Started with Primary Sources*, LIBR. OF CONG., https://www.loc.gov/programs/teachers/getting-started-with-primary-sources/. They are absolutely essential to historical analysis, interpretation and understanding. There are countless examples of regularly assigned primary sources that would violate the Stop WOKE Act, as they "advance," "espouse" or "endorse" one or more of the prohibited concepts. Consider concept 1, "Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex." The idea that white people are superior to people of color is a powerful throughline that has run across hundreds of years of U.S. history. It's not possible to read some of the most famous texts and speeches delivered by our most esteemed Presidents without encountering it.

Take Thomas Jefferson's landmark 1785 book *Notes on the State of Virginia*, where he articulated his "suspicion" that "the blacks, whether originally a distinct race, or made distinct by time and circumstances, are inferior to the whites in the endowments both of body and mind." Thomas Jefferson, *Notes on the State*

*of Virginia*, available online at https://docsouth.unc.edu/southlit/-jefferson/jefferson.html. Or the famous 1858 Abraham Lincoln-Stephen Douglas debates during which Lincoln said: "there is a physical difference between the white and black races which I believe will forever forbid the two races living together on terms of social and political equality. And inasmuch as they cannot so live, while they do remain together there must be the position of superior and inferior, and I as much as any other man am in favor of having the superior position assigned to the white race." Abraham Lincoln, Fourth Debate with Stephen A. Douglas at Charleston, Illinois, *in* 5 COLLECTED WORKS OF ABRAHAM LINCOLN 145, 145-46, available online at https://quod.lib.umich.edu-/l/lincoln/lincoln3/1:20.1?rgn=div2;view=fulltext.

The Stop WOKE Act would prohibit students from engaging with these sources, or any other primary sources that express the concept of white supremacy. It is understandable that the state of Florida now finds the notion of superior and inferior races abhorrent—but is it not strange that a law purportedly designed to combat present-day race discrimination effectively prevents students from studying race discrimination in the past? As John Hope Franklin argued in 1957, we have to confront the "wickedness of human exploitation and injustice that have characterized too much of this nation's past" if we hope to "build a better

America." John Hope Franklin, *The New Negro History,* 64 THE CRISIS 67, 75 (James W. Ivy ed., Feb. 1957).

Understanding our past is inextricably linked to the health of our democracy. To quote UCLA's history department:

> [K]nowledge of history is the precondition of political intelligence. Without history, a society shares no common memory of where it has been, what its core values are, or what decisions of the past account for present circumstances. Without history, we cannot undertake any sensible inquiry into the political, social, or moral issues in society. And without historical knowledge and inquiry, we cannot achieve the informed, discriminating citizenship essential to effective participation in the democratic processes of governance and the fulfillment for all our citizens of the nation's democratic ideals.

*Significance of History for the Educated Citizen*, UCLA HISTORY PUBLIC HISTORY INITIATIVE, https://phi.history.ucla.edu/nchs/preface/significance-history-educated-citizen/.

**D. The Stop WOKE Act is an unprecedented and dangerous attack on academic freedom.**

Ellen Schrecker, professor emerita at Yeshiva University and leading expert on McCarthyism in the universities, believes that what is happening in Florida today is worse than what happened under McCarthy. Interview with Ellen Schrecker, Professor Emeria of History, Yeshiva Univ. (Jan. 7, 2023). As she explained in a 2021 article, "[t]he Red Scare of the 1950s marginalized dissent and chilled the nation's campuses, but it did not interfere with such matters as

curriculum or classroom teaching." Ellen Schrecker, *Yes, these bills are the new McCarthyism*, ACADEME BLOG (Sept. 12, 2021), https://academeblog.org/-2021/09/12/yes-these-bills-are-the-new-mccarthyism/. In other words: while there have been prior attempts to ban particular speakers and organizations from campus (notably Communist or Socialist individuals and organizations during the Cold War), the attempt to prohibit the expression of particular *ideas* is unique to our current moment.

"We ought to learn from history," the AAUP urges, "that education cannot possibly thrive in an atmosphere of state-encouraged suspicion and surveillance." AAUP *Freedom in the Classroom* Report. The quality of education is eroded when state universities are governed by diktats that tell professors what they can and cannot teach. Amna Khalid & Jeffrey Aaron Snyder, *Dark Times for Academic Freedom in the Sunshine State,* PERSUASION (Feb. 10, 2023) https://www.persuasion.-community/p/dark-times-for-academic-freedom-in; Amna Khalid & Jeffrey Aaron Snyder, *Conservative Attacks on Higher Ed are Attacks on Democracy*, CHRON. OF HIGHER EDUC. (Apr. 13, 2023) https://www.chronicle.com/article/conservative-attacks-on-higher-ed-are-attacks-on-democracy. With the Stop WOKE Act in place, critical thinking skills will atrophy and students will be woefully unprepared to take on their roles as citizens.

## CONCLUSION

The preliminary injunction should be upheld.

Respectfully submitted this 23rd day of June, 2023.

/s/ *Laurie Webb Daniel*
Laurie Webb Daniel
Georgia Bar No. 204225
Matthew D. Friedlander
Georgia Bar No. 416707
Skyler McDonald
Georgia Bar No. 599142
WEBB DANIEL FRIEDLANDER LLP
75 14th Street N.W.
Suite 2450
Atlanta, GA 30309
T: (404) 433-6430
laurie.daniel@webbdaniel.law
matthew.friedlander@webbdaniel.law
skyler.mcdonald@webbdaniel.law

*Counsel for Professors Amna Khalid and Jeffrey Aaron Snyder, as Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 5,634 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. Rule 32-4.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

This 23rd day of June, 2023.

/s/ *Laurie Webb Daniel*
Laurie Webb Daniel

*Counsel for Professors Amna Khalid and Jeffrey Aaron Snyder, as Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, I electronically filed the foregoing **BRIEF OF PROFESSORS AMNA KHALID AND JEFFREY AARON SNYDER AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS/ APPELLEES** with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, which I understand will automatically send an e-mail notification of such filing to the counsel of record for this matter.

/s/ *Laurie Webb Daniel*
Laurie Webb Daniel

*Counsel for Professors Amna Khalid and Jeffrey Aaron Snyder, as Amici Curiae*