No. 22-13994

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ADRIANA NOVOA, ET AL.,

*Plaintiffs-Appellees*,

v.

MANNY DIAZ, JR., ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of Florida, No. 4:22-cv-324-MW-MAF

# BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES

Jay R. Schweikert
    *Counsel of Record*
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 216-1461
jschweikert@cato.org

*Counsel for the Cato Institute*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule No. 26.1(a)(6), *amicus* certifies that the following persons have an interest in the outcome:

1. Cato Institute, *amicus curiae*

2. Jay Schweikert, counsel for *amicus curiae*

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus*'s participation.

Respectfully submitted,

/s/ *Jay R. Schweikert*

June 23, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICUS CURIAE* ........................................................1

SUMMARY OF THE ARGUMENT ......................................................2

ARGUMENT ...................................................................................4

I.   FLORIDA'S CLAIM THAT PROFESSORS AT PUBLIC UNIVERSITIES ENGAGE IN "GOVERNMENT SPEECH" WHEN THEY TEACH IS UNSUPPORTED BY CASELAW. ...............................................4

II.  FLORIDA'S CLAIM THAT PROFESSORS AT PUBLIC UNIVERSITIES HAVE NO FREE SPEECH RIGHTS WHEN THEY TEACH IS A GRAVE ATTACK ON ACADEMIC FREEDOM. ...................................11

CONCLUSION ...............................................................................16

CERTIFICATE OF COMPLIANCE.....................................................18

CERTIFICATE OF SERVICE .............................................................19

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Trs. of UNC-Wilmington*, 640 F.3d 550 (4th Cir. 2011)............................7

*Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991)......................................... passim

*Connick v. Myers*, 461 U.S. 138 (1983)................................................................3, 5

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)............................................ 7, 9, 15

*Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488 (3d Cir. 1998) ...................................10

*Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332 (6th Cir. 2010)................................8

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ...................................................... 3, 5, 6

*Grutter v. Bollinger*, 539 U.S. 306 (2003)...............................................................9

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)................................. 3, 12, 14, 16

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007) ...............8

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ........................................7, 14

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ...............................................................12

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)....................................................3, 4

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .......................................................2

*Shelton v. Tucker*, 364 U.S. 479 (1960)...................................................................12

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ................................. 11, 12, 13, 15

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .......................8

*United States v. Associated Press*, 52 F.Supp. 362 (S.D.N.Y. 1943).....................14

**Statutes**

Fla. Stat. § 1000.05(9)................................................................................................2

Fla. Stat. §1000.05(4)(a) .......................................................................................2, 12

**Other Authorities**

Afshan Jafar et al., Am. Ass'n of Univ. Professors, *Preliminary Report of the Special Committee on Academic Freedom and Florida* (May 24, 2023)........................13

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, files *amicus* briefs in courts across the nation, and issues the annual *Cato Supreme Court Review*.

*Amicus* is interested in this case because it touches on core First Amendment questions of public-employee speech and academic freedom, with potentially grave ramifications for higher education in Florida and across the nation.

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in whole or in part. No one other than *amicus* and its members made monetary contributions to its preparation or submission. All parties have consented to the filing of this brief.

## SUMMARY OF THE ARGUMENT

The Stop WOKE Act is an attempt by the state of Florida to dictate what professors at public universities may and may not say in the classroom. At present, the Act proscribes eight viewpoints, ranging from belief in systemic racism to support for affirmative action. Fla. Stat. §1000.05(4)(a)(1)–(8). These perspectives are popular among progressives on campus—and now, voicing support for them while teaching is against the law. A professor who "espouses, promotes, [or] advances" one of the forbidden viewpoints, Fla. Stat. § 1000.05(4)(a), exposes herself to lawsuits and her university to heavy sanctions. Fla. Stat. § 1000.05(9), 92(5).

The First Amendment forbids viewpoint discrimination. This is so even when the government takes aim at historically unprotected speech, like obscenity or fighting words. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387–88 (1992). Faced with the Herculean task of making a law that suppresses viewpoints among those who wish to engage in *protected* speech appear constitutional, the state of Florida seeks refuge in an extreme position. It argues that professors at public universities enjoy no free speech rights at all when they teach—that what comes out of their mouths in the classroom or lecture hall is "government speech, which is wholly unprotected by the First Amendment." Br. of Defs.-Appellants at 11.

*Amicus* writes separately to refute this claim. *First*, it is squarely contradicted by caselaw: The Supreme Court declined to apply its reasoning in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), to university professors, in recognition of the fact that "expression related to academic scholarship or classroom instruction" may "implicate[] additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." 547 U.S. at 425. Absent Florida's attempt to extend *Garcetti* to where it explicitly does not reach, that leaves college professors with free speech rights on the job—albeit ones that can under some circumstances be regulated, in line with the Supreme Court's jurisprudence on speech by government employees in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983), as well as the balancing test this Court set down for university professors in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991).

*Second*, Florida's wholesale rejection of First Amendment rights for college professors when they speak in the classroom is a grave assault on academic freedom. Supreme Court precedent has long recognized that this freedom is "a special concern of the First Amendment," and that it is of "transcendent value" to American culture and society. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). The state's position to the contrary, if endorsed by this Court, would force professors under precisely such a "pall of orthodoxy" as *Keyishian* concluded the Constitution "does

not tolerate," badly damaging the reputation of Florida's public universities in the process. *Id.*

## ARGUMENT

## I. FLORIDA'S CLAIM THAT PROFESSORS AT PUBLIC UNIVERSITIES ENGAGE IN "GOVERNMENT SPEECH" WHEN THEY TEACH IS UNSUPPORTED BY CASELAW.

At times, the government may lawfully regulate speech by its employees when it could not punish the same speech by a private individual. This is so because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Nevertheless, government employees are not "constitutionally […] compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Id.*

The task thus becomes to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id. See also Bishop v. Aronov*, 926 F.2d 1066, 1072 (11th Cir. 1991) ("Though *Pickering* addresses only out-of-school speech by teachers, we take it as our starting point because of the balancing it suggests. In and out of school, some balance must be reached.").

4

Until the Supreme Court's 2006 decision in *Garcetti*, the one critical question to be answered by a court before it embarked on a balancing of interests was whether the speech at issue was on a matter of public concern; if it was not, the government employer was allowed to prohibit the speech as it saw fit. *Connick v. Myers*, 461 U.S. 138, 146 (1983) ("When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.").

*Garcetti v. Ceballos*, 547 U.S. 410 (2006), introduced a new wrinkle, in the form of a second pre-balancing question. Under *Garcetti*, even if the speech at issue is on a matter of public interest and so otherwise subject to balancing analysis, the government employer wins by default if the employee said what he said "pursuant to [his] official duties." 547 U.S. at 421. The denial of First Amendment rights to employees speaking in such a manner is absolute: "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* This is the "pure government speech" Florida envisions for its professors.

However, the state's line of argument here was anticipated by the *Garcetti* Court. Writing in dissent, Justice Souter observed that the "domain beyond the pale

of the First Amendment" the majority had carved out was "spacious enough to include even the teaching of a public university professor, and I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write 'pursuant to […] official duties.'" *Garcetti,* 547 U.S. at 438 (Souter, J., dissenting).

The majority acknowledged the legitimacy of this concern. Recognizing the possibility that its holding (on the free speech rights of a deputy district attorney speaking as part of his job) could have "important ramifications for academic freedom, at least as a constitutional value," the Court concluded that it "need not, and for that reason do[es] not, decide whether the analysis [it] conduct[s] would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* at 425.

Florida acknowledges that "*Garcetti* reserved the question whether its holding applies to classroom instruction." Br. of Defs.-Appellants at 12. But as the lower court pointed out, "[r]efusing to take 'no' for an answer, Defendants assert this Court must apply *Garcetti*'s reasoning to the professor speech at issue here, notwithstanding the Supreme Court's explicit refusal to do so. […] Defendants cast the Supreme Court's clear constitutional concerns aside." App. 314.

The state of Florida may be reluctant to take instruction from the Supreme Court, but circuit courts have had no difficulty abiding by the limitations set forth in *Garcetti*. Indeed, as Appellees explain in detail in their brief, every circuit court to squarely consider the question has refused the application of *Garcetti* to academic expression in higher education. Br. of Appellees at 40–46. *See, e.g.*, *Adams v. Trs. of UNC-Wilmington*, 640 F.3d 550, 562, 564 (4th Cir. 2011) (holding that, in the case of a professor retaliated against by his public employer for speaking on political and religious topics, "*Garcetti* would not apply in the academic context of a public university as represented by the facts of this case" and that "[a]pplying *Garcetti* to the academic work of a public university faculty member under the facts of this case could place beyond the reach of First Amendment protection many forms of public speech or service a professor engaged in during his employment"); *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) (concluding that "if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court"); *Meriwether v. Hartop*, 992 F.3d 492, 505–06 (6th Cir. 2021) ("Simply put, professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship. […] If professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity.").

7

Florida tries to shore up its argument that *Garcetti* can be made to apply to college professors by citing several cases that, according to the state, stand for the proposition that "the government speech doctrine applies to in-class instruction by state-employed educators." Br. of Defs.-Appellants at 29. The fatal flaw with this argument, however, is that the "state-employed educators" in the state's major cases were schoolteachers, not college professors—a distinction on which these decisions were quite clear. *See Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 343 (6th Cir. 2010) (noting that "*Garcetti*'s caveat offers no refuge to Evans-Marshall" because she "is not a teacher at a 'public college[ ]' or 'universit[y]'" (alterations in original)); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) (contrasting "constitutional protection of scholarly viewpoints in post-secondary education" with the speech of "primary and secondary teachers, when conducting the education of captive audiences").

To be sure, primary and secondary schools themselves are not First Amendment-free zones: "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). But in such schools, speech restrictions are more permissible than they are in universities, which, "given the important purpose of public education and the expansive freedoms of speech and thought associated with the university

environment, […] occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Whether a restriction on the speech of public schoolteachers passes constitutional muster says little about whether the same restriction would be constitutional as applied to university professors.

In sum, to defend a law that engages in flagrant viewpoint discrimination, the state of Florida has staked out the position that professors at public universities enjoy no free speech rights whatsoever when they speak as part of their job duties, like teaching in the classroom. This view was recognized as extreme and dangerous in the very Supreme Court decision Florida leans on for support, and the sister circuits of this Court have followed the *Garcetti* Court's guidance and concluded, rightly, that college professors are protected by the First Amendment when they speak on the job. This Court should do likewise.

Of course, such a holding would not mean that college professors' speech cannot be regulated by their employers at all. With *Garcetti* inapplicable, the framework to apply is simply the traditional *Pickering-Connick* test, or circuit adaptations thereof. *See, e.g., Demers*, 746 F.3d at 412 ("We hold that academic employee speech not covered by *Garcetti* is protected under the First Amendment, using the analysis established in *Pickering*."). And the adaptation in this circuit is the test set forth by this Court in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991).

As a threshold matter, *Bishop* squarely acknowledges the First Amendment rights of university professors engaged in classroom speech. 926 F.2d at 1075 ("The University, by its memo […] restricted the instructional activities of Dr. Bishop […] We read the memo's restrictions narrowly because they implicate First Amendment freedoms."). While this Court in *Bishop* declined to find that "academic freedom is an *independent* First Amendment right," it "consider[ed] the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment" as an integral part of its balancing test. *Id.* (emphasis added).

Judicial commentary on *Bishop* has likewise recognized the case's strong statement in favor of academic free speech rights. *See Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) (acknowledging *Bishop*'s "finding that a public university's restrictions on a professor's in-class speech 'implicate[d] First Amendment freedoms'") (internal citation omitted). And as the lower court in this case recognized, "if *Bishop* stands for anything, it is that the First Amendment places some limit on the State's ability to prohibit what a professor may say in a university classroom." App. 319.

Again, such recognition does not make a professor's free speech rights dispositive as to the outcome of a First Amendment challenge. In fact, this Court's balancing was not favorable to Dr. Bishop. *Bishop*, 926 F.2d at 1076 ("Dr. Bishop's interest[s] in academic freedom and free speech do not displace the University's

10

interest inside the classroom."). But to go beyond such balancing considerations and suggest, as Florida does, that university professors enjoy no free speech right *at all* is flatly at odds with this Court's precedent.

## II. FLORIDA'S CLAIM THAT PROFESSORS AT PUBLIC UNIVERSITIES HAVE NO FREE SPEECH RIGHTS WHEN THEY TEACH IS A GRAVE ATTACK ON ACADEMIC FREEDOM.

As the Supreme Court has long recognized, "[t]he essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation […] Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

With the passage of the Stop WOKE Act, the state of Florida has imposed exactly such a "strait jacket." But with its assertion that the professors so straitjacketed have nothing to complain of, since they have no free speech rights to lose in any event, it has gone a step further—from an unwise and presumptively unconstitutional piece of viewpoint-discriminatory legislation to a bald denial of the very freedom that the *Sweezy* Court considered all but "self-evident." As a practical matter, that freedom is essential to the very functioning of higher education. "No

field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes." *Sweezy*, 354 U.S. at 250.

Yet Florida has declared eight principles that are popular topics of contemporary academic and social debate to be off limits for professors to "espouse[], promote[], [or] advance[]" in the classroom. Fla. Stat. § 1000.05(4)(a). Such ignoble attempts by states to cut off social debate through educational legislation are, sadly, not uncommon throughout our nation's history, but they have been soundly and consistently rejected. *See, e.g., Meyer v. Nebraska*, 262 U.S. 390, 403 (1923) (law prohibiting the teaching of and in foreign languages struck down as unconstitutional); *Sweezy*, 354 U.S. at 266–67 (New Hampshire legislative inquiry into the allegedly subversive content of a university lecture held unconstitutional); *Shelton v. Tucker*, 364 U.S. 479, 490 (1960) (Arkansas law compelling professors to disclose their membership in various organizations struck down as unconstitutional); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 592–93 (1967) (New York law mandating ideological purity oaths for professors struck down as unconstitutional).

If Florida's attempt to legislate the "correct" answers to controversial social science questions is successful, it will severely damage the reputation of Florida colleges and the quality of the education they offer. As this Court observed in

*Bishop*, "quality faculty members will be hard to attract and retain if they are to be shackled in much of what they do." 926 F.2d at 1075. In a recently released report on the post-Stop WOKE educational situation in Florida, the American Association of University Professors laments that "filling [academic] positions with any qualified candidates is becoming difficult" and "candidates are turning down job offers in Florida even without having any other offers in hand." Afshan Jafar et al., Am. Ass'n of Univ. Professors, *Preliminary Report of the Special Committee on Academic Freedom and Florida* 16 (May 24, 2023).[2] According to the report, faculty members are compromising their teaching by "changing syllabi or assignments out of a sense of caution." One tenured law professor reported that "'[t]here is literally not a class I teach where I am not somehow violating policies and laws.'" *Id.* As the Supreme Court observed in *Sweezy*, "[s]cholarship cannot flourish in an atmosphere of suspicion and distrust." 354 U.S. at 250.

Moreover, Florida's infringement on academic freedom is a legislative salvo in the culture wars, and one without an obvious limiting principle. If instruction by professors at public schools becomes subject to the ideological constraints of whichever party is in power, higher education in Florida will devolve into a cynical exercise in partisan politics. Forcing college professors not to express support for one set of viewpoints in a current academic and social debate is as stark an example

---

[2] *Available at* https://www.aaup.org/file/Preliminary_Report_Florida.pdf.

as could be imagined of the "pall of orthodoxy over the classroom," *Keyishian*, 385 U.S. at 603, intolerable to both the First Amendment and America's "deep[] commit[ment] to safeguarding academic freedom." As the *Keyishian* Court observed, "[t]he classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" *Id.* (citing *United States v. Associated Press*, 52 F.Supp. 362 (S.D.N.Y. 1943)).

In addition to these practical and constitutional objections to Florida's scheme to dictate the views professors may express in the classroom, the state's position that professors have no free speech rights when they teach fundamentally misunderstands the role of academic speech in a free society. To wit, it would be not only unwise and unjust, but *illogical* to apply *Garcetti* to university professors, because the "official duties" of such employees include not just teaching, but researching and expressing opinions on their particular academic subject matters. Indeed, the other circuit courts that have rejected the application of *Garcetti* in this context have relied in part on exactly this principle. *See, e.g.*, *Meriwether*, 992 F.3d at 507 (recognizing that "[t]he need for the free exchange of ideas in the college classroom is unlike that in other public workplace settings" because "in the college classroom[,] there are three critical interests at stake (all supporting robust speech protection): (1) the

students' interest in receiving informed opinion, (2) the professor's right to disseminate his own opinion, and (3) the public's interest in exposing our future leaders to different viewpoints"); *Demers*, 746 F.3d at 411 (holding that "teaching and academic writing are at the core of the official duties of teachers and professors" and that "*Garcetti* does not—indeed, consistent with the First Amendment, cannot— apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor").

In other words, these courts have recognized the same truth: that teaching on matters of public concern, including opining on those matters, is *part of the job* of a professor. This aspect of the job will necessarily be most prominent in the humanities, where the Plaintiff-Appellee professors teach and "few, if any principles are accepted as absolutes." *Sweezy*, 354 U.S. at 250. But professorial viewpoints will be expressed in any discipline, and for several different educational purposes. They might be sincerely held. They might be assumed for the sake of argument, as in a Socratic exchange between a professor and a student. Or they might be expressed as opposing viewpoints for a classroom debate. As Florida conceded below, voicing an opinion for any of these purposes is unlawful under the Stop WOKE Act. App. 300– 02.

Florida thus encourages this Court to agree that it is reasonable to deny professors, who are hired in part to express opinions, any constitutional latitude to

do so. That is about as sensible as hiring a sushi chef and forbidding her to use knives, or demanding that a golfer play without his clubs. By arguing that what comes out of a public university professor's mouth when she teaches is merely "government speech" that may be set down by legislative fiat, Florida has fundamentally misunderstood the role of a teacher in higher education.

What the state envisions is certainly grim, and more than a little dronelike in in its vision of professors as directed by an intelligence not their own. But fortunately for Florida's college students, this view does not accurately describe the role of professors at public universities, whose expressions of opinion in the classroom are protected by the "special concern of the First Amendment," *Keyishian*, 385 U.S. at 603, as well as by the "strong predilection for academic freedom as an adjunct of the free speech rights" of that Amendment. *Bishop*, 926 F.2d at 1075.

## CONCLUSION

For the foregoing reasons, this Court should affirm the lower court's holding that professors at public universities enjoy First Amendment rights when they teach. Furthermore, these rights must be incorporated into any attempt under relevant precedent to balance professors' interest in speech with their employer's interest in workplace regulation.

Respectfully submitted,

DATED: June 23, 2023.                    */s/ Jay R. Schweikert*

16

Jay R. Schweikert
  *Counsel of Record*
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 216-1461
jschweikert@cato.org

*Counsel for the Cato Institute*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32, I certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. 29(a)

because it contains 3,704 words, excluding the parts exempted by Fed. R. App. P.

32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been

prepared in a proportionally spaced typeface in 14-point Times New Roman font.

/s/ *Jay R. Schweikert*
June 23, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court, who will enter it into the CM/ECF system, which will send a notification of such filing to the appropriate counsel.


_/s/ Jay R. Schweikert_
June 23, 2023