

March 17, 2025

**<u>Via</u> ECF**
David J. Smith
Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

      Re:   *Novoa v. Commissioner of the FL State Board of Education, et al.*,
               No. 22-13994, Plaintiffs-Appellees' Notice of Supplemental Authority

Dear Mr. Smith:

     Under Federal Rule of Appellate Procedure 28(j), Plaintiff-Appellees Adriana Novoa and the First Amendment Forum at the University of South Florida bring the Court's attention to the Seventh Circuit's recent decision in *Kilborn v. Amiridis*. There, the Seventh Circuit joined the Second, Fourth, Fifth, Sixth, and Ninth Circuits in holding that *Garcetti*'s "official duties" framework does not apply to speech related to scholarship or teaching in higher education. No. 23-3196, 2025 WL 783357, at *4 (7th Cir. Mar. 12, 2025). *Kilborn* underscores why that is the correct view of the law and why the State is wrong here on two pivotal issues.

     First, *Kilborn* undermines the State's claim that faculty speech is unprotected government speech, affirming that "the university classroom is 'peculiarly the marketplace of ideas.'" 2025 WL 783357, at *6 (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)).

     Second, *Kilborn* shows the State mistakenly relies on cases involving primary and secondary school teaching, like *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007), to argue it can control a professor's in-class instruction. Appellants' Br. 7, 29. As *Kilborn* rightly notes, *Mayer*'s holding does not apply to university professors. 2025 WL 783357, at *4. Like *Bishop*, *Kilborn* acknowledges that a professor's First Amendment rights may be abridged only after a careful balancing test. *Bishop v. Aronov*, 926 F.2d 1066, 1072–75 (11th Cir. 1991) (citing *Pickering v. Board of Education*, 391 U.S. 563 (1968)); *Kilborn*, 2025 WL 783357, at *7–8. The Stop WOKE Act does not balance; it simply censors endorsement of eight concepts. Because censorship does not further any legitimate pedagogical concern,

David J. Smith; Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
March 17, 2025
Page 2 of 2

the Stop WOKE Act necessarily fails the *Bishop* and *NTEU* balance. Appellees' Br. 25–38.

*Kilborn* is yet one more decision affirming that the First Amendment protects faculty speech. Appellees' Br. 42. As the Second, Fourth, Fifth, Sixth, Seventh, and Ninth Circuits have, this Court should hold *Garcetti*'s "official duties" framework does not apply to speech related to scholarship or teaching in higher education.

Sincerely,

Greg Harold Greubel
IA Bar No. AT0015474; PA Bar No. 321130;
NJ Bar No. 171622015; CA Bar No. 343028
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
Tel: (215) 717-3473, ext. 230
greg.greubel@thefire.org

*Attorney for Plaintiffs-Appellees Adriana Novoa, Sam Rechek, and the First Amendment Forum.*

cc:    All Counsel of Record via ECF

Encl. *Kilborn v. Amiridis*, No. 23-3196, 2025 WL 783357 (7th Cir. Mar. 12, 2025)

2025 WL 783357
Only the Westlaw citation is currently available.
United States Court of Appeals, Seventh Circuit.

Jason J. KILBORN, Plaintiff-Appellant,
v.
Michael AMIRIDIS, et al., Defendants-Appellees.

No. 23-3196
|
Argued September 19, 2024
|
Decided March 12, 2025

**Synopsis**
**Background:** Law school professor filed § 1983 action against state university officials alleging that his discipline for including expurgated racial slur in law school exam question violated his constitutional rights to free speech and due process. The United States District Court for the Northern District of Illinois, Sara L. Ellis, J., 2023 WL 7219998, dismissed complaint, and professor appealed.

**Holdings:** The Court of Appeals, Kirsch, Circuit Judge, held that:

as matter of first impression, professor's exam question and in-class remarks were protected by First Amendment;

it was clearly established that First Amendment offered qualified protection to professors at public universities;

professor's exam question, his out-of-class statements to students regarding his reaction to controversy caused by exam questions, and in-class remarks about frivolous litigation and pretextual police stops were protected by First Amendment;

issue of whether university's interest in ensuring that its students could learn free of harassment outweighed professor's First Amendment rights involved fact questions that could not be resolved on motion to dismiss;

it was not clearly established that public employer's requirement that employee attend diversity training program violated employee's First Amendment right against compelled speech;

university's suspension of professor with pay did not violate his procedural due process rights;

professor did not have protected property interest in raise;

professor plausibly pled injury-in-fact required for standing to seek injunction; and

university's nondiscrimination policy was not unconstitutionally vague.

Affirmed in part, reversed in part, vacated in part, and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 22 C 475 — Sara L. Ellis, *Judge.*

**Attorneys and Law Firms**

Patrick F. Solon, Attorney, Vitale, Vickrey, Niro, Solon & Gasey LLP, Chicago, IL, for Plaintiff-Appellant.

Elizabeth E. Babbitt, John F. Kennedy, Paul Coogan, Andrew S. Murphy, Elizabeth Ann Winkowski, Attorneys, Taft Stettinius & Hollister LLP, Chicago, IL, for Defendants-Appellees.

Joshua M. File, Attorney, Katz, Friedman, Eisenstein, Johnson, Bareck & Bertuca, Chicago, IL, for Amici Curiae Sean M. Anderson, Amitai Aviram, Ralph Brubaker, Matthew W. Finkin, Attorney, Eric T. Freyfogle.

Rima N. Kapitan, Attorney, Kapitan Gomaa Law, P.C., Chicago, IL, for Amicus Curiae American Association of University Professors.

Before Rovner, Hamilton, and Kirsch, Circuit Judges.

**Opinion**

Kirsch, Circuit Judge.

**\*1** After Professor Jason Kilborn included an expurgated racial slur in a law school exam question, University of Illinois Chicago officials opened an investigation into allegations that he had created a racially hostile environment for non-white students. The University found that Kilborn

had violated its nondiscrimination policy and suspended him from teaching until he completed a diversity training program. He was also denied a two percent raise. Kilborn sued several University officials, alleging that they had violated his constitutional rights to free speech and due process. Because a university professor's academic speech receives qualified First Amendment protection under the Supreme Court's decisions in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), we reverse the dismissal of Kilborn's retaliation claim. But we affirm the dismissal of Kilborn's remaining federal claims.

I

This appeal arises out of a motion to dismiss, so we accept the well-pleaded facts in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 475 (7th Cir. 2024). But we do not presume the truth of conclusory allegations. *Id.*

Jason Kilborn is a tenured professor at the University of Illinois Chicago School of Law, where he regularly teaches a course on civil procedure. For the past decade, he has included the same question on the final exam. The question concerns a fictional former employee who says she "quit her job at Employer after she attended a meeting in which other managers expressed their anger at Plaintiff, calling her a 'n____' and 'b___' (profane expressions for African Americans and women) and vowed to get rid of her." The exam question appears exactly like this, with the racial and gender slurs expurgated.

Unlike in prior years, students who took the exam in December 2020 were upset by Kilborn's use of the expurgated slurs and shared their displeasure with the law school dean. In response, Kilborn reached out to students to discuss the exam question. He sent a note of regret to his class for any distress caused by the expurgated references, exchanged emails with a student about the incident, and participated in a cordial, constructive, four-hour Zoom meeting with a member of the Black Law Students Association (BLSA).

During the Zoom meeting, the BLSA member asked Kilborn why the dean had not shown him a student petition criticizing the exam question. Kilborn replied that perhaps the dean had not shared the petition with him because she feared he might "become homicidal" if he read it. Kilborn made the comment in jest, and the conversation continued for another three hours without any indication that the student felt threatened or distressed by the statement. However, the student later told the dean and other University administrators that Kilborn had said that he "was feeling homicidal" or "would become homicidal." Asserting that they feared a possible threat of imminent violence, University officials placed Kilborn on indefinite administrative leave, cancelled his classes for the term, and barred him from campus. Kilborn was ultimately released to unrestricted duty a few days later, but only after he submitted to drug testing and a medical examination. His classes remained cancelled. Kilborn believes that the University officials' concern about his homicidal jest simply provided a pretext to punish him for his exam question and to mollify complaining students.

**\*2** The University's response to Kilborn's controversial exam question did not end there. It opened an investigation into allegations that Kilborn had created a racially hostile environment for non-white students. As part of the investigation, the University reviewed comments Kilborn had made in a class he taught two semesters earlier. There, Kilborn had discussed the relationship between frivolous litigation, plaintiff incentives, and media coverage:

> The fact that other plaintiffs see that one other plaintiff lost isn't a disincentive. If it were, frivolous litigation would have ended long ago, because lots of plaintiffs have been pushed to the wall and lost. You don't hear about those stories in the media. You hear about idiot people winning $1 million verdict against Subway for having 11.5"-long sandwiches. That's what makes the press, right, that Subway lost. Not that they win against this ridiculously frivolous case. That wasn't in the media, only in the legal media, maybe, if you were paying attention. And that's the problem. If they win, no one hears about this. They only hear about it if they lose, and God forbid that, then all the cockroaches come out of the walls, they're thinking, right?

In the same discussion, Kilborn also remarked: "I'm not subjecting my corporate bottom line to that public lynching; I'm sorry, that's not the right word to use." And in a discussion on race-based police stops, Kilborn used an African American Vernacular English (AAVE) accent while repeating the lyrics of a Jay-Z song which describes the pretextual stop of a young Black man ("You was doin' 55 in a 54.").

At the end of its investigation, the University concluded that Kilborn had violated the harassment aspect of its nondiscrimination policy. The University based its finding on Kilborn's use of the expurgated racial slur in the exam question, his out-of-class conversations with students concerning the exam question, his in-class remarks about "cockroaches" and "lynching," and his use of an AAVE accent. Specifically, it found that Kilborn's out-of-class comments expressed insensitivity and hostility toward students voicing concern and that his in-class remarks were inappropriate and racially charged. Kilborn believes these findings are unsupported by the facts and that University officials only relied on them to reach the predetermined conclusion that he should be punished.

Kilborn received two punishments for violating the University's nondiscrimination policy. The University declared him ineligible for an across-the-board two percent merit raise and required him to participate in an eight week diversity training program. The training program included coursework, self-reflection papers, and meetings with a trainer who would provide feedback regarding his engagement and commitment to the goals of the program. Kilborn could not return to the classroom until he satisfactorily completed the program.

Kilborn has repeatedly asked University officials what he should have done differently to avoid violating the nondiscrimination policy, but he alleges they have never told him. Although the policy does not include a definition for harassment, University officials understand its scope to be broader than applicable law. As a result, Kilborn fears the University may enforce the policy against him again. To avoid further consequences, Kilborn has refrained from teaching certain pedagogically relevant cases in his class.

 *3  Kilborn sued several University officials responsible for the actions taken against him. In his complaint, Kilborn raised four federal claims under 42 U.S.C. § 1983 for violations of his First, Fifth, and Fourteenth Amendment rights. He claimed that these officials: (1) retaliated against him for his constitutionally protected speech; (2) compelled him to express commitment to the goals of the diversity program; (3) did not afford him adequate process before depriving him of constitutionally protected property interests; and (4) construed the University's nondiscrimination policy in a way that fails to provide fair notice of what conduct is proscribed. Kilborn also raised several state law claims.

The University officials moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim, which the district court granted as to the federal claims. After dismissing the federal law claims with prejudice, the district court declined to exercise supplemental jurisdiction over the remaining state law claims and dismissed them without prejudice. Kilborn timely appealed. For the reasons given below, we reverse the dismissal of Kilborn's First Amendment retaliation claim and affirm the dismissal of his remaining federal claims. Because Kilborn has a viable federal claim, we vacate the dismissal of his state law claims for further consideration by the district court.

II

We review de novo the district court's dismissal of Kilborn's claims. *Hagan v. Quinn*, 867 F.3d 816, 820 (7th Cir. 2017). "For a complaint to survive a motion to dismiss, it must allege enough facts to state a claim to relief that is plausible on its face." *Cielak*, 112 F.4th at 479 (quotation omitted). Similarly, dismissal based on qualified immunity is appropriate only if Kilborn's "well-pleaded allegations, taken as true, do not state a claim of violation of clearly established law." *Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020) (quotation omitted).

A

Kilborn first raises a First Amendment retaliation claim. He alleges that the adverse actions taken against him were in retaliation for his use of the expurgated racial slur and other constitutionally protected speech. The district court found that Kilborn's speech was not constitutionally protected and dismissed his claim. We conclude that Kilborn has plausibly alleged that his speech is constitutionally protected and reverse the dismissal of his claim.

Public employees do not relinquish their First Amendment rights as a condition of entering government service. *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. But the

government's interest in regulating speech is far greater when it is acting as an employer than as a sovereign. See *Waters v. Churchill*, 511 U.S. 661, 671–72, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). Like private employers, the government needs to exercise control over its employees to provide public services effectively. *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). And it simply "could not function if every employment decision became a constitutional matter." *Connick*, 461 U.S. at 143, 103 S.Ct. 1684.

To balance these competing interests, the Supreme Court established a two part test in *Connick* and *Pickering* to determine whether a public employee's speech is protected by the First Amendment. First, we determine whether the employee is speaking as a citizen on a matter of public concern. *Connick*, 461 U.S. at 147, 103 S.Ct. 1684. If so, we balance the employee's interests against the government's interests. *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. In *Garcetti*, the Supreme Court clarified that public employees are not speaking as citizens when they make statements pursuant to their official duties. 547 U.S. at 421, 126 S.Ct. 1951. We consider whether the rule in *Garcetti* applies to Kilborn's speech before applying the public concern analysis and balancing test laid out in *Connick* and *Pickering.*

1

*4 Kilborn's exam question and in-class remarks fall within his teaching responsibilities as a professor at the University. If *Garcetti* applies, this speech would not receive any First Amendment protection because Kilborn made it pursuant to his official duties. *Id.* But *Garcetti* does not apply. The Supreme Court made clear that its decision did not extend to cases "involving speech related to scholarship or teaching." *Id.* at 425, 126 S.Ct. 1951. Instead, it reserved the question in response to Justice Souter's concern that the decision would otherwise "imperil First Amendment protection of academic freedom in public colleges and universities." *Id.*; *id.* at 438, 126 S.Ct. 1951 (Souter, J., dissenting). As the Court itself recognized, "expression related to academic scholarship or classroom instruction implicates additional constitutional interests" that could have "important ramifications for academic freedom." *Id.* at 425, 126 S.Ct. 1951 (majority opinion).

In singling out the public university setting from an otherwise generally applicable rule, the Court reaffirmed its long-held view that "universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). For example, in *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Court recognized that academic freedom is "a special concern of the First Amendment" and "is of transcendent value to all of us and not merely to the teachers concerned." *Id.* at 603, 87 S.Ct. 675. To safeguard it, the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.* Similarly, in *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), the Court recognized the "essentiality of freedom in the community of American universities" which plays a "vital role" in our democracy. *Id.* at 250, 77 S.Ct. 1203. "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Id.*

We decline the University officials' invitation to extend *Garcetti* to speech involving university teaching and scholarship when the Supreme Court was unwilling to do so. Nor are we alone. Every other circuit to decide the issue has recognized that *Garcetti* does not apply to university teaching or scholarship. See *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011); *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021); *Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023).

For similar reasons, the University officials are not entitled to qualified immunity on this issue. Before *Garcetti*, it was clearly established that the *Connick*-*Pickering* test offered qualified protection to public employees, including professors at public universities. E.g., *Keen v. Penson*, 970 F.2d 252, 257–58 (7th Cir. 1992); see also *Omosegbon v. Wells*, 335 F.3d 668, 676–77 (7th Cir. 2003) (stating that academic freedom claims "are subject to all the usual tests that apply to assertions of First Amendment rights"). *Garcetti* did not purport to change the law with respect to university teaching and scholarship. 547 U.S. at 425, 126 S.Ct. 1951. And we have not suggested in any subsequent decision that *Garcetti* would apply in this context—only in different contexts. See, e.g., *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479–80 (7th Cir. 2007) (addressing primary and secondary school teaching); *Renken v. Gregory*, 541 F.3d 769, 774 (7th Cir. 2008) (addressing a university professor's speech that did not involve scholarship or teaching). In fact, we have even recognized that a college or university "instructor's freedom to express [his] views on [an] assigned course is protected" even though classroom speech is also "part of the instructor's

official duties." *Piggee v. Carl Sandburg Coll.*, 464 F.3d 667, 671 (7th Cir. 2006). Because our pre-*Garcetti* cases clearly establish a right to academic freedom in this context, and neither *Garcetti* nor our more recent case law undermines that right, *Garcetti* does not supply a basis for granting qualified immunity. Accord *Adams*, 640 F.3d at 565–66.

**\*5** We do not suggest that reliance on *Garcetti* would never be appropriate to support qualified immunity. In some cases, there may be genuine uncertainty about whether the speech at issue falls within *Garcetti*'s exception for university teaching or scholarship. See, e.g., *Demers*, 746 F.3d at 406–10, 417 (granting qualified immunity where a university professor's speech involved sharing a two page pamphlet detailing his plan to reorganize the school's communications program). But where, like here, a plaintiff's speech falls comfortably within the core of what constitutes university teaching and scholarship, university officials cannot win on qualified immunity merely by proposing an extension to *Garcetti* that courts have not yet recognized or rejected.

2

Next, we turn to the public concern analysis. Speech involves a matter of public concern when it addresses subjects of general interest that may be of value or concern to the broader public. *Lane v. Franks*, 573 U.S. 228, 241, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014). This category of speech is not limited to "matters of transcendent importance," but also includes "matters in which the public might be interested, as distinct from wholly personal grievances." *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996); see also *Snyder v. Phelps*, 562 U.S. 443, 454, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (distinguishing between "broad issues of interest to society at large" and "matters of purely private concern") (quotation omitted).

In determining whether a statement addresses a matter of public concern, we consider the "content, form, and context" of the speech. *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. Although content is the most important factor, the *Connick* test "looks to the overall *objective* or *point* of the speech, as ascertained by *all three* factors of content, form, and context." *Kristofek v. Village of Orland Hills*, 712 F.3d 979, 985 (7th Cir. 2013). "[N]o factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 562 U.S. at 454, 131 S.Ct. 1207.

Applying this standard, the district court held that none of Kilborn's speech addressed a matter of public concern. It found that (1) the exam question could not contribute to broader public discourse because only Kilborn would read the students' responses, (2) Kilborn's out-of-class remarks were directed at individual students and concerned only his personal reaction to the controversy, and (3) Kilborn's in-class statements would not inform broader public debate on frivolous litigation or pretextual police stops.

**\*6** The district court erred in two important respects. First, the district court did not give adequate weight to the academic context of Kilborn's speech. In this setting, speech may not inform broader public discourse because it is directed narrowly at students or other scholars, but that does not detract from its public importance. Assuring an "unfettered interchange of ideas" lies at the heart of the First Amendment. *Lane*, 573 U.S. at 235–36, 134 S.Ct. 2369 (quotation omitted). And the university classroom is "peculiarly the marketplace of ideas." *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675 (quotation omitted). For this reason, we have recognized that "the First Amendment protects the right of faculty members to engage in academic debates, pursuits, and inquiries and to discuss ideas, narratives, concepts, imagery, and opinions— scientific, political or aesthetic—with an audience whom the speaker seeks to inform, edify, or entertain." *Trejo v. Shoben*, 319 F.3d 878, 884 (7th Cir. 2003) (cleaned up); accord *Heim*, 81 F.4th at 228–29 (explaining how "the special academic setting" guides its public concern analysis); *Meriwether*, 992 F.3d at 506–07 (stating that "what constitutes a matter of public concern and what raises academic freedom concerns is of essentially the same character") (quotation omitted).

Our case law reflects the public importance of academic speech, even when it is narrowly directed toward students and other scholars. For example, in *Trejo* we assumed that a "spirited 'academic and intellectual debate' " among professors and graduate students could be a matter of public concern even if it took place over "late night drinks and a meal at the hotel's restaurant and bar." 319 F.3d at 881, 885–86. And in *Pugel v. Board of Trustees*, 378 F.3d 659 (7th Cir. 2004), we recognized that a presentation on scientific research addressed a matter of public concern even though the audience consisted of only a small group of scientists. *Id.* at 668; accord *Heim*, 81 F.4th at 228–29 (rejecting the argument that academic research was not a matter of public concern because it was intended for consumption by a relatively narrow audience).

We do not mean to suggest that a university professor's speech addresses a matter of public concern whenever it is directed toward students or other scholars. See, e.g., *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019) (professor's conversation with students on whether he would win a teaching award was a wholly personal concern); *Trejo*, 319 F.3d at 886–87 (professor's speech was designed to "solicit female companionship," not to "serve any truly pedagogical purpose"). The content, form, and context of a university professor's speech are all relevant in making this determination. See *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. We are simply clarifying that academic speech can be a matter of public concern even if it does not inform broader public discourse.

Kilborn's exam question, out-of-class statements, and in-class remarks are all academic speech that address matters of public concern, notwithstanding the limited size of Kilborn's audience. The exam question was designed to give students experience confronting a highly charged situation that they may encounter in real-life practice and to be a continuation of the learning that occurred in the classroom. The content, form, and context of the exam question give no indication that it involved a matter of private concern rather than serving broader pedagogical purposes. Kilborn's in-class statements performed a similar function. They were designed to engage students and stimulate in-class discussion on topics of significant interest to the broader community, including frivolous litigation and pretextual police stops. Kilborn's out-of-class remarks also contributed to a public discussion, initiated by members of the BLSA community, on the propriety of using expurgated slurs in a law school exam. Although Kilborn's remarks were made to individual students, even the University recognized that they were directed at a broader group of people.

Second, the district court's analysis focused too narrowly on particular words (and accents) Kilborn used rather than considering whether the "overall thrust and dominant theme" of his speech "spoke to broader public issues." *Snyder*, 562 U.S. at 454, 131 S.Ct. 1207. The relevant question is not whether Kilborn's speech fell "short of refined social or political commentary," but whether the issues he was trying to highlight "are matters of public import." *Id.*; see also *Rankin v. McPherson*, 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (explaining that the "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern"); *Trejo*, 319 F.3d at 885–86 (noting that whether speech is "too provocative, insensitive, and/or 'politically incorrect' " is irrelevant). To be sure, the focus of our analysis is on the particular content of Kilborn's speech rather than its subject matter more generally. *Kubiak v. City of Chicago*, 810 F.3d 476, 483 (7th Cir. 2016). But that is to determine whether the speech has a public or private character, not whether the speech is valuable enough to inform broader public discourse. *Id.*; see also *Snyder*, 562 U.S. at 454, 131 S.Ct. 1207.

**\*7** The dominant theme of Kilborn's in-class speech concerned pretextual police stops and the relationship between frivolous litigation, plaintiff incentives, and media coverage. These are undeniably matters of public concern. Kilborn's references to cockroaches and lynching and his use of an AAVE accent may have been insensitive, but they do not affect the public character of his speech. Cf. *Snyder*, 562 U.S. at 454, 131 S.Ct. 1207. Similarly, Kilborn made his out-of-class statements in the context of a public discussion that was occurring at the University. Although he expressed his personal reaction to the controversy with individual students, the overall thrust of his speech addressed a matter of public concern: the propriety of using expurgated slurs in exam questions. See *id.* The University even acknowledged that Kilborn's remarks were directed at a broader community and not simply the individual students he was communicating with.

The University may disagree with Kilborn's pedagogical approach or think his statements fall short of the refined commentary it expects of its professors, but that is not something we consider at this stage of the *Connick*-*Pickering* test. See *id.* Instead, we consider the University's interests at the balancing stage of the analysis, which we turn to next.

3

Although Kilborn's speech receives some measure of protection under the First Amendment, it is not absolute. We weigh Kilborn's interest in expressing his speech against the interests of the University. See *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. A public employer's interest is generally limited to the efficient and effective delivery of public services. See *id.* But in the academic setting, a public university also possesses its own First Amendment interests in academic freedom. See *Keen*, 970 F.2d at 257 (noting that "the asserted academic freedom of a professor can conflict with the academic freedom of the university"); accord *Heim*, 81 F.4th at 230–33.

For example, we have recognized that a university's "ability to set a curriculum is as much an element of academic freedom as any scholar's right to express a point of view." *Webb v. Bd. of Trs. of Ball State Univ.*, 167 F.3d 1146, 1149 (7th Cir. 1999); see also *Heim*, 81 F.4th at 231–33 (recognizing a university's interest in hiring professors with particular research interests).

The University officials do not suggest that the University had its own competing academic freedom interests. Cf. *id.* at 230–33 (distinguishing between cases where university administrators discipline college teachers for expressing controversial views and cases where there is a legitimate academic basis for the university's actions). In fact, the University noted that its findings did not hinge on whether there were legitimate pedagogical reasons for Kilborn's use of the expurgated racial slur. Instead, the University officials assert an interest in maintaining a safe campus where students can learn free of harassment.

To be sure, the University has a substantial interest in ensuring its students can learn free of harassment. See *Keen*, 970 F.2d at 258 (recognizing a university's interest under *Pickering* in making sure its students are "not subject to demeaning, insulting, and inappropriate comments"); *Piggee*, 464 F.3d at 673–74 (rejecting the argument that "colleges have no right to prohibit speech that amounts to ... harassment"). But here, the parties dispute why Kilborn was punished. The University officials claim they disciplined Kilborn because his speech was threatening and harassing to students. The University's investigation concluded that Kilborn's out-of-class remarks expressed insensitivity and hostility toward students voicing concern and that his in-class comments were inappropriate and racially charged. By contrast, Kilborn alleges that the investigation was not supported by the facts and that University officials intentionally misconstrued his statements to provide a pretext for punishing him for his controversial exam question and to mollify complaining students.

**\*8** That is not a dispute we can resolve this early in the litigation. At this stage, we accept the well-pleaded facts in the complaint as true and draw reasonable inferences in Kilborn's favor. *Cielak*, 112 F.4th at 475. And it is reasonable to infer from the well-pleaded facts in Kilborn's complaint that University officials punished him for the controversial exam question and used the investigation to establish a pretext for their actions. See *Waters*, 511 U.S. at 677, 114 S.Ct. 1878 ("It is necessary that the decisionmaker reach its conclusion about what was said in good faith, rather than as a pretext ...."). To take one example, the University's investigation substantiated an allegation that Kilborn had referred to racial minorities as cockroaches and found that the comment was racially charged. But a transcript of the class recording, which is included in the complaint, supports Kilborn's allegation that his reference to cockroaches had nothing to do with race or racial minorities.

We conclude that this is not "one of those rare cases" where we can engage in *Pickering* balancing "on the basis of pleadings alone." *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1121 (7th Cir. 2013) (cleaned up); see also *Brown v. City of Tulsa*, 124 F.4th 1251, 1269 & n.7 (10th Cir. 2025) (collecting cases that recognize *Pickering* balancing generally requires a more fully developed factual record than is available on a motion to dismiss). For the foregoing reasons, we reverse the district court's dismissal of Kilborn's First Amendment retaliation claim.

B

Next, Kilborn raises a compelled speech claim. He argues that he was forced to participate in an eight week diversity course where he was compelled to express his commitment to the goals of the program. Even if his factual allegations support such an inference, the University officials are entitled to qualified immunity.

The First Amendment protects both the right to speak and "the right to refrain from speaking." *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). When government officials compel individuals "to mouth support for views they find objectionable," they violate this "cardinal constitutional command." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 892, 138 S.Ct. 2448, 201 L.Ed.2d 924 (2018); see also *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (government officials cannot force citizens to endorse a particular belief nor "prescribe what shall be orthodox in ... matters of opinion").

Similarly, public employees receive some measure of protection against compulsion by their employer to endorse messages they find objectionable. In *Janus*, the Supreme Court held that government policies forcing employees to subsidize the speech of public-sector unions are unconstitutional. 585 U.S. at 929–30, 138 S.Ct. 2448. In reaching its decision, the Court also opined on the appropriate

standard to evaluate compelled speech claims more broadly. It observed that "if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Id.* at 908, 138 S.Ct. 2448 (citing *Garcetti,* 547 U.S. at 421–22, 126 S.Ct. 1951). If the compelled speech is not part of the employee's official duties, the Court suggested (without deciding) that some form of heightened scrutiny or modified *Pickering* analysis may apply. *Id.* at 895, 907–08, 138 S.Ct. 2448.

Here, Kilborn asserts that he was compelled to express his commitment to the goals of the diversity training program. However, the factual allegations in his complaint only show that he had to attend a course, write self-reflection papers, and meet with a trainer who would provide feedback regarding his engagement and commitment to the goals of the program. Kilborn says the need for feedback raised the "obvious issue" that he would not be allowed to teach if he did not adequately express his commitment to the program. But Kilborn does not allege that his trainer compelled him to endorse any particular message (or that he, in fact, did so) as a condition of completing the course. Absent more specific allegations, it is questionable whether Kilborn has done enough to make out a compelled speech claim.

**\*9** But we do not need to decide the question. Even if it were reasonable to infer that Kilborn was compelled to express commitment to the goals of the diversity training program, Kilborn still fails to state a claim because the University officials are entitled to qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes,* 584 U.S. 100, 104, 138 S.Ct. 1148, 200 L.Ed.2d 449 (2018) (quotation omitted). And the Supreme Court has repeatedly stressed that courts should not "define clearly established law at a high level of generality." *Id.* (quotation omitted). Here, that means Kilborn had to show that existing precedent clearly establishes Kilborn's right *as a public employee* not to be compelled to speak. See *Waters,* 511 U.S. at 671–72, 114 S.Ct. 1878 (recognizing that the government has "far broader powers" to regulate speech when it is acting as an employer than as a sovereign). He has not done so.

Instead, the cases Kilborn relies on involve the government acting in its sovereign capacity, not as an employer. See *Wooley,* 430 U.S. at 708, 97 S.Ct. 1428; *Barnette,* 319 U.S. at 629, 63 S.Ct. 1178; *303 Creative LLC v. Elenis,* 600 U.S. 570, 580–81, 143 S.Ct. 2298, 216 L.Ed.2d 1131 (2023); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 515 U.S. 557, 571–73, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). For example, Kilborn points to the Supreme Court's decision in *Barnette.* There, the Court held that a government policy requiring students to salute the flag was unconstitutional. *Barnette,* 319 U.S. at 642, 63 S.Ct. 1178. But West Virginia was acting in its sovereign capacity in *Barnette.* Not only was the failure to salute the flag punishable by expulsion, but the expelled children were also considered "unlawfully absent" and could be "proceeded against as delinquent[s]." *Id.* at 629, 63 S.Ct. 1178. And an expelled child's parents could even be prosecuted and sentenced to thirty days in jail. *Id.* That is a far cry from Kilborn's situation, where the failure to express his commitment to the goals of the diversity training program only threatened his ability to teach at the University. Cf. *id.* at 645, 63 S.Ct. 1178 (Murphy, J., concurring) (noting that "not only is the privilege of public education conditioned on compliance" but that "compliance is compulsory and not optional").

The Supreme Court's decision in *Janus* provides some support for Kilborn's position, but not enough to overcome qualified immunity. *Janus* dealt with compelled subsidies of union speech, not the compelled speech of public employees. 585 U.S. at 893–94, 138 S.Ct. 2448. And while the Court opined on how it might evaluate compelled speech claims, it expressly declined to clarify which standard applies. See *id.* at 895, 907–08, 138 S.Ct. 2448. As a result, several questions remain unresolved: Is it part of an employee's official duties under *Garcetti* to express commitment to the goals of a training program? See *id.* at 908, 138 S.Ct. 2448. If not, what level of judicial scrutiny applies? See *id.* at 895, 907–08, 138 S.Ct. 2448 (suggesting without deciding that heightened scrutiny or some form of *Pickering* may apply). Does the level of scrutiny depend on whether the compelled speech claim involves a "blanket requirement" or a "single supervisory decision"? See *id.* at 907, 138 S.Ct. 2448 (quotation omitted).

Because existing precedent does not resolve these questions, the University officials could reasonably believe that requiring an employee to express commitment to the goals of a training program germane to his position is constitutionally permissible. We decline to resolve the questions left open after *Janus* given the lack of briefing on the subject. It is enough to decide that the University officials would be entitled to qualified immunity even if Kilborn's allegations of compelled speech were plausible. See *Pearson v. Callahan,* 555 U.S. 223, 240–42, 129 S.Ct. 808, 172 L.Ed.2d 565

(2009). We affirm the district court's dismissal of Kilborn's compelled speech claim.

### C

Next, Kilborn raises a procedural due process challenge. He argues that his suspension with pay and the University's refusal to grant him a raise are deprivations of property without due process of law. Neither allegation states a plausible claim for relief.

 **\*10**  The Fourteenth Amendment prevents states from depriving a person of property without due process of law. Before considering what process is due, we first determine whether the plaintiff has been deprived of a protected property interest. *Luellen v. City of East Chicago*, 350 F.3d 604, 613 (7th Cir. 2003). An interest is protected property under the Fourteenth Amendment if "existing rules or understandings that stem from an independent source such as state law" secure certain benefits and "support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

In the employment context, a protected property interest "can arise from a statute, regulation, municipal ordinance, or an express or implied contract." *Covell v. Menkis*, 595 F.3d 673, 675 (7th Cir. 2010). But it does not extend to "purely dignitary or otherwise nonpecuniary dimensions of employment." *Swick v. City of Chicago*, 11 F.3d 85, 87 (7th Cir. 1993). Rather, a plaintiff "must show some economic loss" or "establish an identifiable impact on his future income or economic benefits." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 530 (7th Cir. 2000).

Kilborn first argues that his suspension with pay was a "severe sanction" entitling him to due process protections. But suspension with full pay is not a deprivation of a protected property interest. *Townsend v. Vallas*, 256 F.3d 661, 676 (7th Cir. 2001). Even if state law entitled him to a certain amount of process for a severe sanction, "[p]rocedural interests under state law are not themselves property rights that will be enforced in the name of the Constitution." *Swartz v. Scruton*, 964 F.2d 607, 610 (7th Cir. 1992). And Kilborn has not suggested that his suspension impacted his future job opportunities or income, which could trigger due process protections. See *Swick*, 11 F.3d at 86–87; *Bordelon*, 233 F.3d at 530–31. At most, he alleges that defamatory statements made by the University—not its decision to suspend him—have tainted his career prospects.

Kilborn also argues that his loss of a two percent, across-the-board raise is a deprivation of property. But Kilborn acknowledges that this was a merit raise and he does not suggest he was entitled to it, contractually or otherwise. In fact, he concedes that the University did not formally grant him the raise before it was revoked. That is not a protected property interest under our case law. See *Swartz*, 964 F.2d at 610; see also *Townsend*, 256 F.3d at 676.

We affirm the district court's dismissal of Kilborn's procedural due process claim.

### D

Finally, Kilborn seeks an injunction barring the University from enforcing its nondiscrimination policy. He claims the University officials' interpretation of the policy is unconstitutionally vague because it fails to give fair notice to employees about what conduct the policy prohibits. Before addressing the merits of his claim, we first consider whether Kilborn has standing to bring it.

To establish Article III standing, Kilborn must show that he has suffered an injury in fact, that the injury was caused by the University officials' conduct, and that a favorable decision has some likelihood of remedying the injury. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). The University officials argue that Kilborn has not suffered an injury in fact. But an Article III injury exists where there is an objectively reasonable chilling effect on the plaintiff's speech and he self-censors as a result. *Id.* Here, Kilborn alleges that University officials have already enforced the nondiscrimination policy against him, yet they refuse to explain what he should have done differently, despite his repeated requests. To avoid violating the policy again, he has refrained from using pedagogically relevant cases in class because he fears they may be too racially charged. That is enough to establish an injury in fact. Cf. *Bell v. Keating*, 697 F.3d 445, 454–55 (7th Cir. 2012) ("[W]hen one cannot know what triggers the ordinance such that it will be enforced, he may fairly assume that it can and will always be enforced and that total abstention from the protected activity is necessary to avoid arrest and prosecution.").

**\*11** Turning to the merits, a statute is impermissibly vague if it fails to provide fair notice of what conduct is proscribed or if it encourages arbitrary and discriminatory enforcement. *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). But we are dealing with a workplace policy, not a statute. And the government enjoys greater latitude to craft reasonable workplace regulations than it has when drafting the criminal code. *Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000); see also *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("The degree of vagueness that the Constitution tolerates ... depends in part on the nature of the enactment."); *Waters*, 511 U.S. at 673, 114 S.Ct. 1878. Therefore, we consider Kilborn's claim bearing in mind that the University's nondiscrimination policy need not resemble a criminal statute. See *Keen*, 970 F.2d at 259.

Kilborn argues that the nondiscrimination policy is unconstitutionally vague because the word "harassment" is not defined by the policy and offers no guidance on what conduct it purports to proscribe. But harassment on its own defines "a range of inappropriate conduct" sufficient to satisfy due process in the employment setting. *Greer*, 212 F.3d at 369. Kilborn believes that the University's policy is more concerning because the University understands it to be broader than applicable law. However, the University clarified that "conduct may violate the Policy even where the conduct does not rise to the level of a violation of law" when it "unreasonably interferes with a student's participation in an academic program." Like *Greer*, we find that the policy adequately defines a range of inappropriate conduct in accordance with due process. If University officials try to stretch the meaning of harassment beyond what the word can reasonably bear, Kilborn would have a viable claim for retaliation (as he may have here).

Finally, Kilborn argues that the First Amendment requires public universities to have clearer workplace policies than other public employers. But he provides little support for this proposition. To the contrary, we have recognized that a "university need not adopt a quasi-criminal code before it can discipline its professors." *Keen*, 970 F.2d at 259; see also *Piggee*, 464 F.3d at 674 (concluding that it was "not unreasonable" for a university to enforce its sexual harassment policy even though the policy "may not have been a perfect fit for the behavior at issue"). And even if we were to require public universities to adopt a quasi-criminal code, the University's use of "harassment" would likely still satisfy due process. Several circuits have held that use of the term "harass" in a criminal statute is not unconstitutionally vague despite lacking a definition. *United States v. Shrader*, 675 F.3d 300, 310–11 (4th Cir. 2012); *United States v. Conlan*, 786 F.3d 380, 385–86 (5th Cir. 2015); *United States v. Bowker*, 372 F.3d 365, 380–83 (6th Cir. 2004); *United States v. Osinger*, 753 F.3d 939, 944–45 (9th Cir. 2014).

We affirm the district court's dismissal of Kilborn's vagueness claim.

### III

The district court declined to exercise supplemental jurisdiction over Kilborn's state law claims after it dismissed his federal claims with prejudice. Because we reverse the dismissal of Kilborn's First Amendment retaliation claim, we also vacate the district court's dismissal of his state law claims for further consideration.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED

**All Citations**

--- F.4th ----, 2025 WL 783357

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on March 17, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 17, 2025                    */s/ Greg H. Greubel*
                                          *Greg H. Greubel*