2025 WL 3685613
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

Stuart REGES, Plaintiff - Appellant,
v.
Ana Mari CAUCE, in her official capacity as President of the University of Washington; Magdalena Balazinska, in her official and individual capacities as Director of the Paul G. Allen School of Computer Science & Engineering; Dan Grossman, in his official and individual capacities as Vice Director of the Paul G. Allen School of Computer Science & Engineering; Nancy Allbritton, in her official and individual capacities as Dean of the College of Engineering, Defendants - Appellees.

No. 24-3518
|
Argued and Submitted May 15, 2025 San Francisco, California
|
Filed December 19, 2025

Appeal from the United States District Court for the Western District of Washington, John H. Chun, District Judge, Presiding, D.C. No. 2:22-cv-00964-JHC

**Attorneys and Law Firms**

Joshua T. Bleisch (argued) and Ronald London, Foundation for Individual Rights and Expression, Washington, D.C.; Sara Berinhout and James M. Diaz, Foundation for Individual Rights and Expression, Philadelphia, Pennsylvania; Carl J. Marquardt, Law Office of Carl J. Marquardt, Seattle, Washington; for Plaintiff-Appellant.

R. David Hosp (argued) and Katherine Kerrick, Orrick Herrington & Sutcliffe LLP, Boston, Massachusetts; Aaron Brecher and Robert M. McKenna, Orrick Herrington & Sutcliffe LLP, Seattle, Washington; for Defendants-Appellees.

Ilya Shapiro and Tim Rosenberger, Manhattan Institute, New York, New York, for Amicus Curiae Manhattan Institute.

Katherine Blankenship, PEN America Center Inc., Coral Gables, Florida, for Amicus Curiae PEN America Center Inc.

Ethan W. Blevins, Pacific Legal Foundation, Sacramento, California, for Amicus Curiae Pacific Legal Foundation.

Michael H. McGinley, Ross Ufberg, and Andrew F. Figueiredo, Dechert LLP, Philadelphia, Pennsylvania, for Amicus Curiae Students for Liberty.

Omer A. Khan, Rocklin, California, for Amici Curiae James G. Martin Center for Academic Renewal.

Matthew P. Gordon and Jonathan P. Hawley, Perkins Coie LLP, Seattle, Washington, for Amicus Curiae Washington State University.

Before: Sidney R. Thomas, Milan D. Smith, Jr., and Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress;

Partial Concurrence and Partial Dissent by Judge S.R. Thomas

## OPINION

BRESS, Circuit Judge:

***2** A public university investigated, reprimanded, and threatened to discipline a professor for contentious statements he made in a class syllabus. The statements, which mocked the university's model syllabus statement on an issue of public concern, caused offense in the university community. Yet debate and disagreement are hallmarks of higher education. Student discomfort with a professor's views can prompt discussion and disapproval. But this discomfort is not grounds for the university retaliating against the professor. We hold that the university's actions toward the professor violated his First Amendment rights. We reverse and remand for further proceedings.

### I

### A

Stuart Reges is a Teaching Professor at the University of Washington's (UW) Paul G. Allen School of Computer Science and Engineering. Reges has taught introductory computer science courses at the Allen School since 2004.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Before coming to UW, Reges taught computer science at the University of Arizona for eight years and at Stanford University for ten years.

Reges has publicly commented on sensitive issues throughout his career. For example, he has spoken with local and national media about his identity and mental health as a gay man. In 2018, Reges wrote an article entitled "Why Women Don't Code," which led a group of students to petition against the renewal of his contract.

The present controversy relates to UW's adoption of an official school "land acknowledgment." A land acknowledgment is a formal statement acknowledging that certain land was originally home to the Indigenous people who historically resided there. UW's main campus is in Seattle, Washington, and Washington State is home to numerous federally recognized tribes. In 2015, the university adopted the following land acknowledgment: "The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations." According to UW's Office of Minority Affairs & Diversity, this land acknowledgment was developed, with input from local tribes, "to acknowledge that our campus sits on occupied land" and to recognize the "difficult, painful[,] and long history" associated with this state of affairs.

Land acknowledgments are sometimes recited at public events, and as more institutions have adopted them, they have become "the subject of myriad mainstream media articles, social media posts[,] and online videos" weighing in on their value. Chloe Veltman, *So You Began Your Event with An Indigenous Land Acknowledgment. Now What?*, NPR (Mar. 15, 2023), https://www.npr.org/2023/03/15/1160204144/indigenous-land-acknowledgments. This debate is understandable, because "[a]fter millennia of Native history, and centuries of displacement and dispossession, acknowledging original Indigenous inhabitants is complex." *Honoring Original Indigenous Inhabitants: Land Acknowledgment*, Nat'l Museum of the Am. Indian, https://americanindian.si.edu/nk360/informational/land-acknowledgment. While proponents believe that land acknowledgments show respect and bring awareness to tribes and tribal issues, others have criticized land acknowledgments as "hollow gestures" which amount to mere "moral exhibitionism." Emily St. James, *The Rise of Land Acknowledgments—and Their Limitations*, Vox (July 18, 2022), https://www.vox.com/the-highlight/23200329/land-acknowledgments-indigenous-landback; Graeme Wood, *'Land Acknowledgments' Are Just Moral Exhibitionism*, The Atlantic (Nov. 28, 2021), https://www.theatlantic.com/ideas/archive/2021/11/against-land-acknowledgements-native-american/620820/.

We of course take no position on this policy or societal debate. But we identify this disagreement to underscore that the wisdom and appropriateness of land acknowledgments is a matter of public concern and ongoing discussion. Testimony from UW officials in this case likewise reflects the present debate and controversy over the practice of land acknowledgments.

***3** In 2019, the Allen School revised its "Best Practices for Inclusive Teaching" to recommend that instructors include an "Indigenous Land Acknowledgement" in their course syllabi. This document offered UW's official land acknowledgment as an example, while making clear that its suggestions were "not prescriptions," but only "ideas" intended to help faculty be "more effective teacher[s] and better role model[s] for more of your students."

Professor Reges viewed UW's land acknowledgment, and the recommendation to include it in syllabi, as a political statement. Reges believes that land acknowledgments are part of "an agenda of 'diversity, equity, and inclusion' that treats some groups of students as more deserving of recognition and welcome than others on account of their race or other immutable characteristic." He therefore did not think it was appropriate for the Allen School to recommend the inclusion of this "political statement" in syllabi. Reges also disagreed with the factual premise of the land acknowledgment, as he believed that "most of the land currently occupied by UW was densely forested before the land was cleared to make way for the campus." He thought the land acknowledgment expressed "that UW's presence is somehow illegitimate, shameful, morally wrong, or unlawful," and considered it "an empty, performative act of moralism" ripe for parody.

Reges was not alone in his skepticism. On December 8, 2021, another faculty member emailed UW's "diversity-allies" and faculty mailing lists to share a "thought-provoking" article from *The Atlantic* (cited above) criticizing land acknowledgments. In a reply-all, Reges wrote that he had "been thinking a lot about land acknowledgments" and that he was considering including his own version of a

land acknowledgment on his computer science syllabus next quarter, "because the Allen School lists this as a diversity best practice." Reges's reply included a draft of his own proposed land acknowledgement.

B

On January 3, 2022, the first day of UW's Winter Quarter, Reges met with his Computer Science and Engineering 143: Computer Programming II (CSE 143) class in an online session. This introductory course is required for certain majors and included roughly 500 students. During the session, students accessed Reges's syllabus, which contained the following statement: "I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington." Although Reges briefly mentioned the statement during class, it appears most students did not notice it at the time.

The statement drew significant attention after class. Later that day, a student submitted a complaint expressing her concerns with the parody statement. She also mentioned that "[a]fter further research," she had discovered Reges's "Why Women Don't Code" article, which the student had "not been able to fully read because it is very triggering." The student wrote that she felt "intimidated" and unwelcome in Reges's class and believed that she would not "be supported and led to be successful in this required course for my major." On the same day, another student shared a screenshot of Reges's land acknowledgment on Reddit, where it received significant criticism.

The Director of the Allen School, Professor Magdalena Balazinska, learned of Reges's land acknowledgment on January 4, 2022, when a colleague forwarded her the Reddit thread. The statement was also brought to the school's attention by its Diversity, Equity, and Inclusion (DEI) student committee. That committee emailed the school's assistant director for DEI to complain about the inclusion of "this offensive language ... in the intro-to-CS course, where students, including those from under-represented indigenous communities, first encounter CS and the Allen School culture." The committee called for the statement to be removed from the syllabus and replaced "with a statement acknowledging the right of [indigenous] people to the land taken from them through years of colonialism." The student DEI committee further charged that "Stuart Reges has repeatedly expressed prejudiced views where he has no right to do so" because of the Allen School's failure to hold Reges and others accountable in the past.

***4** Later that day, Balazinska emailed Reges asking him to remove the statement from his syllabus "immediately" because it was creating a "toxic environment" in a required course for the computer science major. Balazinska caveated that Reges was "welcome to voice your opinion and opposition to land acknowledgments, as you have, in other settings." In addition to sharing his draft statement with other faculty, Reges had included it in the signature block of some of his emails.

After Reges refused to remove the statement from his syllabus, Balazinska directed school IT staff to replace the online syllabus with a version excluding the statement. Balazinska and Professor Daniel Grossman, the Allen School's Vice Director, also approved a tweet from the school's Twitter account condemning the "offensive" statement and relaying that the school was "horrified" and working to replace Reges's syllabus on the course website. In an email to other administrators, Balazinska also proposed asking Reges's students to submit official complaints, which would "help[ ] us to take action."

On January 5, 2022, Balazinska emailed the CSE 143 students to apologize for the "offensive" land acknowledgment, inform them that the statement had been removed from the syllabus, and encourage those who felt they had not been "treated fairly and respectfully" to submit a complaint via one of three linked reporting channels. In addition to verbal complaints, the record contains a set of thirteen written complaints made between January 3, 2022, and March 28, 2022.

These complaints were critical of Reges and his views. One student stated that "[t]his sort of factually wrong, intentionally inflammatory, and trauma-mocking statement tarnishes the reputation of the Allen School," and that "[h]aving a professor like this, with a history of misogynistic and racist statements, and who places statements like this in their course policies," was antithetical to creating an inclusive environment. This student further took issue with Reges's reference to the labor theory of property, "a problematic theory of property rights," and opined that "even using the problematic theory of property rights used here, this land still ought to belong to the Coast Salish peoples."

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Another student, who identified as Native, wrote that "this whole incident has made me feel so directly despised and unsafe that I'm certain if I hadn't transferred in I wouldn't be at the Paul Allen school right now." A different student wrote that the Allen School should part ways with Reges because he "does not believe in present-day systematic racism or sexism, ideas that are core to improving our systems of education." Similarly, the school's Assistant Director for Diversity and Access reported that student ambassadors were struggling with "whether to be fully honest about their experiences at the Allen School" with prospective students, that some current students resented having to take CSE 143 with Reges, and that her staff felt undermined and disillusioned. The Assistant Director believed that "Stuart's words have a very real negative impact on our entire community including staff."

On January 7, 2022, the Allen School opened a second section of CSE 143 led by a different faculty member. Around 170 of Reges's roughly 500 students transferred to the new section. After several students asked about grading policies for the new section, the professor leading it stated that he planned to use the same grading system as Reges.

***5** The controversy over Reges's mock land acknowledgment also attracted media attention. On January 6, 2022, Reges appeared on a local conservative talk show to discuss UW's response to his land acknowledgment. Reges also published an opinion piece and gave interviews to the press, including to a student paper.

C

On February 23, 2022, Reges emailed UW's "diversity-allies" mailing list to link an article covering the events in January surrounding his parody land acknowledgment. In his email, Reges also publicized his plans to "continue this protest when I teach the CSE142 course in spring and will have the opportunity to distribute a syllabus on paper (more difficult to censor)."

Reges's post led to additional complaints. Citing the "emotional harm to students," the school's Recruiter for Diversity & Access asked how she could recruit Native students "into an environment where their history is questioned and their rights are denied." For its part, the student employee union relayed that teaching assistants "no longer feel comfortable mentioning their own views on topics related to land acknowledgements and DEI, for fear of retaliation from Stuart Reges." The union asked the school to "take prompt action" because Reges's behavior violated the school's commitment to inclusion and the non-discrimination and harassment provision of UW's collective bargaining agreement.

On March 2, 2022, Balazinska informed Reges that she was initiating disciplinary process based on potential violations of the Faculty Code, university policy, and the collective bargaining agreement. She requested a meeting, at which she asked Reges to agree not to include his statement in any future syllabi. When Reges refused, Balazinska escalated the matter to Dean Nancy Allbritton, the head of the College of Engineering (which oversees the Allen School). Around this time, Reges posted a copy of his land acknowledgment outside his faculty office.

On April 21, 2022, Allbritton informed Reges that she was convening a special faculty committee to investigate potential violations of university policy. On October 14, 2022, the committee delivered an oral report to Allbritton finding that the parody statement had a "significant impact" on the "morale of Native American students, and their learning," among other things, and that "[t]he level of disruption was extraordinary." In addition to the discomfort and emotional harm that some students experienced, the committee reported that as a result of Reges's statement, one Native student had taken a leave of absence, and another had dropped out. As we discuss below, the first student, who was not in Reges's class, also gave other reasons for taking a leave of absence, including feeling "used" after meeting with Balazinska to discuss the student's complaint and that the Allen School was excessively focused on testing. The record does not support the existence of the second student who reportedly dropped out.

Several months later, on June 13, 2023, Allbritton sent Reges a letter summarizing the committee's findings and closing the investigation. The committee found that Reges had likely violated university policy and caused "significant disruption"—which included the one student who took a leave of absence and the other who supposedly dropped out. But Allbritton declined to impose sanctions because of the possibility that Reges's "actions were intended to generate discussion." Allbritton further observed that UW had not restricted Reges's "ability to express your views or publicize your land acknowledgement statement outside the context of your course syllabus," noting that Reges had shared his land

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

acknowledgment through his email signature block and by posting it on his office door.

***6** Nevertheless, Allbritton warned that if Reges included his land acknowledgment in future syllabi, "and if that inclusion leads to further disruption, I will have no option but to conclude that your intent is to cause deliberate offense and further that disruption" in violation of UW's Executive Order 31 (EO-31) and the Faculty Code, and to "proceed with next steps." EO-31, the university's "Nondiscrimination and Affirmative Action" policy, is directed at "the goal of promoting an environment that is free of discrimination, harassment, and retaliation." It provides that UW may discipline "any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation."

Allbritton's letter also reinstated Reges's merit pay increase, which had "been automatically held in abeyance pending this investigation in accordance with University policy" for academic years 2021–22 and 2022–23. Reges claims he had not previously been informed that he was approved for a merit increase or that it had been withheld during the disciplinary investigation.

D

On July 13, 2022, while he was still under investigation, Reges sued Director Balazinska, Vice Director Grossman, Dean Allbritton, and Ana Marie Cauce, UW's President, raising claims of First Amendment retaliation and viewpoint discrimination. Reges also challenged EO-31 as facially overbroad and unconstitutionally vague. The defendants moved to dismiss for failure to state a claim, and while that motion was pending, the parties cross-moved for summary judgment. The parties agreed that there were no material factual disputes and that summary judgment could be adjudicated.

The district court resolved the motion to dismiss and summary judgment motions together. The court first found that Reges had stated claims for First Amendment retaliation and viewpoint discrimination because he engaged in protected speech. The court reasoned that these claims were subject to balancing under *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), because Reges's suit arose in the government employment context. Although the court found that Reges spoke on a matter of public concern, it granted summary judgment to defendants because, under *Pickering*, UW's interest in mitigating disruption to university staff functions, teaching assistants, and the learning environment outweighed Reges's First Amendment interests.

As evidence of disruption, the district court noted that students, including Native students, had reported feeling unwelcome and intimidated, and that 30% of Reges's students had transferred to the new CSE 143 section. The court also relied on the faculty committee's claim that one Native student dropped out. Although Reges objected to the faculty committee's report on hearsay grounds, the court explained that it did not consider this evidence for the truth of the matter asserted, but as reflecting UW's understanding of the disruption caused by Reges's speech.

The district court also dismissed Reges's overbreadth and vagueness challenges to EO-31 under Federal Rule of Civil Procedure 12(b)(6) and denied leave to amend. The court rejected Reges's position that EO-31's restriction on "unacceptable or inappropriate" conduct was impermissibly open-ended and subjective, reasoning that EO-31 tied these terms to UW's goal of "promoting an environment that is free of discrimination, harassment, and retaliation." The court construed EO-31 to reach conduct that " 'resemble[s]' discrimination, harassment, or retaliation, even if not unlawful under employment laws." It concluded that by this construction, EO-31 was not overbroad or vague.

Reges appeals.

II

The public university occupies a central place in the law of the First Amendment. The First Amendment protects the free exchange of ideas. The university is a primary generator and repository of ideas, a place in which unfettered academic debate and open discourse promotes the search for truth and prepares students for a discordant world lacking in orthodoxy. When we place limits on what professors may say or impose punishment for the views they express, we destock the marketplace of ideas and imperil future generations who must be exposed to a range of ideas and readied for the disharmony of a democratic society.

***7** This special relationship between the First Amendment and the university is firmly enshrined in precedent. Because "[t]he classroom is peculiarly the 'marketplace of ideas,'

" academic freedom is "a special concern of the First Amendment." *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *see also Grutter v. Bollinger*, 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) ("We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."); *Healy v. James*, 408 U.S. 169, 180–81, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) ("[W]e break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom.").

The Supreme Court has thus long reiterated that under the First Amendment, "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675. Faculty at universities play a significant role in driving the development of ideas in our country; that important responsibility cannot be carried out without the protections that the First Amendment affords. *See id.* ("Scholarship cannot flourish in an atmosphere of suspicion and distrust." (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality opinion))). Indeed, "[t]o impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Id.* (quoting *Sweezy*, 354 U.S. at 250, 77 S.Ct. 1203).

This is not merely because such a restraint would stifle academic thought and advancement, but because "the Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas." *Id.* (alterations omitted). The Supreme Court said many years ago that "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy*, 354 U.S. at 250, 77 S.Ct. 1203. This central teaching of First Amendment law remains just as relevant today.

The First Amendment's commitment to academic freedom is, of course, not without some costs. Open discourse often "induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). But if these are downsides, they are considered too fleeting to outweigh the foundational values underlying the First Amendment's protections for academic speech. "Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). This "hazardous freedom ... is the basis of our national strength and of the independence and vigor of Americans." *Id.* at 508–09, 89 S.Ct. 733.

These important First Amendment principles guide our analysis of UW's response to Professor Reges's speech. The UW community was free to regard Reges's speech as disrespectful, self-aggrandizing, or worse. We do not doubt the sincerity of their objections. Students, faculty, and staff at the University honored the traditions of the First Amendment by speaking out against Reges and his views, as was their right. But Reges has rights, too. And here, we conclude that UW violated the First Amendment in taking adverse action against Reges based on his views on a matter of public concern.

## III

***8** We first address Reges's retaliation claim. "To establish a prima facie First Amendment retaliation claim, the plaintiff must prove that '(1) [ ]he engaged in protected speech; (2) the defendants took an "adverse employment action" against h[im]; and (3) h[is] speech was a "substantial or motivating" factor for the adverse employment action.' " *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022) (alterations in original) (quoting *Howard v. City of Coos Bay*, 871 F.3d 1032, 1044 (9th Cir. 2017)). In the public employment context, a government employer can defeat a prima facie retaliation claim by demonstrating that its "legitimate administrative interests outweigh the employee's First Amendment rights" under the *Pickering* balancing test. *Howard*, 871 F.3d at 1044–45 (quoting *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)).

We conclude that Reges's speech is protected and that his First Amendment interests outweigh UW's interests under *Pickering.* We therefore reverse the district court's grant of summary judgment for UW and direct the entry of summary judgment for Reges on his First Amendment retaliation claim.

A

Reges has established a prima facie retaliation claim. As the district court noted, UW does not meaningfully dispute that Reges experienced adverse employment action because of his speech. "In a First Amendment retaliation case, an adverse employment action is an act that is reasonably likely to deter employees from engaging in constitutionally protected speech." *Coszalter v. City of Salem*, 320 F.3d 968, 970 (9th Cir. 2003). "[A] government act of retaliation need not be severe and it need not be of a certain kind," with the "relevant inquiry" being whether the government took " 'action designed to retaliate against and chill political expression.' " *Id.* at 975 (quoting *Thomas v. Carpenter*, 881 F.2d 828, 829 (9th Cir. 1989)).

UW was free to ask Reges to consider removing his parody statement. But its ensuing conduct—which included opening a lengthy disciplinary investigation (during which a merit pay increase was withheld), reprimanding Reges, and threatening him with further discipline—plainly qualifies as adverse employment action under our precedents. *See, e.g.*, *Dodge*, 56 F.4th at 779 (recognizing "that the insinuation or threat that 'some form of punishment or adverse regulatory action' may follow" can constitute adverse employment action (quoting *Greisen v. Hanken*, 925 F.3d 1097, 1114 (9th Cir. 2019))); *Coszalter*, 320 F.3d at 976 (concluding that "an unwarranted disciplinary investigation" could constitute adverse employment action). There is similarly no dispute that Reges's speech was the substantial or motivating factor for these adverse employment actions. Reges has therefore satisfied the second and third elements of a First Amendment retaliation claim.

UW instead challenges the district court's determination that Reges satisfied the remaining element of a prima facie claim: that he engaged in protected speech. Defendants argue that because UW requires professors to distribute syllabi, Reges's statement does not relate to his own scholarship or teaching and should instead be considered "government speech" that UW could rightfully control. This position rests on two connected strands of First Amendment jurisprudence.

UW first invokes the Supreme Court's holding in *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. This is because "[r]estricting speech that owes its existence to a public employee's professional responsibilities ... simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22, 126 S.Ct. 1951.

***9** *Garcetti* involved a deputy district attorney, Ceballos, who determined that an affidavit used to secure a search warrant contained serious misrepresentations. *Id.* at 414, 126 S.Ct. 1951. Ceballos's supervisors in the district attorney's office disagreed with Ceballos's assessment of the warrant, and Ceballos claimed they retaliated against him for his allegedly protected speech concerning the warrant. *Id.* at 414–15, 126 S.Ct. 1951.

The Supreme Court held that Ceballos's claim was not subject to *Pickering* balancing because his "expressions were made pursuant to his duties" as a prosecutor. *Id.* at 421, 126 S.Ct. 1951. That Ceballos's "duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance." *Id.* at 422, 126 S.Ct. 1951; *see also id.* (explaining that although government employees "retain the prospect of constitutional protection for their contributions to the civic discourse," this "does not invest them with a right to perform their jobs however they see fit"). The Court further justified its holding on the ground that government employers must have "sufficient discretion to manage their operations," including by "ensur[ing] that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id.* at 422–23, 126 S.Ct. 1951.

But *Garcetti* importantly reserved the question of whether its holding "would apply in the same manner to a case involving speech related to scholarship or teaching," acknowledging the possibility "that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Id.* at 425, 126 S.Ct. 1951. We addressed this open question in *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014). There, we squarely held that "*Garcetti* does not apply to 'speech related to scholarship or teaching' " and that "such speech is governed by *Pickering*." *Id.* at 406 (quoting *Garcetti*, 547 U.S. at 425, 126 S.Ct. 1951). We reasoned that "teaching and academic writing are at the core of the official duties of teachers and professors" and "a special concern of the First Amendment."

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

*Id.* at 411, 126 S.Ct. 1951 (quoting *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675). Applying *Garcetti* to this academic speech would therefore "directly conflict with the important First Amendment values previously articulated by the Supreme Court." *Id.*

As the district court correctly concluded below, Reges's parody land acknowledgment falls within *Demers*'s carve-out for speech related to scholarship or teaching. "[S]peech about a school's curriculum" or "concern[ing] 'what was taught at the school' " is "related to scholarship or teaching" even when "not made while teaching a class or producing scholarship." *Jensen v. Brown*, 131 F.4th 677, 689 (9th Cir. 2025) (quoting *Demers*, 746 F.3d at 415). In the university setting, we have applied this exception to a pamphlet by a communications professor weighing in on an active debate about how to restructure his school, *Demers*, 746 F.3d at 406–07, and to a math professor's handout criticizing changes to math department policy. *Jensen*, 131 F.4th at 684, 689.

In this case, Reges's statement relates to teaching because it addresses "what was taught at the school." *Id.* at 689 (quoting *Demers*, 746 F.3d at 415). The Allen School's "Best Practices for Inclusive Teaching" specifically suggested that professors include a land acknowledgment in their syllabi to make professors' "teaching [ ] as effective as possible," with the land acknowledgment part of a set of "ideas" "*designed to help you be a more effective teacher* and better role model." And UW's own land acknowledgment, which the Allen School offered as an example for inclusion on syllabi, itself reflected not only a particular pedagogy and view of history ("our campus sits on occupied land"), but also the university's position on the appropriateness of publicly acknowledging the presence of "the original caretakers of this land." Reges sought to counter this teaching with his own teaching on these issues. By commenting on an issue that the faculty was "actively debating," *Demers*, 746 F.3d at 407, and criticizing a school policy, *see Jensen*, 131 F.4th at 689, Reges operated outside of *Garcetti*'s purview. The dissent says that "Reges has not argued that the propriety of land acknowledgments on syllabi is remotely related to the fundamentals of computer science." But it was, of course, the Allen School that first recommended that its instructors include land acknowledgments on their syllabi.

***10** UW additionally contends that Reges's syllabus statement is not protected scholarship or teaching because syllabi are not "independently published" documents. In its view, because Reges's speech was in a document that professors were required to distribute, it falls within the scope of *Garcetti.* That is not correct. Our case law does not restrict *Demers* to speech made in "independently published" publications. This would undermine *Demers*'s central premise that academic speech is protected even when made pursuant to a professor's official duties. 746 F.3d at 409. To say that UW required Reges to distribute a syllabus merely restates the legally inert proposition that the statement relates to his official duties. And in any event, in this case the record reflects that at UW, "the syllabus is the purview of the faculty." The university does not review the contents of syllabi before they are posted, and faculty have "great flexibility" in determining the contents of their syllabi.

UW also advances the closely related proposition that Reges's statement should be treated as "government speech" because the university sought to convey its own message in course syllabi and could " 'take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted' by its individual messengers." *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). We have already explained why, as a general matter, Reges's dissenting speech on a matter of public concern is not government speech under *Garcetti*. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527, 142 S.Ct. 2407, 213 L.Ed.2d 755 (2022) (explaining that speech pursuant to official duties is "the government's own speech"). Characterizing professors' speech in an academic context as "government speech" would effectively swallow the academic speech exception to *Garcetti* that we recognized in *Demers.*

As to the syllabus in particular, we also reject UW's government speech argument on its own terms. When the government speaks, it " 'is entitled to say what it wishes,' and to select the views that it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (citation omitted) (quoting *Rosenberger*, 515 U.S. at 833, 115 S.Ct. 2510). In assessing what constitutes government speech, courts "conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression," which includes "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff v. City of Bos.*, 596 U.S. 243, 252, 142 S.Ct. 1583, 212 L.Ed.2d 621 (2022).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Reges's statement does not constitute "government speech" under this standard. The record shows that Reges was speaking in his own capacity as a professor, and not on behalf of his employer. As we noted above, UW acknowledges that "the syllabus is the purview of the faculty," syllabi are not reviewed by the university before posting, and faculty have "great flexibility" in determining the contents of their syllabi. As an objective matter, it is also highly unlikely that students could reasonably perceive Reges as speaking on UW's behalf when his statement begins: "*I* acknowledge ...." In fact, the record reflects that students attributed the speech to Reges, as they argued that Reges's speech warranted condemnation because it conflicted with UW's views and policies on inclusivity. We do not decide whether a statement contained in a syllabus could never constitute government speech, or whether a university may limit the kinds of information that professors include in their syllabi (such as the course readings and class policies). But in the present circumstances, UW cannot claim that Reges is speaking on its behalf.

The Sixth Circuit's decision in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), is instructive here. In that case, Professor Meriwether, a philosophy professor at Shawnee State University, sued after he was investigated for not complying with a policy requiring faculty to refer to students by their preferred pronouns. *Meriwether*, 992 F.3d at 498–502. Before opening its investigation, Shawnee State refused a proposed compromise under which Meriwether would "use students' preferred pronouns but place a disclaimer in his syllabus 'noting that he was doing so under compulsion and setting forth his personal and religious beliefs about gender identity.' " *Id.* at 500.

***11** The Sixth Circuit rejected Shawnee State's contention that *Garcetti* governed Professor Meriwether's speech, explaining that Shawnee State's move to prevent "Meriwether from describing his views on gender identity *even in his syllabus*" still had to be justified under *Pickering* balancing. *Id.* at 506 (emphasis added). The court explained that "the academic-freedom exception to *Garcetti* covers all classroom speech related to matters of public concern, whether that speech is germane to the contents of the lecture or not." *Id.* at 507. This is so because "[t]he need for the free exchange of ideas in the college classroom is unlike that in other public workplace settings." *Id.* Some classroom speech, such as "call[ing] roll at the start of class," may be the "type of non-ideological ministerial task" falling outside of the academic-speech exception to *Garcetti*. *Id.* But when a university "wants its professors ... to communicate a message" on a matter of public concern and a professor "does not want to communicate [that message] to his students," that is "not a matter of classroom management" but one "of academic speech." *Id.* This same basic observation applies here.

Defendants' reliance on *Johnson v. Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011), and *Downs v. Los Angeles Unified School District*, 228 F.3d 1003 (9th Cir. 2000), does not alter our analysis. In *Johnson*, a high school math teacher hung banners in his classroom with statements such as "IN GOD WE TRUST" and "All men are created equal, they are endowed by their CREATOR." 658 F.3d at 958. School policy permitted such decorations "subject to specific limitations and the satisfaction of the principal or a District administrator." *Id.* at 967. We rejected the teacher's free speech challenge because his banners were properly understood as government speech. *Id.* at 970. Similarly, in *Downs*, we found that a high school teacher's bulletin board criticizing homosexuality "contained only 'government speech' " where school policy gave administrators authority over the contents of bulletin boards. 228 F.3d at 1006–07, 1009, 1011–12.

Unlike Reges's land acknowledgment, the messages we considered in *Johnson* and *Downs* were not directly attributed to an individual speaker and concerned spaces that were not acknowledged to be "the purview of the faculty," as UW regards syllabi. Defendants' appeal to cases involving high schools also ignores our observation that "the degree of freedom an instructor should have in choosing what and how to teach will vary depending on whether the instructor is a high school teacher or a university professor." *Demers*, 746 F.3d at 413; *see also Johnson*, 658 F.3d at 966 n.12 (noting that *Garcetti*'s " 'academic freedom' carve-out" does not apply to "primary and secondary school teachers" (quoting *Garcetti*, 547 U.S. at 425, 126 S.Ct. 1951)). Because universities "occupy a special niche in our constitutional tradition," *Grutter*, 539 U.S. at 329, 123 S.Ct. 2325, we cannot conclude that university faculty can be restricted on the same basis as high school teachers.

For these reasons, we agree with the district court that Reges engaged in protected speech, not government speech. He engaged in academic speech that falls outside of *Garcetti*'s exception to *Pickering.*

B

Because Reges's statement was not government speech, we therefore consider whether his retaliation claim survives *Pickering* balancing. Under *Pickering*, an employee must first "show that his or her speech addressed 'matters of public concern.' " *Demers*, 746 F.3d at 412 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731)). If so, we then assess whether "the employee's interest 'in commenting upon matters of public concern' ... outweigh[s] 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Id.* (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

UW does not contest the district court's determination that Reges's statement addressed matters of public concern. It instead argues that Reges's First Amendment interest is outweighed by UW's interest in avoiding disruption on campus. We conclude that *Pickering* balancing favors Reges.

1

***12** As an initial matter, Reges unquestionably spoke on a matter of public concern. "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.' " *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). We have said that "[t]he 'essential question is whether the speech addressed matters of public as opposed to personal interest.' " *Demers*, 746 F.3d at 415 (quoting *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009)). Government employee speech touches on a matter of public concern "[e]ven if only 'a relatively small segment of the general public' might have been interested" in the speech. *Jensen*, 131 F.4th at 687 (quoting *Hernandez v. City of Phoenix*, 43 F.4th 966, 978 (9th Cir. 2022)). Speech that addresses matters of public concern is therefore "defined broadly." *Demers*, 746 F.3d at 415 (quoting *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 978 (9th Cir. 2002)).

In this case, Reges did not speak about a private grievance or personnel dispute, *see id.*, but about a matter of public concern both within the UW community and more broadly. He included a parody land acknowledgment in his syllabus to comment on the propriety of land acknowledgments, to challenge the Allen School's recommendation to include a land acknowledgment on syllabi, and to question the factual basis for UW's land acknowledgment. Reges also sought to situate land acknowledgments within a broader "agenda of 'diversity, equity, and inclusion,' " which he opposes. Reges's statement waded into a significant public debate about land acknowledgments and the political environment that favors them. As UW acknowledges, there is a live controversy even in the field of Native American studies over land acknowledgments. Reges's speech, however misguided one might regard it, was core political speech that merits the highest First Amendment protection.

Indeed, even UW's administrators saw apparent value in Reges's speech, as shown by the fact that they permitted Reges to post the statement on his office door and in his email signature, to discuss it with colleagues, and to give interviews expressing his views about land acknowledgments and UW's reaction. Dean Allbritton herself acknowledged that Reges's land acknowledgment could be understood as "intended to generate discussion, rather than merely to denigrate members of the community." Because we agree that Reges's speech was not merely denigrating, we are not called upon to determine what protection, if any, such speech would receive in this context. *See Meriwether*, 992 F.3d at 508 (explaining that "[a] basketball coach using racial epithets to motivate his players does not" address "a matter of public concern"); *Buchanan v. Alexander*, 919 F.3d 847, 853–54 (5th Cir. 2019) (rejecting a First Amendment retaliation claim where a professor used profanity and discussed her sex life and the sex lives of her students). Reges's statement sought to contribute to the debate on land acknowledgments and the culture that promotes them.

The context in which Reges offered his mock land acknowledgment—the public university setting—underscores both that Reges spoke on a matter of public concern and the high value of his speech under the First Amendment. *See Demers*, 746 F.3d at 415 (explaining that "[w]e consider 'the content, form, and context of a given statement' " (quoting *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684)). Given "the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment," *Grutter*, 539 U.S. at 329, 123 S.Ct. 2325, Reges spoke in a unique setting that is of "special concern" to the First Amendment, *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675. We therefore agree with the Sixth Circuit that "what constitutes a matter of public concern and what raises academic freedom concerns is of essentially the same

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

character." *Meriwether*, 992 F.3d at 507 (quoting *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1188 (6th Cir. 1995)).

***13** The parodic manner of Reges's speech does not detract from its First Amendment value. *See Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1400 (9th Cir. 1997) ("Parody is regarded as a form of social and literary criticism, having a socially significant value as free speech under the First Amendment."); *see also, e.g., Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54–55, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Nor does the fact that some listeners may have found it disrespectful or distasteful. The First Amendment protects "a teacher's freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975).

Defendants nevertheless argue that Reges has only a de minimis First Amendment interest because he remained free to express his views on land acknowledgments through other channels. UW points out that it allowed Reges to display his mock land acknowledgment on his office door and email signature, and even in other syllabi (if doing so would not cause more disruption). Because UW allowed all of this, it believes that Reges's expressive rights as to the syllabus in question "count for little in the *Pickering* balance."

We reject this curious argument as inconsistent with the First Amendment. It is basic First Amendment law that in the absence of a neutral restriction, like one based on time, place, or manner, the government may not escape First Amendment scrutiny by limiting a speaker to certain places or modes of expression. *See, e.g., Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." (quoting *Schneider v. New Jersey*, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939))). UW offers no authority countenancing a different approach when analyzing the strength of a public university professor's First Amendment interest. And there is no small degree of irony in UW's position, considering that permitting Reges to speak on the topic of land acknowledgments elsewhere effectively concedes that this speech has value, is not totally out of bounds, and could be offered without causing unwarranted disruption.

We therefore conclude that, based on its content and the context in which it was offered, Reges's speech had significant First Amendment value.

2

We turn next to whether UW has demonstrated "a legitimate administrative interest in suppressing the speech that outweigh[s] the plaintiff's First Amendment rights." *Dodge*, 56 F.4th at 776–77 (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731). In assessing whether the government has met this burden, we must necessarily weigh the high value of Reges's speech, for "[t]he more tightly the First Amendment embraces the speech[,] the more vigorous a showing of disruption must be made." *Id.* at 782 (quoting *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992)). Given that Reges spoke on a contested issue of public concern in a public university setting, UW faces "a particularly heavy burden under the *Pickering* test." *Id.*; *see also id.* ("The government's burden in proving disruption 'varies with the content of the speech.' " (quoting *Hyland*, 972 F.2d at 1139)).

In a standard *Pickering* inquiry, we consider the fact that "government employers have a strong interest in prohibiting speech by their employees that impairs close working relationships among co-workers, impedes performance of the speaker's job duties, interferes with the effective functioning of the employer's operations, or undermines the employer's mission." *Hernandez*, 43 F.4th at 976 (citing *Rankin v. McPherson*, 483 U.S. 378, 388, 390, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684; *Pickering*, 391 U.S. at 570, 572–73, 88 S.Ct. 1731). But "the *Pickering* analysis 'requires a fact-sensitive, context-specific balancing of competing interests.' " *Dodge*, 56 F.4th at 784 (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 980 (9th Cir. 1998)). What counts as a legitimate administrative interest in managing a police department, for example, does not necessarily carry over to the public university setting.

***14** We have already recognized that in the context of higher education, the government does not have the same interest in maintaining "close working relationship[s]" between professors and university leadership, because "anyone who has spent time on college campuses knows that the vigorous exchange of ideas and resulting tension between an administration and its faculty is as much a part of college life as homecoming and final exams." *Bauer v. Sampson*,

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

261 F.3d 775, 785 (9th Cir. 2001); *see also* *Jorjani v. N.J. Inst. of Tech.*, 151 F.4th 135, 143 (3d Cir. 2025) (observing that *Pickering*'s concern about maintaining close working relationships "is irrelevant inside the university"). Given the vital First Amendment interest in promoting the free exchange of ideas in the university setting, this insight about *Pickering*'s application in the university context extends to relationships within the university more broadly.

In this case, it is readily apparent that the disruption that occurred at UW after Reges included his land acknowledgment in his Winter 2022 syllabus is attributable to one irreducible source: student discomfort and anger with Reges's views. It is unclear from the record whether the complaints were limited to a relatively small subset of the student population. Some of the written complaints may have been prompted by the Allen School's own possible solicitation of student complaints. But the larger point is that in the public university setting, student disagreement with a professor's academic speech on an issue of public concern cannot alter the *Pickering* analysis in the government's favor. The reason is foundational: the First Amendment's protections for academic freedom in public universities will necessarily lead to disagreements on campus. Student unrest is an inevitable byproduct of our core First Amendment safeguards in the higher education context. This unrest therefore cannot be the type of disruption that permits restricting or punishing a professor's academic speech.

Higher education may reaffirm students' perspectives, but it can also challenge them. And to have one's views challenged can be unsettling. But that is the very nature of the public university experience under a First Amendment that reflects "this Nation's dedication to safeguarding academic freedom." *Healy*, 408 U.S. at 180–81, 92 S.Ct. 2338; *see also* *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994) (explaining that a university's "efficient provision of services ... actually depends, to a degree, on the dissemination in public fora of controversial speech implicating matters of public concern").

If student anxiety or outrage toward a professor's academic speech could justify restricting what a professor says, then universities would cease to occupy any "special niche" in our First Amendment traditions. *Grutter*, 539 U.S. at 329, 123 S.Ct. 2325. Student discontent that leads university administrators to censor professors would "cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675. And the tides of popular campus sentiment would drown out dissenting viewpoints, with the adverse reactions of students and staff operating as an impermissible "heckler's veto" that restricts speech based on a hostile audience reaction. *See* *Meinecke v. City of Seattle*, 99 F.4th 514, 522 (9th Cir. 2024). If criticizing land acknowledgments creates disruption on campus and warrants investigation and reprimand, what other views would cause offense and be excluded next? All of this would be contrary to long-established First Amendment precedents, which protect academic freedom to promote the development of ideas and expose students to a range of views. *See* *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675; *Sweezy*, 354 U.S. at 250, 77 S.Ct. 1203.

Under *Pickering*, therefore, avoiding the disruption on college campuses "that necessarily accompanies controversial speech," *Dodge*, 56 F.4th at 782 (brackets and quotations omitted), cannot justify the suppression of the very diversity of views that is central to the mission of higher education. Some types of government employers depend on command and control. But under the First Amendment, a public university's oversight of academic speech lacks any comparable justification. We said fifty years ago that "[t]he desire to maintain a sedate academic environment, 'to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint,' is not an interest sufficiently compelling ... to justify limitations on a teacher's freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Adamian*, 523 F.2d at 934 (quoting *Tinker*, 393 U.S. at 509, 89 S.Ct. 733). That time-tested observation resolves the *Pickering* analysis in Reges's favor.

***15** The dissent's focus on student "distress" fails for the same reason, as it would allow students' emotional reactions to academic speech to "cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675. Although the dissent would hold that universities can retaliate against professors for their academic speech when it causes "distress" that impacts "student learning," exposure to views that distress and offend is a form of education unto itself. As the Supreme Court has said, "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Id.* (quotations and parentheses omitted). The dissent would seemingly grant college students the power to restrict their professors' academic speech in the name of avoiding distress—a surefire way to silence unpopular or controversial speech that the First Amendment robustly protects.

We draw additional support from our decision in *Rodriguez v. Maricopa County Community College District*, 605 F.3d 703 (9th Cir. 2010), the facts of which bear a fair resemblance to the immediate case. In *Rodriguez*, a math professor, Kehowski, sent "racially-charged" emails to a community college listserv that went to every college employee. *Id.* at 705. In one email, Kehowski criticized "Dia de la raza," asking, "Why is the district endorsing an explicitly racist event?" *Id.* In another, Kehowski wrote, "YES! Today's Columbus Day! It's time to acknowledge and celebrate the superiority of Western Civilization." *Id.* Although the college condemned Kehowski's statements, it declined to pursue disciplinary action against him, citing academic freedom considerations. *Id.* at 706. Other college employees then sued, claiming that the college's failure to take action against Kehowski created a hostile work environment. *Id.* at 705–06.

We held that the college was not required to discipline the professor. Although *Rodriguez* did not involve a First Amendment claim for retaliation—the point of the suit was to challenge the school's failure to investigate and punish the professor—our reasoning in *Rodriguez* accords with our reasoning here. We explained that "the problem with plaintiffs' suit" was that "[t]heir objection to Kehowski's speech [was] based entirely on his point of view, and it is axiomatic that the government may not silence speech because the ideas it promotes are thought to be offensive." *Id.* at 708. This was "particularly so on college campuses," as "[i]ntellectual advancement has traditionally progressed through discord and dissent," and institutions of higher education "have historically fostered that exchange." *Id.* If "certain points of view may be declared beyond the pale," we explained, colleges and universities could not fulfill their role. *Id.* Indeed, we "doubt[ed] that a college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment and justify the judicial intervention that plaintiffs seek." *Id.* at 710. These same considerations guide us to our holding that the negative reaction to Reges's land acknowledgment cannot justify retaliating against Reges for his academic speech.

3

UW nevertheless argues that it relied on more tangible forms of disruption beyond student unrest, such as Native students dropping out or taking leaves of absence, greater difficulties recruiting Native students, and students in Reges's computer science course switching to the other section that the Allen School made available. Our fine dissenting colleague raises some of these same points. But all these forms of disruption are just further manifestations of on-campus disagreement with the message in Reges's syllabus statement and the way Reges communicated his views. For the reasons we have just explained, these disruptions cannot alter our *Pickering* calculus.

On this record, the alleged disruption also suffers from problems of proof. Under *Pickering*, speech "is disruptive only when there is an 'actual, material and substantial disruption, or there are reasonable predictions of disruption in the workplace.' " *Dodge*, 56 F.4th at 782 (alterations omitted) (quoting *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009)). Even setting aside that the disruption that invariably accompanies controversial academic speech is insufficient, *Adamian*, 523 F.2d at 934, UW's claims of more tangible disruption are inadequately substantiated. *Cf. Jorjani*, 151 F.4th at 142–44 (concluding that the record contained insufficient evidence of on-campus disruption to warrant public university's decision to not renew professor's contract based on his controversial speech).

***16** Dean Allbritton's final letter to Reges referenced "[o]ne Native American student feeling compelled to take a leave of absence from the University" and "[o]ne Native American student feeling compelled to drop out of the University." That two of the thousands of students at the University of Washington decided to leave the school likely would not qualify as materially disruptive under any circumstances. But even setting that aside, the two students in question are not compelling evidence of disruption.

The first student—who was not a student in Reges's class—described other factors influencing the decision to take a leave of absence, including the lack of available tutoring services, the Allen School's focus on testing, and feeling "used" after meeting with Balazinska to discuss Reges. UW also could not explain whether this student's mental health problems began with or pre-dated Reges's speech. The dissent references student "absences" and notes that "students cannot be educated when they are absent." But the absence of this single student who did not even take Reges's course is the only absence the dissent identifies.

As for the second student, it appears undisputed that this student does not exist. UW claims that whether the second student existed is "irrelevant," apparently because it believed

the student had dropped out. UW identifies nothing in the record to support the reasonableness of this belief. But suffice it to say, the university cannot justify retaliating against Reges based on phantom evidence of disruption.

UW's other assertions of disruption are similarly unsupported. It is speculative whether the university faced or would face difficulties recruiting Native students because of a statement on Reges's Winter 2022 computer science syllabus. UW has supplied no concrete evidence supporting this speculation. *See Nichols v. Dancer*, 657 F.3d 929, 933–34 (9th Cir. 2011) ("[A]n employer cannot prevail under *Pickering* based on mere speculation that an employee's conduct will cause disruption."). The complaint from the Allen School's Recruiter for Diversity & Access likewise provides no specifics on how Reges's statement impacted recruiting and instead reflects bare disagreement with Reges's views and the "emotional harm" they caused. It provides no support for UW's theory that Reges's class syllabus land acknowledgment materially harmed the Allen School's efforts to recruit Native students. There is also no factual support for any allegation that Reges would "target" Native American students and disadvantage them in their education, or that he would retaliate against teaching assistants. Nor can we say that such disruption was reasonably predictable, *Dodge*, 56 F.4th at 782, when Reges spoke about his land acknowledgment in other contexts—including in other syllabi—and there is no indication that disruption ensued.

Similarly, although UW points out that roughly 170 of Reges's 500 students switched to the new section of CSE 143, the record does not indicate why they did so. While it is true that these students were informed that the grading system would not change for this alternative section, the new instructor had a preexisting reputation for more lenient grading and a different lecture style. The record also does not reveal whether these students would have dropped Reges's course if the new section were not offered. There are many reasons why students would leave one class for another, including general dislike for the professor (or, as may be the case here, his expression of other unpopular views that UW does not claim are unprotected). None of this demonstrates disruption sufficient to justify limiting or punishing Reges's academic speech. On this record, there is a shortage of evidence that Reges's syllabus statement "was the source of" students switching to another class. *Bauer*, 261 F.3d at 785. Nor is there evidence that Reges's land acknowledgment affected the quality of his classroom instruction or denied educational benefits to his students.

***17** Finally, UW's assertions of disruption are significantly undermined by the fact that defendants permitted Reges to express the same views about land acknowledgments in other settings, such as on his office door, his email signature, and in interviews with the media. As UW acknowledges, Reges has also included his mock land acknowledgment statement in all syllabi after Winter 2022, with far less incident.

Although defendants tout Reges's other speech about land acknowledgments as evidence that UW has given Reges beneficent leeway, Reges's other speech only raises further questions as to why a statement on one syllabus would prove so disruptive as to warrant an extensive investigation into Reges. UW maintains that it acted only as to the Winter 2022 syllabus statement because that statement, in particular, proved disruptive. But First Amendment protection that rises and falls depending on how upset students become at a professor's message is little protection at all.

We hold that UW has not met its burden under *Pickering* of demonstrating that its legitimate interests outweigh Reges's interest in speaking on a matter of public concern in the university setting. The district court erred in granting summary judgment to defendants, and we direct that summary judgment be entered for Reges on his First Amendment retaliation claim. Because Reges's viewpoint discrimination claim is also "subject to the same *Pickering* analysis," *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1149 (9th Cir. 2025), summary judgment for Reges is warranted on this claim as well. The record is clear that the University took action against Reges as a result of the views he expressed in his mock land acknowledgment. That is viewpoint discrimination. On remand, it will be for the district court to determine the appropriate relief on the retaliation and viewpoint discrimination claims.

## IV

We now address Reges's overbreadth and vagueness challenges to Executive Order 31, UW's "Nondiscrimination and Affirmative Action" policy. EO-31 begins with the following paragraph:

> The University of Washington, as an institution established and maintained by the people of the state, is committed

> to providing equality of opportunity and an environment that fosters respect for all members of the University community. This policy has the goal of promoting an environment that is free of discrimination, harassment, and retaliation. To facilitate that goal, the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed *unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation.*

(Emphasis added). The order then defines the terms "discrimination," "harassment," and "retaliation," and provides that "[t]erms used in this policy are intended to have the meaning given to them by applicable federal or state laws and regulations." Reges maintains that EO-31, and specifically its coverage of "unacceptable or inappropriate" conduct, is vague and overbroad under the First Amendment.

The district court rejected Reges's facial challenges under Rule 12(b)(6). As we recounted above, the court construed EO-31's restriction on "unacceptable or inappropriate" conduct in light of the policy's goal of "promoting an environment that is free of discrimination, harassment, and retaliation." It then concluded that the policy only reaches conduct that " 'resemble[s]' discrimination, harassment, or retaliation, even if not unlawful under employment laws." The court reasoned that by this limiting construction, the policy was not facially overbroad or vague "because the terms 'discrimination,' 'harassment,' and 'retaliation' are defined" by reference to federal and state law.

***18** Relying on the district court's narrowing construction, defendants argue that EO-31 is neither vague nor overbroad. But at least at the Rule 12(b)(6) stage, the district court's narrowing construction was untenable. Courts "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *United States v. Stevens*, 559 U.S. 460, 481, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)). We apply state canons of construction when interpreting state statutes. *See Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 485 (9th Cir. 2024). EO-31 is a regulation, *see* Wash. Rev. Code § 34.05.010(2)–(3), which, under Washington law, is interpreted using "the same principles used to interpret statutes." *Puget Soundkeeper All. v. State*, 189 Wash.App. 127, 356 P.3d 753, 757 (2015). "When the words in a statute are clear and unequivocal," Washington courts "assume the Legislature meant exactly what it said and apply the statute as written." *In re Recall of Pearsall-Stipek*, 141 Wash.2d 756, 10 P.3d 1034, 1041 (2000) (quoting *In re Custody of Smith*, 137 Wash.2d 1, 969 P.2d 21, 25 (1998)).

EO-31 targets "*any* conduct that is deemed unacceptable or inappropriate, *regardless* of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation." Despite the broad sweep of this text, UW, like the district court, reads EO-31 to "tether[ ]" the terms "unacceptable" and "inappropriate" to the concepts of unlawful discrimination and retaliation. As further support, UW notes that EO-31 lists specific policies aimed at discrimination, harassment, and retaliation immediately after its prohibition on "unacceptable or inappropriate" conduct; provides that its terms "have the meaning given to them by applicable federal or state law and regulations"; and includes "Nondiscrimination" and "Non-Retaliation" in its title and the titles of its subsections.

Although this language standing alone provides some support for UW's reading, the inference of any "tether" to the legal definitions of harassment, discrimination, and retaliation is broken by EO-31's plain text, which reaches "*any* conduct," including (there is no dispute) expression, "*regardless of whether* the conduct rises to the level of unlawful discrimination, harassment, or retaliation." Given this language, EO-31 is not "readily susceptible" to the district court's interpretation that only conduct "resembling" unlawful discrimination, harassment, or retaliation is covered. *See Stevens*, 559 U.S. at 481, 130 S.Ct. 1577 (quoting *Reno*, 521 U.S. at 884, 117 S.Ct. 2329).

Because the district court's limiting construction conflicts with the plain text of EO-31, it was improper. Although Reges asks us to answer the constitutional question without the district court's narrowing construction, we think that question is best left to the district court in the first instance. In evaluating that issue, the district court may also consider whether a proper understanding of EO-31 may be informed by how the policy has been enforced and applied in practice. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 726, 144 S.Ct. 2383, 219 L.Ed.2d 1075 (2024) (directing further exploration of the law and facts in a First Amendment facial challenge).

* * *

For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

S.R. THOMAS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that *Pickering* balancing applies to Professor Stuart Reges's First Amendment retaliation and viewpoint discrimination claims.

However, I respectfully disagree with the majority's conclusion that Reges's speech interests outweigh the University of Washington's interests. Universities have a responsibility to protect their students. This University, like other universities in the American West, has a particular obligation to its Native students. The disruption Reges's speech caused to Native students' learning outweighed his own First Amendment interests.

***19** I also respectfully disagree with the majority's conclusion that the University's policy, EO-31, is not readily susceptible to the district court's limiting construction.

I

I agree with the majority that Reges's First Amendment retaliation and viewpoint discrimination claims depend on the outcome of *Pickering* balancing, but I respectfully disagree as to the outcome of that balancing. "In *Pickering*, the Supreme Court instructed that courts must conduct ' "a fact-sensitive and deferential weighing of the government's legitimate interests" as employer against the First Amendment rights of the employee.' " *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 781 (9th Cir. 2022) (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 720 (9th Cir. 2022)). We do not consider Reges's statement "in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

A

The University had weighty interests in educating and enrolling Native students. In *Pickering* balancing, the government has a legitimate interest in avoiding "speech by their employees that impairs close working relationships among co-workers, impedes performance of the speaker's job duties, interferes with the effective functioning of the employer's operations, or undermines the employer's mission." *Hernandez v. City of Phoenix*, 43 F.4th 966, 976 (9th Cir. 2022). "Reasonable predictions of disruption" can be sufficient to justify speech restrictions. *See Dodge*, 56 F.4th at 782 (quoting *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009)). A government employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick v. Myers*, 461 U.S. 138, 152, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

Educating and enrolling Native students is a core part of the University's "mission," as well as the "effective functioning" of its "operations." *Hernandez*, 43 F.4th at 976. Universities have a responsibility to educate all their students. American universities, especially in the West, have a special responsibility to their Native students. The University has repeatedly acknowledged this responsibility. The University has a memorandum of understanding with regional tribes, which commits the University to, among other things, "[e]nhance efforts to recruit, retain[,] and successfully graduate more American Indian undergraduate, graduate and professional students." The University's Office of Tribal Relations has said that "it is important for the University of Washington to work together to develop strong working relationships with tribal citizens and leaders. Existing relationships between the UW and certain tribal communities have demonstrated benefits for both sides including sharing knowledge, research opportunities, and educational opportunities for tribal members and descendants." And of course, the University has its own land acknowledgment, which it developed in consultation with tribal leaders throughout the state and region.

Reges's "land acknowledgment" disrupted student learning, especially for Native students. Students reported that "they will not attend class or will be dropping [Reges's] course rather than take the course." One Native student took a leave of absence, in significant part because of Reges's statement. To be sure, as the majority notes, this student had other

reasons for taking leave. But Reges's "land acknowledgment" was one of the primary reasons that student stopped receiving an education. As any educator knows, students cannot be educated when they are absent.

***20** Moreover, several students, in written complaints, showed how Reges went beyond offense to threaten their learning: "this whole incident has made me feel so directly despised and unsafe that I'm certain if I hadn't transferred in I wouldn't be at the Paul Allen school right now"; "I am intimidated and already do not feel welcome in this class, nor do I feel like I will be supported and led to be successful in this required course for my major." The University noted that the volume of written complaints was "unprecedented." Based on all this information, the University reasonably concluded that there was "significant impact" to the "morale of Native American students, and their learning." That is a disruption to the University's ability to educate its Native students.

It also matters that Reges included the statement on a syllabus for a fundamentals of computer science class. That is part of the "context" of the statement. *See Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. Reges has not argued that the propriety of land acknowledgments on syllabi is remotely related to the fundamentals of computer science. The University has an interest in their students learning about topics related to their classes, rather than engaging in whatever controversial discussion their professor feels like having; that interest is part of the University's interest in the "effective functioning" of its educational curriculum. *See Hernandez*, 43 F.4th at 976.

The majority suggests that this kind of disruption to student learning is categorically inadequate to outweigh a professor's speech interests. It holds that "[t]his [student] unrest ... cannot be the type of disruption that permits restricting or punishing a professor's academic speech," and it reasons that "First Amendment protection that rises and falls depending on how upset students become at a professor's message is little protection at all." There are good reasons to be concerned about student unrest becoming a heckler's veto. But student learning is the heart of any university's mission, and it is common sense that students do not learn well when they experience extreme distress, as happened here. In a case like this, where student unrest went beyond mere offense and rose to the level of distress and absences, and where the University's particular responsibility to Native students is implicated, such disruption can outweigh a professor's speech interests.

*Rodriguez v. Maricopa County Community College District*, 605 F.3d 703 (9th Cir. 2010), is not to the contrary. First, as the majority acknowledges, *Rodriguez* only held that the college did not create a hostile work environment by not disciplining a professor, not that the college would have violated the First Amendment had it done the opposite and disciplined the professor. *Id.* at 711. *Rodriguez* thus did not address *Pickering* balancing at all. *See generally id.* Second, *Rodriguez* focused on university employee distress, not student distress. *Id.* at 705, 708. That distinction matters because university employee distress is worth little in *Pickering* balancing. *See Dodge*, 56 F.4th at 782; *Bauer v. Sampson*, 261 F.3d 775, 785 (9th Cir. 2001) ("[A]nyone who has spent time on college campuses knows that the vigorous exchange of ideas and resulting tension *between an administration and its faculty* is as much a part of college life as homecoming and final exams." (emphasis added)). But our precedents have not similarly discounted university student distress, and wisely so, because of the fundamental impact that extreme student distress can have on student learning.

The University also reasonably predicted that Reges's "land acknowledgment" would disrupt enrollment of Native students. A current Native student complained that they would never have enrolled had they seen Reges's statement. The University's diversity and access recruiter noted that Reges's "land acknowledgment" undermined her operations: "How am I supposed to recruit students into an environment where their history is questioned and their rights are denied?" Contrary to the majority's reasoning, the predicted disruption to enrollment was not mere "speculation." The current students' statements, along with the "unprecedented" volume of complaints, make the prediction of disruption reasonable.

***21** In sum, the actual and reasonably anticipated disruption to the University's education and enrollment of Native students was significant.

B

Compared to the University's interests, Reges's interests are far less weighty, even though he spoke on a matter of public concern. He was allowed to put his "land acknowledgment" at the bottom of his emails. He was allowed to send it to his colleagues. He was allowed to post it outside his office. He was allowed to discuss it in interviews with the press, including a University student newspaper. The only forum the University disallowed him from repeating his

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

"land acknowledgment" was a syllabus for an introduction to computer science course—a course that is required for certain majors. Reges's interest in speaking about land acknowledgments in this single forum does not outweigh the University's interest in avoiding disruption to its Native students' learning.

I would hold that these alternative fora available to Reges are part of the "context in which the dispute arose" that must be considered in *Pickering* balancing. Rankin, 483 U.S. at 388, 107 S.Ct. 2891. The majority argues that this is a "curious argument" that is "inconsistent with the First Amendment." It is admittedly novel, because our cases have not addressed, one way or another, [1] what alternative avenues for speech mean for a government employee's interests under *Pickering.* On the facts here, Reges's interest in putting his "land acknowledgment" on his syllabus is slim, because he was still allowed to repeat it everywhere else.

And allowing Reges to speak in these alternative fora does not diminish the University's argument that Reges's "land acknowledgment" was disruptive, because sharing it in these alternative fora did not cause the same kind of disruption that adding it to the syllabus did. That is not a surprising difference: a Professor's speech has a different significance when it is in a document that governs how he will run his class and grade students, than it does when he is talking outside of class with colleagues or giving interviews to the press.

* * *

Because the disruption to the University's mission and operations was great, I would hold that the University's interests prevail over Reges's, and would thus affirm the district court.

II

I also respectfully disagree with the majority's conclusion that the University's policy, EO-31, is not susceptible to the district court's limiting construction. The disputed language in EO-31 says:

> This policy has the goal of promoting an environment that is free of discrimination, harassment, and retaliation. To facilitate that goal, the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation.

The district court construed the phrase "conduct that is deemed unacceptable or inappropriate" to be limited to conduct that " 'resemble[s]' discrimination, harassment, or retaliation, even if not unlawful under employment laws."

***22** The majority determines that there is no "tether" to unlawful discrimination, harassment, or retaliation because of the words "*any* conduct" and "regardless." If EO-31 said "any conduct" is sanctionable "regardless of whether the conduct *is* unlawful discrimination, harassment, or retaliation," then I would agree. But EO-31 instead says "any conduct" is sanctionable "regardless of whether the conduct *rises to the level of* unlawful discrimination, harassment, or retaliation." That preserves the tether: under the plain language of EO-31, sanctionable conduct still must resemble unlawful discrimination, harassment, or retaliation, but need not be as extreme. Thus, EO-31 is "readily susceptible" to the district court's limiting construction. *United States v. Stevens*, 559 U.S. 460, 481, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (quoting *Reno v. ACLU*, 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)).

Other tools of statutory interpretation bolster this view, as the majority acknowledges. The purpose of this provision, stated in the sentence immediately preceding the disputed language, is to "promot[e] an environment that is free of discrimination, harassment, and retaliation." The title of EO-31 includes "Nondiscrimination," and the subtitle of the relevant provision is "Nondiscrimination and Non-Retaliation." Immediately after the disputed provision, EO-31 lists specific policies aimed at discrimination, harassment, and retaliation. And EO-31 defines discrimination, harassment, and retaliation as "hav[ing] the meaning given to them by applicable federal or state laws and regulations." In sum, this provision is all about unlawful discrimination, harassment, and retaliation, so the district court's limiting construction—that prohibited conduct must "resemble" unlawful discrimination, harassment, or retaliation—is sound. I would affirm the district court.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

### III

Because the University's interest in avoiding disruption to the education and enrollment of Native students outweighs Reges's interest in repeating his "land acknowledgment" in this particular forum, the district court was correct to grant summary judgment to the University on the First Amendment retaliation and viewpoint discrimination claims.

Because EO-31's "tether" to "unlawful discrimination, harassment, or retaliation" is not severed, it is readily susceptible to the district court's limiting construction, to conduct that " 'resemble[s]' discrimination, harassment, or retaliation, even if not unlawful under employment laws." Under that limiting construction, EO-31 is not unconstitutionally vague or overbroad, at least as an employment policy.

For these reasons, I respectfully dissent.

**All Citations**

--- F.4th ----, 2025 WL 3685613

## Footnotes

1 The majority's citation to *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), does not address *Pickering* balancing in the government employment context.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.